IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

---------------------------------------------------------------x
                                                :
*In re*                                         :    Chapter 11
                                                :
MAGNA ENTERTAINMENT CORP., *et al.*,            :    Case No. 09-10720 (MFW)
                                                :
                                                :    **Jointly Administered**
         Debtors.                               :    (Requested) Obj. Deadline:
                                                :    October 13, 2009 at 12:00 p.m.
                                                :    (Requested) Hearing Dates:
---------------------------------------------------------------x    October 14, 2009 at 10:30 a.m.

### DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105 AND 364 AND BANKRUPTCY RULES 4001 AND 6004 TO ENTER INTO SECOND AMENDED AND RESTATED DEBTOR IN POSSESSION CREDIT AGREEMENT WITH MID ISLANDI SF.

Magna Entertainment Corp. ("Magna Entertainment") and its affiliated debtors, as debtors in possession (together, the "Debtors" and, collectively with Magna Entertainment's non-debtor subsidiaries, "MEC"),[1] respectfully represent:

### Jurisdiction

1. The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: (i) Magna Entertainment Corp., 8374; (ii) The Santa Anita Companies, Inc., 6180; (iii) Los Angeles Turf Club, Incorporated, 6200; (iv) Pacific Racing Association, 5367; (v) MEC Land Holdings (California) Inc., 7410; (vi) Gulfstream Park Racing Association Inc., 6292; (vii) GPRA Thoroughbred Training Center, Inc., 2326; (viii) MEC Dixon, Inc., 7005; (ix) MEC Holdings (USA) Inc., 8494; (x) Sunshine Meadows Racing, Inc., 4288; (xi) Thistledown, Inc., 5742; (xii) MEC Maryland Investments, Inc., 4637; (xiii) 30000 Maryland Investments LLC, 1704, (xiv) Remington Park, Inc., 2024; (xv) GPRA Commercial Enterprises Inc., 6156; (xvi) Pimlico Racing Association, Inc., 4527; (xvii) The Maryland Jockey Club of Baltimore City, Inc., 3840; (xviii) Laurel Racing Association Limited Partnership, 0504; (xix) Laurel Racing Assoc., Inc., 0505; (xx) Prince George's Racing, Inc., 6493; (xxi) Southern Maryland Racing, Inc., 9850; (xxii) Southern Maryland Agricultural Association, 9661; (xxiii) Maryland Jockey Club, Inc., 3124; (xxiv) AmTote International, Inc., 1143; (xxv) MEC Pennsylvania Racing Services, 9924; and (xxvi) MEC Lone Star, LP 0489.

1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

2. Commencing on March 5, 2009 (the "Petition Date"), each of the Debtors filed voluntary petitions pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the Bankruptcy Court. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. In accordance with orders of the Bankruptcy Court, the Debtors' cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3. On March 18, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the statutory committee of unsecured creditors (the "Creditors' Committee").

## MEC's Businesses

4. MEC is the leading owner and operator of horse racetracks in North America. It is also a leading supplier, via simulcasting, of live racing content to the inter-track, off-track betting and account-wagering markets. Magna Entertainment is the direct or indirect parent company of each of the other Debtors.

5. MEC operates or manages seven thoroughbred racetracks (Santa Anita Park, Gulfstream Park, Pimlico Race Course, Laurel Park, Golden Gate Fields, Thistledown, and Portland Meadows), one harness racing track (The Meadows), and two racetracks which run both thoroughbred and quarter horse meets (Lone Star Park at Grand Prairie and Remington Park). MEC complements its live-racing operations with simulcast wagering, casino gaming at some

venues, off-track betting facilities in certain states, and a national account-wagering business known as XpressBet that permits customers to place wagers by telephone or Internet for races run at more than 100 North American racetracks, and internationally on races in Australia, South Africa, Dubai, Germany, the United Kingdom and Hong Kong. MEC also owns AmTote International, Inc. which provides totalisator services to the pari-mutuel industry.[2]

6. Under a series of March 2007 agreements, MEC owns a 50% interest in a joint venture called TrackNet Media Group, LLC ("TrackNet Media"). TrackNet Media distributes MEC's horse racing content through various media outlets to other racetracks, off-track betting facilities, casinos and advance-deposit wagering companies, and purchases horse racing content from third parties to be made available through various outlets. A separate joint venture called HorseRacing TV, or HRTV, provides horse racing programming to more than 16 million cable and satellite-TV subscribers.

