IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

----------------------------------------------------------x
: 
*In re* : Chapter 11
:
**MAGNA ENTERTAINMENT CORP.,** : Case No. 09-10720 (MFW)
*et al.*, :
: Jointly Administered
Debtors. :
: Hearing Date: March 3, 2010 at 3:00 p.m.
----------------------------------------------------------x Obj. Deadline: February 24, 2010 at 4:00 p.m.

**MOTION OF DEBTORS FOR ORDER PURSUANT
TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE AND
BANKRUPTCY RULES 2002, 6004 AND 6006 (I) APPROVING CURE PROCEDURES
AND (II) AUTHORIZING THE SALE OF THE MARYLAND JOCKEY CLUB ASSETS**

Magna Entertainment Corp. ("Magna Entertainment") and its affiliated

debtors, as debtors in possession (together, the "Debtors" and, collectively with Magna

Entertainment's non-debtor subsidiaries, "MEC"),[1] respectfully represent:

**Jurisdiction**

1. The United States Bankruptcy Court for the District of Delaware

(the "Bankruptcy Court") has jurisdiction to consider this matter pursuant to 28 U.S.C.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Magna Entertainment Corp., 8374; (ii) The Santa Anita Companies, Inc., 6180; (iii) Los Angeles Turf Club, Incorporated, 6200; (iv) Pacific Racing Association, 5367; (v) MEC Land Holdings (California) Inc., 7410; (vi) Gulfstream Park Racing Association Inc., 6292; (vii) GPRA Thoroughbred Training Center, Inc., 2326; (viii) MEC Dixon, Inc., 7005; (ix) MEC Holdings (USA) Inc., 8494; (x) Sunshine Meadows Racing, Inc., 4288; (xi) Thistledown, Inc., 5742; (xii) MEC Maryland Investments, Inc., 4637; (xiii) 30000 Maryland Investments LLC, 1704, (xiv) Old RP, Inc., 2024; (xv) GPRA Commercial Enterprises Inc., 6156; (xvi) Pimlico Racing Association, Inc., 4527; (xvii) The Maryland Jockey Club of Baltimore City, Inc., 3840; (xviii) Laurel Racing Association Limited Partnership, 0504; (xix) Laurel Racing Assoc., Inc., 0505; (xx) Prince George's Racing, Inc., 6493; (xxi) Southern Maryland Racing, Inc., 9850; (xxii) Southern Maryland Agricultural Association, 9661; (xxiii) Maryland Jockey Club, Inc., 3124; (xxiv) AmTote International, Inc., 1143; (xxv) MEC Pennsylvania Racing Services, Inc., 9924; and (xxvi) MEC Lone Star, LP, 0489.

§§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Background**

2. Commencing on March 5, 2009 (the "Petition Date"), each of the Debtors filed petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the Bankruptcy Court. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. In accordance with an Order of the Bankruptcy Court, the Debtors' cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3. On March 18, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the statutory committee of unsecured creditors (the "Creditors' Committee").

**MEC's Businesses**

4. MEC is the leading owner and operator of horse racetracks in North America. It is also a leading supplier, via simulcasting, of live racing content to the inter-track, off-track betting and account-wagering markets. Magna Entertainment is the direct or indirect parent company of each of the other Debtors.

5. As of the Petition Date, MEC operated or managed seven thoroughbred racetracks (Santa Anita Park, Gulfstream Park, Pimlico Race Course, Laurel Park, Golden Gate Fields, Thistledown, and Portland Meadows), one harness racing track (The Meadows), and two racetracks which run both thoroughbred and quarter horse meets (Lone Star Park at Grand Prairie and Remington Park). On August 26, 2009, the Bankruptcy Court entered an order authorizing MEC to reject that certain

Racing Services Agreement, pursuant to which MEC Pennsylvania Racing Services, Inc. operated The Meadows and accordingly, MEC no longer operates The Meadows. In addition, on September 15, 2009, the Bankruptcy Court entered an order authorizing MEC to sell Remington Park to Global Gaming RP, LLC and was consummated on January 1, 2010.

