# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Magna Entertainment Corp., et al. | Case No. 09-10720 (MFW) |
| | Related Docket No: 1678 |
| Debtor. | |

## EMERGENCY MOTION (AMENDED) OF THE MAYOR & CITY COUNCIL OF BALTIMORE FOR AN ORDER COMPELLING THE DEBTORS TO COMPLY WITH BANKRUPTCY RULES 2002 AND 6004 AND LOCAL RULE 9006-1(c) IN CONNECTOIN WITH THE SALE OF MARYLAND JOCKEY CLUB OR ITS ASSETS

The Mayor & City Council of Baltimore (the "City"), by and through its undersigned counsel, hereby moves for the entry of an Order compelling the Debtors to comply with Bankruptcy Rules 2002 and 6004 and Local Rule 9006-1(c) and directing the Debtors[1] to provide reasonable notice and an opportunity to object to the proposed terms of the sale of Maryland Jockey Club or its assets.

## JURISDICTION

1.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors in these chapter 11 cases are: (i) Magna Entertainment Corp., (ii) The Santa Anita Companies, Inc.; (iii) Los Angeles Turf Club, Incorporated; (iv) Pacific Racing Association; (v) MEC Land Holdings (California) Inc.; (vi) Gulfstream Park Racing Association Inc.; (vii) GPRA Thoroughbred Training Center, Inc.; (viii) MEC Dixon, Inc.; (ix) MEC Holdings (USA) Inc.; (x) Sunshine Meadows Racing, Inc.; (xi) Thistledown, Inc.; (xii) MEC Maryland Investments, Inc.; (xiii) 30000 Maryland Investments LLC; (xiv) Remington Park, Inc.; (xv) GPRA Commercial Enterprises Inc.; (xvi) Pimlico Racing Association, Inc.; (xvii) The Maryland Jockey Club of Baltimore City, Inc.; (xviii) Laurel Racing Association Limited Partnership; (xix) Laurel Racing Assoc., Inc.; (xx) Prince George's Racing, Inc.; (xxi) Southern Management Racing, Inc.; (xxii) Southern Maryland Agricultural Association; (xxiii) Maryland Jockey Club, Inc.; and (xxiv) AmTote International, Inc.

## BACKGROUND

**A.     The City's Interest in the Maryland Jockey Club and its Assets**

2.      The City has strong legal, pecuniary, and cultural interests in Pimlico Race Course ("Pimlico") and the Preakness Stakes (the "Preakness"), two assets of Maryland Jockey Club that the Debtors seek to auction.  Pimlico, the second oldest thoroughbred race course in the nation, is situated on approximately 116 acres of land in the Park Heights neighborhood of the City of Baltimore.  The race course and, in particular, the Preakness are important parts of the long and rich history of thoroughbred horse racing in Baltimore.  The Preakness has run annually, without interruption, at Pimlico for more than 100 years.

3.      On May 16, 2009, Pimlico conducted the 134th running of the Preakness. Approximately 80,000 people attended the race in Baltimore, and millions more watched televised and webcast coverage of the event around the world.  The name "Preakness" was derived for the race from the name of the horse who won the inaugural Dinner Party Stakes race at Pimlico in 1870.  Since then, Baltimoreans have cheered many famous thoroughbred race horses at Pimlico, including Sea Biscuit, Man o' War, Secretariat, War Admiral, Citation, Secretariat, Barbaro, Smarty Jones, and Rachel Alexandra, among numerous others.

4.      The financial benefits of the Preakness for the City are substantial.  The Maryland Department of Business and Economic Development estimated that the economic impact of the 2007 Preakness and related events was about $24 million.  Significant economic impact flows to the City of Baltimore directly through tax revenue from tourism.  The State Department of Business and Economic Development estimated that the 2007 Preakness generated $1.4 million in state and local taxes.  Hotels, restaurants, caterers, shops, vendors, and many other Baltimore

businesses earn millions of dollars on Preakness Day and in connection with the many related events conducted in the days leading up to the Preakness.

5.     The City has a legal interest in Pimlico and the Preakness and is responsible for enforcing various zoning, health, housing, and other municipal codes, all of which are intended to protect the public, including (among others) horse racing fans, employees of Pimlico, and the neighboring property owners.  The City also stands to realize substantial revenue from taxes associated with the transfer of the real estate on which Pimlico is located, and that real estate is subject to certain encumbrances in favor of the City, such as zoning ordinances, a planned urban development, and any other interests that restrict the use and operation of the real estate.  In addition, Maryland law provides that the Preakness remain at Pimlico except in the event of a disaster or emergency.

