IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

---------------------------------------------------------------x
                                                :
*In re*                                         :    **Chapter 11**
                                                :
MAGNA ENTERTAINMENT CORP., *et al.*,            :    Case No. 09-10720 (MFW)
                                                :
                                                :    **Jointly Administered**
                        Debtors.                :
                                                :    (Requested) Hearing Date: 3/3/10 at 3:00 pm (ET)
                                                :    (Requested) Obj. Deadline: 3/3/10 at 3:00 pm (ET)
---------------------------------------------------------------x

### EMERGENCY MOTION OF THE DEBTORS PURSUANT TO 11 U.S.C. §§ 105 AND 364 AND BANKRUPTCY RULES 4001 AND 6004 TO ENTER INTO THE FIRST AMENDMENT TO THE SECOND AMENDED AND RESTATED DEBTOR IN POSSESSION CREDIT AGREEMENT WITH MID US FINANCING

Magna Entertainment Corp. ("Magna Entertainment") and its affiliated debtors, as debtors in possession (together, the "Debtors" and, collectively with Magna Entertainment's non-debtor subsidiaries, "MEC"),[1] respectfully represent:

### Jurisdiction

1.  The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Magna Entertainment Corp., 8374; (ii) The Santa Anita Companies, Inc., 6180; (iii) Los Angeles Turf Club, Incorporated, 6200; (iv) Pacific Racing Association, 5367; (v) MEC Land Holdings (California) Inc., 7410; (vi) Gulfstream Park Racing Association Inc., 6292; (vii) GPRA Thoroughbred Training Center, Inc., 2326; (viii) MEC Dixon, Inc., 7005; (ix) MEC Holdings (USA) Inc., 8494; (x) Sunshine Meadows Racing, Inc., 4288; (xi) Thistledown, Inc., 5742; (xii) MEC Maryland Investments, Inc., 4637; (xiii) 30000 Maryland Investments LLC, 1704, (xiv) Old RP, Inc., 2024; (xv) GPRA Commercial Enterprises Inc., 6156; (xvi) Pimlico Racing Association, Inc., 4527; (xvii) The Maryland Jockey Club of Baltimore City, Inc., 3840; (xviii) Laurel Racing Association Limited Partnership, 0504; (xix) Laurel Racing Assoc., Inc., 0505; (xx) Prince George's Racing, Inc., 6493; (xxi) Southern Maryland Racing, Inc., 9850; (xxii) Southern Maryland Agricultural Association, 9661; (xxiii) Maryland Jockey Club, Inc., 3124; (xxiv) AmTote International, Inc., 1143; (xxv) MEC Pennsylvania Racing Services, Inc., 9924; and (xxvi) MEC Lone Star, LP, 4287.

1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

2. Commencing on March 5, 2009 (the "Petition Date"), each of the Debtors filed petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the Bankruptcy Court. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. In accordance with an Order of the Bankruptcy Court, the Debtors' cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3. On March 18, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the statutory committee of unsecured creditors (the "Creditors' Committee").

## MEC's Businesses

4. MEC is the leading owner and operator of horse racetracks in North America. It is also a leading supplier, via simulcasting, of live racing content to the inter-track, off-track betting and account-wagering markets. Magna Entertainment is the direct or indirect parent company of each of the other Debtors.

5. As of the Petition Date, MEC operated or managed seven thoroughbred racetracks (Santa Anita Park, Gulfstream Park, Pimlico Race Course, Laurel Park, Golden Gate Fields, Thistledown, and Portland Meadows), one harness racing track (The Meadows), and two racetracks which run both thoroughbred and quarter horse meets (Lone Star Park at Grand Prairie and Remington Park). On August 26, 2009, the Bankruptcy Court entered an order authorizing

MEC to reject that certain Racing Services Agreement, pursuant to which MEC Pennsylvania Racing Services, Inc. operated The Meadows and accordingly, MEC no longer operates The Meadows. In addition, on September 15, 2009, the Bankruptcy Court entered an order authorizing MEC to sell Remington Park to Global Gaming RP, LLC and was consummated on January 1, 2010.

