IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

------------------------------------------------------------x
                    :

*In re*                     :        **Chapter 11**
                    :

**MAGNA ENTERTAINMENT CORP., *et al.*,**   :      **Case No. 09-10720 (MFW)**
                    :

           **Debtors.**         :      **Jointly Administered**
                    :
------------------------------------------------------------x

**DISCLOSURE STATEMENT FOR THE SECOND AMENDED JOINT PLAN OF AFFILIATED
DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,
MI DEVELOPMENTS INC. AND MI DEVELOPMENTS US FINANCING INC.
PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

Dated: March 22, 2010

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

– and –

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700

Attorneys for Debtors and
Debtors in Possession


KRAMER LEVIN NAFTALIS &
FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

– and –

PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(302) 652-4100

Attorneys for the Official Committee of
Unsecured Creditors


SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

– and –

YOUNG CONAWAY STARGATT &
TAYLOR LLP
The Brandywine Building
1000 East Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

Attorneys for MI Developments Inc. and MI
Developments US Financing Inc.

# I.  INTRODUCTION

Magna Entertainment Corp., The Santa Anita Companies, Inc., Los Angeles Turf Club, Inc., Pacific Racing Association, MEC Land Holdings (California) Inc., Gulfstream Park Racing Association Inc., GPRA Thoroughbred Training Center, Inc., MEC Dixon, Inc., MEC Holdings (USA) Inc., Sunshine Meadows Racing, Inc., Thistledown, Inc., MEC Maryland Investments, Inc., 30000 Maryland Investments LLC, Old RP, Inc., *f/k/a*, Remington Park, Inc., GPRA Commercial Enterprises Inc., Pimlico Racing Association, Inc., The Maryland Jockey Club of Baltimore City, Laurel Racing Association Limited Partnership, Laurel Racing Assoc., Inc., Prince George's Racing, Inc., Southern Maryland Racing, Inc., Southern Maryland Agricultural Association, Maryland Jockey Club, Inc., AmTote International, Inc., MEC Pennsylvania Racing Services, Inc. and MEC Lone Star, L.P. (collectively, the "Debtors"), the Official Committee of Unsecured Creditors, MI Developments Inc. and MI Developments US Financing Inc. submit this Disclosure Statement, dated March 22, 2010 (the "Disclosure Statement"), in connection with the solicitation of acceptances and rejections with respect to the Second Amended Joint Plan of Affiliated Debtors, the Official Committee of Unsecured Creditors, MI Developments Inc. and MI Developments US Financing Inc. submit this Disclosure Statement, Pursuant to Chapter 11 of the United States Bankruptcy Code, dated March 22, 2010 (the "Plan"), a copy of which is annexed to this Disclosure Statement as Exhibit "A".  Unless otherwise defined herein, capitalized terms used shall have the same meanings ascribed to them in the Plan.

The purpose of this Disclosure Statement is to set forth information (1) regarding the history of the Debtors, their businesses and the Chapter 11 Cases, (2) regarding the terms and conditions of the settlement in principle of the Committee Litigation, (3) concerning the Plan and alternatives to the Plan, (4) advising holders of Claims and Equity Interests of their rights under the Plan, (5) assisting the holders of Claims in making an informed judgment as to whether they should vote to accept or reject the Plan, and (6) assisting the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

On March ___, 2010, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order approving this Disclosure Statement, in accordance with section 1125 of the Bankruptcy Code, as containing adequate information of a kind and in sufficient detail to enable hypothetical reasonable investors typical of holders of Claims  against the Debtors to make an informed judgment in voting to accept or reject the Plan.  However, the Bankruptcy Court has not passed on the merits of the Plan.  No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  In voting on the Plan, holders of Claims should not rely on any information relating to the Debtors and their business, other than the information contained in this Disclosure Statement, the Plan and all exhibits hereto and thereto.

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM OR EQUITY INTEREST.  THE DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW.  THE DESCRIPTION OF THE PLAN IS A SUMMARY ONLY, WHICH IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN, AND IF ANY INCONSISTENCY EXISTS BETWEEN THE TERMS AND PROVISIONS OF THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS AND PROVISIONS OF THE PLAN ARE CONTROLLING.  HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS.

Pursuant to provisions of the Bankruptcy Code, only classes of claims or equity interests which are (i) "impaired" by a plan of reorganization and (ii) entitled to receive a distribution under such plan are entitled to vote on the plan. In this case, only Claims in Classes 2, 3, 5 through 26 and 35 are impaired by and entitled to receive a distribution under the Plan, and holders of Claims in those Classes are the only Entities entitled to vote to accept or reject the Plan. Classes of Claims or Equity Interests that are not impaired under the Plan, and each holder of a claim or interest in such class, are conclusively presumed to have accepted the Plan, and solicitation of acceptances from these holders of claims of such class is not required. Claims in Class 1, 4 and 27 through 34 are unimpaired by the Plan, and holders thereof are conclusively presumed to have accepted the Plan. Holders of Equity Interests in Classes 36 through 61 are impaired and not entitled to receive any distributions or retain their Equity Interests pursuant to the Plan and, therefore, are deemed to have rejected the Plan.

THE RECORD DATE FOR DETERMINING THE HOLDERS OF CERTAIN CLAIMS THAT MAY VOTE ON THE PLAN IS MARCH 19, 2010 (the "Voting Record Date").

If you are entitled to vote to accept or reject the Plan, accompanying this Disclosure Statement should be a ballot ( "Ballot") for casting your vote(s) on the Plan and a pre-addressed envelope for the return of the Ballot.

BALLOTS FOR ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED ONLY TO THOSE HOLDERS OF CLAIMS IN CLASSES 2, 3, 5 THROUGH 26 AND 35, BECAUSE THEY ARE THE ONLY HOLDERS OF CLAIMS THAT MAY VOTE TO ACCEPT OR REJECT THE PLAN.

If you are the holder of a Claim in one of these Classes and did not receive a Ballot, received a damaged or illegible Ballot, or lost your Ballot, or if you are a party in interest and have any questions concerning this Disclosure Statement, any Exhibits hereto, the Plan or the voting procedures in respect thereof, please contact:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Arielle G. Lenza, Esq.
(212) 310-8000

**THE BOARDS OF DIRECTORS OF THE DEBTORS HAVE UNANIMOUSLY APPROVED THE TERMS OF THE DEBTORS' PLAN AND RECOMMEND THAT THE HOLDERS OF CLAIMS IN ALL SOLICITED CLASSES VOTE TO ACCEPT THE PLAN.**

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AS CO-PROPONENTS OF THE PLAN WITH THE DEBTORS, MI DEVELOPMENTS INC. AND MI DEVELOPMENTS US FINANCING INC., RECOMMEND THAT THE HOLDERS OF CLAIMS IN ALL SOLICITED CLASSES VOTE TO ACCEPT THE PLAN.**

After carefully reviewing this Disclosure Statement and the Exhibits attached hereto, please indicate your vote with respect to the Plan on the enclosed Ballot and return it in the envelope provided. Voting procedures and requirements are explained in greater detail elsewhere in this Disclosure Statement and on the Ballot.

**HOLDERS OF CLAIMS IN CLASSES 2, 3, 5, 6, 9 THROUGH 26 AND 35 PLEASE VOTE AND RETURN YOUR BALLOTS TO:**

**Kurtzman Carson Consultants, LLC**
**Attention: Magna Ballot Processing Center**
**2335 Alaska Avenue**
**El Segundo, California 90245**

**HOLDERS OF CLAIMS IN CLASSES 7 AND 8 PLEASE VOTE AND RETURN YOUR BALLOTS TO YOUR NOMINEE SO THAT IT CAN PROCESS YOUR INSTRUCTIONS AND SUBMIT A MASTER BALLOT THAT IS ACTUALLY RECEIVED BY THE SOLICITATION AGENT NO LATER THAN 4:00 P.M. (PREVAILING EASTERN TIME) ON APRIL 16, 2010, UNLESS SUCH TIME IS EXTENDED BY THE DEBTORS. EACH NOMINEE SHOULD SUBMIT THE MASTER BALLOT TO THE SOLICITATION AGENT IN THE ENVELOPE PROVIDED OR AT THE FOLLOWING ADDRESS:**

**Magna Entertainment Corp.**
**c/o Kurtzman Carson Consultants LLC**
**1230 Avenue of the Americas, 7th Floor**
**New York, NY 10020**
**Attn: David M. Sharp**
**(917) 639-4276**

**IN ORDER TO BE COUNTED, BALLOTS MUST BE RECEIVED BY 4:00 P.M. (PREVAILING EASTERN TIME) ON APRIL 16, 2010. ANY EXECUTED BALLOTS WHICH ARE TIMELY RECEIVED BUT WHICH DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN.**

The Debtors believe that prompt confirmation and implementation of the Plan is in the best interests of the Debtors, all holders of Claims and Equity Interests, and the Debtors' chapter 11 estates.

In accordance with the Disclosure Statement Order and section 1128 of the Bankruptcy Code, the Bankruptcy Court has fixed April ___, 2010, at __:__ __.m. (prevailing Eastern Time), in Courtroom No. 4 of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801, as the date, time and place of the hearing to consider confirmation of the Plan, and April ___, 2010, at __:__ __.m. (prevailing Eastern Time), as the last date for filing an objection to confirmation of the Plan. The hearing on confirmation of the Plan may be adjourned from time to time without further notice except for the announcement of the adjourned date and time at the hearing on confirmation or any adjournment thereof.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY AND THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE SUCH DATE. HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD READ IT CAREFULLY AND IN ITS ENTIRETY, AND

WHERE POSSIBLE, CONSULT WITH COUNSEL OR OTHER ADVISORS PRIOR TO VOTING ON THE PLAN.

CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE FORWARD LOOKING PROJECTIONS AND FORECASTS, BASED UPON CERTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON BY ANY PERSONS FOR ANY OTHER PURPOSE OTHER THAN BY HOLDERS OF CLAIMS ENTITLED TO VOTE FOR THE PURPOSE OF DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTORS OR ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

## II.  COMPROMISE AND SETTLEMENT

The backbone of the Plan is the compromise and settlement in principle of the Committee Litigation (the "Settlement"). Specifically, and as set forth more fully in Section E.9 below, on July 21, 2009, the Creditors' Committee commenced an adversary proceeding against MID Islandi sf. ("MID Islandi"), the Debtors' largest prepetition secured lender, MI Developments Inc. ("MID"), Magna Entertainment's controlling shareholder, and certain other third party defendants asserting, among other things, claims of fraudulent transfer, equitable subordination, recharacterization and breaches of fiduciary duty. The Settlement is the result of extensive negotiations among the Creditors' Committee, MID and certain of the other third party defendants.

To implement the settlement in principle of the Committee Litigation, the parties have agreed to, among other things, the following terms and conditions:

- ➢ The Creditors' Committee has agreed to dismiss the Committee Litigation, with prejudice, on the Effective Date.

- ➢ MID has agreed that it or MI Developments US Financing Inc. ("MID US Financing" or "MID Transferee") shall pay (a) Eighty Nine Million Dollars ($89,000,000.00) for distribution of the Creditor Cash to holders of Allowed Non-MJC General Unsecured Claims (the "Committee Litigation Settlement Payment"), (b) cash in an amount necessary to satisfy, in full, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, the Allowed PNC Claim and Allowed MJC Claims, on the terms and subject to the conditions set forth in the Plan and (c) One Million Five Hundred Thousand Dollars ($1,500,000.00) for payment of certain fees and expenses of the Creditors' Committee's professionals and certain members of the Creditors' Committee incurred in connection with the Committee Litigation.

- ➢ In full satisfaction and release of all of its Claims against the Debtors, the Debtors, the Creditors' Committee and MID agree that on the Effective Date:

  - – MID Transferee shall receive net sale proceeds received from the sale of Lone Star Park, if any, in excess of the first Twenty Million Dollars ($20,000,000.00)

or, in the event that the sale of Lone Star Park has not been consummated as of the Effective Date, the LSP Trust Interests entitling it to receive its share of the Lone Star Park sale proceeds;

– MID Transferee shall receive the first Twenty Million Dollars ($20,000,000.00) of net sale proceeds received from the sale of Thistledown or, in the event that the sale of Thistledown has not been consummated as of the Effective Date, the Thistledown Trust Interests entitling it to receive its share of the Thistledown sale proceeds;

– Equity Interests in certain of the Reorganized Debtors shall be issued to MID Transferee, and assets of certain Reorganized Debtors shall be transferred to MID Transferee, pursuant to the Plan, such that on the Effective Date, MID Transferee shall own the Debtors' racetracks known as Santa Anita Park, Golden Gate Fields, Gulfstream Park, the Maryland Jockey Club and AmTote and certain other assets of the Debtors;

– The Debtors or the Reorganized Debtors shall convey to MID Transferee certain non-debtor assets, including the assets of XpressBet, Inc. and Magna Entertainment's interests in TrackNet Media Group LLC, HRTV, LLC, MEC Media Television Holdings Inc. and MEC Oregon Racing, Inc.;

– Any proceeds received by the Debtors or the Reorganized Debtors from the settlement or resolution of the PA Meadows Litigation shall go to MID Transferee.

➢ Holders of Allowed Non-MJC General Unsecured Claims, Allowed 8.55% Note Claims and Allowed 7.25% Note Claims shall receive, subject to certain reductions, including a reduction of the KLNF Contingency Fee, their pro rata share of (a) the Committee Litigation Settlement Payment, (b) the first Twenty Million Dollars ($20,000,000.00) of net sale proceeds from the sale of Lone Star Park or, in the event that the sale of Lone Star Park has not been consummated as of the Effective Date, the LSP Trust Interests entitling them to receive their share of the Lone Star Park sale proceeds; and (c) net sale proceeds received from the sale of Thistledown, if any, in excess of the first Twenty Million Dollars ($20,000,000.00) or, in the event that the sale of Thistledown has not been consummated as of the Effective Date, the Thistledown Trust Interests entitling them to receive their share of the Thistledown sale proceeds.