7. As of February 4, 2009, MEC employed approximately 2,748 full-time employees and 2,145 part-time employees in North America, approximately 1,862 of whom were represented by unions. For the year ended December 31, 2008, MEC's unaudited consolidated financial statements showed revenues from continuing operations of approximately $593 million, of which approximately $413 million was attributable to pari-mutuel wagering. As of December 31, 2008, MEC's unaudited consolidated financial statements reflected assets totaling approximately $1.054 billion and liabilities totaling approximately $947.3 million.

---

[2] A totalisator is a computerized system that enables pari-mutuel betting by calculating payoff odds, displaying them, and producing tickets based on incoming wagers.

## The Debtors' Asset Sales

8.  Pursuant to an order, dated May 11, 2009 (the "<u>MEC Bid Procedures Order</u>"), [Docket No. 543], the Bankruptcy Court authorized the Debtors to implement an auction process and establish bidding procedures for the sale of certain of the Debtors' assets, including, Remington Park, Thistledown, Lone Star Park, the Ocala Property and the Dixon Property. Since entry of the MEC Bid Procedures Order, Miller Buckfire & Co., LLC ("<u>Miller Buckfire</u>"), the Debtors' financial advisors, have been aggressively marketing the assets subject to the MEC Bid Procedures Order.

9.  As a result of the Debtors' efforts, the Bankruptcy Court entered an order, dated September 2, 2009, approving the sale of the Ocala Property to Par Avenue, LLC for $8,100,000.00 and the sale closed on September 17, 2009. In addition, at the hearing on September 15, 2009, the Bankruptcy Court approved the sale of Remington Park to Global Gaming RP, LLC for $80,250,000.00 and Thistledown to Harrah's Operating Company, Inc. ("<u>Harrah's</u>") for $89,500,000.00, of which $42,000,000.00 will be paid immediately upon closing. The Debtors are also negotiating a purchase agreement with a potential purchaser for the sale of Portland Meadows and, on the date hereof, received an offer to purchase the Dixon Property for a purchase price of $3,000,000.00.[3]

10.  Furthermore, on September 14, 2009, MEC Lone Star, LP ("<u>MEC Lone Star</u>"), the entity that owns and operates Lone Star Park, commenced a voluntary case under chapter 11 of the Bankruptcy Code in order to facilitate the sale of Lone Star Park. At a hearing

---

[3] The Debtors had entered into an agreement for the sale of the Dixon Property for $4,000,000.00. Unfortunately, on October 2, 2009, at the expiration of the applicable due diligence period, the purchaser terminated the agreement and the Debtors withdrew the motion seeking to sell the Dixon Property to that purchaser.

on September 22, 2009, the Bankruptcy Court approved certain bid procedures for Lone Star Park (the "LSP Bid Procedures Order"), authorized the Debtors to anoint Global Gaming LSP, LLC ("Global Gaming") as a "stalking horse" for Lone Star Park, with a bid in the amount of $27,000,000.00. Pursuant to the LSP Bid Procedures Order, the Debtors held an auction for Lone Star Park on October 7, 2009 and the Debtors will seek entry of a Sale Order approving the sale of Lone Star Park on October 14, 2009. Accordingly, to date, the Debtors' efforts have resulted in obtaining purchase agreements for at least $157,350,000.00 (and possibly $204,850,000.00) in proceeds from their asset sales.

**The DIP Credit Agreement**

11. On the Petition Date, the Debtors filed the Motion (I) for Authorization to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364, (B) Utilize Cash Collateral of the Prepetition Secured Lenders, (C) Grant Adequate Protection to Prepetition Secured Lenders, and (D) Grant Related Relief, and (II) to Schedule a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "DIP Motion") [Docket No. 12], seeking, among other things, authorization for Magna Entertainment (the "Borrower") to obtain secured postpetition financing in an aggregate principal amount not to exceed $38,400,000, pursuant to the terms of that certain Debtor in Possession Credit Agreement (as amended, the "DIP Credit Agreement"), dated March 6, 2009, with MID Islandi sf., acting through its Zug, Switzerland Branch (the "MID Lender"). On April 22, 2009, the Bankruptcy Court entered an order granting the relief requested in the DIP Motion on a final basis (the "Final Order") [Docket No. 382].[4]

---

[4] The Final Order and the DIP Credit Agreement were amended to incorporate the subsequent chapter 11 filings of MEC Pennsylvania Racing Services, Inc. and MEC Lone Star LP.