6. MEC complements its live-racing operations with simulcast wagering, casino gaming at some venues, off-track betting facilities in certain states, and a national account-wagering business known as XpressBet that permits customers to place wagers by telephone or Internet for races run at more than 100 North American racetracks, and internationally on races in Australia, South Africa, Dubai, Germany, the United Kingdom and Hong Kong. MEC also owns AmTote International, Inc. which provides totalisator services to the pari-mutuel industry.[2]

7. Under a series of March 2007 agreements, MEC owns a 50% interest in a joint venture called TrackNet Media Group, LLC ("<u>TrackNet Media</u>"). TrackNet Media distributes MEC's horse racing content through various media outlets to other racetracks, off-track betting facilities, casinos and advance-deposit wagering companies, and purchases horse racing content from third parties to be made available through various outlets. A separate joint venture called HorseRacing TV, or HRTV, provides horse racing programming to more than 16 million cable and satellite-TV subscribers.

8. As of February 4, 2009, MEC employed approximately 2,748 full-time employees and 2,145 part-time employees in North America, approximately 1,862

---

[2] A totalisator is a computerized system that enables pari-mutuel betting by calculating payoff odds, displaying them, and producing tickets based on incoming wagers.

of whom were represented by unions. For the year ended December 31, 2008, MEC's unaudited consolidated financial statements showed revenues from continuing operations of approximately $593 million, of which approximately $413 million was attributable to pari-mutuel wagering. As of December 31, 2008, MEC's unaudited consolidated financial statements reflected assets totaling approximately $1.054 billion and liabilities totaling approximately $947.3 million.

**Maryland Jockey Club**

    **(i)   Pimlico Race Course**

    9.    Pimlico Race Course is situated on approximately 116 acres of land in Baltimore, Maryland, approximately 30 miles from Laurel Park. The Preakness Stakes, the middle jewel of thoroughbred racing's Triple Crown, has run annually and without interruption at Pimlico Race Course on the third Saturday of each May since 1909. This year's race, which occurred on May 16, 2009, marked the 134th anniversary of the classic horse racing event.

    10.    In 2009, Pimlico Race Course's season lasted approximately 20 racing days that fell between early April and mid-June. During this meet, Pimlico hosted 10 graded stakes races, including The Preakness Stakes. Average daily attendance in 2009 was approximately 3,200 customers per live racing day.

    11.    Pimlico Race Course's handle was approximately $204.1 million in 2009, which includes wagers made at (i) Pimlico Race Course on its races, (ii) other wagering venues and through various account wagering operations on Pimlico Race Course's races, and (iii) Pimlico Race Course on imported races through Pimlico Race Course's inter-track facilities. Wagers on Pimlico Race Course's races totaled approximately $126.8 million in 2009. Of this amount, approximately $120 million in

wagers were placed at other wagering venues to which its signal was exported via simulcast and through various account wagering operations.

12. Pimlico Race Course's facilities include a grandstand with seating for approximately 13,000 customers, a one-mile dirt track with 1 3/16-mile and 3/4-mile chutes, a 7/8-mile turf course, stalls for approximately 700 horses and parking facilities sufficient to accommodate approximately 3,500 cars. During The Preakness Stakes, temporary seating facilities and the use of Pimlico Race Course's infield enable Pimlico Race Course to attract over 100,000 patrons.

**(ii) Laurel Park**

13. Laurel Park is located on approximately 236 acres of land in Laurel, Maryland, between Washington, D.C. and Baltimore. Laurel Park's racing season in 2008 was 134 days, and complements Pimlico Race Course's racing season by holding race meets from January to April, in August, and from September to December. Average daily attendance at Laurel Park in 2008 was approximately 2,500 customers per live racing day.

14. Laurel Park's handle was approximately $341.9 million in 2008, which includes wagers made at (i) Laurel Park on its races, (ii) at other wagering venues on Laurel Park's races through various account wagering operations, and (iii) Laurel Park on imported races. Wagers on Laurel Park's races totaled approximately $228 million in 2008. Of this amount, approximately $212.4 million in wagers were placed at other wagering venues to which Laurel Park exported its signal via simulcast and through various account wagering operations.