**B.     Procedural History**

6.     In March 2009, the Debtors first sought Court approval of bidding procedures for the sale of certain assets of the Debtors, including Pimlico and the Preakness [Docket No. 93]. In connection with their request, the Debtors included a copy of a form agreement that would serve as the basis for the proposed auction.  The City and a handful of other parties objected to those proposed procedures [City's Objection at Docket No. 194].  Following objections, the Debtors withdrew their sale motion as it related to the Preakness and other Maryland assets.

7.     After months of remaining silent about their plans for the Preakness, at 8:45 p.m. on October 9, 2009, the Friday before the Columbus Day holiday, the Debtors again sought approval of bidding procedures for the sale of "The Maryland Jockey Club," an undefined term described generally as consisting of certain assets including "Pimlico Race Course" and "The Preakness Stakes" [Docket No. 1275].  The Debtors indicated that they would be seeking to sell

3

these assets "free and clear of all liens claims and encumbrances" [Docket No. 1275]. In contrast to the motion that the Debtors filed in March 2009, the Debtors did not seek in their October motion approval of the sale of the Maryland Jockey Club, and they did not make available the form agreement that would form the basis of the sale or a copy of a proposed form of sale order.

8. The Debtors sought to shorten the time for objections to the proposed bidding procedures to one-half of a business day with all objections to be due on 12:00 p.m. the following Tuesday – the first day City employees returned to their offices after the holiday weekend [Docket No. 1276]. The Debtors also requested that any objections be argued the following morning, Wednesday, October 14, 2009. The Debtors argued in their papers and in open court that the expedited schedule was necessary because "the Amended DIP Credit Agreement obligates the Debtors to obtain Sale Orders for [Maryland Jockey Club or its assets] by February 26, 20[10]" [Docket No. 1276].

9. On October 28, 2009, the Court entered an Order Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, (A) Scheduling an Auction at which the Debtors Will Solicit Higher and Better Offers in Connection with the Sale of Maryland Jockey Club or its Assets, in Whole or in Part (B) Approving the Bidding Procedures for Such Assets, (C) Approving the Form and Scope of Notice and (D) Granting Related Relief (the "<u>Bid Procedures Order</u>") [Docket No. 1361]. The Order provides that bids for the Preakness must contain a statement that "such bidder shall not move The Preakness outside of the State of Maryland." Bid Procedures Order at 5.

10. The Bid Procedures Order contemplates a process for the Debtors to enter into a "stalking horse agreement" subject to the approval of the Court. The Debtors were to "file a motion seeking approval of the 'stalking horse' agreement(s) and bid protections, if any …, no

4

later than November 9, 2009 at 5:00 p.m." Id. at 6. The Bid Procedures Order established January 8, 2010 as the date for an auction of the Maryland Jockey Club or its assets (the "MJC Auction") and January 20, 2010 as the date of the hearing on the approval of the sale of the Maryland Jockey Club or its assets (the "MJC Sale Hearing"). Id. at 7, 10.

11. The Bid Procedures Order also approved a form Notice of Auction and Sale Hearing (the "Sale Notice") and mandated that the Debtors serve the Bid Procedures Order and a notice in substantially the same form as the Sale Notice on parties in interest "no later than five (5) days after the entry of [the Bid Procedures] Order." Id. at 10. The approved form Sale Notice did not identify the date by which parties must file objections to the sale and left blank other relevant dates, such as the date of the MJC Sale Hearing. The City has never received a copy of the Sale Notice identifying the deadline for objections or the date of the Sale Hearing. The only version of the Sale Notice that is available on the Court's docket is the approved form Sale Notice (without the relevant dates).

12. The Debtors never filed a motion for approval of a "stalking horse" agreement. Unlike with sales of other assets in this case (e.g., Thistledown Racetrack and Lone Star Park), the Debtors never have made public even the most general terms of the proposed sale, such as the terms of the form agreement that will serve as the basis of the MJC Auction and sale negotiations (the "Form Agreement").

13. The City has made multiple written requests for a completed version of the Sale Notice, a copy of the Form Agreement, and the order that the Debtors intend to propose for approval of the sale. The City's counsel has explained its interest in the sale and expressed concern that the Debtors' sale schedule would not permit the City adequate time to evaluate the affect of the sale on the City's legal interests. The Debtors counsel responded promising to

5

forward to the City a copy of the sale agreement at the time it is executed. As to the Sale Notice that the Debtors were required to provide within five (5) days of the entry of the Bid Procedures Order, the Debtors stated that the "notice is no longer relevant given the subsequent notices of adjournment of the auction and sale hearing." The Debtors did not dispute that they failed to serve the Sale Notice.