6. MEC complements its live-racing operations with simulcast wagering, casino gaming at some venues, off-track betting facilities in certain states, and a national account-wagering business known as XpressBet that permits customers to place wagers by telephone or Internet for races run at more than 100 North American racetracks, and internationally on races in Australia, South Africa, Dubai, Germany, the United Kingdom and Hong Kong. MEC also owns AmTote International, Inc. which provides totalisator services to the pari-mutuel industry.[2]

7. Under a series of March 2007 agreements, MEC owns a 50% interest in a joint venture called TrackNet Media Group, LLC ("TrackNet Media"). TrackNet Media distributes MEC's horse racing content through various media outlets to other racetracks, off-track betting facilities, casinos and advance-deposit wagering companies, and purchases horse racing content from third parties to be made available through various outlets. A separate joint venture called HorseRacing TV, or HRTV, provides horse racing programming to more than 16 million cable and satellite-TV subscribers.

8. As of February 4, 2009, MEC employed approximately 2,748 full-time employees and 2,145 part-time employees in North America, approximately 1,862 of whom

---

[2] A totalisator is a computerized system that enables pari-mutuel betting by calculating payoff odds, displaying them, and producing tickets based on incoming wagers.

were represented by unions. For the year ended December 31, 2008, MEC's unaudited consolidated financial statements showed revenues from continuing operations of approximately $593 million, of which approximately $413 million was attributable to pari-mutuel wagering. As of December 31, 2008, MEC's unaudited consolidated financial statements reflected assets totaling approximately $1.054 billion and liabilities totaling approximately $947.3 million.

**The Chapter 11 Plan**

9. As the Bankruptcy Court is aware, on January 11, 2010, the Debtors, the Creditors' Committee, MI Developments Inc. ("MID") and MID Islandi sf. ("MID Islandi") announced that a global compromise and settlement (the "Settlement") had been reached with respect to the adversary proceeding styled *The Official Committee of Unsecured Creditors of Magna Entertainment Corp., et al. v. MI Developments, Inc., MID Islandi, Frank Stronach, Jerry D. Campbell, William Menear, Anthony R. Campbell and W. Thomas Hodgson*, Adversary Pro. No. 09-51523 (the "Committee Litigation") and that the Settlement would form the basis of a chapter 11 plan.

10. On February 18, 2010, as a result of the joint efforts of the Debtors, the Creditors' Committee, MID and MI Developments US Financing Inc. ("MID US Financing" or "MID Lender") (collectively, the "Proponents"), the Debtors filed that certain Joint Plan of Affiliated Debtors, the Official Committee of Unsecured Creditors, MI Developments Inc. and MI Developments US Financing Inc. Pursuant to Chapter 11 of the United States Code (the "Plan") and a corresponding disclosure statement (the "Disclosure Statement"). Hearings to consider approval of the Disclosure Statement and confirmation of the Plan are scheduled for March 23, 2010 and April 20, 2010, respectively. A condition precedent to the Effective Date (as defined in the Plan) is that the Effective Date occur prior to April 30, 2010. The Proponents

believe that, absent the Settlement, given the size of the MID's claims against the Debtors, and the fact that such claims are secured claims with liens on substantially all of the Debtors' assets, general unsecured creditors were faced with the possibility of receiving no recovery on account of their claims. The Settlement, however, will result in recoveries for general unsecured claimants through the treatment set forth in the Plan.