➢ In the event that the sales of Lone Star Park or Thistledown or their respective assets, in whole or in part, have not been consummated as of the Effective Date, the assets and reorganized equity of each entity will be placed into Operating Trusts and MID Transferee and the holders of Allowed General Unsecured Claims, Allowed 8.55% Note Claims and Allowed 7.25% Note Claims shall receive the applicable Operating Trust Interests entitling them to payment of the sales proceeds upon consummation of the applicable sales in accordance with the Plan.

In addition, the Plan provides certain releases to, among others, MID Islandi, MID, MID US Financing, the Debtors and certain of their Related Persons and to effectuate the Settlement and the

terms of the Plan, the Debtors, MID, MID US Financing and the Creditors' Committee entered into that certain Plan Support Agreement, dated February 18, 2010 (the "Plan Support Agreement") and attached hereto as Exhibit "B." Pursuant to the Plan Support Agreement, the parties agreed to, among other things, take any and all action as is reasonably requested by the Debtors to support approval of the Disclosure Statement and confirmation of the Plan.

The Settlement resolves claims asserted by the Creditors' Committee against MID and the third party defendants for, among other things, recharacterization and/or equitable subordination of the MID Claims and claims for breaches of fiduciary duty by MID and certain officers and directors of Magna Entertainment. Given the size of the MID Claims, and the fact that such claims were asserted as secured claims with liens on substantially all of the Debtors' assets, absent the Settlement, general unsecured creditors of each of the Debtors faced the possibility of receiving no recovery on account of their claims. Under the Settlement, however, all holders of Non-MJC General Unsecured Claims, Allowed 8.55% Note Claims and Allowed 7.25% Note Claims will receive their pro rata share of the consideration provided by MID US Financing and the proceeds of certain asset sales, as set forth above. The Settlement resolves an extremely complex litigation regarding difficult claims, and a potential dispute over asset valuations, by providing equal recoveries to all general unsecured claimants. With respect to the creditors holding claims against the MJC Debtors, because MID was not asserting liens directly against the assets of such Debtors, as part of the Settlement, creditors holding claims against the MJC Debtors will receive a different treatment than unsecured creditors of the other Debtors.

### III. OVERVIEW OF PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms and provisions of the Plan, see Article V. below, entitled "The Plan of Reorganization." The Plan represents the product of negotiations among the Debtors and key parties in interest.

The Plan provides for the classification and treatment of Claims against and Equity Interests in the Debtors. The Plan designates 35 Classes of Claims and 26 Classes of Equity Interests, which classify as Claims against and Equity Interests in the Debtors. These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Equity Interests as well as the compromise and settlement described herein.

The following table provides a summary of the classification and treatment of Claims and Equity Interests under the Plan:

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| -- | Administrative Expense Claims | No | Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, on the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim shall become an Allowed Claim, upon receipt of sufficient funds from MID Transferee, the Disbursing Agent shall (i) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim or (ii) satisfy and | 100% Unimpaired |

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| | | | discharge such Allowed Administrative Expense Claim in accordance with the terms and conditions of the agreements with respect thereto. | |
| -- | Priority Tax Claims | No | Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, on the Effective Date, each holder of an Allowed Priority Tax Claim shall be entitled to receive distributions in an amount equal to the full amount of such Allowed Priority Tax Claim. At the option and discretion of MID Transferee, which option shall be exercised, in writing, on or prior to the commencement of the Confirmation Hearing, upon receipt of sufficient funds from MID Transferee, such payment shall be made by the Disbursing Agent (a) in full, in Cash, on the Effective Date, (b) in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, in full, in Cash, in equal quarterly installments, commencing on the first (1st) Business Day following the Effective Date and ending on the fifth (5th) anniversary of the commencement of the Chapter 11 Cases, together with interest accrued thereon at a rate to be determined by the Bankruptcy Court and set forth in the Confirmation Order, or (c) by mutual agreement of the holder of such Allowed Priority Tax Claim and the Debtors or Reorganized Debtors (as directed by MID Transferee), as the case may be. | 100% Unimpaired |
| 1 | Priority Non-Tax Claims | No | Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, unless otherwise mutually agreed upon by the holder of an Allowed Priority Non-Tax Claim and MID Transferee, upon the Disbursing Agent's receipt of sufficient funds from the MID Transferee, each holder of an Allowed Priority Non-Tax Claim shall receive from the Disbursing Agent in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Priority Non-Tax Claim, Cash in an amount equal to such Allowed Priority Non-Tax Claim on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is possible. | 100% Unimpaired |
| 2 | MID Claims | Yes | Subject to the provisions of Section 2.1(d) and 21.2 of the Plan, the holder of the MID Claims shall receive, in full satisfaction, settlement, release, and | N/A Impaired |

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| | | | discharge of, and in exchange for such MID Claims:<br><br>(a)    On the Effective Date, (i) the MID LSP Sale Proceeds and the MID Thistledown Sale Proceeds, if any, or (ii) if the Operating Trusts are created, the LSP Trust Interests and/or the Thistledown Trust Interests, as applicable, entitling the holder of the MID Claims to receive the MID LSP Sale Proceeds and the MID Thistledown Sale Proceeds, as soon as practicable upon consummation of the LSP Sale and/or Thistledown Sale, if any, as applicable;<br><br>(b)    On the Effective Date: The PA Meadows Proceeds or, in the event that the PA Meadows Litigation has not been settled or resolved by Final Order, the PA Meadows Litigation shall be assigned to MID; the MID Non-Debtor Assets; the MID Reorganized Debtor Stock; and the MID Reorganized Debtor Assets. | |
| 3 | Wells Fargo Claims | No | Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, on the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Wells Fargo Claim, the holder of the Allowed Wells Fargo Claim shall receive one of the following distributions: (i) the payment of such holder's Allowed Wells Fargo Claim in Cash; (ii) the sale or disposition proceeds of the property securing the Allowed Wells Fargo Claim to the extent of the value of their respective interests in such property; (iii) the surrender to the holder of the Allowed Wells Fargo Claim of the property securing such Claim; (iv) such other distributions as shall be necessary to satisfy the requirements of chapter 11 of the Bankruptcy Code, or (v) such other treatment as may be agreed upon by MID Transferee and holder of the Allowed Wells Fargo Claim. The manner and treatment of the Allowed Wells Fargo Claim shall be determined by MID Transferee, subject to the consent of the Debtors, in writing, to be received by the holder of the Wells Fargo Claim two (2) business days prior to the Ballot Date. | 100%<br><br>Impaired |

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| 4 | PNC Claims | No | Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, on the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed PNC Claim, each holder of an Allowed PNC Claim shall receive payment of such holder's Allowed PNC Claim in Cash. | 100% <br><br> Unimpaired |
| 5 | BMO Claims | No | Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, on the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed BMO Claim, the holder of the Allowed BMO Claim shall receive one of the following distributions: (i) the payment of such holder's Allowed BMO Claim in Cash; (ii) the sale or disposition proceeds of the property securing the Allowed BMO Claim to the extent of the value of their respective interests in such property; (iii) the surrender to the holder of the Allowed BMO Claim of the property securing such Claim; (iv) such other distributions as shall be necessary to satisfy the requirements of chapter 11 of the Bankruptcy Code, or (v) such other treatment as may be agreed upon by MID Transferee and holder of the Allowed BMO Claim. The manner and treatment of the Allowed BMO Claim shall be determined by MID Transferee, subject to the consent of the Debtors, in writing, to be received by the holder of the BMO Claim two (2) business days prior to the Ballot Date. | 100% <br><br> Impaired |
| 6 | Secured Claims | No | Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, on the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Secured Claim, the holders of Allowed Secured Claims shall receive one of the following distributions: (i) the payment of such holder's Allowed Secured Claim in Cash; (ii) the sale or disposition proceeds of the property securing an Allowed Secured Claim to the extent of the value of their respective interests in such property; (iii) the surrender to the holders of the Allowed Secured Claims of the property securing such Claim; (iv) such other distributions as shall be necessary to satisfy the requirements of chapter 11 of the Bankruptcy Code, or (v) such other treatment as may be agreed upon by MID Transferee and | 100% <br><br> Impaired |

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| | | | holder of the Allowed Secured Claim. The manner and treatment of Allowed Secured Claims shall be determined by MID Transferee, subject to the consent of the Debtors, in writing, to be received by the holder of the Secured Claim two (2) business days prior to the Ballot Date. | |
| 7 | 8.55% Note Claims | Yes | Commencing on the Effective Date, each holder of an Allowed 8.55% Note Claim shall receive on account of such Allowed 8.55% Note Claim:<br><br>(a) Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, on the Effective Date, distributions of such holder's Pro Rata Share of Creditor Cash; and<br><br>(b) In the event that the Operating Trusts are created, such holder's Pro Rata Share of the LSP Trust Interests and/or the Thistledown Trust Interests, as applicable. | 42%<br><br>Impaired |
| 8 | 7.25% Note Claims | Yes | Commencing on the Effective Date, each holder of an Allowed 7.25% Note Claim shall receive on account of such Allowed 7.25% Note Claim:<br><br>(a) Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, on the Effective Date, distributions of such holder's Pro Rata Share of Creditor Cash; and<br><br>(b) In the event that the Operating Trusts are created, such holder's Pro Rata Share of the LSP Trust Interests and/or the Thistledown Trust Interests, as applicable. | 42%<br><br>Impaired |

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| 9-26 | Non-MJC General Unsecured Claims | Yes | Commencing on the Effective Date, each holder of an Allowed Non-MJC General Unsecured Claim (other than holders of 8.55% Note Claims and 7.25% Note Claims, which shall receive the treatment set forth in Section 11.1 and 12.1 of the Plan, respectively) shall receive on account of such Allowed Non-MJC General Unsecured Claim:<br><br>(a)    Subject to the provisions of Sections 2.1(d) and 21.2 of the Plan, on the Effective Date, distributions of such holder's Pro Rata Share of Creditor Cash; and<br><br>(b)    In the event that the Operating Trusts are created, such holder's Pro Rata Share of the LSP Trust Interests and/or the Thistledown Trust Interests, as applicable. | 42%<br><br>Impaired |
| 27-34 | MJC Claims | Yes | Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, unless otherwise mutually agreed upon by the holder of an Allowed MJC Claim and MID Transferee, MID Transferee shall pay to each holder of an Allowed MJC Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed MJC Claim, Cash in an amount equal to one hundred percent (100%) of such holder's Allowed MJC Claim on the the Effective Date. | 100%<br><br>Unimpaired |
| 35 | Insured Litigation Claims | Yes | Unless otherwise mutually agreed upon by the holder of an Allowed Insured Litigation Claim and the Debtors or the Reorganized Debtors, as the case may be, each holder of an Allowed Insured Litigation Claim shall be entitled, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Insured Litigation Claim, to proceed with the liquidation of such Claim, including any litigation pending as of the Petition Date and seek recovery from the applicable Insurance Carrier; provided, however, that under no circumstances, shall the holder of an Allowed Insured Litigation Claim recover from the Reorganized Debtors any amounts with respect to such Allowed Insured Litigation Claim, except with respect to the payment of a deductible which may be required thereunder, which such amount, | N/A<br><br>Impaired |

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| | | | upon settlement or resolution of the litigation underlying the Allowed Insured Litigation Claim, the holder to the Allowed Insured Litigation Claim may assert as a Non-MJC General Unsecured Claim or an MJC General Unsecured Claim, as applicable. | |
| 36-61 | Equity Interests | No | On the Effective Date, all of the Debtors' Equity Interests shall be cancelled and the holders shall not be entitled to, and shall not receive or retain any property or interest in property under the Plan. | 0% Impaired |
| | | | On the Effective Date, the Reorganized Magna Entertainment Stock, Reorganized Sunshine Meadows Stock, Reorganized Santa Anita Companies Stock, Reorganized MEC Land Holdings Stock, Reorganized Holdings Stock, Reorganized MEC Pennsylvania Stock, Reorganized Dixon Stock and Reorganized Old Stock shall be issued and distributed to the Reorganized Debtors Plan Administrator in accordance with provisions of Article XVI of the Plan. | |
| | | | On the Effective Date, the Reorganized MEC Maryland Stock, Reorganized AmTote Stock, Reorganized GPRA Commercial Stock, Reorganized L.A. Turf Club Stock, Reorganized Pacific Racing Stock and Reorganized Palm Meadows Training Center Stock shall be issued and distributed in accordance with the terms and provisions of Sections 6.1 and 32.3 of the Plan. | |
| | | | The Reorganized Prince George Racing Stock, Reorganized Pimlico Stock, Reorganized Maryland Jockey Club Stock, Reorganized Maryland Jockey Club of Baltimore City Stock, Reorganized Southern Maryland Racing Stock, Reorganized Southern Maryland AA Stock, Reorganized Laurel Racing Stock and Reorganized Laurel Racing Association Stock shall be issued to the Reorganized Plan Administrator, provided, however, that in the event the MID Transferee elects to take the Reorganized MJC Debtors Stock pursuant to the MJC Option, such Reorganized | |

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| | | | Stock will be distributed in accordance with the terms of Section 6.1 of the Plan. | |
| | | | In the event that the LSP Sale has not been consummated, the Reorganized MEC Lone Star Stock shall be issued and transferred to the LSP Trust in accordance with the terms and provisions of Section 19.4 of the Plan. | |
| | | | In the event that the Thistledown Sale has not been consummated, the Reorganized Thistledown Stock shall be issued and transferred to the Thistledown Trust in accordance with the terms and provisions of Section 19.4 of the Plan. | |

## IV.  OVERVIEW OF THE DEBTORS' OPERATIONS AND CHAPTER 11 CASES

### A.  The Debtors' Corporate Structure

Magna Entertainment, the direct or indirect parent of each of the other Debtors, was incorporated in Delaware on March 4, 1999, as a wholly-owned subsidiary of the Canadian automotive-parts supplier Magna International Inc. ("Magna International"). Magna Entertainment is headquartered at 455 Magna Drive, Aurora, Ontario, Canada. The other Debtors are incorporated in either Delaware, California, Maryland, Ohio, Oklahoma, Florida, or Ontario, Canada.