12. As modified, and following discussions with the Creditors' Committee, the maturity date of the Debtors' obligations pursuant to the DIP Credit Agreement was established as November 6, 2009 (the "Maturity Date"). Notwithstanding the Maturity Date, as clearly set forth in the Debtors' Budget, as defined in the DIP Credit Agreement and presented in testimony to the Bankruptcy Court, the Debtors forecasted that, absent additional funding, MEC would face a severe liquidity crisis towards the end of September or early October.

13. The Debtors commenced these chapter 11 cases anticipating that their sales process would conclude well before the Maturity Date and the forecasted liquidity crisis. The Debtors' sales process, however, has been clouded due to reasons beyond the Debtors' control, such as the Creditors' Committee's challenges to the MID Lender's prepetition liens. Accordingly, despite the success of the Debtors' management in cutting costs, the Debtors' net cash flow projections have proven accurate such that MEC will face a liquidity crisis in mid-late October that will impair the Debtors' ability to continue operations. To accommodate the additional time required to conduct an orderly liquidation, Miller Buckfire surveyed various sources of additional financing, including financing from unrelated third parties that would be sufficient to retire the Debtors' obligations under the DIP Credit Agreement and provide financing sufficient to support the Debtors' reorganization efforts and allow the Debtors to continue their asset sales process in an orderly fashion.

14. Miller Buckfire contacted nineteen (19) potential third party lenders who have historically been active in the debtor-in-possession financing market. Of the seven (7) parties who executed confidentiality agreements, only three (3) parties submitted term sheets. While certain of those parties indicated a willingness to extend credit to the Debtors junior to certain of the Debtors' third party lenders, none of the parties would agree to lend funds on a

US_ACTIVE:\43183949\05\43183949_5.DOC\61366.0003
RLF1-3445159-1                                              6

basis that was junior to MID Lender, the Debtors' largest prepetition secured creditor. Furthermore, MID Lender, through its affiliate MI Developments Inc. ("MID"), informed the Debtors that it would not consent to any facility that primed its prepetition liens (*i.e.*, a non-consensual priming fight would be required).

15. Given the restrictions facing the Debtors, the Debtors negotiated that certain Amended and Restated Debtor-in-Possession Credit Agreement, dated as of August 26, 2009 (the "First Amended DIP Credit Agreement").[5] As explained in further detail below, to make certain clarifications, and to better reflect the progression of the Debtors' sales process, the Debtors have agreed to further amend the DIP Credit Agreement in accordance with that certain Second Amended and Restated Debtor-in-Possession Credit Agreement, dated as of October 9, 2009 (the "Amended DIP Credit Agreement") a copy of which is annexed hereto as Exhibit "A", with MID Lender to obtain additional capital to fund the Debtors' chapter 11 cases and continue the Debtors' sales process and reorganization efforts.

## The Amended DIP Credit Agreement[6]

16. The Amended DIP Credit Agreement (i) provides for an additional commitment of $26,000,000, such that the aggregate committed amount of postpetition financing to be made available by the MID Lender shall be in a principal amount not to exceed $64,400,000 (as amended, the "DIP Credit Facility"), (ii) extends the Maturity Date, and (iii)

---

[5] As discussed in greater detail below, the Debtors entered into the Amended and Restated DIP Credit Agreement on August 26, 2009, subject to approval from the Bankruptcy Court and in advance of filing this Motion, in order for MID to obtain clarification from the Ontario Securities Commission regarding MID Lender's ability to enter into the Amended and Restated DIP Credit Agreement absent minority shareholder approval.

[6] Capitalized terms used in this section, but not otherwise defined herein, shall have the meanings ascribed to those terms in the Amended DIP Credit Agreement.

contemplates the division of the Debtors' assets into three (3) pools, each with certain timing requirements:

(a) Pool I Assets: The Dixon Property, Lone Star Park, the Ocala Property, Portland Meadows, Remington Park and the Thistledown Property.

(b) Pool II Assets: The AmTote Property and the XpressBet Property.

(c) Pool III Assets: The Maryland Jockey Club, Golden Gate Fields, Gulfstream Park, and Santa Anita Park.

Taking into consideration the Debtors' accomplishments to date with respect to the sales of the Ocala Property, Remington Park, Thistledown, and Lone Star Park, as summarized above, as well as in an effort to continue the Debtors' aggressive marketing and sales process, the Amended DIP Credit Agreement requires that Sale Orders for each pool of assets be entered by certain dates and requires that the Debtors obtain a certain threshold amount of the aggregate sale proceeds.