15. Laurel Park's facilities include a grandstand with seating for approximately 5,200 customers, a 1 1/8-mile dirt track with a seven and one half-furlong chute which opened in January 2005, and a 7/8-mile turf course which opened in September 2005. Laurel Park has stalls for approximately 1,000 horses and parking facilities sufficient to accommodate approximately 8,000 cars.

**(iii) The Bowie Training Center**

16. The Bowie Training Center is located in Prince George's County, Maryland on 162 acres situated approximately eight (8) miles from Laurel Park and thirty (30) miles from Pimlico Race Course. Originally opened in 1914 as a racetrack, the property has been used since 1985 as a year-round training center to support thoroughbred racing at Pimlico Race Course and Laurel Park. In 2008, the Bowie Training Center's aggregate revenues were approximately $2.126 million.

17. The facility includes approximately 1,000 stalls, a one-mile oval dirt main track, and a quarter mile dirt-covered track. In addition, the Bowie Training Center includes seventeen (17) barns and dormitories capable of accommodating up to 224 grooms.

**The MJC Bid Procedures Order**

18. Pursuant to an order, dated October 28, 2009 (the "MJC Bid Procedures Order") [Docket No. 1361], the Bankruptcy Court:

    (a)    authorized the Debtors to implement an auction process and establish bidding procedures for the sale of Maryland Jockey Club and its assets, in whole or in part;

    (b)    scheduled the auction for Maryland Jockey Club or its assets, in whole or in part, for January 8, 2010 (the "MJC Auction");

(c) scheduled the hearing to consider the sale for January 20, 2010 (the "MJC Sale Hearing");

(d) set the deadline by which parties were required to submit definitive bids was November 2, 2009 (the "Bid Deadline")

(e) authorized the Debtors, in their business judgment, and upon consultation with the Creditors' Committee, to enter into final negotiations with bidders with the intent of entering into one or more "stalking horse" agreement(s) and file a motion seeking approval of the "stalking horse" agreement(s) and bid protections no later than November 9, 2009;

(f) required the Debtors to inform the State of Maryland ("Maryland") of all "Qualified Bids" on or prior to December 7, 2009, and confirm to Maryland that each bidder of a Qualified Bid does not intend to move The Preakness outside of the State;

(g) required that Maryland inform the Debtors by December 21, 2009 whether it intends to exercise its right of first refusal; and

(h) agreed that, in the event that Maryland seeks to assert a right of first refusal with respect to any of the Qualified Bids, a hearing will be scheduled prior to the MJC Auction (the "Maryland Hearing").

19. The Debtors received six (6) bids by the Bid Deadline. Although the Debtors endeavored within the timeframe set forth in the MJC Bid Procedures Order to negotiate a purchase agreement that could serve as a "stalking horse" agreement, the Debtors were unable to do so. Accordingly, as required by the MJC Bid Procedures Order, prior to December 7, 2009, the Debtors disclosed the identities of all six (6) of the parties who submitted Qualified Bids by the Bid Deadline to Maryland and confirmed that no bidder intended to move The Preakness outside of the State of Maryland.

20. In addition, on December 23, 2009, the Debtors provided a chart to Maryland that outlined certain key provisions with respect to the Qualifying Bids and

included, among others, provisions regarding the use of the properties, the number of racing days and covenants regarding The Preakness. In the letter accompanying that chart, the Debtors advised that they were in active negotiations with one of the six bidders. Subsequently thereto, the Debtors also forwarded a draft of that purchase agreement to Maryland. Pursuant to the MJC Bid Procedures Order and the adjourned dates therein, Maryland had until December 28, 2009, to inform the Debtors whether it would exercise its purported right of first refusal. Maryland has asserted, however, that it is unable to reach a decision as to whether it will exercise its purported right of first refusal until it knows the underlying terms and provisions of each Qualifying Bid and has preserved its right to do so.

21. Due to ongoing negotiations with certain of the bidders who submitted Qualified Bids and the Debtors' goal of appointing a stalking horse prior to the MJC Auction, by notices, dated January 9, 2010, January 15, 2010, and January 29, 2010, further adjourned the MJC Auction has been adjourned to February 23, 2010 and the MJC Sale Hearing to March 3, 2010. The Maryland Hearing has been adjourned to a date to be determined.