14. On January 6, 2010, the Debtors filed a Notice of Adjournment of Auction and Sale Hearing for Maryland Jockey Club condensing the period of time between the MJC Auction and the MJC Sale Hearing to four (4) days, with a weekend intervening [Docket No. 1644]. On January 15, 2010, the Debtors filed a Second Notice of Adjournment of Auction and Sale Hearing for Maryland Jockey Club, which moved the date of the auction and MJC Sale Hearing to February 10, 2010 and February 26, 2010 respectively [Docket No. 1677]. Most recently, the Debtors adjourned for the third time the auction and MJC Sale Hearing, this time setting February 23, 2010 as the date of the auction and March 3, 2010 as the date of the MJC Sale Hearing [Docket No. 1729]. The MJC Sale Hearing is currently scheduled to occur after the date by which the Debtors were required under the Amended DIP Credit Agreement to obtain Sale Orders for Maryland Jockey Club or its assets. The exigencies that the Debtors claimed justified an expedited sale procedure apparently no longer exist.[2]

15. To date, the Debtors still have not filed a motion to approve the sale of the Maryland Jockey Club or its assets, have not served the Sale Notice, have not provided any information about the proposed sale terms (such as a form agreement), have not made available a

---

[2] News sources have reported that the Debtors have been actively involved in efforts to challenge the Anne Arundel County Council's decision in December 2009 to allow Cordish Cos. to build a 4,750-machine slots casino at Arundel Mills mall in suburban Baltimore.

6

form of order approving the sale, and have not given notice of the deadline for parties to file any objections to the approval of the MJC Sale.

## ARGUMENT

**A.   The Bankruptcy Rules, the Court's Local Rules, and Due Process Require Reasonable Notice of the Terms of a Proposed Sale of Assets Free and Clear of Liens.**

16.    The Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") mandate that a debtor seeking to sell property of the estate outside the ordinary course must provide parties in interest with reasonable notice of the sale and opportunity for hearing. In particular, under Bankruptcy Rule 2002(a)(2), parties in interest are entitled to twenty-one (21) days' notice of the sale of property of the estate other than in the ordinary course of business. See also Bankruptcy Rule 6004(a) (requiring that notice of a proposed sale of property not in the ordinary course of business "shall be given pursuant to [Bankruptcy Rule] 2002(a)(2)"). Bankruptcy Rule 2002(c) requires that such notice "shall include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections."

17.    In addition, Bankruptcy Rule 6004(c) requires that a debtor file a motion to seek authority to sell estate property free and clear of liens or other interests. The motion under Bankruptcy Rule 6004(c) shall be made in accordance with Bankruptcy Rule 9014 (governing contested matters) and must be accompanied by a notice that "shall include the date of the hearing on the motion and the time within which objections may be filed and served on the debtor in possession or trustee." Bankruptcy Rule 6004(c). Under Bankruptcy Rule 9014(a), all requests for relief initiating contested matters, such as those made pursuant to Bankruptcy Rule 6004(c), must be made by motion "and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought."

18. The Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules") establish additional requirements for the process of obtaining authority to sell property of the estate. For example, Local Rule 9006-1(c) requires that all motion papers (including any motion to sell estate property outside the ordinary course) shall be filed and served as least fourteen (14) days prior to a hearing date scheduled for such motion, and seventeen (17) days if service is by mail. With respect to motions to sell property ("Sale Motions"), such motion must "attach or include":  (1) a copy of "the proposed purchase agreement, or form of such agreement substantially similar to the one the debtor reasonably believes it will execute in connection with the proposed sale"; and (2) "a copy of a proposed form of sale order." Local Rule 6004-1. A Sale Motion also must highlight "material terms" such as whether the sale is to an insider, any provisions releasing claims, any provisions seeking to have the sale declared exempt from taxes, and any provisions seeking to waive the stay imposed by Bankruptcy Rule 6004(h).

19. In addition to the Bankruptcy Rules and the Local Rules, this Court is guided by due process considerations. Folger Adam Security, Inc. v. Dematteis/MacGregor, JV, 209 F.3d 252, 264-65 (3d Cir. 2000) (holding that improper notice of a free and clear sale violates the due process rights of a party whose interest the sale attempted to extinguish). The Third Circuit has recognized in the context of Section 363 sales that due process "requires 'notice reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections.'" Id. at 265 (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314-15 (1950)). To comport with due process requirements, notice "must be of such nature as to reasonably convey the required information." Id.

**B.     The Debtors Have Not Satisfied their Due Process Obligations with Respect to Maryland Jockey Club or its Assets.**

20.     The Debtors have not even served a Sale Notice, yet they have scheduled to proceed with the MJC Auction on February 23 and the MJC Sale Hearing on March 3. Not only have the Debtors failed to comply with the Bid Procedures Order, which requires that that the Debtors serve the Sale Notice within five (5) days of the entry of the Bid Procedures Order (entered on October 28, 2009), but they also cannot possibly comply with the 21-day sale notice requirement under Bankruptcy Rule 2002(a)(2).