**The First Amendment to the Second Amended DIP Credit Agreement**

11. On the Petition Date, the Debtors filed that certain Motion (I) for Authorization to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364, (B) Utilize Cash Collateral of the Prepetition Secured Lenders, (C) Grant Adequate Protection to Prepetition Secured Lenders, and (D) Grant Related Relief, and (II) to Schedule a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "DIP Motion") [Docket No. 12], seeking, among other things, authorization for Magna Entertainment (the "Borrower") to obtain secured postpetition financing in an aggregate principal amount not to exceed $38,400,000.00, pursuant to the terms of that certain Debtor in Possession Credit Agreement (as amended, the "DIP Credit Agreement"), dated March 6, 2009, with MID Islandi. On April 22, 2009, the Bankruptcy Court entered an order granting the relief requested in the DIP Motion on a final basis [Docket No. 382].

12. Following discussions with the Creditors' Committee, the maturity date of the Debtors' obligations pursuant to the DIP Credit Agreement was established as November 6, 2009 (the "Maturity Date"). Notwithstanding the Maturity Date, as clearly set forth in the Debtors' Budget, as defined in the DIP Credit Agreement and presented in testimony to the Bankruptcy Court, the Debtors forecasted that, absent additional funding, MEC would face a severe liquidity crisis towards the end of September or early October.

13. In early August 2009, the Debtors negotiated that certain Amended and Restated Debtor-in-Possession Credit Agreement, dated as of August 26, 2009 (the "First Amended DIP Credit Agreement"). To make certain clarifications, and to better reflect the progress of the Debtors' sales process, the Debtors and MID Islandi agreed to further amend the DIP Credit Agreement in accordance with that certain Second Amended and Restated Debtor-in-Possession Credit Agreement, dated as of October 9, 2009 (the "Second Amended DIP Credit Agreement") to obtain additional capital to fund the Debtors' chapter 11 cases and continue the Debtors' sales process and reorganization efforts. On October 28, 2009, the Bankruptcy Court entered that certain Order (I) Supplementing Final DIP Order and (II) Authorizing Debtors to Enter into Second Amended and Restated Debtor in Possession Credit Agreement (the "Final Order") [Docket No. 1362].

14. The Second Amended DIP Credit Agreement (i) provided for an additional commitment of $26,000,000.00, such that the aggregate committed amount of postpetition financing to be made available by MID Islandi shall be in a principal amount not to exceed $64,400,000.00, (ii) extended the Maturity Date and (iii) contemplated the division of the Debtors' assets into three (3) pools, each with certain sale timing requirements. With respect to the Maturity Date, the Second Amended DIP Credit Agreement provides that the Maturity Date will occur on the earlier of:

> (i) April 30, 2010;
>
> (ii) the acceleration of all or any portion of the Obligations pursuant to Section 9.2 of the Second Amended and Restated Credit Agreement; and
>
> (iii) the effective date of a confirmed plan of reorganization;

*See* Second Amended DIP Credit Agreement at § 1.1, definition of Maturity Date. The Second Amended DIP Credit Agreement provides, however, that, in connection with (i) above, the Maturity Date will be automatically extended for one month in the event that a chapter 11 plan has been confirmed by the Bankruptcy Court, but not yet consummated. Accordingly, as set forth above, the timeline and the Effective Date condition established for the Plan solicitation and confirmation process endeavors to satisfy the Debtors' obligations under the Second Amended DIP Credit Agreement.

15. From October 2009 through January 2010, the Debtors satisfied the first tranche of obligations under the Second Amended DIP Credit Agreement in the amount of $38,400,000.00 through (i) the closing of the sale of the Ocala Property to Par Avenue Properties, LLC on September 17, 2009, the Debtors repaid $7,648,427.56 of the outstanding obligations under the Second Amended DIP Credit Agreement, (ii) the closing of the sale of the Dixon Property to Ocala Meadows on November 30, 2009, the Debtors repaid $2,957,176.29 of the outstanding obligations under the Second Amended DIP Credit Agreement and (iii) the closing of the sale of Remington Park to Global Gaming RP, LLC on January 1, 2010, the Debtors repaid $27,794,396.15 of the outstanding obligations under the Second Amended DIP Credit Agreement.