On March 10, 2000, Magna International separated its non-automotive assets and operations from its automotive assets and operations by distributing shares of Magna Entertainment Class A Subordinate Voting Stock ("Class A Stock") to Magna International's shareholders. Following that spin-off transaction, Magna Entertainment became a separately traded, public company controlled by Magna International.

MID is an Ontario corporation and the successor to Magna International's real estate division, which was reorganized as an autonomous business unit within Magna International between August 1998 and July 1999. MID is a real estate operating company engaged principally in the ownership, management, leasing, development and acquisition of industrial and commercial properties. Members of the Magna International group of companies are MID's primary tenants and provide approximately 98% of the annual real estate revenue generated by MID's income-producing properties.

On August 19, 2003, the shareholders of Magna International approved the spin-off of MID to Magna International's shareholders. In connection with the spin-off transaction, Magna International transferred its controlling investment in Magna Entertainment to MID and MID continues to be Magna Entertainment's controlling shareholder.

MID is the controlling shareholder of Magna Entertainment as a result of its direct or indirect ownership of all of the issued and outstanding shares of Magna Entertainment's Class B Stock

("Class B Stock") and 218,116 shares of Class A Stock. Class B Stock is entitled to 20 votes per share and Class A Stock is entitled to one vote per share. As a result of its shareholdings in Magna Entertainment, MID is able to exercise approximately 95% of the total voting power attached to Magna Entertainment's outstanding voting securities. The Board of Directors of Magna Entertainment has established a committee of independent directors to whom they have delegated the responsibility of reviewing any proposed related-party transactions, including any proposed transactions between Magna Entertainment and MID or Magna Entertainment and Magna International. In addition, and as explained more fully below, MID Islandi, is an Icelandic, indirect, wholly-owned subsidiary of MID and was one of the Debtors' secured lenders. On December 31, 2009, MID Islandi transferred its claims against the Debtors to MID US Financing, a Delaware corporation.

Mr. Frank Stronach is the Chairman of Magna International, MID and Magna Entertainment. He was the Chief Executive Officer of Magna Entertainment as of the Petition Date, but resigned such position, as of April 7, 2009. Mr. Stronach and three other members of his family are trustees of the Stronach Trust. The Stronach Trust controls MID through the right to direct a majority of its voting shares. M Unicar Inc. ("M Unicar"), a Canadian holding company, controls Magna International. M Unicar, in turn, is controlled indirectly by the Stronach Trust.

As a publicly traded company, Magna Entertainment is subject to the information disclosure requirements of the Securities Exchange Act of 1934, as amended, and applicable Canadian securities laws, and prior to the Petition Date, filed annual, quarterly, and current reports and other information with the U.S. Securities and Exchange Commission and the Canadian securities regulatory authorities.

## B. The Debtor's Prepetition Business Operations

The Debtors are the leading owners and operators of horse racetracks in North America. The Debtors were also a leading supplier, via simulcasting, of live racing content to the inter-track, off-track betting and account-wagering markets.

The Debtors' primary source of revenue is the commissions they earn from pari-mutuel wagering at their racetracks. With pari-mutuel wagering, the customers' wagers on horse races are aggregated in a commingled pool (the "Mutuel Pool") and the payoff to winning customers is determined by both the total dollar amount of wagers in the Mutuel Pool and the allocation of those dollars among the various kinds of bets. Unlike casino gambling, racetrack customers bet against each other rather than against the Debtors and, therefore, the Debtors bear no risk of loss with respect to wagering conducted at their racetracks. The Debtors' commission, called the "take-out," is a pre-determined percentage of the total amount wagered on each event, regardless of the outcome, and the remaining balance of the Mutuel Pool is distributed to winning patrons.

Generally, from a patron's perspective, the take-out is the same for wagers placed "on-track" (meaning placed at one of the Debtors' racetracks or otherwise directly with the Debtors) as it is for wagers on a Debtor-race placed "off-track" (meaning placed with a non-Debtor racing business, including third-party OTB locations and other racetracks that have the right to allow their customers to bet on races conducted at one of the Debtors' racetracks pursuant to simulcasting arrangements). The percentage of the take-out the Debtors retain, however, depends on whether the wager is placed "on-track" or "off-track" and whether the patron is wagering on a live race or on a simulcast race. The Debtors also must always pay a portion of its gross "take-out" to the horse owners in the form of purses or race winnings, which encourages horse owners and their trainers to enter horses in races at the Debtors' tracks. Depending on the location of the racetrack, a portion of the take-out also may be allocated to the

state and local government for specified uses like public education. The amount of take-out typically varies between straight and exotic wagers on races. Nationwide, the blended gross take-out rate is approximately twenty percent (20%).

As of the Petition Date, the Debtors owned some of the most prestigious racetracks in the world, including racetracks in California, Florida, Maryland, Texas, Oklahoma, Ohio, Oregon and Ebreichsdorf, Austria. The Debtors also operated, under a racing services agreement, one racetrack in Pennsylvania that it previously owned. The Debtors own two (2) horse boarding and training centers, Palm Meadows Training Center in Florida and Bowie Training Center in Maryland. The racetracks, which are described in greater detail below, include seven thoroughbred racetracks, one standardbred (harness racing) racetrack and two racetracks that run both thoroughbred and quarterhorse meets.

Horse racing is a highly regulated industry. In the United States, individual states control the operations of racetracks located within their respective jurisdictions with the intent of, among other things, protecting the public from unfair and illegal gambling practices, generating tax revenue, licensing racetracks and operators and preventing organized crime from being involved in the industry. Although the specific form may vary, states that regulate horse racing generally do so through a horse racing commission or other gambling regulatory authority. Regulatory authorities perform background checks on all racetrack owners prior to granting them the necessary operating licenses. State regulation of horse races extends to virtually every aspect of racing and usually extends to details such as the presence and placement of specific race officials, including timers, placing judges, starters and patrol judges.

In the United States, interstate pari-mutuel wagering on horse racing is also subject to the Federal Interstate Horseracing Act of 1978 and the Federal Interstate Wire Act of 1961. As a result of these two statutes, racetracks can commingle wagers from different racetracks and wagering facilities and broadcast horse racing events to other licensed establishments.

As of the Petition Date, the Debtors satisfied the applicable licensing requirements of the racing and gambling regulatory authorities in each state or province where they maintained racetracks and/or carried on business, including the California Horse Racing Board, the Florida Department of Business and Professional Regulation Division of Pari-Mutuel Wagering, the Texas Racing Commission, the Maryland Racing Commission, the Virginia Racing Commission, the Oklahoma Horse Racing Commission, the Ohio State Racing Commission, the Pennsylvania State Harness Racing Commission, the Pennsylvania Gaming Control Board, the Nevada Gaming Commission, the New Jersey Casino Control Commission, the Oregon Racing Commission and the Government of the Province of Lower Austria.

## 1.    Racetracks.

### a.    Gulfstream Park and the Palm Meadows Training Center

Gulfstream Park, which opened in 1939, is situated on approximately 250 acres of land in the cities of Hallandale and Aventura, between Miami and Fort Lauderdale in Florida, and is owned by Debtor Gulfstream Park Racing. The Breeders' Cup, one of the preeminent series of races in the United States, was held at Gulfstream Park in 1989, 1992 and 1999. In 2009, average daily attendance at Gulfstream Park was approximately 4,000 customers per live racing day. Gulfstream Park had total "handle" during 2009 of approximately $674 million, including wagers made at (i) Gulfstream Park on its races, (ii) other wagering venues and through various account wagering systems on Gulfstream Park's races and (iii) Gulfstream Park on imported races through Gulfstream Park's inter-track facilities.

The Debtors completed a two (2) year redevelopment of Gulfstream Park in 2006. The project included significant modifications and enhancements to the racing surfaces and stable area, including the construction of a new, wider turf course and the construction of a modern clubhouse/grandstand offering an array of restaurants and entertainment facilities.

Gulfstream Park also has casino operations with approximately 825 slot machines, a poker lounge offering twenty (20) no-limit tables, and a simulcast racing area. Gulfstream Park offers customers a number of different dining and entertainment options and an improved quality of entertainment, including the addition in August 2007 of Christine Lee's, a well known local restaurant with a thirty-seven (37) year history in Southern Florida.

In connection with the redevelopment of Gulfstream Park, MEC decided to develop and enhance the lands surrounding Gulfstream Park. As a result, GPRA Commercial, a wholly-owned subsidiary of GPRA, formed a joint venture with FC Gulfstream Park, Inc. ("Forest City") pursuant to that certain Limited Liability Company Agreement of The Village at Gulfstream Park (the "Gulfstream LLC Agreement"), dated May 1, 2005. In connection with the Gulfstream LLC Agreement, GPRA entered into a ninety-nine (99) year ground lease with The Village at Gulfstream Park for the development of that property and GPRA Commercial owns a fifty percent (50%) interest in the joint venture.

The Village at Gulfstream Park is an ongoing development project of restaurants, entertainment and retail outlets in conjunction with and adjacent to the Debtors' horse racing facility, Gulfstream Park. The Village at Gulfstream Park has entered into certain leases with known entities such as Crate & Barrel, Williams-Sonoma and West Elm. Upon completion, the Debtors expect The Village at Gulfstream Park to result in the development of 1,500 condominiums, 750,000 square feet of retail space, 140,000 square feet of office space, a 500-room hotel and a 2,500 seat cinema. The Village at Gulfstream Park hosted its grand opening on February 11, 2010.

In 2002, the Debtors developed a horse boarding and training center that sits on approximately 324 acres of land in Palm Beach County, Florida and is operated in conjunction with Gulfstream Park ("Palm Meadows"). Palm Meadows is owned by Debtor Palm Meadows Training Center.

Palm Meadows opened in November 2002 and currently includes a $1\frac{1}{8}$-mile dirt track, a 7/8 turf course, one-mile dirt jogging track, stalls for up to 1,424 horses, administrative offices, dormitories, a pavilion and a 60,000 square foot compost building. Palm Meadows is primarily used by horse trainers, many of whom train the horses that race at Gulfstream Park. In 2009, Palm Meadows' total revenues were approximately $2.7 million.

### b. Golden Gate Fields

Golden Gate Fields is a thoroughbred racetrack situated on approximately 154 acres of land located in the cities of Albany and Berkeley, California. Golden Gate Fields is operated by Debtor Pacific Racing. Golden Gate Fields' racing season lasts for approximately 127 racing days. The season is split throughout the year and has varied for the last few years. Average daily attendance in 2009 was approximately 2,500 customers per live racing day. Golden Gate Fields had total "handle" during 2009 of approximately $487 million, including wagers made at (i) Golden Gate Fields on its races, (ii) other wagering venues and through various account wagering systems on Golden Gate Fields' races (excluding wagers placed in Southern California, and wagers placed via advanced deposit wagering systems licensed

to operate in California) and (iii) Golden Gate Fields on imported races through Golden Gate Fields' inter-track facilities.

Golden Gate Fields' facilities include a one-mile track and a 7/8-mile turf course, stalls for over 1,350 horses, a main grandstand with seating for approximately 8,000 customers, a clubhouse with seating for approximately 4,500 customers and parking for over 4,100 cars. Golden Gate Fields also features several restaurants, including the Turf Club with seating for approximately 1,200 customers.

### c.    Santa Anita Park and The Shops at Santa Anita

The Debtors also own and operate Santa Anita Park, one of the racing industry's jewels, located in Arcadia, California. Santa Anita Park is situated on approximately 305 acres of land approximately 14 miles northeast of Los Angeles, California, and is owned by Debtor Santa Anita Companies. Debtor L.A. Turf Club, a wholly-owned subsidiary of The Santa Anita Companies, holds the racing license and operates the racetrack at Santa Anita Park.

Santa Anita Park hosts the Santa Anita Meet, which generally commences on December 26th and runs until the end of April each year and, during such meet, the Santa Anita Handicap, an American thoroughbred horse race, is held annually in early March, and the Santa Anita Derby, is held in early April. Santa Anita Park also was the site of the Breeders' Cup World Thoroughbred Championships in 2003, 2008 and 2009. The average daily attendance at Santa Anita Park in 2009 was approximately 8,400 customers per live racing day, which represents one of the highest average daily attendance figures for all North American racetracks. Santa Anita Park also operates an inter-track wagering facility, where customers can wager on races that are imported to Santa Anita Park from other racetracks, throughout the year.

In addition, the Debtors lease Santa Anita Park to The Oak Tree Racing Association, which is an unaffiliated not-for-profit California association that holds a license to host the Oak Tree Meet for five to six weeks each Fall. Pursuant to this lease, which terminates the later of November 30, 2016 or the close of the 2016 Oak Tree Meet, The Santa Anita Companies hosts and operates The Oak Tree Meet. In connection therewith, The Santa Anita Companies receives a percentage of the on-track handle wagered on races run during the Oak Tree Meet, and a percentage of The Oak Tree Racing Association net commissions from fees earned on racing content, exported from, or imported to, Santa Anita Park.