17. Each pool of assets, as well as the amount of aggregate sale proceeds, was designed to ensure the Debtors' ability to achieve the requisite conditions and maximize value for the Debtors' estates. In addition, as reflected by the Amended DIP Credit Agreement, and as discussed below, the Debtors and the MID Lender extended the milestones initially contemplated to address concerns raised by the Creditors' Committee and to run parallel to the extended timeline of their litigation against MID.

18. Specifically, if the Debtors do not obtain one or more Sale Orders with respect to the sale of assets that are Pool I Assets, Pool II Assets and/or Maryland Jockey Club, with aggregate gross sale proceeds of such Sale Orders to be received upon closing totaling at least $175,000,000 (the "Proceeds Condition") by November 30, 2009, the Amended DIP Credit Agreement provides that the Borrower must pay the MID Lender an Additional Arrangement

Fee.[7] In addition, the Debtors' failure to achieve the Proceeds Condition and obtain one or more Sale Orders with respect to all of the remaining Pool III Assets by February 26, 2010 (the "Assets Condition"), constitutes an "Event of Default" pursuant to Section 9.1 (i) of the Amended DIP Credit Agreement. Similarly, the Debtors' failure to achieve the Assets Condition by March 31, 2010, constitutes an "Event of Default" pursuant to Section 9.1(j) of the Amended DIP Credit Agreement. If the Debtors fail to achieve any of the aforementioned conditions that result in an "Event of Default," and the MID Lender chooses to waive the "Event of Default," the Borrower must pay the MID Lender an Additional Arrangement Fee.

19. In addition, pursuant to the Amended DIP Credit Agreement, MID has reaffirmed that it does not intend to bid on the Pool I Assets or the Pool II Assets, and continues to evaluate alternatives with respect to the Pool III Assets.

**The Canadian Proceedings**

20. Commencing on March 30, 2009, certain shareholders (the "MID Shareholders") of MID brought applications before the Ontario Securities Commission (the "OSC") seeking, among other things, an order pursuant to Multilateral Instrument 61-101 – *Protection of Minority Security Holders in Special Transactions* ("MI 61-101")[8] to require that

---

[7] On September 21, 2009, the Ohio Supreme Court ruled that certain legislation regarding video lottery licensing is subject to referendum under the constitution of Ohio. By letter, dated September 23, 2009, Harrah's asserts that this ruling gives it a right to terminate its purchase agreement pursuant to Section 9.1(m) thereof, but, without waiving its right to terminate in the future, it was not electing to do so. As part of the Proceeds Condition, the Amended DIP Credit Agreement provides that the gross proceeds to be received at closing with respect to Thistledown shall only be included in the calculation of the Proceeds Condition if the purchaser waives Section 7.1(g) of the purchase agreement, which makes, as a condition of closing, the absence of certain governmental actions with respect to the video lottery licensing legislation (the "Thistledown Condition").

[8] MI 61-101 is a Canadian securities law that regulates special types of transactions, including certain types of related party transactions, by providing a number of protections to minority shareholders. Those protections include voting rights that arise in certain limited circumstances. More specifically, unless

MID obtain minority shareholder approval of any proposed related party transactions between MID and MEC prior to consummation or entry into the proposed transaction. As mentioned above, in order to get authorization for MID Lender to enter into the First Amended DIP Credit Agreement, MID filed the First Amended DIP Credit Agreement with the OSC and requested that the OSC consider the transaction in its proceedings.

21. On September 9 and 10, 2009, a two-member panel of the OSC held hearings on the merits of the MID Shareholders' applications. At the hearing, the panel heard detailed submissions, arguments and evidence from and on behalf of MID, MEC, the MID Shareholders and OSC staff. MEC also strongly objected to the orders sought by the MID Shareholders on the basis that such orders would have had an immediate and devastating impact on MEC and its stakeholders, including MID as its largest secured creditor, and its unsecured creditors. On September 14, 2009, the OSC rendered its decision and, in summary, the OSC dismissed the applications brought by the MID Shareholders in their entirety. A copy of such order is annexed hereto as Exhibit "B."

22. As mentioned above, the First Amended Agreement was further amended by the Amended DIP Credit Agreement to make certain clarifications, as well as adjust the sale milestones to more accurately reflect the Debtors' sales process and the schedule of the Creditors' Committee's litigation against MID Lender. Accordingly, as a matter of Canadian securities law, there are no prohibitions or restrictions on the ability of the MID Lender to consummate the Amended DIP Credit Agreement.