**Relief Requested**

22. By this Motion, the Debtors seek entry of an order (the "Sale Order"), the form of which will be submitted prior to the MJC Sale Hearing, (a) approving procedures for the assumption and assignment of contracts and lease to any purchaser(s) and/or resolve any objections thereto (the "Cure Procedures") and (b) authorizing the Debtors to sell the Maryland Jockey Club or its assets, in whole or in part, free and clear of all liens, claims and encumbrances to the Winning Bidder, as defined in the MJC Bid Procedures Order.

**Basis for Relief**

23. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be undertaken by private sale or by public auction. *In re Dura Automotive Sys., Inc.*, Case No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, *253 (Bankr. D. Del. Aug. 15, 2007) ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.") (internal citations omitted).

24. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *In re Dura Automotive*, 2007 Bankr. LEXIS 2764 at * 258, citing *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re Delaware and Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the

*Abbotts Dairies* decision); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same).

25. In the circumstances of valid business justifications, applicable principles of law attach to a debtor's decision a strong presumption "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Sub. Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted). In this District, once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (a) the debtor in possession has provided the interested parties with adequate and reasonable notice, (b) the sale price is fair and reasonable, and (c) the purchaser is proceeding in good faith. *In re Delaware and Hudson Ry. Co.*, 124 B.R. at 166; *accord. In re Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749 at *3 (Bankr. D. Del. May 20, 2002).

26. The Debtors submit that the decision to sell the Maryland Jockey Club and its assets, in whole or in part, to the Winning Bidder is based upon their sound business judgment and should be approved. The Debtors believe their prepetition and postpetition marketing efforts and their arms'-length negotiations with the parties who submitted Qualified Bids in accordance with the MJC Bid Procedures Order will result in a purchase price that is fair and reasonable. Furthermore, the sale of the Maryland Jockey Club and its assets, in whole or in part, to the Winning Bidder will only be

consummated after the assets have undergone a rigorous auction process governed by the MJC Bid Procedures Order and the Winning Bidder proves to be the highest or best bidder. Thus, the Debtors submit that the sale of the Maryland Jockey Club and its assets, in whole or in part, to the Winning Bidder is within their business judgment and in the best interests of the Debtors' estates.

**Sale Free and Clear of Liens Pursuant
to Section 363(f) of the Bankruptcy Code**

27. Pursuant to Section 363(f) of the Bankruptcy Code, a debtor may sell property free and clear of liens, claims and encumbrances if one of the following conditions is satisfied:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Because section 363(f) of the Bankruptcy Code is written in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Purchased Assets "free and clear" of liens and interests. *In re Dura Automotive*, 2007 Bankr. LEXIS 2764 at * 264.

28. PNC Bank, National Association ("PNC"), pursuant to prepetition loan and security agreements and MID Islandi, sf. (collectively, with its affiliates, the "MID Lender" and, together with PNC, the "Secured Lenders") pursuant to that certain

(i) Second Amended and Restated Debtor in Possession Credit Agreement, dated October 9, 2009 and (ii) Second Amended and Restated Loan and Security Agreement, dated as of November 27, 2002 (the "DIP Agreements"), hold, as security for the Debtors' obligations under their respective loan agreements, valid, fully-perfected first and second priority liens on and security interests in the Maryland Debtors' Assets. In addition, the MID Lender has a lien on the equity interests of the Maryland Debtors. The Debtors believe that they will obtain the Secured Lenders' consent to sell those assets to the Purchaser or the Winning Bidder, free and clear of each Secured Lenders' liens, claims and encumbrances by the MJC Sale Hearing.