21.     The Debtors also have not yet moved for approval of the sale and presumably will not do so until after the MJC Auction when a final agreement can be reached with a purchaser. As of the date of this filing, the schedule for the MJC Auction and the MJC Sale Hearing allows fewer than ten (10) days for parties in interest to review any proposed purchase agreement and form of order approving the sale. The Debtors have previously set even more condensed schedules for the MJC Auction and MJC Sale Hearing, one time even scheduling the auction for January 21 and the sale hearing for January 25 with a weekend between the two events. Because the time between the MJC Auction and the MJC Sale Hearing is less than fourteen (14) days, the Debtors cannot propose a final sale agreement for approval and comply with the time requirements of Local Rule 9006-1(c).

22.     The Debtors' current inability to comply with the Bankruptcy Rules and Local Rules is not the only troubling aspect of the Debtors' management of the process for selling their Maryland assets. The Debtors also have been unwilling to disclose any aspects of their discussions with potential bidders or the terms of any proposed sale. They have demonstrated a pattern of unexpectedly adjourning the MJC Auction and MJC Sale Hearing with short notice, and they have a history of seeking expedited relief with respect to the sale of the their Maryland

9

assets. All of these unconventional and erratic maneuvers cause the City to have concerns that it will be deprived of a meaningful opportunity to consider the terms of any proposed sale of Maryland Jockey Club or its assets.

23. The City is especially concerned about the terms of the sale in light of the only information that has been revealed about the form sale agreement to date. The City initially objected to the Debtors' proposed bidding procedures for the Maryland Assets and then withdrew its objection (but reserved all other rights) in reliance on Debtors' representation that any bidder for the Preakness would be required to commit to keeping the race in Maryland [Docket No. 194]. But according to the Memorandum in Support of Maryland's Right of First Refusal filed recently by the State of Maryland [Docket No. 1637], the Debtors apparently seek to render this Court-ordered commitment ineffective by agreeing that any such covenant expires at the closing of the sale. This apparent disregard for the Bid Procedures Order causes the City to question whether the Debtors are complying with other aspects of their obligations. The Debtors' failure to communicate or provide information about the ongoing sale process only heightens this concern.

24. The City is entitled under the Bankruptcy Rules and Local Rule 9006-1 to a reasonable period of time to review the terms of the sale to make sure the City's interests are protected and that the sale complies with existing state and local law. As described more fully above, the City has important interests in tax revenue from the sale of real estate located in Baltimore City, encumbrances on real estate located in Baltimore City, and certain statutory rights that cannot be avoided. Blindsiding the City by disclosing the purchase agreement and proposed sale order only days before the MJC Sale Hearing would not only violate the notice requirements of the Bankruptcy Rules and the Local Rules, but it also would violate the City's

due process rights to "notice reasonably calculated, under all the circumstances, to apprize [the City] of the pendency of the action and afford them an opportunity to present their objections." Folger Adam Security, 209 F.3d at 264-65.

25. The Debtors should have no reason to disregard the notice and service requirements of the Bankruptcy and Local Rules. The reasons given by the Debtors in October 2009 for accelerating the sale schedule no longer apply. The MJC Sale Hearing now will not occur until after February 26, 2010, the deadline that the Debtors claimed justified expedited consideration of proposed bidding procedures. There should be no acceptable reason at this point why the Debtors cannot build into the scheduling of the MJC Auction and MJC Sale Hearing the required fourteen (14) days for parties in interest to consider the sale terms, analyze any objections to the sale, conduct limited discovery pursuant to Bankruptcy Rule 9014, and prepare for the MJC Sale Hearing.

## REQUESTED RELIEF

WHEREFORE, for the foregoing reasons, the City respectfully requests that the Court enter an Order: (1) compelling the Debtors to comply with the provisions of Bankruptcy Rules 2002 and 6004 and Local Rule 9006-1(c) by, among other things: (a) providing 21-days' notice of the proposed sale of Maryland Jockey Club or its assets and the date by which objections to the sale are due; and (b) serving a Sale Motion at least fourteen (14) days in advance of the MJC Sale Hearing (seventeen (17) day if service is by first-class mail) with a copy of the proposed form of sale order and purchase agreement; and (2) granting to the City such other and further relief as this Court deems necessary and just.

Dated: February 11, 2010
Wilmington, DE

Respectfully submitted,

 /s/ *Jennifer Patone Cook, Esquire*
Jennifer Patone Cook (Bar No. 4997)
Klehr Harrison Harvey Branzburg LLP
919 Market Street, Suite 1000
Wilmington, DE 19801-3062
Telephone: (302) 426-1189
Facsimile: (302) 426–9193

and

Thomas C. Dame, Esquire
David G. Sommer, Esquire
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore MD 21201
Telephone: (410) 727-7702
Facsimile: (410) 468-2786

Attorneys for the Mayor & City Council of Baltimore