16. Since the Debtors' entry into the Second Amended DIP Credit Agreement, there has been an unexpected decline in revenues generated by the horse racing business that has adversely affected the handle and wagering revenues at the Debtors' racetracks. The Debtors have also lost profits due to the cancellation of four (4) race days at Santa Anita Park as a result of poor weather conditions and track drainage issues.

17. In order to offset these shortfalls, on February 9, 2010, the Debtors drew down approximately Two Million Five Hundred Thousand Dollars ($2,500,000.00) pursuant to the Second Amended DIP Credit Agreement, which amount represents the remaining amount available under that agreement. Notwithstanding, the Debtors will not have the requisite liquidity to fund operations after March 3, 2010 without access to additional financing, and thus, simultaneously with the negotiations to finalize the terms and provisions of the Plan and the Disclosure Statement, the Debtors commenced discussions with MID to address the Debtors' liquidity concerns and provide additional funding that would serve as a bridge to the Effective Date. Those discussions culminated into that certain First Amendment to the Second Amended and Restated Debtors in Possession Credit Facility, dated February 25, 2010 (the "First Amendment"), a copy of which is annexed hereto as Exhibit "A".

18. Pursuant to the First Amendment, MID US Financing[3] has agreed to make an additional Seven Million Dollars ($7,000,000.00) available to the Debtors. The Debtors believe that, with these additional funds, they will have the necessary financing to support their operations until the Effective Date.

### Bankruptcy Rule 4001 Concise Statement

19. Pursuant to Bankruptcy Rule 4001 and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the following are the material amendments to the Second Amended DIP Credit Agreement proposed in the First Amendment:[4]

---

[3] Effective January 6, 2010, MID Islandi assigned all rights under the Second Amended DIP Credit Agreement to MID US Financing.

[4] The summaries and descriptions of the terms and conditions of the First Amendment set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the

| Commitment<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)*<br>*Local Bankruptcy Rule*<br>*4001-2(a)(ii)* | Increased availability, on a non-revolving, senior, secured, superpriority basis, of up to an additional $7,000,000.00, thereby increasing the DIP Tranche 3 Credit Commitment to $33,000,000.00. |
|---|---|
| Fees<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | Arrangement Fee: equal to the product of (i) $7,000,000.00 and (ii) 3.00%. |

## Relief Requested

20. By this motion, the Debtors request that entry of the proposed order, (the "Interim Order"), substantially in the form attached hereto as Exhibit "B," pursuant to sections 105, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2 (i) approving the Debtors' entry into and performance under the First Amendment on an interim basis, (ii) supplementing the DIP orders previously entered by this Court and (iii) scheduling a hearing to consider the Debtors entry into and performance under the First Amendment on a final basis for March 23, 2010 at 10:30 a.m. (prevailing Eastern Time).

**The Debtors Should Be Authorized
to Enter into the First Amendment**

21. As set forth above in further detail, the Debtors have filed the Plan and Disclosure Statement that not only embodies the terms and conditions of the Settlement, but provides for recoveries to general unsecured creditors and a seamless exit from chapter 11. To efficiently utilize the additional funding requested herein, the Debtors and their co-Proponents have agreed to a timeline that endeavors to achieve the Effective Date by April 30, 2010.

---

significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the First Amendment. In the event there is a conflict between this Motion and the First Amendment, the First Amendment shall control in all respects.

22. Absent entry into the First Amendment, the Debtors will not have sufficient funds to meet their day-to-day obligations or continue under chapter 11. Approval of the First Amendment will provide the Debtors with immediate access to financing necessary to satisfy their current and ongoing operating expenses through the conclusion of the chapter 11 plan process, which is already well on its way. Unless the costs and expenses associated with this process, as well as the Debtors' business operations, are paid, the Debtors will be forced to cease operations and convert their cases to cases under chapter 7 of the Bankruptcy Code, which would result in irreparable harm to the Debtors' businesses, substantial deterioration of the going concern value of the businesses and uncertain recoveries to general unsecured creditors.