Santa Anita Park had one of the highest total handles of all North American racetracks in 2009, totaling approximately $1,214 million. This amount includes wagers made at: (i) Santa Anita Park on its races (including The Oak Tree Meet), (ii) other wagering venues and through various account wagering operations on Santa Anita Park's races (excluding wagers placed in Northern California and via account wagering systems licensed to operate in California) and (iii) Santa Anita Park on imported races through Santa Anita Park's inter-track facilities.

Santa Anita Park's facilities include a large art deco-style grandstand structure with seating for approximately 19,000 customers, as well as standing room for additional customers, a one-mile oval dirt track and a 7/8-mile turf course, stalls for approximately 2,000 horses, and parking facilities sufficient to accommodate approximately 17,000 cars. During the summer of 2007, Santa Anita Park installed a synthetic track surface in response to a mandate from the California Horse Racing Board. Due to track drainage problems, however, Santa Anita lost eight (8) racing days in 2008. In response to these problems, in July 2008, Santa Anita commenced an overhaul of its main track, which included removal of

the entire asphalt base, and reconstituting the track with a mixture of a synthetic material of binder and fiber.

Furthermore, in January 2004, the Debtors completed certain renovation and improvement projects that included the opening of Sirona's, a 25,000 square foot sports bar and restaurant located across from the walking ring. Sirona's operates year-round from an open-air terrace overlooking a seven acre garden paddock.

In September 2006, Santa Anita Commercial Enterprise, Inc. ("SA Commercial"), a wholly owned non-debtor subsidiary of Magna Entertainment, entered into a Limited Liability Company Agreement with Santa Anita Commercial Holdings Co., LLC, an affiliate of Caruso Affiliated, to develop approximately fifty-one (51) acres of undeveloped land surrounding Santa Anita Park (the "The Shops at Santa Anita"). SA Commercial owns a fifty percent (50%) interest in The Shops at Santa Anita.

This project contemplates a mixed-use development with approximately 800,000 square feet of retail space, entertainment and restaurants as well as approximately 4,000 parking spaces. Construction at The Shops at Santa Anita has been delayed due to zoning related issues.

### d. Remington Park

Remington Park is situated on approximately 370 acres adjacent to Interstates 35 and 44 in Oklahoma City, Oklahoma, and was owned by Old RP.

In 2009, Remington Park's racing schedule consisted of two meets totaling 117 days of live racing, which included a 50 day quarter horse meet from mid-March through early June and a 67 day thoroughbred meet from mid-August through mid-December 2009. The real property underlying Remington Park is leased from the Oklahoma Zoological Trust, pursuant to a lease which extends through 2013, with options to renew until 2063 in ten-year increments.

Remington Park's horseracing handle was approximately $122 million in 2009, including wagers made at (i) Remington Park on its races, (ii) other wagering venues and through various account wagering operations on Remington Park's races and (iii) Remington Park on races imported to its inter-track and associated off-track betting facilities.

Remington Park also operates 700 electronic gaming machines in its casino. During 2009, the machines generated an average daily net win per unit of $271. Under the terms of Oklahoma state legislation, the distribution of revenues from Remington Park's electronic gaming operations varies based on the annual gross gaming revenues less all monetary payouts ("Adjusted Gross Revenues"). The legislation allocates between ten percent (10%) and thirty percent (30%) of the Adjusted Gross Revenues to the State, primarily for the funding of education, between twenty percent (20%) and thirty percent (30%) for the benefit of the horsemen, and the remaining fifty percent (50%) to sixty percent (60%) to Remington Park. Remington Park was eligible to introduce an additional 50 machines in January 2010. In addition, Remington Park is permitted to furnish 100% of its gaming floor with Class III gaming machines.

Remington Park's facilities include a grandstand with seating for approximately 20,000 customers, 21 suites for corporate and group events, a one-mile dirt track, a 7/8-mile turf course, stalls for approximately 1,400 horses, lighting to permit night racing and parking facilities sufficient to accommodate approximately 8,000 cars.

As discussed in greater detail in Section 7.a. of this Disclosure Statement, on January 1, 2010, the Debtors consummated the sale of Remington Park to Global Gaming RP, LLC.

### e. The Maryland Jockey Club: Pimlico Race Course, Laurel Park and the Bowie Training Center

#### (i) Pimlico Race Course

Pimlico Race Course is situated on approximately 116 acres of land in Baltimore, Maryland, approximately 30 miles from Laurel Park. The Preakness Stakes, the middle jewel of thoroughbred racing's Triple Crown, has run annually and without interruption at Pimlico Race Course on the third Saturday of each May since 1909. Last year's race, which occurred on May 16, 2009, marked the 134th anniversary of the classic horse racing event.

In 2009, Pimlico Race Course's season lasted for approximately twenty (20) racing days that fell between early April and mid-June. During this meet, Pimlico Race Course hosted ten (10) graded stakes races, including The Preakness Stakes. Attendance for the 2009 Preakness Stakes was approximately 77,850 customers. Average daily attendance in 2009, excluding the Preakness Stakes, was approximately 3,200 customers per live racing day.

Pimlico Race Course's handle was approximately $189 million in 2009, which amount includes wagers made at (i) Pimlico Race Course on its races, (ii) other wagering venues and through various account wagering operations on Pimlico Race Course's races and (iii) Pimlico Race Course on imported races through Pimlico Race Course's inter-track facilities.

Pimlico Race Course's facilities include a grandstand with seating for approximately 13,000 customers, a one-mile dirt track with 1 3/16-mile and 3/4-mile chutes, a 7/8-mile turf course, stalls for approximately 700 horses and parking facilities sufficient to accommodate approximately 3,500 cars. During the Preakness Stakes, temporary seating facilities and the use of Pimlico Race Course's infield enable Pimlico Race Course to accommodate over 100,000 patrons.

#### (ii) Laurel Park

Laurel Park is located on approximately 236 acres of land in Laurel, Maryland, between Washington, D.C. and Baltimore. Laurel Park's racing season in 2009 was 125 days, and complements Pimlico Race Course's racing season by holding race meets from January to April, in August, and from September to December. Average daily attendance at Laurel Park in 2009 was approximately 2,400 customers per live racing day.

Laurel Park's handle was approximately $276 million in 2009, which amount includes wagers made at (i) Laurel Park on its races, (ii) other wagering venues on Laurel Park's races through various account wagering operations and (iii) Laurel Park on imported races through Laurel Park's inter-track facilities.

Laurel Park's facilities include a grandstand with seating for approximately 5,200 customers, a 1 1/8-mile dirt track with a seven and one half-furlong chute which opened in January 2005, and a 7/8-mile turf course which opened in September 2005. Laurel Park has stalls for approximately 1,000 horses and parking facilities sufficient to accommodate approximately 8,000 cars.

(iii)     The Bowie Training Center

The Bowie Training Center is located in Prince George's County, Maryland on approximately 162 acres situated approximately 8 miles from Laurel Park and 30 miles from Pimlico Race Course. Originally opened in 1914 as a racetrack, the property has been used since 1985 as a year-round training center to support thoroughbred racing at Pimlico Race Course and Laurel Park. In 2009, the cost to operate the Bowie Training Center was approximately $2.1 million.

The facility includes approximately 1,000 stalls, a one-mile oval dirt main track, and a quarter mile dirt-covered track. In addition, the Bowie Training Center includes seventeen (17) barns and dormitories capable of accommodating up to 224 grooms.

f.     **Thistledown**

Thistledown racecourse sits on approximately 128 acres in North Randall, Ohio, and is owned by Debtor Thistledown. Thistledown's 2009 racing season consisted of 122 racing days that fell between April and October. Thistledown hosts the Summit, Thistledown, Randall and Cranwood meets. Annually, Thistledown hosts the Ohio Derby, which is the premier graded stakes race in Ohio. Throughout the year, Thistledown operates as an inter-track wagering facility where customers can wager on races that are imported to Thistledown from other racetracks.

In 2009, Thistledown's handle was approximately $147 million, which amount includes wagers made at (i) Thistledown on its races, (ii) other wagering venues and through various account wagering operations on Thistledown's races and (iii) Thistledown on races imported through Thistledown's inter-track facilities. Thistledown also exports its simulcast signal to as many as 700 off-track and inter-track wagering facilities in the United States.

Thistledown's facilities include a grandstand with seating for approximately 8,000 customers, a 600 seat tiered dining room, a 200 seat private party suite, a luxury suite for corporate and group events, a one-mile oval track, stalls for approximately 1,200 horses and parking for approximately 6,000 cars.

As described in further detail in Section 7.c. of this Disclosure Statement, on September 15, 2009, the Bankruptcy Court approved the sale of Thistledown to Harrah's Operating Company, Inc.

g.     **Lone Star Park at Grand Prairie**

MEC Lone Star operates Lone Star Park at Grand Prairie, one of the newest horse racing facilities in the United States, located approximately twelve (12) miles west of Dallas, Texas. Lone Star Park hosts thoroughbred and American quarter horse meets.

In 2009, Lone Star Park's handle was approximately $231 million, which amount includes wagers made at (i) Lone Star Park on its races, (ii) other wagering venues and through various account wagering operations on Lone Star Park's races and (iii) Lone Star Park on races imported through Lone Star Park's inter-track facilities.

As described in further detail in Section 7.b. of this Disclosure Statement, on October 29, 2009, the Bankruptcy Court approved the sale of Lone Star Park to Global Gaming LSP, LLC.

### h. Portland Meadows

Portland Meadows is a thoroughbred racetrack located on approximately 110 acres in the Delta Park area of Portland, Oregon, and is operated by Magna Entertainment's wholly-owned non-debtor subsidiary, MEC Oregon Racing, Inc. ("MEC Oregon"), pursuant to a long-term operating lease with a consortium of individuals and entities. MEC Oregon owns an approximate twenty-two percent (22%) interest in the real property upon which the Portland Meadows facility is located and the remainder of the property is owned by third parties. Under the terms of the operating lease, MEC Oregon has the exclusive right to use and operate the racetrack for horse racing and special purposes, including the operation of a golf course. The operating lease does not have a termination date, however it may be terminated if MEC Oregon fails to maintain its racing license or comply with the terms of the operating lease.

Portland Meadows offers approximately 68 live racing days between October and April. Portland Meadows' facilities include a grandstand with seating for approximately 10,000 customers, a one-mile sand track, stalls for approximately 850 horses and parking facilities to accommodate approximately 2,500 cars.

In 2009, Portland Meadows' handle was approximately $92 million, which amount includes wagers made at (i) Portland Meadows on its races, (ii) other wagering venues and through various account wagering operations on Portland Meadows' races and (iii) Portland Meadows on races imported through Portland Meadows' inter-track and associated off-track betting facilities.

### i. Magna Racino

Magna Racino is situated on approximately 650 acres in Ebreichsdorf, just outside Vienna, Austria and is owned by Magna Entertainment's wholly owned non-debtor subsidiary, MEC Racing Holding GmbH. During 2008, over 16,000 guests visited Magna Racino on 14 race days between April and November.

Magna Racino features both thoroughbred and standardbred racing on three different tracks, a 5/8-mile sand track, a one-mile sand track and a one-mile turf course. Magna Racino's sportsbook facility, which allows patrons to place bets on sporting events, is operated by Admiral Sportwetten AG ("Admiral") and entitles Magna Racino to a percentage of all the wagers placed with Admiral at Magna Racino. Magna Racino also has 150 video lottery terminals operated by the Austrian Lottery, a division of Casinos Austria AG. Pursuant to that agreement, Magna Racino receives a percentage of the gross profit and recovers certain costs from the video lottery terminal operations. In 2009, Magna Racino generated total revenues of approximately $3.0 million, including rental and recovered costs generated by the video lottery terminals.

As discussed in greater detail in Section 7.g. of this Disclosure Statement, on July 31, 2009, the Bankruptcy Court approved the sale of Magna Racino to Bvsarantaexi Beteiligungsverwaltung GmBH and that sale was consummated on October 1, 2009.

### 2. Non-Racetrack Operations

The Debtors complement their live-racing operations with simulcast wagering, casino gaming at some venues, its own OTB facilities in certain states, and a national account-wagering business known as XpressBet that permits customers to place wagers by telephone or Internet for races run at more than 100 North American racetracks, and internationally on races in Australia, South Africa, Dubai, Germany, the United Kingdom and Hong Kong. In 2009, XpressBet's total revenues were approximately

$46.0 million. MagnaBet, the European equivalent of XpressBet, permits customers residing in European countries to place wagers on horse racing using the Internet or telephone. The Debtors' U.S. and European operations also included the production and sales operations for StreuFex, a horse bedding product. As discussed in greater detail in Section 7.f. of this Disclosure Statement, on September 1, 2009, the Debtors consummated the sale of the StreuFex operations to Ing Johann Payerl.

Magna Entertainment also owns Debtor AmTote, a provider of totalisator services to the pari-mutuel industry. AmTote Canada Inc. ("AmTote Canada") and AmTote Australasia, Pty, Limited ("AmTote Australasia") are wholly-owned non-debtor subsidiaries of AmTote. Together, AmTote, AmTote Canada, and AmTote Australasia provide a variety of wagering interfaces and connectivity products for racetracks, off-track betting operators and account wagering providers, both domestically and abroad. The interface enables customers to place bets on horse races that are made either at a racetrack, an off-track betting facility, or through an account wagering provider, such as a bet submitted via the Internet, calculates the aggregate total of the bets, and determines the payoff odds. AmTote provides totalisator services to 40% of the racing industry and has approximately seventy-four (74) contracts for such services. AmTote Canada has approximately nine (9) contracts for totalisator services. In 2009, AmTote's consolidated revenues, including AmTote Canada and AmTote Australasia, were approximately $39 million.