---

exempted from these protections, or otherwise excluded from the application of the related party transaction rules altogether, a related party transaction must be approved by at least a simple majority of the votes cast by minority shareholders of the issuer.

## Bankruptcy Rule 4001 Concise Statement

23. Pursuant to Bankruptcy Rule 4001 and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the following are the material amendments to the DIP Credit Agreement proposed in the Amended DIP Credit Agreement:[9]

| **Commitment**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | Increased availability, on a non-revolving, senior, secured, superpriority basis, of up to $26,000,000. |
|---|---|
| **Term**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | Earliest to occur of: (i) April 30, 2010, (ii) the acceleration of all or any portion of the Obligations pursuant to Section 9.2 of the Amended and Restated Credit Agreement, and (iii) the effective date of a confirmed plan of reorganization; provided, however, that, in connection with (i) above, the Maturity Date will be automatically extended for one month in the event that a chapter 11 plan has been confirmed by the Bankruptcy Court, but not yet consummated. (Amended and Restated DIP Credit Agreement at § 1.1, definition of Maturity Date) |
| **Fees**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Arrangement Fee: 3.00% of the amount of Tranche 3 Credit Commitment to be paid from the initial Tranche 3 Advance. (Amended DIP Credit Agreement at § 4.3(a))<br><br>Additional Arrangement Fee: A non-refundable fee equal to the product of (i) the DIP Credit Commitment and (ii) 2.00%.<br><br>The Borrower shall pay to the Lender an Additional Arrangement Fee on January 29, 2010 and each time that any of the following shall occur:<br><br>(i) by November 30, 2009, the Proceeds Condition shall not |

---

[9] The summaries and descriptions of the terms and conditions of the Amended DIP Credit Agreement set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the Amended DIP Credit Agreement. In the event there is a conflict between this Motion and the Amended DIP Credit Agreement, the Amended DIP Credit Agreement shall control in all respects.

| | |
|---|---|
| | have been achieved; |
| | (ii) by February 26, 2010, the Assets Condition shall not have been achieved and the Event of Default occurring pursuant to Section 9.1(i) relating to any such failure of the Assets Condition to have been achieved shall have been waived in writing by the Lender in its sole discretion; and |
| | (iii) by March 31, 2010, the Assets Condition shall not have been achieved and the Events of Default occurring pursuant to Section 9.1(i) and 9.1(j) relating to any such failure of the Assets Condition to have been achieved shall have been waived in writing by the Lender in its sole discretion. |
| | Each such Additional Arrangement Fee incurred pursuant to this Section 4.3(b) shall be due and payable to the Lender on January 29, 2010 and the Business Day immediately succeeding the date set forth in the foregoing sub-clauses (i) to (iv). (Amended DIP Credit Agreement at § 4.3(b)) |
| | Commitment Fee: 1.00% per annum of the unutilized amount under the DIP Credit Commitment to be paid on the last Banking Day of each Fiscal Quarter and on the Maturity Date. (Amended DIP Credit Agreement at § 4.3(c)). |
| **Events of Default**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | In addition to the "Events of Default" included in the DIP Credit Agreement, the Amended DIP Credit Agreement provides that the following shall constitute an "Event of Default:"<br><br>(i) the Additional Arrangement Fee due and payable pursuant to Section 4.3(b) shall not have been paid. (Amended DIP Credit Agreement § 9.1(h)).<br><br>(ii) the Assets Condition shall not have occurred by February 26, 2010.<br><br>(iii) any Event of Default occurring pursuant to Section 9.1(h) shall have been waived by the Lender in writing, and the Assets Condition shall not have occurred by March 31, 2010. (Amended DIP Credit Agreement § 9.1(j)). |

## Relief Requested

24. By this motion, the Debtors request entry of the proposed order, (the "Supplemental Final Order"), substantially in the form attached hereto as Exhibit "C," pursuant to (a) sections 105, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002 4001 and 9014 and Local Rule 4001-2 approving the Debtors' entry into and performance under the Amended DIP Credit Agreement that amends the DIP Credit Agreement and (b) paragraph three (3) of Final Order.

### The Debtors Should Be Authorized to Enter into the Amended DIP Credit Agreement

25. As set forth above in further detail, to date, and subject to the Thistledown Provision, the Debtors have been successful in securing purchase agreements for proceeds in an amount of at least $157,350,000.00. Furthermore, Miller Buckfire continues to aggressively market the remainder of the Debtors' assets and is engaged in negotiations with several potential purchasers, with the intent to secure a "stalking horse" purchaser for each of the assets.