29. Furthermore, as stated on the record on January 11, 2010, as part of a global settlement of that certain adversary proceeding styled *The Official Committee of Unsecured Creditors of Magna Entertainment Corp., et al. v. MI Developments, Inc., MID Islandi, Frank Stronach, Jerry D. Campbell, William Menear, Anthony R. Campbell and W. Thomas Hodgson*, Adversary Pro. No. 09-51523, the MID Lender has agreed to a global settlement that will satisfy the Debtors' obligations under the DIP Agreements. In addition, as part of the global settlement, the MID Lender is entitled to receive the first Twenty Million Dollars ($20,000,000.00) of proceeds from the sale, as well as fifty-percent (50%) of sales proceeds in excess of that amount and has also agreed to satisfy, in full, the Debtors' obligations to PNC from such sale proceeds. Accordingly, a sale of the Maryland Debtors' assets free and clear of liens, claims, and encumbrances satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

### The Winning Bidder Should be Afforded All
### Protections Under Section 363(m) as a Good Faith Purchaser

30.     Section 363(m) of the Bankruptcy Code protects the sale of a debtor's property to a good faith purchaser. Section 363(m) provides,

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).   Although the Bankruptcy Code does not define "good faith," the Bankruptcy Court of Appeals for the Third Circuit (the "Third Circuit") has noted that the phrase "encompasses one who purchases in 'good faith' and 'for value.'" *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986).  Further, the Third Circuit has recognized that the type of misconduct that would destroy a purchaser's good faith status involves "'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" *Id.* (remanding case involving insider transaction back to the bankruptcy court for further consideration of good faith where there was evidence that the sale had been orchestrated between insiders and some of the sale conditions were not disclosed to the debtor's creditors) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978).

31.     As will be further demonstrated at the MJC Sale Hearing, the sale of the Maryland Jockey Club and its assets, in whole or in part, to the Winning Bidder will be proposed in good faith as a result of arms'-length negotiations between the Debtors and the Winning Bidder.  In addition, as will be further demonstrated at the MJC Sale Hearing, the Debtors believe that the Winning Bidder should be afforded the

protections of section 363(m) of the Bankruptcy Code because the Winning Bidder will have, by definition, complied with the MJC Bid Procedures Order and produced the highest or best offer for the Maryland Jockey Club.

**Assumption and Assignment of Executory Contracts and Unexpired Leases**

32. To facilitate and effect the sale of the Maryland Jockey Club, the Debtors also seek authority to assume and assign certain contracts and leases to the Winning Bidder. Section 365 allows the debtor in possession to "maximize the value of the debtor's estate" by assuming executory contracts or unexpired leases that "benefit the estate" and by rejecting those that do not. *Cinicola v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001) (quotations omitted); *COR Route 5 Co., LLC v. The Penn Traffic Co. (In re The Penn Traffic Co.)*, 524 F.3d 373, 382 (2d Cir. 2008). Section 365 of the Bankruptcy Code authorizes the proposed assumptions and assignments, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. *See* 11 U.S.C. § 365(f)(2).

33. The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in "light of the proposed assumption." *In re Fleming Cos.*, 499 F.3d 300 (3d Cir. 2007) (*quoting Cinicola*, 248 F.3d at 120 n. 10). *See also Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (same); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

34. Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of a lease from debtor has financial resources and has expressed a willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid); s*ee also In re Vitanza*, Case No. No. 98-19611DWS, 1998 WL 808629, at *26 (Bankr. E.D. Pa. 1998) ("The test is not one of guaranty but simply whether it appears that the rent will be paid and other lease obligations met.").

35. As set forth in the MJC Bid Procedures Order, the Winning Bidder must submit evidence to demonstrate they have the financial wherewithal and ability to consummate the transactions contemplated in connection with the sale, including future performance of any contracts or leases. Moreover, at the MJC Sale Hearing, the Debtors will provide evidence that all requirements for the assumption and assignment of contracts or leases proposed to be assigned to the Winning Bidder will be satisfied.

**Proposed Procedures for Assumption,
Assignment and Cure of Contracts and Leases**

36. In connection with the sale of the Maryland Jockey Club, the Debtors will also assume and assign certain contracts and leases. Therefore, the Debtors submit that it is necessary to establish (a) a process to pay cure obligations, if any, pursuant to section 365 of the Bankruptcy Code for those contracts and leases that the Debtors seek to assume and assign to the Winning Bidder(s), and (b) a process for

counterparties of such contracts and leases to object (the "Cure Procedures"). The Debtors propose the following Cure Procedures:

 (a) Notice of Cure Procedures:

  1. Following the MJC Auction, but no later than March 15, 2010, the Debtors will file a schedule listing the cure amounts, if any, for each contract and lease they intend to assume and assign (the "Cure Schedule") to the Winning Bidder and will serve the Cure Schedule on the parties to those contracts and leases.