23. Simply stated, the First Amendment is the only immediate source of liquidity necessary to continue the Debtors' operations. The terms and provisions of the First Amendment are fair and reasonable, and were negotiated in good faith on an arms'-length basis. Furthermore, the Debtors believe the First Amendment will incentivize the Debtors to maintain the current chapter 11 plan process schedule. Under these circumstances, the Debtors submit that the relief request herein is appropriate and in the best interests of the estates.

### Waiver of Bankruptcy Rules 6004(a) and (h)

24. To implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Exemption from Formal Valuation and Minority Shareholder Approval Requirements of Applicable Canadian Securities Law

25. The proposed transaction between Magna Entertainment and MID US Financing is a "related party transaction" for Magna Entertainment for purposes of applicable

US_ACTIVE:\43317923\01\61366.0003
RLF1 3542813v.1

10

Canadian securities law and, in particular, Multilateral Instrument 61-101 – Protection *of Minority Security Holders in Special Transactions* ("MI 61-101"). MI 61-101 requires that, unless exempted, an issuer proposing to carry out certain types of related party transactions is required to obtain a formal valuation of the assets involved in a related party transaction from a qualified and independent valuator. MI 61-101 also requires that, unless exempted, a related party transaction must be approved by at least a simple majority of the votes cast by "minority" shareholders of each class of equity securities of the issuer.

26. Magna Entertainment is relying on exemptions from the formal valuation requirement and the minority shareholder approval requirement under MI 61-101 for a related party transaction which provides that a formal valuation and minority shareholder approval are not required where: (i) the transaction is subject to court approval, or a court orders that the transaction be effected, under bankruptcy or insolvency law (the "Bankruptcy Exemption"); (ii) the court is advised of the requirements of MI 61-101 regarding formal valuations and minority shareholder approval for related party transactions and of the Bankruptcy Exemption; and (iii) the court does not require a formal valuation or minority shareholder approval.

27. In the event this Court approves the proposed transaction between Magna Entertainment and MID US Financing, such approval would be relied upon by Magna Entertainment as the basis for an exemption from the formal valuation and minority shareholder approval requirements of MI 61-101 pursuant to Sections 5.5(f) and 5.7(d) thereof, with respect to its consummation of the transaction.

## Notice

28. Notice of this Motion has been provided to: (i) the United States Trustee for the District of Delaware; (ii) the Creditors' Committee; (iii) the SEC; (iv) the IRS; (v) The

Bank of Montreal; (vi) MI Developments US Financing Inc.; (vii) MI Developments Inc.; (viii) PNC Bank, N.A.; (ix) SunTrust Bank; (x) Wells Fargo Bank, N.A.; (xi) The Bank of New York; (xii) the Oklahoma Horse Racing Commission; (xiii) the Florida Department of Business and Professional Regulation Division of Pari-Mutuel Wagering; (xiv) the Maryland Racing Commission; (xv) the California Horse Racing Board; (xvi) the Ohio State Racing Commission; (xvii) the Maryland Slots Commission; (xviii) the Texas Racing Commission; (xix) the Virginia Racing Commission; (xx) the Pennsylvania State Harness Racing Commission; (xxi) the Pennsylvania Gaming Control Board; (xxii) the Nevada Gaming Commission; (xxiii) the New Jersey Casino Control Commission; (xxiv) the Oregon Racing Commission; and (xxv) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 or requesting to receive notice prior to the date hereof. The Debtors submit that such notice is sufficient under the circumstances.

## No Previous Request

29. Other than in connection with obtaining the Final Order, no previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE the Debtors respectfully request entry of the Interim Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: February 26, 2010
      Wilmington, Delaware

Respectfully submitted,

/s/ Mark D. Collins

Mark D. Collins, Esq. (No. 2981)
L. Katherine Good, Esq. (No. 5101)
Drew G. Sloan, Esq. (No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtors and Debtors in Possession*