### 3. Real Property

#### a. The Ocala Property

In 2002, Debtor MEC Holdings and Debtor Sunshine Meadows (collectively, the "Ocala Debtors") purchased certain real property located in Ocala, Florida (the "Ocala Property"). The Ocala Property consists of approximately 490 acres and is located in Marion County, Florida, one of the major thoroughbred breeding centers of the world. The Ocala Debtors purchased the Ocala Property with the intent to develop the property into either a racetrack or a horse training facility. However, due to, among other reasons, the economic climate and financing availability, the Ocala Debtors did not pursue the development of the Ocala Property.

As discussed in greater detail in Section 7.d. of this Disclosure Statement, on September 2, 2009, the Bankruptcy Court entered an order authorizing the Debtors to sell the Ocala Property to Par Avenue Properties LLC and the sale closed on September 17, 2009.

#### b. The Dixon Property

In 2001, Debtor MEC Dixon purchased certain property in Dixon, California (the "Dixon Property"). The Dixon Property consists of approximately 260 acres located in Northern California. MEC Dixon purchased the Dixon Property with the intent to develop the property into a racetrack to be known as "Dixon Downs." In November 2006, the City of Dixon granted entitlements for the development of Dixon Downs and, until April 2007, MEC Dixon was planning for such development of the Dixon Property. However, a voter referendum in April 2007 voted down the project and the municipality rescinded the entitlements. MEC Dixon did not pursue further development.

As discussed in greater detail in Section 7.e. of this Disclosure Statement, on November 19, 2009, the Bankruptcy Court entered an order authorizing the sale of the Dixon Property to Ocala Meadows Lands LLC and that sale closed on November 30, 2009.

## C. The Debtor's Capital Structure and Prepetition Financing

The Debtors have a highly leveraged capital structure, including senior and junior secured financing obligations of approximately $500 million and subordinated unsecured note obligations of approximately $225 million. The instruments evidencing these obligations are described below.

### 1. Secured Financings

#### a. PNC Agreements

As of the Petition Date, certain of the Debtors were parties to the PNC Agreements. Amounts outstanding under the PNC Agreements bear interest at U.S. prime rate or London Interbank Offered Rate ("LIBOR") plus 2.6%, in the case of the two term loans, and 7.7% in the case of the converted term loan. Each of the PNC Agreements permits prepayment without penalty in certain circumstances. The maturity dates of the three PNC Agreements are December 1, 2013, June 7, 2017 and December 1, 2013. On February 27, 2009, PNC notified the Debtors that they were in default under the PNC Agreements for failure to comply with certain financial covenants. The obligations of the Debtors under the PNC Agreements are secured by security interests in substantially all of the assets of the Debtors located in Maryland and, among other things, deeds of trust on land, buildings and improvements on the Pimlico and Laurel Park racetracks and the Bowie Training Center. As of the Petition Date, the aggregate principal amount outstanding under the PNC Agreements was approximately $13.1 million.

#### b. The Wells Fargo Agreement

As of the Petition Date, Santa Anita Companies was party to the Wells Fargo Agreement. The Wells Fargo Agreement, as amended, provides for a secured term loan in the amount of approximately $67.5 million, that bears interest at LIBOR plus 2% and a revolving loan not to exceed $7.5 million. Debtor L.A. Turf Club is guarantor under the Wells Fargo Agreement. Santa Anita Companies' obligations pursuant to the Wells Fargo Agreement are secured by a first priority lien on the real property of the Santa Anita Park racecourse, as well as on the capital stock of Santa Anita Companies and the capital stock of L.A. Turf Club and an assignment of the lease between L.A. Turf Club, the racetrack operator, and Santa Anita Companies. The maturity date for both facilities is October 31, 2012. In January 2009, Santa Anita Companies notified Wells Fargo, that it had not met a financial covenant under the Wells Fargo Agreement. As of the Petition Date, the aggregate principal amount outstanding under the Wells Fargo Agreement was approximately $61.2 million with respect to the term loan and approximately $3.9 million under the revolver.

#### c. The BMO Credit Agreement

As of the Petition Date, Magna Entertainment was party to the BMO Credit Agreement. The BMO Credit Agreement, as amended, provided for a secured revolving facility with an aggregate commitment of $40 million that matured on March 5, 2009 and was secured by a first priority lien on all of Magna Entertainment's present and after-acquired personal property, a first mortgage on the real property of the Golden Gate Fields racecourse, and a second mortgage on the real property of the Santa Anita Park racecourse. The loans under the facility bear interest at the U.S. base rate plus 5% or the LIBOR plus 6%. Magna Entertainment's obligations under the BMO Credit Agreement were guaranteed by Pacific Racing, MEC Land Holdings, Santa Anita Companies, and L.A. Turf Club. In January 2009, BMO notified Magna Entertainment that Magna Entertainment had not met a financial covenant under the BMO Credit Agreement. As of the Petition Date, the aggregate amount outstanding under the BMO

Credit Agreement was approximately $39.9 million, which included issued letters of credit totaling approximately $1.9 million.

### d. The Remington Park Agreement

As of the Petition Date, Debtor Old RP was party to that certain Loan Agreement (the "Remington Park Agreement"), dated July 22, 2005, between Old RP, as borrower, and MID Islandi, as lender, and the guarantors identified below. The Remington Park Agreement, as amended, provided $34.2 million to finance the build-out of Remington Park's casino facility and is evidenced by, among other things, a grid promissory note in the amount of $40 million, and secured by, among other things, a perfected first priority encumbrance on substantially all of Remington Park, Inc.'s leasehold interest in the Remington Park property (real and personal). The loan under the Remington Park Agreement has a ten-year term from the completion date of the reconstruction project, which was November 28, 2005. Certain cash from the operations of Remington Park were required to be used to pay deferred interest on the loan plus a portion of the principal. In addition, the Remington Park Agreement requires a quarterly cash flow sweep of not less than 75% of Remington Park's excess cash flow during each fiscal quarter. This cash flow sweep was applied solely to capitalized interest. Remington Park, Inc.'s obligations under the Remington Park Agreement are guaranteed by the Palm Meadows Training Center, Gulfstream Park Racing Association, Inc., and Magna Entertainment and secured by such guarantors' assets. As of the Petition Date, the aggregate principal amount and interest outstanding under the Remington Park Agreement was approximately $22.8 million.

### e. The Gulfstream Agreement

As of the Petition Date, Debtor Gulfstream Park Racing was party to that certain Third Amended and Restated Gulfstream Loan Agreement (the "Gulfstream Agreement"), dated December 22, 2006, between Gulfstream Park Racing Association, Inc., as borrower, and MID Islandi, as lender, and the guarantors identified below. The Gulfstream Agreement, as amended, provides for a first tranche of $115 million, a second tranche of $25.75 million and a third tranche of $21.5 million. Each of these tranches is secured by the operations forming Gulfstream Park, and over all of the other assets of Gulfstream Park, Remington Park and Palm Meadows, excluding licenses and permits, and certain assets of Magna Entertainment. The first tranche was used to fund the reconstruction of facilities at Gulfstream Park and has a ten-year term that commenced on February 1, 2006, and requires monthly blended payments of principal and interest based on a 25-year amortization period at a fixed rate of 10.5% per annum after February 1, 2006. The second tranche is to fund the design and construction of phase one of a slots facility to be located in the existing Gulfstream Park clubhouse building and certain start-up costs, including the acquisition of 500 slot machines. The second tranche matures on December 31, 2011, bears interest at a fixed rate of 10.5% per annum compounded semi-annually, and requires blended payments of principal and interest based on a 25-year amortization period. In addition, the second tranche requires a mandatory annual cash flow sweep of not less than 75% of Gulfstream Park's total excess cash flow, after permitted capital expenditures and debt service, to be used to repay the additional principal made available pursuant to this tranche. Finally, the third tranche is to fund the design and construction of phase two of the slots facility. The third tranche matures on December 31, 2011, bears interest at a fixed rate of 10.5% per annum, compounded semi-annually, and requires blended payments of principal and interest based on a 25-year amortization period. However, $100 million under the Gulfstream Agreement was due March 20, 2009.

Gulfstream Park Racing Association, Inc.'s obligations under the Gulfstream Agreement were guaranteed by Magna Entertainment, Remington Park, Inc., GPRA Thoroughbred Training Center

and GPRA Commercial Enterprises, Inc. As of the Petition Date, the aggregate principal amount including interest outstanding under the Gulfstream Agreement was approximately $170.8 million.

### f.     SunTrust Agreement

As of the Petition Date, Debtor AmTote was party to that certain Amended and Restated Loan and Security Agreement (the "SunTrust Agreement"), dated October 25, 2007, between AmTote, as borrower, and SunTrust Bank, as lender. The SunTrust Agreement provided for a secured term loan of $4.2 million and an equipment loan up to $10 million and is secured by all of AmTote's personal property and a stock pledge agreement. AmTote's obligations under the SunTrust Agreement were guaranteed by AmTote Canada. The loans under the SunTrust Agreement matured on May 30, 2009. As of the Petition Date, the aggregate principal amount outstanding under the SunTrust Agreement was approximately $4.2 million.

In order to avoid any action SunTrust Bank could have taken against AmTote Canada due to AmTote's chapter 11 filing and to avoid the costs and expenses associated with a parallel bankruptcy filing for AmTote Canada in Canada, the Debtors used part of the proceeds from the DIP Agreement to satisfy and fully discharge its obligations and release its liens under the SunTrust Agreement.

### g.     The Bridge Loan Agreement

As of the Petition Date, Debtor Magna Entertainment was party to the Bridge Loan Agreement. The Bridge Loan Agreement, as amended, provided for a non-revolving loan in the amount of $125 million that bears interest at a rate of LIBOR plus 12.0% per annum and is secured by first, second or third priority liens or mortgages on substantially all of the Debtors' properties. The Bridge Loan Agreement was required to be repaid by way of the payment of the net proceeds of any asset sale, any equity offering, or any debt offering, subject to specified amounts required to be paid to eliminate other prior-ranking indebtedness. The Bridge Loan Agreement matured on March 20, 2009. Magna Entertainment's obligations under the Bridge Loan Agreement were guaranteed by Pacing Racing, MEC Land Holdings, Gulfstream Park Racing, Palm Meadows Training Center, MEC Dixon, MEC Holdings, Sunshine Meadows, Thistledown, MEC Maryland, and 30000 Maryland. The guarantees were secured by liens over the lands owned by Golden Gate Fields, Santa Anita Park, and Thistledown, and liens over the undeveloped land in Dixon, California and Ocala, Florida, as well as by pledges of the shares of certain Magna Entertainment subsidiaries. The loan was also cross-defaulted to all other obligations to MID Islandi and to other significant indebtedness of the Debtors and certain subsidiaries. As of the Petition Date, the aggregate principal amount outstanding under the Bridge Loan Agreement was approximately $125 million.

### h.     The 2008 Loan Agreement

As of the Petition Date, Debtor Magna Entertainment was party to the 2008 Loan Agreement. The 2008 Loan Agreement provided for a secured non-revolving loan in the amount of $125 million, available in four tranches. The first tranche was drawn in the amount of $50 million (plus costs and fees) and was provided for use solely to fund (i) operations, (ii) payments of principal or interest and other costs under the 2008 Loan Agreement and under other loans provided by MID Islandi to Magna Entertainment, (iii) mandatory payments of interest in connection with other existing debt of Magna Entertainment, (iv) maintenance and capital expenditures and (v) capital expenditures required pursuant to the terms of certain joint venture arrangements Magna Entertainment had in Florida and California. The first tranche had a maturity of March 20, 2009.

The second and third tranches were made available for drawdown: (i) in an amount of up to $30 million under the second tranche to fund a slots-license application on behalf of the Magna Entertainment subsidiary that owns and operates Laurel Park in Maryland, following MID's satisfaction with such application and related matters; and (ii) in an amount of the lesser of (a) the amount required to pay out the amount owing under the PNC Agreement and (b) $15 million under the third tranche. On February 12, 2009, the Maryland VLT Facility Location Commission advised that it would not accept the Laurel Park slots application and stated that the application did not meet certain minimum requirements set out in the bidding process. This resulted in the maturity of the second and third tranches. Magna Entertainment was required to repay the second tranche with any refunds of any fees if the Laurel Park slots application is denied or withdrawn.

The 2008 Loan Agreement was secured by first, second, third, or fourth priority liens or mortgages on substantially all of the Debtors' properties. Magna Entertainment's obligations under the 2008 Loan Agreement are guaranteed by Pacific Racing, MEC Land Holdings, Santa Anita Companies, L.A. Turf Club, Southern Maryland AA, Laurel Racing, Maryland Jockey Club, Maryland Racing, Inc., Thistledown, MEC Maryland, and 30000 Maryland. As of the Petition Date, the aggregate principal amount outstanding under the 2008 Loan Agreement was approximately $51.8 million.

### 2.    Convertible Unsecured Notes

Magna Entertainment issued two series of convertible subordinated notes: (i) the 8.55% Notes, maturing June 15, 2010; and (ii) the 7.25% Notes, maturing December 15, 2009, (together, the "Subordinated Notes"). The Subordinated Notes are unsecured obligations of Magna Entertainment.