26. Absent entry into the Amended DIP Credit Agreement, however, on our about mid-late October, the Debtors will not have sufficient funds to meet their day-to-day obligations or continue their sales process. Approval of the DIP Credit Facility will provide the Debtors with immediate access to financing necessary to satisfy their current and ongoing operating expenses through the conclusion of their sales processes. Unless these expenses are paid, the Debtors will be forced to cease operations and convert their cases to cases under chapter 7 of the Bankruptcy Code, which would result in irreparable harm to the Debtors' businesses and substantial deterioration of the going concern value of the businesses.

27. Simply stated, the DIP Credit Facility is the only immediate source of liquidity necessary to continue the Debtors' operations. The terms and provisions of the Amended DIP Credit Agreement are fair and reasonable, were negotiated in consultation with the Creditors' Committee and in good faith on an arms'-length basis. Furthermore, the Debtors believe the Amended DIP Credit Agreement will incentivize the Debtors to maximize value from their asset sales while maintaining an efficient and streamlined sales process. As stated above, the Debtors were unable to obtain additional financing under more favorable terms. Under these circumstances, the Debtors submit that the relief request herein is appropriate and in the best interests of the estates.

### Waiver of Bankruptcy Rules 6004(a) and (h)

28. To implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Exemption from Formal Valuation and Minority Shareholder Approval Requirements of Applicable Canadian Securities Law

29. The proposed transaction between Magna Entertainment and MID Lender is a "related party transaction" for Magna Entertainment purposes of applicable Canadian securities law and, in particular, Multilateral Instrument 61-101 – Protection *of Minority Security Holders in Special Transactions* ("MI 61-101"). MI 61-101 requires that, unless exempted, an issuer proposing to carry out certain types of related party transactions is required to obtain a formal valuation of the assets involved in a related party transaction from a qualified and independent valuator. MI 61-101 also requires that, unless exempted, a related party transaction

must be approved by at least a simple majority of the votes cast by "minority" shareholders of each class of equity securities of the issuer.

30. MEC is relying on exemptions from the formal valuation requirement and the minority shareholder approval requirement under MI 61-101 for a related party transaction which provides that a formal valuation and minority shareholder approval are not required where: (i) the transaction is subject to court approval, or a court orders that the transaction be effected, under bankruptcy or insolvency law (the "Bankruptcy Exemption"); (ii) the court is advised of the requirements of MI 61-101 regarding formal valuations and minority shareholder approval for related party transactions and of the Bankruptcy Exemption; and (iii) the court does not require a formal valuation or minority shareholder approval.

31. In the event this Court approves the proposed transaction between MEC and the DIP Lender, such approval would be relied upon by MEC as the basis for an exemption from the formal valuation and minority shareholder approval requirements of MI 61-101 pursuant to Sections 5.5(f) and 5.7(d) thereof, with respect to its consummation of the transaction.

### Notice

32. Notice of this Motion has been provided to: (i) the United States Trustee for the District of Delaware; (ii) the Creditors' Committee; (iii) the SEC; (iv) the IRS; (v) The Bank of Montreal; (vi) MID Islandi SF.; (vii) MI Developments Inc.; (viii) PNC Bank, N.A.; (ix) SunTrust Bank; (x) Wells Fargo Bank, N.A.; (xi) The Bank of New York; (xii) the Oklahoma Horse Racing Commission; (xiii) the Florida Department of Business and Professional Regulation Division of Pari-Mutuel Wagering; (xiv) the Maryland Racing Commission; (xv) the California Horse Racing Board; (xvi) the Ohio State Racing Commission; (xvii) the Maryland

Slots Commission; (xviii) the Texas Racing Commission; (xix) the Virginia Racing Commission; (xx) the Pennsylvania State Harness Racing Commission; (xxi) the Pennsylvania Gaming Control Board; (xxii) the Nevada Gaming Commission; (xxiii) the New Jersey Casino Control Commission; (xxiv) the Oregon Racing Commission; and (xxv) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 or requesting to receive notice prior to the date hereof. The Debtors submit that such notice is sufficient under the circumstances.

## No Previous Request

33. Other than in connection with obtaining the Final Order, no previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE the Debtors respectfully request entry of the Supplemental Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: October 9, 2009
       Wilmington, Delaware

*/s/ Katherine Good*
Mark D. Collins, Esq. (No. 2981)
L. Katherine Good (No. 5101)
Drew G. Sloan (No. 5069)
RICHARDS, LAYTON & FINGER , P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for the Debtors and Debtors in Possession