 (b) Notice of Adequate Assurance Package:

  1. The Debtors will request that the Winning Bidder identify the contracts and leases to be assigned. The Debtors will also request that the Winning Bidder submit to the Debtors evidence of their ability to provide adequate assurance of future performance on these contracts and leases (the "Adequate Assurance Package").

  2. Upon written request to the Debtors' counsel by a party to a contract or lease proposed to be assigned to the Winning Bidder, the Debtors will provide to such party any Adequate Assurance Package proposed by the Winning Bidder.

 (c) Objections to Cure Amounts or Adequate Assurance:

  1. Any objections to the assumption and assignment of any contract of lease identified on the Cure Schedule, including, without limitation, to the cure amount or the adequacy of the assurance of future performance set forth in the Adequate Assurance Package, must be in writing, filed with the Court and served on the Debtors no later than March 19, 2010 at 12:00 p.m. (prevailing Eastern Time).

 (d) Resolution of Objections:

  1. The Debtors intend to cooperate with the counterparties to contracts and leases to attempt to reconcile any difference in a particular cure amount. If no objections are timely filed, then the cure amounts set forth in the Cure Schedule shall be binding upon the non-debtor party to the lease or contract for all purposes in this case and will constitute an

    assumed final determination of total cure amounts required to be paid by the Debtors in connection with the assumption of such contract or lease and assignment to the Winning Bidder.  In addition, each non-debtor party to a contract and lease on the Cure Schedule that fails to timely object to the proposed assumption and assignment of a contract or leases shall be forever barred from objecting to the assumption by the Debtor and assignment to the Winning Bidder of such contract or lease.

  2. If a timely objection is filed and such objection cannot otherwise be resolved by the parties, the Court may schedule a hearing, and, if the Debtors and the Winning Bidder elect to close prior to such hearing, the cure amount as set forth on the Cure Schedule shall be deposited into escrow.  If the Debtors and the Winning Bidder elect to close, the pendency of a dispute relating to cure amounts will not prevent or delay the closing on any sale of the , including the assumption and assignment of contracts and leases not subject to an objection.

## Notice

37. Notice of this Motion has been provided to: (i) the United States Trustee for the District of Delaware; (ii) the Creditors' Committee; (iii) the SEC; (iv) the IRS; (v) The Bank of Montreal; (vi) MID Islandi SF.; (vii) MI Developments Inc.; (viii) PNC Bank, N.A.; (ix) SunTrust Bank; (x) Wells Fargo Bank, N.A.; (xi) The Bank of New York; (xii) the Oklahoma Horse Racing Commission; (xiii) the Florida Department of Business and Professional Regulation Division of Pari-Mutuel Wagering; (xiv) the Maryland Racing Commission; (xv) the California Horse Racing Board; (xvi) the Ohio State Racing Commission; (xvii) the Maryland Slots Commission; (xviii) the Texas Racing Commission; (xix) the Virginia Racing Commission; (xx) the Pennsylvania State Harness Racing Commission; (xxi) the Pennsylvania Gaming Control Board; (xxii) the Nevada Gaming Commission; (xxiii) the New Jersey Casino Control Commission; (xxiv) the Oregon Racing Commission; and (xxiv) all persons who expressed interest in

purchasing Maryland Jockey Club or its assets, in whole or in part, during the last six (6) months. The Debtors submit that such notice is sufficient under the circumstances.

## No Previous Request

38. No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE the Debtors respectfully request entry of the proposed Sale Order and such other and further relief as the Court may deem just and appropriate.

Dated: February 11, 2010  
       Wilmington, Delaware

Respectfully submitted,

    /s/ Drew G. Sloan
Mark D. Collins, Esq. (No. 2981)
L. Katherine Good, Esq. (No. 5101)
Drew G. Sloan, Esq. (No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtors and Debtors in Possession*