#### a.    8.55% Notes

In June 2003, Magna Entertainment issued $150.0 million of 8.55% Notes which mature on June 15, 2010. The 8.55% Notes are convertible at any time at the option of the holders into shares of Class A Stock at $141.00 per share (adjusted from $7.05 per share as a result of a reverse stock split). The conversion price may be adjusted under certain circumstances. The 8.55% Notes were redeemable in whole or in part, at Magna Entertainment's option, on or after June 2, 2006, at the principal amount plus accrued and unpaid interest, provided that, in connection with any redemption that occurred on or after June 2, 2006 and before June 2, 2008, the closing price of the Class A Stock exceeded 125% of the conversion price for at least 20 trading days in a 30 consecutive trading day period ending on the trading day prior to mailing of the notice of redemption. As of the Petition Date, all the 8.55% Notes remained outstanding.

#### b.    7.25% Notes

In December 2002, Magna Entertainment issued $75.0 million of 7.25% Notes which matured on December 15, 2009. The 7.25% Notes were convertible at any time at the option of the holders into shares of Class A Stock at $170.00 per share (adjusted from $8.50 per share as a result of a reverse stock split). The conversion price may be adjusted under certain circumstances. The 7.25% Notes were redeemable in whole or in part, at Magna Entertainment's option, from and after December 21, 2005, at the principal amount plus accrued and unpaid interest, provided that, in connection with any redemption that occurred on or after December 21, 2005 and before December 15, 2007, the closing price of the Class A Stock exceeded 125% of the conversion price for at least 20 trading days in a 30 consecutive trading day period ending on the trading day prior to mailing of the notice of redemption. As of the Petition Date, all the 7.25% Notes remained outstanding.

### D. Significant Events Leading to Commencement of the Chapter 11 Case[1]

#### 1. Highly-Leveraged Structure.

The Debtors have a highly leveraged capital structure, including junior and senior secured financing obligations of more than $500 million and unsecured note obligations of $225 million. The Debtors incurred recurring net losses due in part to large interest payments on its long-term debt, payment of fees to extend the maturity dates of certain loan agreements, and depreciation and asset impairment write-downs in connection with capital expenditures related to the redevelopment of Gulfstream Park and the construction of the Palm Meadows Training Center and Magna Racino facilities. The Debtors' highly-leveraged capital structure hindered their ability to improve operations and led the Debtors to determine that they needed to undergo a financial restructuring to address their over-leveraged balance sheet.

In addition, the Debtors were faced with the near-term maturity on substantially all of their debt, as well as a substantial concern regarding their ability to service such debt when it became due. Specifically, as a result of MID's termination of the Transaction Agreement (as discussed below) (i) the maturities of the BMO Credit Agreement, the Bridge Loan Agreement and the 2008 Loan Agreement – the Debtors' primary sources of liquidity – were accelerated from March 16, 2009 and March 31, 2009 to March 5, 2009 and March 20, 2009, respectively, (ii) a $100 million payment due under the Gulfstream Agreement was accelerated from March 31, 2009 to March 20, 2009, (iii) the PNC Agreements were in default and (iv) the 7.25% Notes, with an aggregate of $75 million principal amount outstanding, were due on December 15, 2009. Based on its 2009 forecast, the Debtors believed they did not have sufficient liquidity to make the required payments or fund their operations unless they were able to refinance, restructure, amend or otherwise replace these facilities.

#### 2. Revenues and Expenses.

The Debtors also suffered decreased revenues at their racetracks because of a general decline in the number of people attending and wagering on live horse races at North American racetracks. The decline can be attributed to a number of factors. Competition for customers has significantly increased as a result of widespread access to casino gaming, lotteries and other wagering activities. Further, the economic recession that began in 2008 negatively impacted wagering revenues at the Debtors' racetracks and the horse racing industry in general.

The Debtors also experienced significant fluctuations in quarterly operating results due to the seasonality associated with racing schedules. Generally, revenues from racetrack operations are greater in the first quarter of the calendar year than in any other quarter. The Debtors' racetracks are permitted to host a limited number of live racing dates and the number of live racing dates varies from year to year. Revenues in 2008 decreased, in part, because the Debtors lost eight live racing days at Santa Anita Park due to inclement weather and track drainage issues, ran fourteen fewer live race days at Laurel Park and the handle and wagering at the Preakness decreased.

The general decline in attendance at live horse racing events prompted racetrack owners like the Debtors to rely more on secondary revenues from inter-track, off-track and account-wagering

---

[1] The significant events leading to the commencement of the Chapter 11 Cases of MEC Lone Star and MEC Pennsylvania are discussed in Sections 7.b. and 8.a. herein.

markets. Secondary revenue sources such as these have lower margins than the revenues from on-track wagers at the Debtors' live racing events. In addition, the Debtors were faced with escalating competition from Internet gaming companies that offered wagering services with much lower capital expenditure requirements, and thus were able to offer competing services at discount prices.

The high degree of regulation in the pari-mutuel and gaming industry was also a significant obstacle to the Debtors' growth strategy, especially with respect to their efforts to implement (a) casino style alternative gaming at racetracks and (b) account wagering, including telephone, interactive television and Internet-based wagering. The Debtors' expansion opportunities with respect to account wagering relied upon additional states amending their laws to permit account wagering, which has not occurred as quickly as anticipated.

On a consolidated basis, the Debtors' revenues from continuing operations decreased from approximately $617.8 million in the year ended December 31, 2007, to approximately $593.5 million in the year ended December 31, 2008 and further declined in 2009.

Net loss for the year ended December 31, 2008, of approximately $271.8 million increased from a net loss of approximately $113.8 million in the prior year comparative period, reflecting the negative impact of write-downs of long-lived and intangible assets in the aggregate of $174.1 million at the Maryland Jockey Club, Lone Star Park, Golden Gate Fields, the Dixon Property, The Meadows, Magna Racino and Portland Meadows, increased depreciation and amortization primarily related to the slot facilities at Gulfstream Park, and the new racetrack surfaces at Santa Anita Park and Golden Gate Fields, and increased interest expense with higher debt levels compared to the prior year.

3. **Unsuccessful Prepetition Restructuring Initiatives.**

On September 11, 2007, Magna Entertainment's Board of Directors approved and adopted a plan (the "MEC Debt Elimination Plan") to restructure MEC's balance sheet by selling certain assets to pay down debt and by entering into strategic partnerships or joint ventures to allow MEC to substantially eliminate its debt by December 31, 2008, and to pursue a business plan focused on achieving sustainable profitability. Pursuant to the MEC Debt Elimination Plan, and to address immediate liquidity concerns and provide sufficient time to implement the plan, Magna Entertainment received $100 million in funding from (i) a $20 million private placement of Class A Stock to Fair Enterprise Limited, a company that forms part of an estate planning vehicle for the family of Mr. Frank Stronach, the Chairman and former Chief Executive Officer of Magna Entertainment; and (ii) the 2008 Loan Agreement.

The MEC Debt Elimination Plan proceeded more slowly than the Debtors originally expected due to weakness in the real estate and credit markets, which negatively impacted Magna Entertainment's ability to sell non-core assets as originally planned.

On March 31, 2008, the Board of Directors of MID announced that it received a reorganization proposal on behalf of various shareholders of MID that would, among other things, alter the relationship between MID and Magna Entertainment (the "Reorganization Proposal"). Discussions ensued among significant MID shareholders regarding potential amendments to the Reorganization Proposal and, on June 27, 2008, MID announced that, in light of such discussions, the special meeting of MID shareholders to consider the Reorganization Proposal, previously scheduled for July 24, 2008, was being postponed. On September 15, 2008, MID announced that no consensus had been reached with respect to the Reorganization Proposal and MID intended to continue to explore a range of strategic alternatives with respect to its investments in Magna Entertainment.

Given approaching debt maturities and ongoing operational funding requirements, on November 5, 2008, the Debtors announced the engagement of Miller Buckfire & Co., LLC ("Miller Buckfire") as their financial advisor and investment banker to review and evaluate various strategic alternatives including additional asset sales, financing and balance sheet restructuring opportunities and to assist in identifying, managing and executing its asset sales program and possible joint venture transactions.

On November 26, 2008, Magna Entertainment announced that it had entered into a transaction agreement (the "Transaction Agreement") with MID and entities affiliated with Magna Entertainment's Chairman and Chief Executive Officer, Frank Stronach (the "Stronach Group"), to implement a proposed reorganization of MID that included the spin-off of Magna Entertainment and its subsidiaries to MID's existing shareholders. The Transaction Agreement contemplated, among other things, a multi-step series of proposed transactions designed to recapitalize and reposition Magna Entertainment to enable it to pursue its strategy of horse racing, gaming and entertainment on a standalone basis.

Stage One of the proposed transaction consisted of MID entering into the 2008 Loan Agreement and an extension of the maturity date under the Bridge Loan Agreement, the repayment date for $100 million under the Gulfstream Agreement, and the date until which repayments under the Gulfstream Agreement and the Remington Park Agreement would not be subject to a make-whole payment. Stage Two contemplated (i) certain sales of real estate assets to MID; (ii) further extensions under the Bridge Loan Agreement, the Gulfstream Agreement and the 2008 Loan Agreement; (iii) an increase of $25 million in the amount loaned under the 2008 Loan Agreement; (iv) certain amendments to the 2008 Loan Agreement, the Bridge Loan Agreement, the Gulfstream Agreement, and the Remington Park Agreement to, among other things, enable the Debtors to repay their obligations under these agreements in cash or in kind with Class A Stock (or a combination thereof); and (v) a forbearance agreement that prohibited new transactions between MID and Magna Entertainment absent approval by a majority of the minority of holders of Class A Subordinate Voting Shares of MID (the "MID Class A Stock"). Stage Two also contemplated MID adopting a policy of distributing 40% of its annual funds from operations as dividends and MID undertaking a substantial stock buyback of at least $240 million of the MID Class A Stock.

On February 18, 2009, the Transaction Agreement was terminated by MID in accordance with its terms. As noted above, the most immediate result of the termination notice was to accelerate the maturity dates on the BMO Credit Agreement, the Bridge Loan Agreement, and the 2008 Loan Agreement to March 5, 2009 and the Gulfstream Agreement to March 20, 2009.

After MID terminated the Transaction Agreement, the Debtors realized that, without access to further extensions of impending debt maturities, and with a steadily declining liquidity position and no additional sources of liquidity, an out-of-court restructuring would not be feasible. Accordingly, the Debtors determined that the only method to protect the interests of all stakeholders and preserve the value of their assets was to seek protection under the Bankruptcy Code.

## E. The Chapter 11 Cases

### 1. Commencement of the Chapter 11 Cases.

On March 5, 2009, the Debtors commenced their Chapter 11 Cases in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to pursue an orderly in-court restructuring through assets sales and avoid a fire-sale liquidation. The Chapter 11 Cases were assigned

to and presided over by the Honorable Mary F. Walrath, United States Bankruptcy Judge. The Debtors continue to manage their properties and operate their businesses as debtors in possession in accordance with sections 1107 and 1108 of the Bankruptcy Code.

## 2. "First-Day" Orders.

On the Petition Date, the Debtors requested and obtained a series of orders from the Bankruptcy Court designed to ensure a smooth transition into chapter 11 and minimize any disruption of their business operations. The Bankruptcy Court entered orders authorizing the Debtors to, among other things, maintain their existing bank accounts and business forms; pay certain prepetition wages, compensation, tax withholding obligations, and employee benefits; pay prepetition sales and use taxes; provide adequate assurance to utility companies; and honor certain prepetition customer programs.

The Bankruptcy Court also authorized the Debtors to employ Weil, Gotshal & Manges LLP and Richards Layton and Finger, P.A., as attorneys for the Debtors and Debtors in Possession. The Bankruptcy Court further authorized the Debtors in Possession to continue to employ professionals utilized in the ordinary course of business to render services to the Debtors in Possession similar to those services rendered prior to the Petition Date.

## 3. Appointment of the Creditors' Committee.

Section 1102 of the Bankruptcy Code requires that as soon as practicable after the commencement of a chapter 11 case, the United States Trustee shall appoint an official committee of unsecured creditors. On March 18, 2009, the Office of the United States Trustee for the District of Delaware appointed the following members to form the Creditors' Committee: The Bank of New York Mellon, as trustee, Sunrise Partners Limited Partnership, the Jockeys' Guild, The New York Racing Association, Inc., GLG Market Neutral Fund; Madison Capital Management, LLC and Florida Thoroughbred Breeders' and Owners' Association.

The Creditors' Committee retained Kramer Levin Naftalis & Frankel LLP and Pachulski Stang Ziehl & Jones LLP, as its attorneys, and Blackstone Advisory Services, as its financial advisors.

## 4. DIP Financing.

On the Petition Date, the Debtors filed the Motion (I) for Authorization to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364, (B) Utilize Cash Collateral of the Prepetition Secured Lenders, (C) Grant Adequate Protection to Prepetition Secured Lenders, and (D) Grant Related Relief, and (II) to Schedule a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "DIP Motion"), seeking, among other things, authorization for Magna Entertainment to obtain secured postpetition financing in an aggregate principal amount not to exceed $62,500,000.00, pursuant to the terms of that certain Debtor in Possession Credit Agreement, dated March 6, 2009, with MID Islandi. After addressing objections filed by certain parties, including the Creditors' Committee, on April 22, 2009, the Bankruptcy Court entered an order granting the relief requested in the DIP Motion on a final basis in an aggregate principal amount not to exceed $38,400,00.00.

As modified, and following discussions with the Creditors' Committee, the maturity date of the Debtors' obligations pursuant to the DIP Credit Agreement was established as November 6, 2009 (the "Maturity Date"). Notwithstanding the Maturity Date, as clearly set forth in the Debtors' Budget, as defined in the DIP Credit Agreement and presented in testimony to the Bankruptcy Court, the Debtors

forecasted that, absent additional funding, the Debtors would face a severe liquidity crisis towards the end of September or early October 2009.

The Debtors commenced these chapter 11 cases anticipating that their sales process would conclude well before the Maturity Date and the forecasted liquidity crisis. The Debtors' sales process, however, was impeded due to reasons beyond the Debtors' control, such as, among other things, the Committee Litigation. Accordingly, in early August 2009, the Debtors negotiated that certain Amended and Restated Debtor-in-Possession Credit Agreement, dated as of August 26, 2009 (the "First Amended DIP Credit Agreement"). To make certain clarifications, and to better reflect the progress of the Debtors' sales process, the Debtors and MID Islandi agreed to further amend the DIP Credit Agreement in accordance with that certain Second Amended and Restated Debtor-in-Possession Credit Agreement, dated as of October 9, 2009 (the "Amended DIP Credit Agreement") to obtain additional capital to fund the Debtors' chapter 11 cases and continue the Debtors' sales process and reorganization efforts.

The Amended DIP Credit Agreement (i) provided for an additional commitment of $26,000,000.00, such that the aggregate committed amount of postpetition financing to be made available by the MID Islandi shall be in a principal amount not to exceed $64,400,000, (ii) extended the Maturity Date, and (iii) contemplated the division of the Debtors' assets into three (3) pools, each with certain timing requirements:

- o Pool I Assets: The Dixon Property, Lone Star Park, the Ocala Property, Portland Meadows, Remington Park and the Thistledown Property.

- o Pool II Assets: The AmTote Property and the XpressBet Property.

- o Pool III Assets: The Maryland Jockey Club (assets of the MJC Debtors), Golden Gate Fields, Gulfstream Park, and Santa Anita Park.

Each pool of assets, as well as the amount of aggregate sale proceeds, was designed to ensure the Debtors' ability to achieve the requisite conditions and maximize value for the Debtors' estates. In addition, as reflected by the Amended DIP Credit Agreement, and as discussed below, the Debtors and the MID Islandi extended the milestones initially contemplated to address concerns raised by the Creditors' Committee and to run parallel to the extended timeline of their litigation against MID.

On October 28, 2009, the Bankruptcy Court entered that certain Order (I) Supplementing Final DIP Order and (II) Authorizing Debtors to Enter into Second Amended and Restated Debtor in Possession Credit Agreement (the "Final DIP Order").

Specifically, if the Debtors did not obtain one or more Sale Orders with respect to the sale of assets that are Pool I Assets, Pool II Assets and/or the Maryland Jockey Club, with aggregate gross sale proceeds of such Sale Orders to be received upon closing totaling at least $175,000,000.00 (the "Proceeds Condition") by November 30, 2009, the Amended DIP Credit Agreement provides that Magna Entertainment must pay MID Islandi an Additional Arrangement Fee. The Debtors were unable to meet the Proceeds Condition and thus, on December 1, 2009, paid an Additional Arrangement Fee in the amount of $1,076,000.00 to MID Islandi. Pursuant to Section 4.3(b), an Additional Arrangement Fee in an amount of $520,000.00 was due on January 29, 2010. On January 25, 2010, MID, on behalf of MID US Financing, the current holder of the claims arising pursuant to the Amended and Restated DIP Agreement, agreed to delay the timing of the Additional Arrangement Fee to no later than April 30, 2010. MID reserves the right to demand the payment prior to April 30, 2010.

In addition, the Debtors' failure to achieve the Proceeds Condition and obtain one or more Sale Orders with respect to all of the remaining Pool III Assets (the "Assets Condition"), by February 26, 2010 or March 21, 2010, constitutes an "Event of Default" pursuant to Sections 9.1(i) and Section 9.1(j), respectively, of the Amended DIP Credit Agreement. If the Debtors fail to achieve any of the aforementioned conditions that result in an "Event of Default," and MID Islandi chooses to waive the "Event of Default," Magna Entertainment must pay MID Islandi an Additional Arrangement Fee.

Upon the sale of Remington Park, as discussed in further detail below, the Debtors used the proceeds from that sale to repay the first tranche of their DIP Obligations.

On March 23, 2010, the Debtors will seek approval from the Bankruptcy Court of that certain Final Order (I) Authorizing the Debtors to Enter into First Amendment to Second Amendment and Restated Debtor in Possession Credit Agreement and (II) Supplementing DIP Orders, pursuant to which the MI Developments US Financing Inc. provided an additional commitment of $7,000,000.00.

### 5. Corporate Governance Developments.

On March 10, 2009, the Debtors sought authority to sell certain of their assets to MID, subject to higher or better offers, and in connection with that motion, sought authority to implement an auction process and establish bidding procedures (the "MID Sale Motion"). Due to a change in strategy, the Debtors subsequently withdrew the MID Sale Motion. Prior to withdrawing the MID Sale Motion, however, the Debtors received several objections that questioned, among other things, the integrity of the sale process. Specifically, certain parties alleged that the Debtors' relationships with MID and Mr. Frank Stronach undermined the Debtors' ability to conduct a fair auction and sale process. While the Debtors disagreed with these allegations, the Debtors took numerous steps to ensure the integrity of the process and remove any chilling effect that parties perceived to be present.

Specifically, since the Petition Date, with input from the Creditors' Committee and their advisors, the Debtors implemented significant governance safeguards, including (i) the resignation of Mr. Frank Stronach as the CEO of Magna Entertainment, effective as of April 7, 2009, (ii) the retention of FTI Consulting, Inc. to provide the Debtors with certain financial advisory services, including the appointment of Mr. Gregory Rayburn as CEO of Magna Entertainment to oversee the Debtors' restructuring initiative and sales processes, and (iii) the appointment of Warren Mosler to Magna Entertainment's Board of Directors, to serve as an independent director, effective as of April 7, 2009.

To further assuage concerns of any governance shortcomings, on April 29, 2009, Magna Entertainment's Board of Directors adopted a resolution implementing a formal protocol (the "Protocol") to be followed in connection with any discussions, deliberations, and/or decision-making processes involving (a) proposed asset or stock sale transactions that include an asset or stock over which MID or any of its affiliates or subsidiaries, including, without limitation, MID Islandi, maintains a lien or security interest or (b) the restructuring of the indebtedness of the Debtors to MID, MID Islandi and their respective affiliates, pursuant to a chapter 11 plan or otherwise. The Protocol, developed with the input of the Creditors' Committee, provides for a multi-tiered review process which governs how certain transactions shall be vetted and analyzed, ensures that Mr. Frank Stronach will recuse himself from these discussions and vests the ultimate decision-making authority in the independent directors of the Magna Entertainment Board.

### 6. The Greenlight Examiner Motion.

On March 27, 2009 Greenlight Capital Offshore Partners ("Greenlight"), a hedge fund with a significant equity interest in MID, filed that certain motion (the "Examiner Motion") for an order directing the appointment of an examiner, or in the alternative, directing the appointment of a chapter 11 trustee. In the Examiner Motion, Greenlight asserted that an examiner should be appointed because, among other things, the prepetition and postpetition transactions between the Debtors and MID warranted special scrutiny due to the interrelatedness of the parties. Finding no merit in the Examiner Motion, the Debtors filed a response asserting, among other things, that the Examiner Motion was an attempt by Greenlight to relitigate its ongoing dispute with MID before the Ontario Securities Commission (the "OSC") under the guise of being an unsecured creditor of Magna Entertainment. Further, the Debtors asserted that their efforts early on in the chapter 11 cases to ensure maximum transparency and the disinterestedness and independence of management during their restructuring, including the retention of a new Chief Executive Officer ("CEO") to oversee the Debtors' day-to-day operations and the proposed sales of the Debtors' assets, and the appointment of a new independent director to Magna Entertainment's Board of Directors, further militated against the appointment of a trustee. Ultimately, Greenlight and the Debtors agreed to adjourn the Examiner Motion to a date to be determined.

## 7. The Postpetition Sales Processes.

Pursuant to an order, dated May 11, 2009, the Bankruptcy Court authorized the Debtors to implement an auction process and establish bidding procedures for the sale of certain of the Debtors' assets, including Remington Park, Thistledown, the partnership interests in MEC Lone Star, L.P. (the "Lone Star Interests"), the Ocala Property, the Dixon Property and StreuFex. Since entry of the Bid Procedures Order, Miller Buckfire aggressively marketed the assets with the goal of obtaining a purchaser for each asset. Below is a summary of the sale orders that the Debtors have obtained in their Chapter 11 Cases to date:

### a. Remington Park Sale

With respect to Remington Park, Miller Buckfire contacted fifty-two (52) potential purchasers and executed confidentiality agreements with forty-eight (48) of these parties. Miller Buckfire received thirteen (13) non-binding "Expressions of Interest" from various parties and, of those parties, six (6) attended management presentations and tours of Remington Park. As a result of Miller Buckfire's efforts, the Debtors received three (3) definitive bids for Remington Park (the "Remington Bids").

Upon review of the Remington Bids, the Debtors determined that the bid from Global Gaming RP, LLC ("Global Gaming RP") constituted the highest and best offer for Remington Park and the corresponding assets. Accordingly, in an effort to further stimulate the auction process for Remington Park and generate further competitive bidding and, in accordance with the process contemplated and authorized by the Bid Procedures Order, the Debtors, upon consultation with the Creditors' Committee, agreed to establish Global Gaming RP as the "stalking horse" for Remington Park and enter into that certain Asset Purchase Agreement, dated August 10, 2009, by and among Magna Entertainment, Remington Park, Inc., 50000 Delaware, LLC and Global Gaming RP. On August 26, 2009, the Bankruptcy Court entered an order, pursuant to which the Bankruptcy Court, among other things, (i) established Global Gaming RP as the "stalking horse" and (ii) approved the Global Gaming RP's bid to purchase Remington Park in the amount of Eighty Million Two Hundred Fifty Thousand Dollars ($80,250,000).

The Debtors held the auction for Remington Park on September 8, 2009. Global Gaming RP was the only bidder to attend the auction and the Debtors did not receive any other bids for Remington

Park. Accordingly, on September 15, 2009, the Bankruptcy Court entered an order authorizing the Debtors to sell Remington Park to Global Gaming RP and that sale closed on January 1, 2010.

**b.** **Lone Star Park Sale and Chapter 11 Filing**

With respect to the marketing and sale of the partnership interests in MEC Lone Star, Miller Buckfire contacted fifty-two (52) potential buyers. Of those buyers, fifty (50) executed confidentiality agreements and Miller Buckfire received seven (7) first round non-binding indications of interest. In addition, five (5) parties attended management presentations and toured Lone Star Park, and three (3) of those parties submitted second rounds bids through August 31, 2009.

As a result, Miller Buckfire was successful in securing a bid from Global Gaming LSP, LLC ("Global Gaming LSP"), for Lone Star Park that, in the Debtors' business judgment (upon consultation with the Creditors' Committee), was worth pursuing as a stalking horse for Lone Star Park. That bid, however, sought to purchase Lone Star Park and the assets of MEC Lone Star, pursuant to section 363 of the Bankruptcy Code, instead of the Lone Star Interests. Accordingly, to accommodate a bid that the Debtors believed would capture the highest and best value for the Debtors' estates, on September 14, 2009, MEC Lone Star commenced its case under chapter 11 of the Bankruptcy Code.

In an effort to further stimulate the auction process for Lone Star Park and generate further competitive bidding, the Debtors, upon consultation with the Creditors' Committee, agreed to establish Global Gaming LSP as the "stalking horse" for Lone Star Park and enter into that certain Asset Purchase Agreement, dated September 14, 2009, by and among MEC Lone Star and Global Gaming with a purchase price of Twenty Seven Million Dollars ($27,000,000.00). On September 23, 2009, the Court entered an order, pursuant to which the Bankruptcy Court, among other things, established Global Gaming LSP as the "stalking horse" for Lone Star Park.

The Debtors held the auction for Lone Star Park on October 7, 2009. Global Gaming LSP was the only bidder to attend the auction, however, the Debtors received a subsequent offer by LSP Gaming Ventures, Inc. ("LSP Gaming"). At the hearing on October 14, 2009, having been apprised of the facts and circumstances associated with (i) the submission of bids, (ii) the conduct of the Auction and (iii) the submission of the subsequent offer by LSP Gaming, the Bankruptcy Court entered an order reopening the Auction (the "Order to Reopen"). On October 23, 2009, Global Gaming LSP filed a Notice of Appeal from the Order to Reopen.

Pursuant to the Order to Reopen, the Debtors reopened the auction on October 23, 2009. After forty-three rounds (43) of bidding between LSP Gaming and Global Gaming LSP, Global Gaming LSP ultimately submitted the highest and best offer with a purchase price of Forty Seven Million Eight Hundred Fifty-Seven Thousand Dollars ($47,857,000.00), upon the condition that the appeal would be withdrawn, with prejudice. On October 29, 2009, the Bankruptcy Court entered that certain order authorizing the Debtors to sell Lone Star Park to Global Gaming LSP and on November 30, 2009, Global Gaming withdrew its Notice of Appeal.

On January 20, 2010, Global Gaming LSP filed its application for a racing license with the Texas Racing Commission. The Debtors have been advised that approval of the application may take between four (4) and six (6) months. Accordingly, the Debtors will endeavor to close the sale of Lone Star Park during the second quarter of 2010.

**c.** **Thistledown**

With respect to the marketing and sale of Thistledown, Miller Buckfire contacted forty-nine (49) potential buyers. Of those buyers, forty-six (46) executed confidentiality agreements and Miller Buckfire received nine (9) first round non-binding indications of interest. In addition, four (4) parties attended management presentations and toured Thistledown, and three (3) parties submitted qualified bids. Upon receipt of qualified bids from Cleveland Gaming Ventures, LLC ("Penn National"), Harrah's Operating Company, Inc. ("Harrah's") and PNK Development 18, LLC ("Pinnacle"), the Debtors determined that the selection of Penn National as a "stalking horse" with a purchase price of $22,300,000.00 afforded the Debtors with certainty of securing a minimal acceptable bid and enhancing the bidding process at the Auction. In the Debtors' opinion, without the establishment of a "stalking horse," there was no assurance that a satisfactory bid would be submitted.

Pursuant to the agreement with Penn National, and consistent with the establishment of Penn National as a "stalking horse," the Debtors agreed, subject to Bankruptcy Court approval, to seek (a) reimbursement of Penn National's expenses in an amount up to $125,000.00, and (b) a break-up fee in the amount of two percent (2%) of the Penn National purchase price, $446,000.00.

The Debtors held an auction for Thistledown on September 14, 2009 and Penn National, Harrah's and Pinnacle attended. The Debtors informed these parties that they had established Penn National as a "stalking horse," with the entitlements attendant thereto, including, without limitation, the provisions for the reimbursement of expenses and the payment of a break-up fee. Harrah's agreed to participate in the auction, subject to its right to contest the obligation to satisfy the reimbursement obligation and payment of the break-up fee.

At the conclusion of the Auction, Harrah's submitted the highest and best bid. On September 15, 2009, the Bankruptcy Court (i) approved the sale of Thistledown to Harrah's for $89,500,000.00, of which $42,000,000.00 would be paid immediately upon closing and $47,500,000.00 would be paid provided that certain conditions related to video lottery licensing in the State of Ohio were met and (ii) denied the Debtors' request to pay Penn National the break-up fee and reimbursement of expenses.

On September 21, 2009, the Ohio Supreme Court ruled that certain legislation regarding video lottery licensing was subject to referendum under the constitution of Ohio. By letter, dated September 23, 2009, Harrah's asserted that this ruling gave it a right to terminate its purchase agreement pursuant to Section 9.1(m) thereof, but, without waiving its right to terminate in the future, it was not electing to do so. Pursuant to the purchase agreement, all obligations and duties of the parties to consummate the sale may be terminated by either Harrah's or the Debtors if the sale has not closed on or prior to May 15, 2010. Accordingly, the Debtors continue to explore their options with respect to the sale of Thistledown.

### d. The Ocala Property

In late 2007, as part of the MEC Debt Elimination Plan summarized above, Magna Entertainment initiated an active program to sell the Ocala Property and listed the property with a real estate broker. In connection with the Debtors' Chapter 11 Cases, the Debtors reaffirmed their desire to sell the Ocala Property and continued to aggressively market the property. On August 8, 2008, the Debtors entered into a purchase and sale contract with Lincoln Property Co. ("Lincoln") with a contracted purchase price of $16,500,000.00. However, on October 31, 2008, during Lincoln's due diligence review period, and as market conditions deteriorated, Lincoln terminated the contract.

In 2009, the Debtors engaged a real estate broker and their marketing efforts generated offers from two (2) prospective purchasers: Par Avenue Properties, LLC ("Par") and Mr. Frank Stronach, Chairman of Magna Entertainment's Board of Directors. Par submitted an initial informal bid in the form of a marked purchase agreement that provided a purchase price of $5,500,000.00 (the "Par Bid"). Ocala Meadows Lands, LLC (the "Ocala Meadows"), a newly-formed entity indirectly controlled by Fair Enterprises Limited, a company that is part of an estate planning vehicle for the family of Mr. Frank Stronach, countered the Par Bid with an offer to purchase the Ocala Property for $5,750,000.00. Although the Debtors approached Par to solicit a counter-offer, on July 30, 2009, the Debtors received only a definitive bid from Par that was in the same amount as the initial Par Bid. As a result, on August 4, 2009, the Ocala Debtors agreed to sell the Ocala Property to Ocala Meadows, subject to Bankruptcy Court approval and higher or better offers. In that regard, in an effort to solicit further bids from Par, as well as from other parties, the Debtors filed a motion to sell the Ocala Property to Ocala Meadows, subject to higher or better offers and proposed to hold an auction on August 26, 2009.

On August 26, 2009, the Debtors held an auction and both Par and Ocala Meadows attended. At the conclusion of the auction, Par submitted the highest and best offer to purchase the Ocala Property with a purchase price of $8,100,000.00. Accordingly, on September 2, 2009, the Bankruptcy Court entered an order authorizing the Debtors to sell the Ocala Property to Par and that sale closed on September 17, 2009.

e.    **The Dixon Property**

In late 2007, as part of the MEC Debt Elimination Plan summarized above, Magna Entertainment initiated an active program to sell the Dixon Property and in connection with the Debtors' Chapter 11 Cases, the Debtors reaffirmed their desire to sell the Dixon Property and continued to aggressively market the property. The Debtors received three (3) offers from prospective purchasers: (i) an offer from Kenneth L. Wallace ("Wallace") in the amount of $3,200,000.00; (ii) an offer from USA Land Company, LLC in the amount of $2,000,000.00; and (iii) an offer from AKT Properties in the amount of $1,300,000.00. After further negotiations with these parties, the Debtors negotiated the highest and best offer with Wallace for a purchase price in the amount of $4,000,000.00.

Subsequently thereto, the Debtors received an offer from Duffel Financial and Construction Company, Inc. ("Duffel") in the amount of $5,000,000.00, however, days later Duffel submitted a revised offer of $3,000,000.00. Accordingly, the Debtors executed an Agreement of Purchase and Sale for the Dixon Property (the "Wallace Purchase Agreement") with Wallace for $4,000,000.00 and on September 18, 2009, the Debtors filed that certain Motion for Authorization to Sell the Dixon Property Pursuant to Section 363 of the Bankruptcy Code to Wallace (the "First Dixon Motion"), free and clear of all liens, claims and encumbrances [Docket No. 1174]. Prior to the expiration of the applicable due diligence period, however, Wallace terminated the Wallace Purchase Agreement and as a result, the Debtors withdrew the First Dixon Motion by notice, dated October 9, 2009.

In an effort to solicit bids for the Dixon Property and maximize value for the Debtors' estates, the Debtors filed that certain Motion of the Debtors for an Order Authorizing the Sale of the Dixon Property Pursuant to Sections 105(a) and 363 of the Bankruptcy Code (the "Second Dixon Motion"), dated October 22, 2009, requesting that the Bankruptcy Court approve the sale of the Dixon Property to the bidder that submits the highest and best offer for the property at an auction held for the Dixon Property (the "Dixon Auction").

Prior to the Dixon Auction, the Debtors received two (2) bids for the Dixon Property: (i) a bid from Ocala Meadows in the amount of $3,050,000.00 and (ii) a bid from the Marvin L. Oates Trust (the "Oates Trust") in the amount of $3,005,000.00.

On November 17, 2009, the Dixon auction was held and both potential purchasers participated in such auction. The Oates Trust declined to submit a higher bid and Ocala Meadows was determined to be the winning bidder at the Dixon Auction. Accordingly, on November 19, 2009, the Bankruptcy Court entered that certain order authorizing the Debtors, pursuant to sections 105(a) and 363 of the Bankruptcy Code, to sell the Dixon Property to Ocala Meadows free and clear of all liens, claims, and encumbrances and that sale closed on November 30, 2009.

        **f.**        **StreuFex**

MEC Projektentwickslungs GmbH ("MEC GmBH"), a limited liability company incorporated under the laws of Austria and a direct non-debtor subsidiary of Magna Entertainment, owned all shares (the "Stock Interests") of FEX ÖKO-Faserverarbeitungs-GmbH, Dobermannsdorferstraße ("Fex Öko"), a company acquired by MEC GmBH and Magna Entertainment in 2002. Fex Öko is a limited liability Austrian company that owns and operates a manufacturing plant in Neusied/Zaya, Austria which manufactures StreuFex, an environment-friendly horse bedding product.

Subsequent to this acquisition, Magna Entertainment purchased approximately eighty (80) acres of land in Lumberton, North Carolina to accommodate a StreuFex manufacturing facility that is currently owned and operated by Fex Straw Manufacturing, Inc. ("Fex Straw"), a direct non-debtor subsidiary of Magna Entertainment. StreuFex was introduced to the North American market in 2004 and is currently used at Gulfstream Park and the Palm Meadows Training Center.

In 2007, Fex Straw entered into a license agreement with Premier Equine Products Pty Ltd. ("Premier Equine") granting Premier Equine the exclusive license to manufacture and sell StreuFex in Australia, New Zealand, Hong Kong, Macau, Japan, and Singapore for twenty years. Fex Straw received a one-time up-front license fee and continues to receive royalty fees for the duration of the agreement based on the tons of StreuFex manufactured by Premier Equine. If Premier Equine enters into a sublicense agreement, Fex Straw is entitled to a sublicense fee as well as similar royalty fees.

In 2008, Fex Öko's revenues totaled approximately € 1,000,000.00, however, taking into consideration operating expenses and other costs, its net loss was approximately *negative* € 130,000.00. The Debtors decided to sell Fex Öko after determining that continuance of the Fex Öko operations, including the continued maintenance of the facility, was burdensome and would not be in the best interests of their estates or creditors. Moreover, if the Debtors did not sell the Stock Interests, the Debtors would be bound by Austrian law that would require the Debtors to fund costs of approximately € 130,000.00 to wind down the operations of an entity like Fex Öko and such winddown would take at least six (6) months. Further, given the fact that Fex Öko was operating at a loss for a few years and the limited market of potential purchasers, the Debtors did not believe that a public sale of the Stock Interests would generate any bidders. Based on these circumstances, the Debtors decided to sell the Stock Interests to Ing Johann Payerl ("Payerl"), the former owner and current managing director of Fex Öko, for € 1.00. Payerl, as the former owner of Fex Öko, had a distinct interest in purchasing the Stock Interests and continuing Fex Öko's manufacturing operations. In addition, the Debtors were able to include several protective provisions in the purchase agreement to ensure that the sale will not affect Fex Straw's operations' in the United States, and that the Debtors will benefit from subsequent profits, if any, that he receives either from Fex Öko's operations or from a subsequent sale of Fex Öko.

On July 29, 2009, MEC GmBH and Payerl entered into that certain Share Purchase Agreement whereby MEC GmBH sold the Stock Interests to Payerl (the "Share Purchase Agreement"). Subsequently, the Debtors filed that certain Motion for Authorization to Consummate the Sale of Fex Öko Stock Interests, dated August 4, 2009, requesting that the Bankruptcy Court approve the Share Purchase Agreement. Although the Debtors believed that Bankruptcy Court approval was not required for the sale of the Stock Interests which were owned by the non-debtor MEC GmBH, out of an abundance of caution, the Debtors requested Bankruptcy Court approval as such transaction was tantamount to the sale of all of the Debtors' value in MEC GmBH. By order, dated August 26, 2009, the Bankruptcy Court authorized the Debtors to consummate the sale of the Stock Interests to Payerl and that sale was consummated on September 1, 2009.

g.    **Magna Racino**

MEC Grundstucksentwicklungs GmbH (Austria) ("Magna Austria"), an indirect non-debtor subsidiary of Magna Entertainment, owned Magna Racino, a horse racing facility located in Ebreichsdorf, Austria, approximately twenty-five (25) kilometers from the city of Vienna. MEC Magna Racing Veranstaltungs GMBh, another indirect non-debtor subsidiary of Magna Entertainment, operated the track and other facilities at Magna Racino (the "Magna Operations").

Although Magna Racino featured both thoroughbred and standardbred racing on three different tracks, a 5/8-mile sand track, a one-mile sand track and a one-mile turf course, during 2008, Magna Racino held only 14 race days between April and November and attracted only 16,000 guests.

Surrounding Magna Racino sits Golfclub Ebreichsdorf, residential building land and forest land (together with Magna Racino and the Magna Operations, the "Racino Assets"). Golfclub Ebreichsdorf is an eighteen (18) hole golf facility currently leased to Golfplatz Schlo Ebreichsdorf Errichtungs und Vermietungs Gesellschaft m.b.H. & Co Kommanditgessellschaft, which also has a club house owned by the tenant.

Magna Austria was party to that certain credit agreement with Raiffeisenlandesbank Niederoesterreich-Wien AG ("RLB"), dated October 10, 2006 (as amended, the "RLB Loan"), pursuant to which Magna Austria borrowed € 15,000,000.00 to finance the construction of its horse racing facilities. The RLB Loan was secured by substantially all of Magna Austria's assets and matured on December 31, 2009. In July 2009, the aggregate principal amount outstanding under the RLB Loan was € 6,000,000.00 and an installment payment of € 2,500,000.00 was due on June 30, 2009. Pursuant to Austrian law, the Debtors believed that a failure to pay the installment would allow RLB to commence foreclosure proceedings on Magna Austria's assets, absent a bankruptcy filing by Magna Racino and the Magna Operations.

To prevent foreclosure, the Debtors marketed the Racino Assets through their Austrian broker to solicit offers that could generate funds sufficient to retire the RLB Loan. The Debtors received an offer for the Racino Assets in the amount of € 6,500,001.00 from Bvsarantaexi Beteiligungsverwaltung GmbH ("BB-GmBH"), a newly-formed entity indirectly controlled by Fair Enterprises Limited, a company that is part of an estate planning vehicle for the family of Mr. Frank Stronach. The Debtors' broker tried to re-engage two potential buyers who previously expressed interest in the Racino Assets to encourage them to submit higher offers than BB-GmBH's offer. However, one buyer decreased its initial offer 20%, reflecting its perception of the changes in the Austrian real estate market and the other buyer withdrew its offer entirely. Given Magna Racino's level of revenue, and the fact that Magna Racino had been operating at a loss for a few years, the Debtors did not believe that a materially higher or better offer would be obtained through a public sale of the Racino Assets.