**IN THE UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

-----------------------------------------------------------------x
                                                                 :
*In re*                                                          :          **Chapter 11**
                                                                 :
**MAGNA ENTERTAINMENT CORP.**, *et al.*,                         :          **Case No. 09-10720 (MFW)**
                                                                 :
                                                                 :
                    Debtors.                                     :          **Jointly Administered**
                                                                 :
-----------------------------------------------------------------x


**DISCLOSURE STATEMENT FOR THE THIRD AMENDED JOINT PLAN OF AFFILIATED**
**DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,**
**MI DEVELOPMENTS INC. AND MI DEVELOPMENTS US FINANCING INC.**
**PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**


Dated:  March 24, 2010

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
(212) 310-8000

– and –

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700

Attorneys for Debtors and
Debtors in Possession

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

– and –

PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(302) 652-4100

Attorneys for the Official Committee of
Unsecured Creditors

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

– and –

YOUNG CONAWAY STARGATT &
TAYLOR LLP
The Brandywine Building
1000 East Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

Attorneys for MI Developments Inc. and MI
Developments US Financing Inc.

# I.    INTRODUCTION

Magna Entertainment Corp., The Santa Anita Companies, Inc., Los Angeles Turf Club, Inc., Pacific Racing Association, MEC Land Holdings (California) Inc., Gulfstream Park Racing Association Inc., GPRA Thoroughbred Training Center, Inc., MEC Dixon, Inc., MEC Holdings (USA) Inc., Sunshine Meadows Racing, Inc., Thistledown, Inc., MEC Maryland Investments, Inc., 30000 Maryland Investments LLC, Old RP, Inc., *f/k/a*, Remington Park, Inc., GPRA Commercial Enterprises Inc., Pimlico Racing Association, Inc., The Maryland Jockey Club of Baltimore City, Laurel Racing Association Limited Partnership, Laurel Racing Assoc., Inc., Prince George's Racing, Inc., Southern Maryland Racing, Inc., Southern Maryland Agricultural Association, Maryland Jockey Club, Inc., AmTote International, Inc., MEC Pennsylvania Racing Services, Inc. and MEC Lone Star, L.P. (collectively, the "Debtors"), the Official Committee of Unsecured Creditors, MI Developments Inc. and MI Developments US Financing Inc. submit this Disclosure Statement, dated March 24, 2010 (the "Disclosure Statement"), in connection with the solicitation of acceptances and rejections with respect to the Third Amended Joint Plan of Affiliated Debtors, the Official Committee of Unsecured Creditors, MI Developments Inc. and MI Developments US Financing Inc. pursuant to Chapter 11 of the United States Bankruptcy Code, dated March 24, 2010 (the "Plan"), a copy of which is annexed to this Disclosure Statement as Exhibit "A".  Unless otherwise defined herein, capitalized terms used shall have the same meanings ascribed to them in the Plan.

The purpose of this Disclosure Statement is to set forth information (1) regarding the history of the Debtors, their businesses and the Chapter 11 Cases, (2) regarding the terms and conditions of the settlement in principle of the Committee Litigation, (3) concerning the Plan and alternatives to the Plan, (4) advising holders of Claims and Equity Interests of their rights under the Plan, (5) assisting the holders of Claims in making an informed judgment as to whether they should vote to accept or reject the Plan, and (6) assisting the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

On March ___, 2010, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order approving this Disclosure Statement, in accordance with section 1125 of the Bankruptcy Code, as containing adequate information of a kind and in sufficient detail to enable hypothetical reasonable investors typical of holders of Claims  against the Debtors to make an informed judgment in voting to accept or reject the Plan.  However, the Bankruptcy Court has not passed on the merits of the Plan.  No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  In voting on the Plan, holders of Claims should not rely on any information relating to the Debtors and their business, other than the information contained in this Disclosure Statement, the Plan and all exhibits hereto and thereto.

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM OR EQUITY INTEREST.  THE DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW.  THE DESCRIPTION OF THE PLAN IS A SUMMARY ONLY, WHICH IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN, AND IF ANY INCONSISTENCY EXISTS BETWEEN THE TERMS AND PROVISIONS OF THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS AND PROVISIONS OF THE PLAN ARE CONTROLLING.  HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS.

Pursuant to provisions of the Bankruptcy Code, only classes of claims or equity interests which are (i) "impaired" by a plan of reorganization and (ii) entitled to receive a distribution under such plan are entitled to vote on the plan.  In this case, only Claims in Classes 2, 3, 5 through 26 and 35 are impaired by and entitled to receive a distribution under the Plan, and holders of Claims in those Classes are the only Entities entitled to vote to accept or reject the Plan.  Classes of Claims or Equity Interests that are not impaired under the Plan, and each holder of a claim or interest in such class, are conclusively presumed to have accepted the Plan, and solicitation of acceptances from these holders of claims of such class is not required.  Claims in Class 1, 4 and 27 through 34 are unimpaired by the Plan, and holders thereof are conclusively presumed to have accepted the Plan.  Holders of Equity Interests in Classes 36 through 61 are impaired and not entitled to receive any distributions or retain their Equity Interests pursuant to the Plan and, therefore, are deemed to have rejected the Plan.

THE RECORD DATE FOR DETERMINING THE HOLDERS OF CERTAIN CLAIMS THAT MAY VOTE ON THE PLAN IS MARCH 19, 2010 (the "Voting Record Date").

If you are entitled to vote to accept or reject the Plan, accompanying this Disclosure Statement should be a ballot ( "Ballot") for casting your vote(s) on the Plan and a pre-addressed envelope for the return of the Ballot.

BALLOTS FOR ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED ONLY TO THOSE HOLDERS OF CLAIMS IN CLASSES 2, 3, 5 THROUGH 26 AND 35, BECAUSE THEY ARE THE ONLY HOLDERS OF CLAIMS THAT MAY VOTE TO ACCEPT OR REJECT THE PLAN.

If you are the holder of a Claim in one of these Classes and did not receive a Ballot, received a damaged or illegible Ballot, or lost your Ballot, or if you are a party in interest and have any questions concerning this Disclosure Statement, any Exhibits hereto, the Plan or the voting procedures in respect thereof, please contact:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Arielle G. Lenza, Esq.
(212) 310-8000

**THE BOARDS OF DIRECTORS OF THE DEBTORS HAVE UNANIMOUSLY APPROVED THE TERMS OF THE DEBTORS' PLAN AND RECOMMEND THAT THE HOLDERS OF CLAIMS IN ALL SOLICITED CLASSES VOTE TO ACCEPT THE PLAN.**

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AS CO-PROPONENTS OF THE PLAN WITH THE DEBTORS, MI DEVELOPMENTS INC. AND MI DEVELOPMENTS US FINANCING INC., RECOMMEND THAT THE HOLDERS OF CLAIMS IN ALL SOLICITED CLASSES VOTE TO ACCEPT THE PLAN.**

After carefully reviewing this Disclosure Statement and the Exhibits attached hereto, please indicate your vote with respect to the Plan on the enclosed Ballot and return it in the envelope provided.  Voting procedures and requirements are explained in greater detail elsewhere in this Disclosure Statement and on the Ballot.

2

**HOLDERS OF CLAIMS IN CLASSES 2, 3, 5, 6, 9 THROUGH 26 AND 35 PLEASE VOTE AND RETURN YOUR BALLOTS TO:**

**Kurtzman Carson Consultants, LLC**
**Attention: Magna Ballot Processing Center**
**2335 Alaska Avenue**
**El Segundo, California 90245**

**HOLDERS OF CLAIMS IN CLASSES 7 AND 8 PLEASE VOTE AND RETURN YOUR BALLOTS TO YOUR NOMINEE SO THAT IT CAN PROCESS YOUR INSTRUCTIONS AND SUBMIT A MASTER BALLOT THAT IS ACTUALLY RECEIVED BY THE SOLICITATION AGENT NO LATER THAN 4:00 P.M. (PREVAILING EASTERN TIME) ON APRIL 16, 2010, UNLESS SUCH TIME IS EXTENDED BY THE DEBTORS. EACH NOMINEE SHOULD SUBMIT THE MASTER BALLOT TO THE SOLICITATION AGENT IN THE ENVELOPE PROVIDED OR AT THE FOLLOWING ADDRESS:**

**Magna Entertainment Corp.**
**c/o Kurtzman Carson Consultants LLC**
**1230 Avenue of the Americas, 7th Floor**
**New York, NY 10020**
**Attn: David M. Sharp**
**(917) 639-4276**

       **IN ORDER TO BE COUNTED, BALLOTS MUST BE RECEIVED BY 4:00 P.M. (PREVAILING EASTERN TIME) ON APRIL 16, 2010. ANY EXECUTED BALLOTS WHICH ARE TIMELY RECEIVED BUT WHICH DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN.**

       The Debtors believe that prompt confirmation and implementation of the Plan is in the best interests of the Debtors, all holders of Claims and Equity Interests, and the Debtors' chapter 11 estates.

       In accordance with the Disclosure Statement Order and section 1128 of the Bankruptcy Code, the Bankruptcy Court has fixed April ___, 2010, at __:__ __.m. (prevailing Eastern Time), in Courtroom No. 4 of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801, as the date, time and place of the hearing to consider confirmation of the Plan, and April ___, 2010, at __:__ __.m. (prevailing Eastern Time), as the last date for filing an objection to confirmation of the Plan. The hearing on confirmation of the Plan may be adjourned from time to time without further notice except for the announcement of the adjourned date and time at the hearing on confirmation or any adjournment thereof.

       THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY AND THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE SUCH DATE. HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD READ IT CAREFULLY AND IN ITS ENTIRETY, AND

WHERE POSSIBLE, CONSULT WITH COUNSEL OR OTHER ADVISORS PRIOR TO VOTING ON THE PLAN.

CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE FORWARD LOOKING PROJECTIONS AND FORECASTS, BASED UPON CERTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON BY ANY PERSONS FOR ANY OTHER PURPOSE OTHER THAN BY HOLDERS OF CLAIMS ENTITLED TO VOTE FOR THE PURPOSE OF DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTORS OR ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

## II.  **COMPROMISE AND SETTLEMENT**

The backbone of the Plan is the compromise and settlement in principle of the Committee Litigation (the "Settlement").  Specifically, and as set forth more fully in Section E.9 below, on July 21, 2009, the Creditors' Committee commenced an adversary proceeding against MID Islandi sf. ("MID Islandi"), the Debtors' largest prepetition secured lender, MI Developments Inc. ("MID"), Magna Entertainment's controlling shareholder, and certain other third party defendants asserting, among other things, claims of fraudulent transfer, equitable subordination, recharacterization and breaches of fiduciary duty.  The Settlement is the result of extensive negotiations among the Creditors' Committee, MID and certain of the other third party defendants.

To implement the settlement in principle of the Committee Litigation, the parties have agreed to, among other things, the following terms and conditions:

➢ The Creditors' Committee has agreed to dismiss the Committee Litigation, with prejudice, on the Effective Date.

➢ MID has agreed that MI Developments US Financing Inc. ("MID US Financing" or "MID Transferee") shall pay (a) Eighty Nine Million Dollars ($89,000,000.00) for distribution of the Creditor Cash to holders of Allowed Non-MJC General Unsecured Claims (the "Committee Litigation Settlement Payment"), (b) cash in an amount necessary to satisfy, in full, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, the Allowed PNC Claim and Allowed MJC Claims, on the terms and subject to the conditions set forth in the Plan and (c) One Million Five Hundred Thousand Dollars ($1,500,000.00) for payment of certain fees and expenses of the Creditors' Committee's professionals and certain members of the Creditors' Committee incurred in connection with the Committee Litigation.

➢ In full satisfaction and release of all of its Claims against the Debtors, the Debtors, the Creditors' Committee and MID agree that on the Effective Date:

– MID Transferee shall receive net sale proceeds received from the sale of Lone Star Park, if any, in excess of the first Twenty Million Dollars ($20,000,000.00)

or, in the event that the sale of Lone Star Park has not been consummated as of the Effective Date, the LSP Trust Interests entitling it to receive its share of the Lone Star Park sale proceeds;

– MID Transferee shall receive the first Twenty Million Dollars ($20,000,000.00) of net sale proceeds received from the sale of Thistledown or, in the event that the sale of Thistledown has not been consummated as of the Effective Date, the Thistledown Trust Interests entitling it to receive its share of the Thistledown sale proceeds;

– Equity Interests in certain of the Reorganized Debtors shall be issued to MID Transferee, and assets of certain Reorganized Debtors shall be transferred to MID Transferee,  pursuant to the Plan, such that on the Effective Date, MID Transferee shall own the Debtors' racetracks known as Santa Anita Park, Golden Gate Fields, Gulfstream Park, the Maryland Jockey Club and AmTote and certain other assets of the Debtors;

– The Debtors or the Reorganized Debtors shall convey to MID Transferee certain non-debtor assets, including, subject to the XpressBet Option, the assets of XpressBet, Inc. and Magna Entertainment's interests in TrackNet Media Group LLC, HRTV, LLC, MEC Media Television Holdings Inc. and MEC Oregon Racing, Inc.;

– Any proceeds received by the Debtors or the Reorganized Debtors from the settlement or resolution of the PA Meadows Litigation shall go to MID Transferee.

➢ Holders of Allowed Non-MJC General Unsecured Claims, Allowed 8.55% Note Claims and Allowed 7.25% Note Claims shall receive, subject to certain reductions, including a reduction of the KLNF Contingency Fee, their pro rata share of (a) the Committee Litigation Settlement Payment, (b) the first Twenty Million Dollars ($20,000,000.00) of net sale proceeds from the sale of Lone Star Park or, in the event that the sale of Lone Star Park has not been consummated as of the Effective Date, the LSP Trust Interests entitling them to receive their share of the Lone Star Park sale proceeds; and (c) net sale proceeds received from the sale of Thistledown, if any, in excess of the first Twenty Million Dollars ($20,000,000.00) or, in the event that the sale of Thistledown has not been consummated as of the Effective Date, the Thistledown Trust Interests entitling them to receive their share of the Thistledown sale proceeds.

➢ In the event that the sales of Lone Star Park or Thistledown or their respective assets, in whole or in part, have not been consummated as of the Effective Date, the assets and reorganized equity of each entity will be placed into Operating Trusts and MID Transferee and the holders of Allowed General Unsecured Claims, Allowed 8.55% Note Claims and Allowed 7.25% Note Claims shall receive the applicable Operating Trust Interests entitling them to payment of the sales proceeds upon consummation of the applicable sales in accordance with the Plan.

5

In addition, the Plan provides certain releases to, among others, MID Islandi, MID, MID US Financing, the Debtors and certain of their Related Persons and to effectuate the Settlement and the terms of the Plan, the Debtors, MID, MID US Financing and the Creditors' Committee entered into that certain Plan Support Agreement, dated February 18, 2010 (the "Plan Support Agreement") and attached hereto as Exhibit "B." Pursuant to the Plan Support Agreement, the parties agreed to, among other things, take any and all action as is reasonably requested by the Debtors to support approval of the Disclosure Statement and confirmation of the Plan.

The Settlement resolves claims asserted by the Creditors' Committee against MID and the third party defendants for, among other things, recharacterization and/or equitable subordination of the MID Claims and claims for breaches of fiduciary duty by MID and certain officers and directors of Magna Entertainment. Given the size of the MID Claims, and the fact that such claims were asserted as secured claims with liens on substantially all of the Debtors' assets, absent the Settlement, general unsecured creditors of each of the Debtors faced the possibility of receiving no recovery on account of their claims. Under the Settlement, however, all holders of Non-MJC General Unsecured Claims, Allowed 8.55% Note Claims and Allowed 7.25% Note Claims will receive their pro rata share of the consideration provided by MID US Financing and the proceeds of certain asset sales, as set forth above. The Settlement resolves an extremely complex litigation regarding difficult claims, and a potential dispute over asset valuations, by providing equal recoveries to all general unsecured claimants. With respect to the creditors holding claims against the MJC Debtors, because MID was not asserting liens directly against the assets of such Debtors, as part of the Settlement, creditors holding claims against the MJC Debtors will receive a different treatment than unsecured creditors of the other Debtors.

## III.  OVERVIEW OF PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms and provisions of the Plan, see Article V. below, entitled "The Plan of Reorganization." The Plan represents the product of negotiations among the Debtors and key parties in interest.

The Plan provides for the classification and treatment of Claims against and Equity Interests in the Debtors. The Plan designates 35 Classes of Claims and 26 Classes of Equity Interests, which classify as Claims against and Equity Interests in the Debtors. These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Equity Interests as well as the compromise and settlement described herein.

The following table provides a summary of the classification and treatment of Claims and Equity Interests under the Plan:

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| -- | Administrative Expense Claims | No | Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, on the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim shall become an Allowed Claim, upon receipt of sufficient funds from MID Transferee, the Disbursing Agent shall (i) pay to each holder of an Allowed Administrative Expense | 100% Unimpaired |

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| | | | Claim, in Cash, the full amount of such Allowed Administrative Expense Claim or (ii) satisfy and discharge such Allowed Administrative Expense Claim in accordance with the terms and conditions of the agreements with respect thereto. | |
| -- | Priority Tax Claims | No | Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, on the Effective Date, each holder of an Allowed Priority Tax Claim shall be entitled to receive distributions in an amount equal to the full amount of such Allowed Priority Tax Claim.  At the option and discretion of MID Transferee, which option shall be exercised, in writing, on or prior to the commencement of the Confirmation Hearing, upon receipt of sufficient funds from MID Transferee, such payment shall be made by the Disbursing Agent (a) in full, in Cash, on the Effective Date, (b) in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, in full, in Cash, in equal quarterly installments, commencing on the first (1st) Business Day following the Effective Date and ending on the fifth (5th) anniversary of the commencement of the Chapter 11 Cases, together with interest accrued thereon at a rate of four percent (4%) per annum or at such other rate to be determined by the Bankruptcy Court and set forth in the Confirmation Order, or (c) by mutual agreement of the holder of such Allowed Priority Tax Claim and the Debtors or Reorganized Debtors (as directed by MID Transferee), as the case may be. | 100%<br><br>Unimpaired |
| 1 | Priority Non-Tax Claims | No | Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, unless otherwise mutually agreed upon by the holder of an Allowed Priority Non-Tax Claim and MID Transferee, upon the Disbursing Agent's receipt of sufficient funds from the MID Transferee, each holder of an Allowed Priority Non-Tax Claim shall receive from the Disbursing Agent in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Priority Non-Tax Claim, Cash in an amount equal to such Allowed Priority Non-Tax Claim on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is possible. | 100%<br><br>Unimpaired |

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| 2 | MID Claims | Yes | Subject to the provisions of Section 2.1(d) and 23.2 of the Plan, the holder of the MID Claims shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for such MID Claims:<br><br>(a)      On the Effective Date, (i) the MID LSP Sale Proceeds and the MID Thistledown Sale Proceeds, if any, or (ii) if the Operating Trusts are created, the LSP Trust Interests and/or the Thistledown Trust Interests, as applicable, entitling the holder of the MID Claims to receive the MID LSP Sale Proceeds and the MID Thistledown Sale Proceeds, as soon as practicable upon consummation of the LSP Sale and/or Thistledown Sale, if any, as applicable;<br><br>(b)      On the Effective Date:  The PA Meadows Proceeds or, in the event that the PA Meadows Litigation has not been settled or resolved by Final Order, the PA Meadows Litigation shall be assigned to MID; the MID Non-Debtor Assets; the MID Reorganized Debtor Stock; and the MID Reorganized Debtor Assets. | N/A<br><br>Impaired |
| 3 | Wells Fargo Claims | Yes | Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, unless otherwise mutually agreed upon by the holder of the Allowed Wells Fargo Claim and MID Transferee, on the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Wells Fargo Claim, the holder of the Allowed Wells Fargo Claim shall receive payment of such holder's Allowed Wells Fargo Claim in Cash. | 100%<br><br>Impaired |
| 4 | PNC Claims | No | Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, on the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed PNC Claim, each holder of an Allowed PNC Claim shall receive payment of such holder's Allowed PNC Claim in Cash.  The terms and conditions of Section 23.3 of the Plan shall not apply to the payment due to PNC Bank under Section 8.1 of the Plan. | 100%<br><br>Unimpaired |
| 5 | BMO Claims | Yes | Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, unless otherwise mutually agreed upon | 100% |

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| | | | by the holder of the Allowed BMO Claim and MID Transferee, on the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed BMO Claim, the holder of the Allowed BMO Claim shall receive payment in full of such holder's Allowed BMO Claim in Cash. | Impaired |
| 6 | Secured Claims | Yes | Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, on the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Secured Claim, the holders of Allowed Secured Claims shall receive one of the following distributions: (i) the payment of such holder's Allowed Secured Claim in Cash; (ii) the sale or disposition proceeds of the property securing an Allowed Secured Claim to the extent of the value of their respective interests in such property; (iii) the surrender to the holders of the Allowed Secured Claims of the property securing such Claim; (iv) such other distributions as shall be necessary to satisfy the requirements of chapter 11 of the Bankruptcy Code, including, without limitation, the payment of interest with respect thereto, at the lesser of (a) the non-default rate set forth in the applicable contractual documentation and (b) the rate applicable pursuant to applicable non-bankruptcy law as determined by the Bankruptcy Court or (v) such other treatment as may be agreed upon by MID Transferee and holder of the Allowed Secured Claim. The manner and treatment of Allowed Secured Claims shall be determined by MID Transferee, subject to the consent of the Debtors, in writing, to be received by the holder of the Secured Claim two (2) business days prior to the Ballot Date. | 100%<br><br>Impaired |
| 7 | 8.55% Note Claims | Yes | Commencing on the Effective Date, each holder of an Allowed 8.55% Note Claim shall receive on account of such Allowed 8.55% Note Claim:<br><br>(a)    Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, on the Effective Date, distributions of such holder's Pro Rata Share of Creditor Cash; and | 41%<br><br>Impaired |

9

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| | | | (b)      In the event that the Operating Trusts are created, such holder's Pro Rata Share of the LSP Trust Interests and/or the Thistledown Trust Interests, as applicable. | |
| 8 | 7.25% Note Claims | Yes | Commencing on the Effective Date, each holder of an Allowed 7.25% Note Claim shall receive on account of such Allowed 7.25% Note Claim:<br><br>(a)      Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, on the Effective Date, distributions of such holder's Pro Rata Share of Creditor Cash; and<br><br>(b)      In the event that the Operating Trusts are created, such holder's Pro Rata Share of the LSP Trust Interests and/or the Thistledown Trust Interests, as applicable. | 41%<br><br>Impaired |
| 9-26 | Non-MJC General Unsecured Claims | Yes | Commencing on the Effective Date, each holder of an Allowed Non-MJC General Unsecured Claim (other than holders of 8.55% Note Claims and 7.25% Note Claims, which shall receive the treatment set forth in Section 11.1 and 12.1 of the Plan, respectively) shall receive on account of such Allowed Non-MJC General Unsecured Claim:<br><br>(a)      Subject to the provisions of Sections 2.1(d) and 21.2 of the Plan, on the Effective Date, distributions of such holder's Pro Rata Share of Creditor Cash; and<br><br>(b)      In the event that the Operating Trusts are created, such holder's Pro Rata Share of the LSP Trust Interests and/or the Thistledown Trust Interests, as applicable. | 41%<br><br>Impaired |
| 27-34 | MJC Claims | Yes | Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, unless otherwise mutually agreed upon by the holder of an Allowed MJC Claim and MID Transferee, MID Transferee shall pay to each holder of an Allowed MJC Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed MJC Claim, Cash in an amount equal to one hundred percent (100%) of such holder's Allowed MJC Claim on the Effective | 100%<br><br>Unimpaired |

10

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| | | | Date. | |
| 35 | Insured Litigation Claims | Yes | Unless otherwise mutually agreed upon by the holder of an Allowed Insured Litigation Claim and the Debtors or the Reorganized Debtors, as the case may be, each holder of an Allowed Insured Litigation Claim shall be entitled, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Insured Litigation Claim, to proceed with the liquidation of such Claim, including any litigation pending as of the Petition Date and seek recovery from the applicable Insurance Carrier; provided, however, that under no circumstances, shall the holder of an Allowed Insured Litigation Claim recover from the Reorganized Debtors any amounts with respect to such Allowed Insured Litigation Claim, except with respect to the payment of a deductible which may be required thereunder, which such amount, upon settlement or resolution of the litigation underlying the Allowed Insured Litigation Claim, the holder to the Allowed Insured Litigation Claim may assert as a Non-MJC General Unsecured Claim or an MJC General Unsecured Claim, as applicable. | N/A Impaired |
| 36-61 | Equity Interests | No | On the Effective Date, all of the Debtors' Equity Interests shall be cancelled and the holders shall not be entitled to, and shall not receive or retain any property or interest in property under the Plan.<br><br>On the Effective Date, the Reorganized Magna Entertainment Stock, Reorganized Sunshine Meadows Stock, Reorganized Santa Anita Companies Stock, Reorganized MEC Land Holdings Stock, Reorganized Holdings Stock, Reorganized MEC Pennsylvania Stock, Reorganized Dixon Stock and Reorganized Old Stock shall be issued and distributed to the Reorganized Debtors Plan Administrator in accordance with provisions of Article XVI of the Plan.<br><br>On the Effective Date, the Reorganized MEC Maryland Stock, Reorganized AmTote Stock, | 0% Impaired |

11

| Class Number | Class Description | Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|---|
| | | | Reorganized GPRA Commercial Stock, Reorganized L.A. Turf Club Stock, Reorganized Pacific Racing Stock and Reorganized Palm Meadows Training Center Stock shall be issued and distributed in accordance with the terms and provisions of Sections 6.1 and 32.3 of the Plan.<br><br>The Reorganized Prince George Racing Stock, Reorganized Pimlico Stock, Reorganized Maryland Jockey Club Stock, Reorganized Maryland Jockey Club of Baltimore City Stock, Reorganized Southern Maryland Racing Stock, Reorganized Southern Maryland AA Stock, Reorganized Laurel Racing Stock and Reorganized Laurel Racing Association Stock shall be issued to the Reorganized Plan Administrator, provided, however, that in the event the MID Transferee elects to take the Reorganized MJC Debtors Stock pursuant to the MJC Option, such Reorganized Stock will be distributed in accordance with the terms of Section 6.1 of the Plan.<br><br>In the event that the LSP Sale has not been consummated, the Reorganized MEC Lone Star Stock shall be issued and transferred to the LSP Trust in accordance with the terms and provisions of Section 19.4 of the Plan.<br><br>In the event that the Thistledown Sale has not been consummated, the Reorganized Thistledown Stock shall be issued and transferred to the Thistledown Trust in accordance with the terms and provisions of Section 19.4 of the Plan. | |

## IV.  OVERVIEW OF THE DEBTORS' OPERATIONS AND CHAPTER 11 CASES

### A.    The Debtors' Corporate Structure

Magna Entertainment, the direct or indirect parent of each of the other Debtors, was incorporated in Delaware on March 4, 1999, as a wholly-owned subsidiary of the Canadian automotive-parts supplier Magna International Inc. ("Magna International").  Magna Entertainment is headquartered at 455 Magna Drive, Aurora, Ontario, Canada.  The other Debtors are incorporated in either Delaware, California, Maryland, Ohio, Oklahoma, Florida, or Ontario, Canada.

12

On March 10, 2000, Magna International separated its non-automotive assets and operations from its automotive assets and operations by distributing shares of Magna Entertainment Class A Subordinate Voting Stock ("Class A Stock") to Magna International's shareholders. Following that spin-off transaction, Magna Entertainment became a separately traded, public company controlled by Magna International.

MID is an Ontario corporation and the successor to Magna International's real estate division, which was reorganized as an autonomous business unit within Magna International between August 1998 and July 1999. MID is a real estate operating company engaged principally in the ownership, management, leasing, development and acquisition of industrial and commercial properties. Members of the Magna International group of companies are MID's primary tenants and provide approximately 98% of the annual real estate revenue generated by MID's income-producing properties.

On August 19, 2003, the shareholders of Magna International approved the spin-off of MID to Magna International's shareholders. In connection with the spin-off transaction, Magna International transferred its controlling investment in Magna Entertainment to MID and MID continues to be Magna Entertainment's controlling shareholder.

MID is the controlling shareholder of Magna Entertainment as a result of its direct or indirect ownership of all of the issued and outstanding shares of Magna Entertainment's Class B Stock ("Class B Stock") and 218,116 shares of Class A Stock. Class B Stock is entitled to 20 votes per share and Class A Stock is entitled to one vote per share. As a result of its shareholdings in Magna Entertainment, MID is able to exercise approximately 95% of the total voting power attached to Magna Entertainment's outstanding voting securities. The Board of Directors of Magna Entertainment has established a committee of independent directors to whom they have delegated the responsibility of reviewing any proposed related-party transactions, including any proposed transactions between Magna Entertainment and MID or Magna Entertainment and Magna International. In addition, and as explained more fully below, MID Islandi, is an Icelandic, indirect, wholly-owned subsidiary of MID and was one of the Debtors' secured lenders. On December 31, 2009, MID Islandi transferred its claims against the Debtors to MID US Financing, a Delaware corporation.

Mr. Frank Stronach is the Chairman of Magna International, MID and Magna Entertainment. He was the Chief Executive Officer of Magna Entertainment as of the Petition Date, but resigned such position, as of April 7, 2009. Mr. Stronach and three other members of his family are trustees of the Stronach Trust. The Stronach Trust controls MID through the right to direct a majority of its voting shares. M Unicar Inc. ("M Unicar"), a Canadian holding company, controls Magna International. M Unicar, in turn, is controlled indirectly by the Stronach Trust.

As a publicly traded company, Magna Entertainment is subject to the information disclosure requirements of the Securities Exchange Act of 1934, as amended, and applicable Canadian securities laws, and prior to the Petition Date, filed annual, quarterly, and current reports and other information with the U.S. Securities and Exchange Commission and the Canadian securities regulatory authorities.

### B.    The Debtor's Prepetition Business Operations

The Debtors are the leading owners and operators of horse racetracks in North America. The Debtors were also a leading supplier, via simulcasting, of live racing content to the inter-track, off-track betting and account-wagering markets.

13

The Debtors' primary source of revenue is the commissions they earn from pari-mutuel wagering at their racetracks.  With pari-mutuel wagering, the customers' wagers on horse races are aggregated in a commingled pool (the "Mutuel Pool") and the payoff to winning customers is determined by both the total dollar amount of wagers in the Mutuel Pool and the allocation of those dollars among the various kinds of bets.  Unlike casino gambling, racetrack customers bet against each other rather than against the Debtors and, therefore, the Debtors bear no risk of loss with respect to wagering conducted at their racetracks.  The Debtors' commission, called the "take-out," is a pre-determined percentage of the total amount wagered on each event, regardless of the outcome, and the remaining balance of the Mutuel Pool is distributed to winning patrons.

Generally, from a patron's perspective, the take-out is the same for wagers placed "on-track" (meaning placed at one of the Debtors' racetracks or otherwise directly with the Debtors) as it is for wagers on a Debtor-race placed "off-track" (meaning placed with a non-Debtor racing business, including third-party OTB locations and other racetracks that have the right to allow their customers to bet on races conducted at one of the Debtors' racetracks pursuant to simulcasting arrangements).  The percentage of the take-out the Debtors retain, however, depends on whether the wager is placed "on-track" or "off-track" and whether the patron is wagering on a live race or on a simulcast race.  The Debtors also must always pay a portion of its gross "take-out" to the horse owners in the form of purses or race winnings, which encourages horse owners and their trainers to enter horses in races at the Debtors' tracks.  Depending on the location of the racetrack, a portion of the take-out also may be allocated to the state and local government for specified uses like public education.  The amount of take-out typically varies between straight and exotic wagers on races.  Nationwide, the blended gross take-out rate is approximately twenty percent (20%).

As of the Petition Date, the Debtors owned some of the most prestigious racetracks in the world, including racetracks in California, Florida, Maryland, Texas, Oklahoma, Ohio, Oregon and Ebreichsdorf, Austria.  The Debtors also operated, under a racing services agreement, one racetrack in Pennsylvania that it previously owned.  The Debtors own two (2) horse boarding and training centers, Palm Meadows Training Center in Florida and Bowie Training Center in Maryland.  The racetracks, which are described in greater detail below, include seven thoroughbred racetracks, one standardbred (harness racing) racetrack and two racetracks that run both thoroughbred and quarterhorse meets.

Horse racing is a highly regulated industry.  In the United States, individual states control the operations of racetracks located within their respective jurisdictions with the intent of, among other things, protecting the public from unfair and illegal gambling practices, generating tax revenue, licensing racetracks and operators and preventing organized crime from being involved in the industry.  Although the specific form may vary, states that regulate horse racing generally do so through a horse racing commission or other gambling regulatory authority.  Regulatory authorities perform background checks on all racetrack owners prior to granting them the necessary operating licenses.  State regulation of horse races extends to virtually every aspect of racing and usually extends to details such as the presence and placement of specific race officials, including timers, placing judges, starters and patrol judges.

In the United States, interstate pari-mutuel wagering on horse racing is also subject to the Federal Interstate Horseracing Act of 1978 and the Federal Interstate Wire Act of 1961.  As a result of these two statutes, racetracks can commingle wagers from different racetracks and wagering facilities and broadcast horse racing events to other licensed establishments.

As of the Petition Date, the Debtors satisfied the applicable licensing requirements of the racing and gambling regulatory authorities in each state or province where they maintained racetracks and/or carried on business, including the California Horse Racing Board, the Florida Department of

14

Business and Professional Regulation Division of Pari-Mutuel Wagering, the Texas Racing Commission, the Maryland Racing Commission, the Virginia Racing Commission, the Oklahoma Horse Racing Commission, the Ohio State Racing Commission, the Pennsylvania State Harness Racing Commission, the Pennsylvania Gaming Control Board, the Nevada Gaming Commission, the New Jersey Casino Control Commission, the Oregon Racing Commission and the Government of the Province of Lower Austria.

1.  **Racetracks.**

    a.  **Gulfstream Park and the Palm Meadows Training Center**

    Gulfstream Park, which opened in 1939, is situated on approximately 250 acres of land in the cities of Hallandale and Aventura, between Miami and Fort Lauderdale in Florida, and is owned by Debtor Gulfstream Park Racing. The Breeders' Cup, one of the preeminent series of races in the United States, was held at Gulfstream Park in 1989, 1992 and 1999. In 2009, average daily attendance at Gulfstream Park was approximately 4,000 customers per live racing day. Gulfstream Park had total "handle" during 2009 of approximately $674 million, including wagers made at (i) Gulfstream Park on its races, (ii) other wagering venues and through various account wagering systems on Gulfstream Park's races and (iii) Gulfstream Park on imported races through Gulfstream Park's inter-track facilities.

    The Debtors completed a two (2) year redevelopment of Gulfstream Park in 2006. The project included significant modifications and enhancements to the racing surfaces and stable area, including the construction of a new, wider turf course and the construction of a modern clubhouse/grandstand offering an array of restaurants and entertainment facilities.

    Gulfstream Park also has casino operations with approximately 825 slot machines, a poker lounge offering twenty (20) no-limit tables, and a simulcast racing area. Gulfstream Park offers customers a number of different dining and entertainment options and an improved quality of entertainment, including the addition in August 2007 of Christine Lee's, a well known local restaurant with a thirty-seven (37) year history in Southern Florida.

    In connection with the redevelopment of Gulfstream Park, MEC decided to develop and enhance the lands surrounding Gulfstream Park. As a result, GPRA Commercial, a wholly-owned subsidiary of GPRA, formed a joint venture with FC Gulfstream Park, Inc. ("Forest City") pursuant to that certain Limited Liability Company Agreement of The Village at Gulfstream Park (the "Gulfstream LLC Agreement"), dated May 1, 2005. In connection with the Gulfstream LLC Agreement, GPRA entered into a ninety-nine (99) year ground lease with The Village at Gulfstream Park for the development of that property and GPRA Commercial owns a fifty percent (50%) interest in the joint venture.

    The Village at Gulfstream Park is an ongoing development project of restaurants, entertainment and retail outlets in conjunction with and adjacent to the Debtors' horse racing facility, Gulfstream Park. The Village at Gulfstream Park has entered into certain leases with known entities such as Crate & Barrel, Williams-Sonoma and West Elm. Upon completion, the Debtors expect The Village at Gulfstream Park to result in the development of 1,500 condominiums, 750,000 square feet of retail space, 140,000 square feet of office space, a 500-room hotel and a 2,500 seat cinema. The Village at Gulfstream Park hosted its grand opening on February 11, 2010.

    In 2002, the Debtors developed a horse boarding and training center that sits on approximately 324 acres of land in Palm Beach County, Florida and is operated in conjunction with

Gulfstream Park ("Palm Meadows").   Palm Meadows is owned by Debtor Palm Meadows Training Center.

Palm Meadows opened in November 2002 and currently includes a $1^1/_8$-mile dirt track, a 7/8 turf course, one-mile dirt jogging track, stalls for up to 1,424 horses, administrative offices, dormitories, a pavilion and a 60,000 square foot compost building.  Palm Meadows is primarily used by horse trainers, many of whom train the horses that race at Gulfstream Park.  In 2009, Palm Meadows' total revenues were approximately $2.7 million.

### b.      Golden Gate Fields

Golden Gate Fields is a thoroughbred racetrack situated on approximately 154 acres of land located in the cities of Albany and Berkeley, California.  Golden Gate Fields is operated by Debtor Pacific Racing.  Golden Gate Fields' racing season lasts for approximately 127 racing days.  The season is split throughout the year and has varied for the last few years.  Average daily attendance in 2009 was approximately 2,500 customers per live racing day.  Golden Gate Fields had total "handle" during 2009 of approximately $487 million, including wagers made at (i) Golden Gate Fields on its races, (ii) other wagering venues and through various account wagering systems on Golden Gate Fields' races (excluding wagers placed in Southern California, and wagers placed via advanced deposit wagering systems licensed to operate in California) and (iii) Golden Gate Fields on imported races through Golden Gate Fields' inter-track facilities.

Golden Gate Fields' facilities include a one-mile track and a 7/8-mile turf course, stalls for over 1,350 horses, a main grandstand with seating for approximately 8,000 customers, a clubhouse with seating for approximately 4,500 customers and parking for over 4,100 cars.  Golden Gate Fields also features several restaurants, including the Turf Club with seating for approximately 1,200 customers.

### c.      Santa Anita Park and The Shops at Santa Anita

The Debtors also own and operate Santa Anita Park, one of the racing industry's jewels, located in Arcadia, California.  Santa Anita Park is situated on approximately 305 acres of land approximately 14 miles northeast of Los Angeles, California, and is owned by Debtor Santa Anita Companies.  Debtor L.A. Turf Club, a wholly-owned subsidiary of The Santa Anita Companies, holds the racing license and operates the racetrack at Santa Anita Park.

Santa Anita Park hosts the Santa Anita Meet, which generally commences on December 26th and runs until the end of April each year and, during such meet, the Santa Anita Handicap, an American thoroughbred horse race, is held annually in early March, and the Santa Anita Derby, is held in early April.  Santa Anita Park also was the site of the Breeders' Cup World Thoroughbred Championships in 2003, 2008 and 2009.  The average daily attendance at Santa Anita Park in 2009 was approximately 8,400 customers per live racing day, which represents one of the highest average daily attendance figures for all North American racetracks.  Santa Anita Park also operates an inter-track wagering facility, where customers can wager on races that are imported to Santa Anita Park from other racetracks, throughout the year.

In addition, the Debtors lease Santa Anita Park to The Oak Tree Racing Association, which is an unaffiliated not-for-profit California association that holds a license to host the Oak Tree Meet for five to six weeks each Fall.  Pursuant to this lease, which terminates the later of November 30, 2016 or the close of the 2016 Oak Tree Meet, The Santa Anita Companies hosts and operates The Oak Tree Meet.  In connection therewith, The Santa Anita Companies receives a percentage of the on-track

handle wagered on races run during the Oak Tree Meet, and a percentage of The Oak Tree Racing Association net commissions from fees earned on racing content, exported from, or imported to, Santa Anita Park.

Santa Anita Park had one of the highest total handles of all North American racetracks in 2009, totaling approximately $1,214 million.  This amount includes wagers made at: (i) Santa Anita Park on its races (including The Oak Tree Meet), (ii) other wagering venues and through various account wagering operations on Santa Anita Park's races (excluding wagers placed in Northern California and via account wagering systems licensed to operate in California) and (iii) Santa Anita Park on imported races through Santa Anita Park's inter-track facilities.

Santa Anita Park's facilities include a large art deco-style grandstand structure with seating for approximately 19,000 customers, as well as standing room for additional customers, a one-mile oval dirt track and a 7/8-mile turf course, stalls for approximately 2,000 horses, and parking facilities sufficient to accommodate approximately 17,000 cars.  During the summer of 2007, Santa Anita Park installed a synthetic track surface in response to a mandate from the California Horse Racing Board.  Due to track drainage problems, however, Santa Anita lost eight (8) racing days in 2008.  In response to these problems, in July 2008, Santa Anita commenced an overhaul of its main track, which included removal of the entire asphalt base, and reconstituting the track with a mixture of a synthetic material of binder and fiber.

Furthermore, in January 2004, the Debtors completed certain renovation and improvement projects that included the opening of Sirona's, a 25,000 square foot sports bar and restaurant located across from the walking ring.  Sirona's operates year-round from an open-air terrace overlooking a seven acre garden paddock.

In September 2006, Santa Anita Commercial Enterprise, Inc. ("SA Commercial"), a wholly owned non-debtor subsidiary of Magna Entertainment, entered into a Limited Liability Company Agreement with Santa Anita Commercial Holdings Co., LLC, an affiliate of Caruso Affiliated, to develop approximately fifty-one (51) acres of undeveloped land surrounding Santa Anita Park (the "The Shops at Santa Anita").  SA Commercial owns a fifty percent (50%) interest in The Shops at Santa Anita.

This project contemplates a mixed-use development with approximately 800,000 square feet of retail space, entertainment and restaurants as well as approximately 4,000 parking spaces. Construction at The Shops at Santa Anita has been delayed due to zoning related issues.

### d.    Remington Park

Remington Park is situated on approximately 370 acres adjacent to Interstates 35 and 44 in Oklahoma City, Oklahoma, and was owned by Old RP.

In 2009, Remington Park's racing schedule consisted of two meets totaling 117 days of live racing, which included a 50 day quarter horse meet from mid-March through early June and a 67 day thoroughbred meet from mid-August through mid-December 2009. The real property underlying Remington Park is leased from the Oklahoma Zoological Trust, pursuant to a lease which extends through 2013, with options to renew until 2063 in ten-year increments.

Remington Park's horseracing handle was approximately $122 million in 2009, including wagers made at (i) Remington Park on its races, (ii) other wagering venues and through various account

wagering operations on Remington Park's races and (iii) Remington Park on races imported to its inter-track and associated off-track betting facilities.

Remington Park also operates 700 electronic gaming machines in its casino. During 2009, the machines generated an average daily net win per unit of $271. Under the terms of Oklahoma state legislation, the distribution of revenues from Remington Park's electronic gaming operations varies based on the annual gross gaming revenues less all monetary payouts ("Adjusted Gross Revenues"). The legislation allocates between ten percent (10%) and thirty percent (30%) of the Adjusted Gross Revenues to the State, primarily for the funding of education, between twenty percent (20%) and thirty percent (30%) for the benefit of the horsemen, and the remaining fifty percent (50%) to sixty percent (60%) to Remington Park. Remington Park was eligible to introduce an additional 50 machines in January 2010. In addition, Remington Park is permitted to furnish 100% of its gaming floor with Class III gaming machines.

Remington Park's facilities include a grandstand with seating for approximately 20,000 customers, 21 suites for corporate and group events, a one-mile dirt track, a 7/8-mile turf course, stalls for approximately 1,400 horses, lighting to permit night racing and parking facilities sufficient to accommodate approximately 8,000 cars.

As discussed in greater detail in Section 7.a. of this Disclosure Statement, on January 1, 2010, the Debtors consummated the sale of Remington Park to Global Gaming RP, LLC.

### e. The Maryland Jockey Club: Pimlico Race Course, Laurel Park and the Bowie Training Center

#### (i) Pimlico Race Course

Pimlico Race Course is situated on approximately 116 acres of land in Baltimore, Maryland, approximately 30 miles from Laurel Park. The Preakness Stakes, the middle jewel of thoroughbred racing's Triple Crown, has run annually and without interruption at Pimlico Race Course on the third Saturday of each May since 1909. Last year's race, which occurred on May 16, 2009, marked the 134th anniversary of the classic horse racing event.

In 2009, Pimlico Race Course's season lasted for approximately twenty (20) racing days that fell between early April and mid-June. During this meet, Pimlico Race Course hosted ten (10) graded stakes races, including The Preakness Stakes. Attendance for the 2009 Preakness Stakes was approximately 77,850 customers. Average daily attendance in 2009, excluding the Preakness Stakes, was approximately 3,200 customers per live racing day.

Pimlico Race Course's handle was approximately $189 million in 2009, which amount includes wagers made at (i) Pimlico Race Course on its races, (ii) other wagering venues and through various account wagering operations on Pimlico Race Course's races and (iii) Pimlico Race Course on imported races through Pimlico Race Course's inter-track facilities.

Pimlico Race Course's facilities include a grandstand with seating for approximately 13,000 customers, a one-mile dirt track with 1 3/16-mile and 3/4-mile chutes, a 7/8-mile turf course, stalls for approximately 700 horses and parking facilities sufficient to accommodate approximately 3,500 cars. During the Preakness Stakes, temporary seating facilities and the use of Pimlico Race Course's infield enable Pimlico Race Course to accommodate over 100,000 patrons.

(ii)     Laurel Park

Laurel Park is located on approximately 236 acres of land in Laurel, Maryland, between Washington, D.C. and Baltimore.  Laurel Park's racing season in 2009 was 125 days, and complements Pimlico Race Course's racing season by holding race meets from January to April, in August, and from September to December.  Average daily attendance at Laurel Park in 2009 was approximately 2,400 customers per live racing day.

Laurel Park's handle was approximately $276 million in 2009, which amount includes wagers made at (i) Laurel Park on its races, (ii) other wagering venues on Laurel Park's races through various account wagering operations and (iii) Laurel Park on imported races through Laurel Park's inter-track facilities.

Laurel Park's facilities include a grandstand with seating for approximately 5,200 customers, a 1 1/8-mile dirt track with a seven and one half-furlong chute which opened in January 2005, and a 7/8-mile turf course which opened in September 2005.  Laurel Park has stalls for approximately 1,000 horses and parking facilities sufficient to accommodate approximately 8,000 cars.

(iii)    The Bowie Training Center

The Bowie Training Center is located in Prince George's County, Maryland on approximately 162 acres situated approximately 8 miles from Laurel Park and 30 miles from Pimlico Race Course.  Originally opened in 1914 as a racetrack, the property has been used since 1985 as a year-round training center to support thoroughbred racing at Pimlico Race Course and Laurel Park.  In 2009, the cost to operate the Bowie Training Center was approximately $2.1 million.

The facility includes approximately 1,000 stalls, a one-mile oval dirt main track, and a quarter mile dirt-covered track.  In addition, the Bowie Training Center includes seventeen (17) barns and dormitories capable of accommodating up to 224 grooms.

**f.     Thistledown**

Thistledown racecourse sits on approximately 128 acres in North Randall, Ohio, and is owned by Debtor Thistledown.  Thistledown's 2009 racing season consisted of 122 racing days that fell between April and October.  Thistledown hosts the Summit, Thistledown, Randall and Cranwood meets.  Annually, Thistledown hosts the Ohio Derby, which is the premier graded stakes race in Ohio.  Throughout the year, Thistledown operates as an inter-track wagering facility where customers can wager on races that are imported to Thistledown from other racetracks.

In 2009, Thistledown's handle was approximately $147 million, which amount includes wagers made at (i) Thistledown on its races, (ii) other wagering venues and through various account wagering operations on Thistledown's races and (iii) Thistledown on races imported through Thistledown's inter-track facilities. Thistledown also exports its simulcast signal to as many as 700 off-track and inter-track wagering facilities in the United States.

Thistledown's facilities include a grandstand with seating for approximately 8,000 customers, a 600 seat tiered dining room, a 200 seat private party suite, a luxury suite for corporate and group events, a one-mile oval track, stalls for approximately 1,200 horses and parking for approximately 6,000 cars.

19

As described in further detail in Section 7.c. of this Disclosure Statement, on September 15, 2009, the Bankruptcy Court approved the sale of Thistledown to Harrah's Operating Company, Inc.

g.     **Lone Star Park at Grand Prairie**

MEC Lone Star operates Lone Star Park at Grand Prairie, one of the newest horse racing facilities in the United States, located approximately twelve (12) miles west of Dallas, Texas.  Lone Star Park hosts thoroughbred and American quarter horse meets.

In 2009, Lone Star Park's handle was approximately $231 million, which amount includes wagers made at (i) Lone Star Park on its races, (ii) other wagering venues and through various account wagering operations on Lone Star Park's races and (iii) Lone Star Park on races imported through Lone Star Park's inter-track facilities.

As described in further detail in Section 7.b. of this Disclosure Statement, on October 29, 2009, the Bankruptcy Court approved the sale of Lone Star Park to Global Gaming LSP, LLC.

h.     **Portland Meadows**

Portland Meadows is a thoroughbred racetrack located on approximately 110 acres in the Delta Park area of Portland, Oregon, and is operated by Magna Entertainment's wholly-owned non-debtor subsidiary, MEC Oregon Racing, Inc. ("MEC Oregon"), pursuant to a long-term operating lease with a consortium of individuals and entities.  MEC Oregon owns an approximate twenty-two percent (22%) interest in the real property upon which the Portland Meadows facility is located and the remainder of the property is owned by third parties.  Under the terms of the operating lease, MEC Oregon has the exclusive right to use and operate the racetrack for horse racing and special purposes, including the operation of a golf course.  The operating lease does not have a termination date, however it may be terminated if MEC Oregon fails to maintain its racing license or comply with the terms of the operating lease.

Portland Meadows offers approximately 68 live racing days between October and April.  Portland Meadows' facilities include a grandstand with seating for approximately 10,000 customers, a one-mile sand track, stalls for approximately 850 horses and parking facilities to accommodate approximately 2,500 cars.

In 2009, Portland Meadows' handle was approximately $92 million, which amount includes wagers made at (i) Portland Meadows on its races, (ii) other wagering venues and through various account wagering operations on Portland Meadows' races and (iii) Portland Meadows on races imported through Portland Meadows' inter-track and associated off-track betting facilities.

i.     **Magna Racino**

Magna Racino is situated on approximately 650 acres in Ebreichsdorf, just outside Vienna, Austria and is owned by Magna Entertainment's wholly owned non-debtor subsidiary, MEC Racing Holding GmbH.  During 2008, over 16,000 guests visited Magna Racino on 14 race days between April and November.

Magna Racino features both thoroughbred and standardbred racing on three different tracks, a 5/8-mile sand track, a one-mile sand track and a one-mile turf course.  Magna Racino's

sportsbook facility, which allows patrons to place bets on sporting events, is operated by Admiral Sportwetten AG ("Admiral") and entitles Magna Racino to a percentage of all the wagers placed with Admiral at Magna Racino. Magna Racino also has 150 video lottery terminals operated by the Austrian Lottery, a division of Casinos Austria AG. Pursuant to that agreement, Magna Racino receives a percentage of the gross profit and recovers certain costs from the video lottery terminal operations. In 2009, Magna Racino generated total revenues of approximately $3.0 million, including rental and recovered costs generated by the video lottery terminals.

As discussed in greater detail in Section 7.g. of this Disclosure Statement, on July 31, 2009, the Bankruptcy Court approved the sale of Magna Racino to Bvsarantaexi Beteiligungsverwaltung GmBH and that sale was consummated on October 1, 2009.

## 2.    Non-Racetrack Operations

The Debtors complement their live-racing operations with simulcast wagering, casino gaming at some venues, its own OTB facilities in certain states, and a national account-wagering business known as XpressBet that permits customers to place wagers by telephone or Internet for races run at more than 100 North American racetracks, and internationally on races in Australia, South Africa, Dubai, Germany, the United Kingdom and Hong Kong. In 2009, XpressBet's total revenues were approximately $46.0 million. MagnaBet, the European equivalent of XpressBet, permits customers residing in European countries to place wagers on horse racing using the Internet or telephone. The Debtors' U.S. and European operations also included the production and sales operations for StreuFex, a horse bedding product. As discussed in greater detail in Section 7.f. of this Disclosure Statement, on September 1, 2009, the Debtors consummated the sale of the StreuFex operations to Ing Johann Payerl.

Magna Entertainment also owns Debtor AmTote, a provider of totalisator services to the pari-mutuel industry. AmTote Canada Inc. ("AmTote Canada") and AmTote Australasia, Pty, Limited ("AmTote Australasia") are wholly-owned non-debtor subsidiaries of AmTote. Together, AmTote, AmTote Canada, and AmTote Australasia provide a variety of wagering interfaces and connectivity products for racetracks, off-track betting operators and account wagering providers, both domestically and abroad. The interface enables customers to place bets on horse races that are made either at a racetrack, an off-track betting facility, or through an account wagering provider, such as a bet submitted via the Internet, calculates the aggregate total of the bets, and determines the payoff odds. AmTote provides totalisator services to 40% of the racing industry and has approximately seventy-four (74) contracts for such services. AmTote Canada has approximately nine (9) contracts for totalisator services. In 2009, AmTote's consolidated revenues, including AmTote Canada and AmTote Australasia, were approximately $39 million.

## 3.    Real Property

### a.    The Ocala Property

In 2002, Debtor MEC Holdings and Debtor Sunshine Meadows (collectively, the "Ocala Debtors") purchased certain real property located in Ocala, Florida (the "Ocala Property"). The Ocala Property consists of approximately 490 acres and is located in Marion County, Florida, one of the major thoroughbred breeding centers of the world. The Ocala Debtors purchased the Ocala Property with the intent to develop the property into either a racetrack or a horse training facility. However, due to, among other reasons, the economic climate and financing availability, the Ocala Debtors did not pursue the development of the Ocala Property.

21

As discussed in greater detail in Section 7.d. of this Disclosure Statement, on September 2, 2009, the Bankruptcy Court entered an order authorizing the Debtors to sell the Ocala Property to Par Avenue Properties LLC and the sale closed on September 17, 2009.

### b.    The Dixon Property

In 2001, Debtor MEC Dixon purchased certain property in Dixon, California (the "Dixon Property").  The Dixon Property consists of approximately 260 acres located in Northern California.  MEC Dixon purchased the Dixon Property with the intent to develop the property into a racetrack to be known as "Dixon Downs."  In November 2006, the City of Dixon granted entitlements for the development of Dixon Downs and, until April 2007, MEC Dixon was planning for such development of the Dixon Property.  However, a voter referendum in April 2007 voted down the project and the municipality rescinded the entitlements.  MEC Dixon did not pursue further development.

As discussed in greater detail in Section 7.e. of this Disclosure Statement, on November 19, 2009, the Bankruptcy Court entered an order authorizing the sale of the Dixon Property to Ocala Meadows Lands LLC and that sale closed on November 30, 2009.

### C.    The Debtor's Capital Structure and Prepetition Financing

The Debtors have a highly leveraged capital structure, including senior and junior secured financing obligations of approximately $500 million and subordinated unsecured note obligations of approximately $225 million.  The instruments evidencing these obligations are described below.

### 1.    Secured Financings

### a.    PNC Agreements

As of the Petition Date, certain of the Debtors were parties to the PNC Agreements.  Amounts outstanding under the PNC Agreements bear interest at U.S. prime rate or London Interbank Offered Rate ("LIBOR") plus 2.6%, in the case of the two term loans, and 7.7% in the case of the converted term loan.  Each of the PNC Agreements permits prepayment without penalty in certain circumstances.  The maturity dates of the three PNC Agreement are December 1, 2013, June 7, 2017 and December 1, 2013.  On February 27, 2009, PNC notified the Debtors that they were in default under the PNC Agreements for failure to comply with certain financial covenants.  The obligations of the Debtors under the PNC Agreements are secured by security interests in substantially all of the assets of the Debtors located in Maryland and, among other things, deeds of trust on land, buildings and improvements on the Pimlico and Laurel Park racetracks and the Bowie Training Center. As of the Petition Date, the aggregate principal amount outstanding under the PNC Agreements was approximately $13.1 million.

### b.    The Wells Fargo Agreement

As of the Petition Date, Santa Anita Companies was party to the Wells Fargo Agreement.  The Wells Fargo Agreement, as amended, provides for a secured term loan in the amount of approximately $67.5 million, that bears interest at LIBOR plus 2% and a revolving loan not to exceed $7.5 million.  Debtor L.A. Turf Club is guarantor under the Wells Fargo Agreement.  Santa Anita Companies' obligations pursuant to the Wells Fargo Agreement are secured by a first priority lien on the real property of the Santa Anita Park racecourse, as well as on the capital stock of Santa Anita Companies and the capital stock of L.A. Turf Club and an assignment of the lease between L.A. Turf Club, the

racetrack operator, and Santa Anita Companies.  The maturity date for both facilities is October 31, 2012.  In January 2009, Santa Anita Companies notified Wells Fargo, that it had not met a financial covenant under the Wells Fargo Agreement.  As of the Petition Date, the aggregate principal amount outstanding under the Wells Fargo Agreement was approximately $61.2 million with respect to the term loan and approximately $3.9 million under the revolver.

   **c.**  **The BMO Credit Agreement**

    As of the Petition Date, Magna Entertainment was party to the BMO Credit Agreement.  The BMO Credit Agreement, as amended, provided for a secured revolving facility with an aggregate commitment of $40 million that matured on March 5, 2009 and was secured by a first priority lien on all of Magna Entertainment's present and after-acquired personal property, a first mortgage on the real property of the Golden Gate Fields racecourse, and a second mortgage on the real property of the Santa Anita Park racecourse.  The loans under the facility bear interest at the U.S. base rate plus 5% or the LIBOR plus 6%.  Magna Entertainment's obligations under the BMO Credit Agreement were guaranteed by Pacific Racing, MEC Land Holdings, Santa Anita Companies, and L.A. Turf Club.  In January 2009, BMO notified Magna Entertainment that Magna Entertainment had not met a financial covenant under the BMO Credit Agreement.  As of the Petition Date, the aggregate amount outstanding under the BMO Credit Agreement was approximately $39.9 million, which included issued letters of credit totaling approximately $1.9 million.

   **d.**  **The Remington Park Agreement**

    As of the Petition Date, Debtor Old RP was party to that certain Loan Agreement (the "Remington Park Agreement"), dated July 22, 2005, between Old RP, as borrower, and MID Islandi, as lender, and the guarantors identified below.  The Remington Park Agreement, as amended, provided $34.2 million to finance the build-out of Remington Park's casino facility and is evidenced by, among other things, a grid promissory note in the amount of $40 million, and secured by, among other things, a perfected first priority encumbrance on substantially all of Remington Park, Inc.'s leasehold interest in the Remington Park property (real and personal).  The loan under the Remington Park Agreement has a ten-year term from the completion date of the reconstruction project, which was November 28, 2005.  Certain cash from the operations of Remington Park were required to be used to pay deferred interest on the loan plus a portion of the principal.  In addition, the Remington Park Agreement requires a quarterly cash flow sweep of not less than 75% of Remington Park's excess cash flow during each fiscal quarter.  This cash flow sweep was applied solely to capitalized interest.  Remington Park, Inc.'s obligations under the Remington Park Agreement are guaranteed by the Palm Meadows Training Center, Gulfstream Park Racing Association, Inc., and Magna Entertainment and secured by such guarantors' assets.  As of the Petition Date, the aggregate principal amount and interest outstanding under the Remington Park Agreement was approximately $22.8 million.

   **e.**  **The Gulfstream Agreement**

    As of the Petition Date, Debtor Gulfstream Park Racing was party to that certain Third Amended and Restated Gulfstream Loan Agreement (the "Gulfstream Agreement"), dated December 22, 2006, between Gulfstream Park Racing Association, Inc., as borrower, and MID Islandi, as lender, and the guarantors identified below.  The Gulfstream Agreement, as amended, provides for a first tranche of $115 million, a second tranche of $25.75 million and a third tranche of $21.5 million.  Each of these tranches is secured by the operations forming Gulfstream Park, and over all of the other assets of Gulfstream Park, Remington Park and Palm Meadows, excluding licenses and permits, and certain assets of Magna Entertainment.  The first tranche was used to fund the reconstruction of facilities at Gulfstream

23

Park and has a ten-year term that commenced on February 1, 2006, and requires monthly blended payments of principal and interest based on a 25-year amortization period at a fixed rate of 10.5% per annum after February 1, 2006.  The second tranche is to fund the design and construction of phase one of a slots facility to be located in the existing Gulfstream Park clubhouse building and certain start-up costs, including the acquisition of 500 slot machines.  The second tranche matures on December 31, 2011, bears interest at a fixed rate of 10.5% per annum compounded semi-annually, and requires blended payments of principal and interest based on a 25-year amortization period.  In addition, the second tranche requires a mandatory annual cash flow sweep of not less than 75% of Gulfstream Park's total excess cash flow, after permitted capital expenditures and debt service, to be used to repay the additional principal made available pursuant to this tranche.  Finally, the third tranche is to fund the design and construction of phase two of the slots facility.  The third tranche matures on December 31, 2011, bears interest at a fixed rate of 10.5% per annum, compounded semi-annually, and requires blended payments of principal and interest based on a 25-year amortization period.  However, $100 million under the Gulfstream Agreement was due March 20, 2009.

Gulfstream Park Racing Association, Inc.'s obligations under the Gulfstream Agreement were guaranteed by Magna Entertainment, Remington Park, Inc., GPRA Thoroughbred Training Center and GPRA Commercial Enterprises, Inc.  As of the Petition Date, the aggregate principal amount including interest outstanding under the Gulfstream Agreement was approximately $170.8 million.

   f.      **SunTrust Agreement**

As of the Petition Date, Debtor AmTote was party to that certain Amended and Restated Loan and Security Agreement (the "SunTrust Agreement"), dated October 25, 2007, between AmTote, as borrower, and SunTrust Bank, as lender.  The SunTrust Agreement provided for a secured term loan of $4.2 million and an equipment loan up to $10 million and is secured by all of AmTote's personal property and a stock pledge agreement.  AmTote's obligations under the SunTrust Agreement were guaranteed by AmTote Canada. The loans under the SunTrust Agreement matured on May 30, 2009.  As of the Petition Date, the aggregate principal amount outstanding under the SunTrust Agreement was approximately $4.2 million.

In order to avoid any action SunTrust Bank could have taken against AmTote Canada due to AmTote's chapter 11 filing and to avoid the costs and expenses associated with a parallel bankruptcy filing for AmTote Canada in Canada, the Debtors used part of the proceeds from the DIP Agreement to satisfy and fully discharge its obligations and release its liens under the SunTrust Agreement.

   g.      **The Bridge Loan Agreement**

As of the Petition Date, Debtor Magna Entertainment was party to the Bridge Loan Agreement.  The Bridge Loan Agreement, as amended, provided for a non-revolving loan in the amount of $125 million that bears interest at a rate of LIBOR plus 12.0% per annum and is secured by first, second or third priority liens or mortgages on substantially all of the Debtors' properties.  The Bridge Loan Agreement was required to be repaid by way of the payment of the net proceeds of any asset sale, any equity offering, or any debt offering, subject to specified amounts required to be paid to eliminate other prior-ranking indebtedness.  The Bridge Loan Agreement matured on March 20, 2009.  Magna Entertainment's obligations under the Bridge Loan Agreement were guaranteed by Pacing Racing, MEC Land Holdings, Gulfstream Park Racing, Palm Meadows Training Center, MEC Dixon, MEC Holdings, Sunshine Meadows, Thistledown, MEC Maryland, and 30000 Maryland.  The guarantees were secured by liens over the lands owned by Golden Gate Fields, Santa Anita Park, and Thistledown, and liens over the undeveloped land in Dixon, California and Ocala, Florida, as well as by pledges of the shares of certain Magna Entertainment subsidiaries.  The loan was also cross-defaulted to all other obligations to MID

24

Islandi and to other significant indebtedness of the Debtors and certain subsidiaries. As of the Petition Date, the aggregate principal amount outstanding under the Bridge Loan Agreement was approximately $125 million.

### h.        The 2008 Loan Agreement

As of the Petition Date, Debtor Magna Entertainment was party to the 2008 Loan Agreement. The 2008 Loan Agreement provided for a secured non-revolving loan in the amount of $125 million, available in four tranches. The first tranche was drawn in the amount of $50 million (plus costs and fees) and was provided for use solely to fund (i) operations, (ii) payments of principal or interest and other costs under the 2008 Loan Agreement and under other loans provided by MID Islandi to Magna Entertainment, (iii) mandatory payments of interest in connection with other existing debt of Magna Entertainment, (iv) maintenance and capital expenditures and (v) capital expenditures required pursuant to the terms of certain joint venture arrangements Magna Entertainment had in Florida and California. The first tranche had a maturity of March 20, 2009.

The second and third tranches were made available for drawdown: (i) in an amount of up to $30 million under the second tranche to fund a slots-license application on behalf of the Magna Entertainment subsidiary that owns and operates Laurel Park in Maryland, following MID's satisfaction with such application and related matters; and (ii) in an amount of the lesser of (a) the amount required to pay out the amount owing under the PNC Agreement and (b) $15 million under the third tranche. On February 12, 2009, the Maryland VLT Facility Location Commission advised that it would not accept the Laurel Park slots application and stated that the application did not meet certain minimum requirements set out in the bidding process. This resulted in the maturity of the second and third tranches. Magna Entertainment was required to repay the second tranche with any refunds of any fees if the Laurel Park slots application is denied or withdrawn.

The 2008 Loan Agreement was secured by first, second, third, or fourth priority liens or mortgages on substantially all of the Debtors' properties. Magna Entertainment's obligations under the 2008 Loan Agreement are guaranteed by Pacific Racing, MEC Land Holdings, Santa Anita Companies, L.A. Turf Club, Southern Maryland AA, Laurel Racing, Maryland Jockey Club, Maryland Racing, Inc., Thistledown, MEC Maryland, and 30000 Maryland. As of the Petition Date, the aggregate principal amount outstanding under the 2008 Loan Agreement was approximately $51.8 million.

### 2.        Convertible Unsecured Notes

Magna Entertainment issued two series of convertible subordinated notes: (i) the 8.55% Notes, maturing June 15, 2010; and (ii) the 7.25% Notes, maturing December 15, 2009, (together, the "Subordinated Notes"). The Subordinated Notes are unsecured obligations of Magna Entertainment.

### a.        8.55% Notes

In June 2003, Magna Entertainment issued $150.0 million of 8.55% Notes which mature on June 15, 2010. The 8.55% Notes are convertible at any time at the option of the holders into shares of Class A Stock at $141.00 per share (adjusted from $7.05 per share as a result of a reverse stock split). The conversion price may be adjusted under certain circumstances. The 8.55% Notes were redeemable in whole or in part, at Magna Entertainment's option, on or after June 2, 2006, at the principal amount plus accrued and unpaid interest, provided that, in connection with any redemption that occurred on or after June 2, 2006 and before June 2, 2008, the closing price of the Class A Stock exceeded 125% of the conversion price for at least 20 trading days in a 30 consecutive trading day period ending on the trading

25

day prior to mailing of the notice of redemption.  As of the Petition Date, all the 8.55% Notes remained outstanding.

       **b.**       **7.25% Notes**

In December 2002, Magna Entertainment issued $75.0 million of 7.25% Notes which matured on December 15, 2009.  The 7.25% Notes were convertible at any time at the option of the holders into shares of Class A Stock at $170.00 per share (adjusted from $8.50 per share as a result of a reverse stock split).  The conversion price may be adjusted under certain circumstances.  The 7.25% Notes were redeemable in whole or in part, at Magna Entertainment's option, from and after December 21, 2005, at the principal amount plus accrued and unpaid interest, provided that, in connection with any redemption that occurred on or after December 21, 2005 and before December 15, 2007, the closing price of the Class A Stock exceeded 125% of the conversion price for at least 20 trading days in a 30 consecutive trading day period ending on the trading day prior to mailing of the notice of redemption.  As of the Petition Date, all the 7.25% Notes remained outstanding.

      **D.**       **Significant Events Leading to Commencement of the Chapter 11 Case**[1]

       **1.**       **Highly-Leveraged Structure**.

The Debtors have a highly leveraged capital structure, including junior and senior secured financing obligations of more than $500 million and unsecured note obligations of $225 million.  The Debtors incurred recurring net losses due in part to large interest payments on its long-term debt, payment of fees to extend the maturity dates of certain loan agreements, and depreciation and asset impairment write-downs in connection with capital expenditures related to the redevelopment of Gulfstream Park and the construction of the Palm Meadows Training Center and Magna Racino facilities.  The Debtors' highly-leveraged capital structure hindered their ability to improve operations and led the Debtors to determine that they needed to undergo a financial restructuring to address their over-leveraged balance sheet.

In addition, the Debtors were faced with the near-term maturity on substantially all of their debt, as well as a substantial concern regarding their ability to service such debt when it became due.  Specifically, as a result of MID's termination of the Transaction Agreement (as discussed below) (i) the maturities of the BMO Credit Agreement, the Bridge Loan Agreement and the 2008 Loan Agreement – the Debtors' primary sources of liquidity – were accelerated from March 16, 2009 and March 31, 2009 to March 5, 2009 and March 20, 2009, respectively, (ii) a $100 million payment due under the Gulfstream Agreement was accelerated from March 31, 2009 to March 20, 2009, (iii) the PNC Agreements were in default and (iv) the 7.25% Notes, with an aggregate of $75 million principal amount outstanding, were due on December 15, 2009.  Based on its 2009 forecast, the Debtors believed they did not have sufficient liquidity to make the required payments or fund their operations unless they were able to refinance, restructure, amend or otherwise replace these facilities.

---

[1] The significant events leading to the commencement of the Chapter 11 Cases of MEC Lone Star and MEC Pennsylvania are discussed in Sections 7.b. and 8.a. herein.

**2.      Revenues and Expenses.**

The Debtors also suffered decreased revenues at their racetracks because of a general decline in the number of people attending and wagering at live horse races at North American racetracks. The decline can be attributed to a number of factors.  Competition for customers has significantly increased as a result of widespread access to casino gaming, lotteries and other wagering activities. Further, the economic recession that began in 2008 negatively impacted wagering revenues at the Debtors' racetracks and the horse racing industry in general.

The Debtors also experienced significant fluctuations in quarterly operating results due to the seasonality associated with racing schedules.  Generally, revenues from racetrack operations are greater in the first quarter of the calendar year than in any other quarter.  The Debtors' racetracks are permitted to host a limited number of live racing dates and the number of live racing dates varies from year to year.  Revenues in 2008 decreased, in part, because the Debtors lost eight live racing days at Santa Anita Park due to inclement weather and track drainage issues, ran fourteen fewer live race days at Laurel Park and the handle and wagering at the Preakness decreased.

The general decline in attendance at live horse racing events prompted racetrack owners like the Debtors to rely more on secondary revenues from inter-track, off-track and account-wagering markets.  Secondary revenue sources such as these have lower margins than the revenues from on-track wagers at the Debtors' live racing events.  In addition, the Debtors were faced with escalating competition from Internet gaming companies that offered wagering services with much lower capital expenditure requirements, and thus were able to offer competing services at discount prices.

The high degree of regulation in the pari-mutuel and gaming industry was also a significant obstacle to the Debtors' growth strategy, especially with respect to their efforts to implement (a) casino style alternative gaming at racetracks and (b) account wagering, including telephone, interactive television and Internet-based wagering.  The Debtors' expansion opportunities with respect to account wagering relied upon additional states amending their laws to permit account wagering, which has not occurred as quickly as anticipated.

On a consolidated basis, the Debtors' revenues from continuing operations decreased from approximately $617.8 million in the year ended December 31, 2007, to approximately $593.5 million in the year ended December 31, 2008 and further declined in 2009.

Net loss for the year ended December 31, 2008, of approximately $271.8 million increased from a net loss of approximately $113.8 million in the prior year comparative period, reflecting the negative impact of write-downs of long-lived and intangible assets in the aggregate of $174.1 million at the Maryland Jockey Club, Lone Star Park, Golden Gate Fields, the Dixon Property, The Meadows, Magna Racino and Portland Meadows, increased depreciation and amortization primarily related to the slot facilities at Gulfstream Park, and the new racetrack surfaces at Santa Anita Park and Golden Gate Fields, and increased interest expense with higher debt levels compared to the prior year.

Additional financial information concerning certain of the Debtors' assets for the period of the year ended December 31, 2009 is annexed hereto on Schedule I.

**3.      Unsuccessful Prepetition Restructuring Initiatives.**

On September 11, 2007, Magna Entertainment's Board of Directors approved and adopted a plan (the "MEC Debt Elimination Plan") to restructure MEC's balance sheet by selling certain

27

assets to pay down debt and by entering into strategic partnerships or joint ventures to allow MEC to substantially eliminate its debt by December 31, 2008, and to pursue a business plan focused on achieving sustainable profitability.  Pursuant to the MEC Debt Elimination Plan, and to address immediate liquidity concerns and provide sufficient time to implement the plan, Magna Entertainment received $100 million in funding from (i) a $20 million private placement of Class A Stock to Fair Enterprise Limited, a company that forms part of an estate planning vehicle for the family of Mr. Frank Stronach, the Chairman and former Chief Executive Officer of Magna Entertainment; and (ii) the 2008 Loan Agreement.

The MEC Debt Elimination Plan proceeded more slowly than the Debtors originally expected due to weakness in the real estate and credit markets, which negatively impacted Magna Entertainment's ability to sell non-core assets as originally planned.

On March 31, 2008, the Board of Directors of MID announced that it received a reorganization proposal on behalf of various shareholders of MID that would, among other things, alter the relationship between MID and Magna Entertainment (the "Reorganization Proposal").  Discussions ensued among significant MID shareholders regarding potential amendments to the Reorganization Proposal and, on June 27, 2008, MID announced that, in light of such discussions, the special meeting of MID shareholders to consider the Reorganization Proposal, previously scheduled for July 24, 2008, was being postponed.  On September 15, 2008, MID announced that no consensus had been reached with respect to the Reorganization Proposal and MID intended to continue to explore a range of strategic alternatives with respect to its investments in Magna Entertainment.

Given approaching debt maturities and ongoing operational funding requirements, on November 5, 2008, the Debtors announced the engagement of Miller Buckfire & Co., LLC ("Miller Buckfire") as their financial advisor and investment banker to review and evaluate various strategic alternatives including additional asset sales, financing and balance sheet restructuring opportunities and to assist in identifying, managing and executing its asset sales program and possible joint venture transactions.

On November 26, 2008, Magna Entertainment announced that it had entered into a transaction agreement (the "Transaction Agreement") with MID and entities affiliated with Magna Entertainment's Chairman and Chief Executive Officer, Frank Stronach (the "Stronach Group"), to implement a proposed reorganization of MID that included the spin-off of Magna Entertainment and its subsidiaries to MID's existing shareholders.  The Transaction Agreement contemplated, among other things, a multi-step series of proposed transactions designed to recapitalize and reposition Magna Entertainment to enable it to pursue its strategy of horse racing, gaming and entertainment on a standalone basis.

Stage One of the proposed transaction consisted of MID entering into the 2008 Loan Agreement and an extension of the maturity date under the Bridge Loan Agreement, the repayment date for $100 million under the Gulfstream Agreement, and the date until which repayments under the Gulfstream Agreement and the Remington Park Agreement would not be subject to a make-whole payment.  Stage Two contemplated (i) certain sales of real estate assets to MID; (ii) further extensions under the Bridge Loan Agreement, the Gulfstream Agreement and the 2008 Loan Agreement; (iii) an increase of $25 million in the amount loaned under the 2008 Loan Agreement; (iv) certain amendments to the 2008 Loan Agreement, the Bridge Loan Agreement, the Gulfstream Agreement, and the Remington Park Agreement to, among other things, enable the Debtors to repay their obligations under these agreements in cash or in kind with Class A Stock (or a combination thereof); and (v) a forbearance agreement that prohibited new transactions between MID and Magna Entertainment absent approval by a majority of the minority of holders of Class A Subordinate Voting Shares of MID (the "MID Class A

Stock"). Stage Two also contemplated MID adopting a policy of distributing 40% of its annual funds from operations as dividends and MID undertaking a substantial stock buyback of at least $240 million of the MID Class A Stock.

On February 18, 2009, the Transaction Agreement was terminated by MID in accordance with its terms. As noted above, the most immediate result of the termination notice was to accelerate the maturity dates on the BMO Credit Agreement, the Bridge Loan Agreement, and the 2008 Loan Agreement to March 5, 2009 and the Gulfstream Agreement to March 20, 2009.

After MID terminated the Transaction Agreement, the Debtors realized that, without access to further extensions of impending debt maturities, and with a steadily declining liquidity position and no additional sources of liquidity, an out-of-court restructuring would not be feasible. Accordingly, the Debtors determined that the only method to protect the interests of all stakeholders and preserve the value of their assets was to seek protection under the Bankruptcy Code.

### E.    The Chapter 11 Cases

#### 1.    Commencement of the Chapter 11 Cases.

On March 5, 2009, the Debtors commenced their Chapter 11 Cases in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to pursue an orderly in-court restructuring through assets sales and avoid a fire-sale liquidation. The Chapter 11 Cases were assigned to and presided over by the Honorable Mary F. Walrath, United States Bankruptcy Judge. The Debtors continue to manage their properties and operate their businesses as debtors in possession in accordance with sections 1107 and 1108 of the Bankruptcy Code.

#### 2.    "First-Day" Orders.

On the Petition Date, the Debtors requested and obtained a series of orders from the Bankruptcy Court designed to ensure a smooth transition into chapter 11 and minimize any disruption of their business operations. The Bankruptcy Court entered orders authorizing the Debtors to, among other things, maintain their existing bank accounts and business forms; pay certain prepetition wages, compensation, tax withholding obligations, and employee benefits; pay prepetition sales and use taxes; provide adequate assurance to utility companies; and honor certain prepetition customer programs.

The Bankruptcy Court also authorized the Debtors to employ Weil, Gotshal & Manges LLP and Richards Layton and Finger, P.A., as attorneys for the Debtors and Debtors in Possession. The Bankruptcy Court further authorized the Debtors in Possession to continue to employ professionals utilized in the ordinary course of business to render services to the Debtors in Possession similar to those services rendered prior to the Petition Date.

#### 3.    Appointment of the Creditors' Committee.

Section 1102 of the Bankruptcy Code requires that as soon as practicable after the commencement of a chapter 11 case, the United States Trustee shall appoint an official committee of unsecured creditors. On March 18, 2009, the Office of the United States Trustee for the District of Delaware appointed the following members to form the Creditors' Committee: The Bank of New York Mellon, as trustee, Sunrise Partners Limited Partnership, the Jockeys' Guild, The New York Racing Association, Inc., GLG Market Neutral Fund; Madison Capital Management, LLC and Florida Thoroughbred Breeders' and Owners' Association.

The Creditors' Committee retained Kramer Levin Naftalis & Frankel LLP and Pachulski Stang Ziehl & Jones LLP, as its attorneys, and Blackstone Advisory Services, as its financial advisors.

## 4.      DIP Financing.

On the Petition Date, the Debtors filed the Motion (I) for Authorization to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364, (B) Utilize Cash Collateral of the Prepetition Secured Lenders, (C) Grant Adequate Protection to Prepetition Secured Lenders, and (D) Grant Related Relief, and (II) to Schedule a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "DIP Motion"), seeking, among other things, authorization for Magna Entertainment to obtain secured postpetition financing in an aggregate principal amount not to exceed $62,500,000.00, pursuant to the terms of that certain Debtor in Possession Credit Agreement, dated March 6, 2009, with MID Islandi. After addressing objections filed by certain parties, including the Creditors' Committee, on April 22, 2009, the Bankruptcy Court entered an order granting the relief requested in the DIP Motion on a final basis in an aggregate principal amount not to exceed $38,400,00.00.

As modified, and following discussions with the Creditors' Committee, the maturity date of the Debtors' obligations pursuant to the DIP Credit Agreement was established as November 6, 2009 (the "Maturity Date").  Notwithstanding the Maturity Date, as clearly set forth in the Debtors' Budget, as defined in the DIP Credit Agreement and presented in testimony to the Bankruptcy Court, the Debtors forecasted that, absent additional funding, the Debtors would face a severe liquidity crisis towards the end of September or early October 2009.

The Debtors commenced these chapter 11 cases anticipating that their sales process would conclude well before the Maturity Date and the forecasted liquidity crisis.  The Debtors' sales process, however, was impeded due to reasons beyond the Debtors' control, such as, among other things, the Committee Litigation.  Accordingly, in early August 2009, the Debtors negotiated that certain Amended and Restated Debtor-in-Possession Credit Agreement, dated as of August 26, 2009 (the "First Amended DIP Credit Agreement").   To make certain clarifications, and to better reflect the progress of the Debtors' sales process, the Debtors and MID Islandi agreed to further amend the DIP Credit Agreement in accordance with that certain Second Amended and Restated Debtor-in-Possession Credit Agreement, dated as of October 9, 2009 (the "Amended DIP Credit Agreement") to obtain additional capital to fund the Debtors' chapter 11 cases and continue the Debtors' sales process and reorganization efforts.

The Amended DIP Credit Agreement (i) provided for an additional commitment of $26,000,000.00, such that the aggregate committed amount of postpetition financing to be made available by the MID Islandi shall be in a principal amount not to exceed $64,400,000, (ii) extended the Maturity Date, and (iii) contemplated the division of the Debtors' assets into three (3) pools, each with certain timing requirements:

> o   Pool I Assets:  The Dixon Property, Lone Star Park, the Ocala Property, Portland Meadows, Remington Park and the Thistledown Property.

> o   Pool II Assets: The AmTote Property and the XpressBet Property.

> o   Pool III Assets: The Maryland Jockey Club (assets of the MJC Debtors), Golden Gate Fields, Gulfstream Park, and Santa Anita Park.

30

Each pool of assets, as well as the amount of aggregate sale proceeds, was designed to ensure the Debtors' ability to achieve the requisite conditions and maximize value for the Debtors' estates. In addition, as reflected by the Amended DIP Credit Agreement, and as discussed below, the Debtors and the MID Islandi extended the milestones initially contemplated to address concerns raised by the Creditors' Committee and to run parallel to the extended timeline of their litigation against MID.

On October 28, 2009, the Bankruptcy Court entered that certain Order (I) Supplementing Final DIP Order and (II) Authorizing Debtors to Enter into Second Amended and Restated Debtor in Possession Credit Agreement (the "Final DIP Order").

Specifically, if the Debtors did not obtain one or more Sale Orders with respect to the sale of assets that are Pool I Assets, Pool II Assets and/or the Maryland Jockey Club, with aggregate gross sale proceeds of such Sale Orders to be received upon closing totaling at least $175,000,000.00 (the "Proceeds Condition") by November 30, 2009, the Amended DIP Credit Agreement provides that Magna Entertainment must pay MID Islandi an Additional Arrangement Fee. The Debtors were unable to meet the Proceeds Condition and thus, on December 1, 2009, paid an Additional Arrangement Fee in the amount of $1,076,000.00 to MID Islandi. Pursuant to Section 4.3(b), an Additional Arrangement Fee in an amount of $520,000.00 was due on January 29, 2010. On January 25, 2010, MID, on behalf of MID US Financing, the current holder of the claims arising pursuant to the Amended and Restated DIP Agreement, agreed to delay the timing of the Additional Arrangement Fee to no later than April 30, 2010. MID reserves the right to demand the payment prior to April 30, 2010.

In addition, the Debtors' failure to achieve the Proceeds Condition and obtain one or more Sale Orders with respect to all of the remaining Pool III Assets (the "Assets Condition"), by February 26, 2010 or March 21, 2010, constitutes an "Event of Default" pursuant to Sections 9.1(i) and Section 9.1(j), respectively, of the Amended DIP Credit Agreement. If the Debtors fail to achieve any of the aforementioned conditions that result in an "Event of Default," and MID Islandi chooses to waive the "Event of Default," Magna Entertainment must pay MID Islandi an Additional Arrangement Fee.

Upon the sale of Remington Park, as discussed in further detail below, the Debtors used the proceeds from that sale to repay the first tranche of their DIP Obligations.

On March 23, 2010, the Bankruptcy Court entered that certain Final Order (I) Authorizing the Debtors to Enter into First Amendment to Second Amended and Restated Debtor in Possession Credit Agreement and (II) Supplementing DIP Orders, pursuant to which the MI Developments US Financing Inc. provided an additional commitment of $7,000,000.00.

5.    **Corporate Governance Developments.**

On March 10, 2009, the Debtors sought authority to sell certain of their assets to MID, subject to higher or better offers, and in connection with that motion, sought authority to implement an auction process and establish bidding procedures (the "MID Sale Motion"). Due to a change in strategy, the Debtors subsequently withdrew the MID Sale Motion. Prior to withdrawing the MID Sale Motion, however, the Debtors received several objections that questioned, among other things, the integrity of the sale process. Specifically, certain parties alleged that the Debtors' relationships with MID and Mr. Frank Stronach undermined the Debtors' ability to conduct a fair auction and sale process. While the Debtors disagreed with these allegations, the Debtors took numerous steps to ensure the integrity of the process and remove any chilling effect that parties perceived to be present.

31

Specifically, since the Petition Date, with input from the Creditors' Committee and their advisors, the Debtors implemented significant governance safeguards, including (i) the resignation of Mr. Frank Stronach as the CEO of Magna Entertainment, effective as of April 7, 2009, (ii) the retention of FTI Consulting, Inc. to provide the Debtors with certain financial advisory services, including the appointment of Mr. Gregory Rayburn as CEO of Magna Entertainment to oversee the Debtors' restructuring initiative and sales processes, and (iii) the appointment of Warren Mosler to Magna Entertainment's Board of Directors, to serve as an independent director, effective as of April 7, 2009.

To further assuage concerns of any governance shortcomings, on April 29, 2009, Magna Entertainment's Board of Directors adopted a resolution implementing a formal protocol (the "Protocol") to be followed in connection with any discussions, deliberations, and/or decision-making processes involving (a) proposed asset or stock sale transactions that include an asset or stock over which MID or any of its affiliates or subsidiaries, including, without limitation, MID Islandi, maintains a lien or security interest or (b) the restructuring of the indebtedness of the Debtors to MID, MID Islandi and their respective affiliates, pursuant to a chapter 11 plan or otherwise. The Protocol, developed with the input of the Creditors' Committee, provides for a multi-tiered review process which governs how certain transactions shall be vetted and analyzed, ensures that Mr. Frank Stronach will recuse himself from these discussions and vests the ultimate decision-making authority in the independent directors of the Magna Entertainment Board.

## 6.    The Greenlight Examiner Motion.

On March 27, 2009 Greenlight Capital Offshore Partners ("Greenlight"), a hedge fund with a significant equity interest in MID, filed that certain motion (the "Examiner Motion") for an order directing the appointment of an examiner, or in the alternative, directing the appointment of a chapter 11 trustee. In the Examiner Motion, Greenlight asserted that an examiner should be appointed because, among other things, the prepetition and postpetition transactions between the Debtors and MID warranted special scrutiny due to the interrelatedness of the parties. Finding no merit in the Examiner Motion, the Debtors filed a response asserting, among other things, that the Examiner Motion was an attempt by Greenlight to relitigate its ongoing dispute with MID before the Ontario Securities Commission (the "OSC") under the guise of being an unsecured creditor of Magna Entertainment. Further, the Debtors asserted that their efforts early on in the chapter 11 cases to ensure maximum transparency and the disinterestedness and independence of management during their restructuring, including the retention of a new Chief Executive Officer ("CEO") to oversee the Debtors' day-to-day operations and the proposed sales of the Debtors' assets, and the appointment of a new independent director to Magna Entertainment's Board of Directors, further militated against the appointment of a trustee. Ultimately, Greenlight and the Debtors agreed to adjourn the Examiner Motion to a date to be determined.

## 7.    The Postpetition Sales Processes.

Pursuant to an order, dated May 11, 2009, the Bankruptcy Court authorized the Debtors to implement an auction process and establish bidding procedures for the sale of certain of the Debtors' assets, including Remington Park, Thistledown, the partnership interests in MEC Lone Star, L.P. (the "Lone Star Interests"), the Ocala Property, the Dixon Property and StreuFex. Since entry of the Bid Procedures Order, Miller Buckfire aggressively marketed the assets with the goal of obtaining a purchaser for each asset. Below is a summary of the sale orders that the Debtors have obtained in their Chapter 11 Cases to date:

32

### a. Remington Park Sale

With respect to Remington Park, Miller Buckfire contacted fifty-two (52) potential purchasers and executed confidentiality agreements with forty-eight (48) of these parties. Miller Buckfire received thirteen (13) non-binding "Expressions of Interest" from various parties and, of those parties, six (6) attended management presentations and tours of Remington Park. As a result of Miller Buckfire's efforts, the Debtors received three (3) definitive bids for Remington Park (the "Remington Bids").

Upon review of the Remington Bids, the Debtors determined that the bid from Global Gaming RP, LLC ("Global Gaming RP") constituted the highest and best offer for Remington Park and the corresponding assets. Accordingly, in an effort to further stimulate the auction process for Remington Park and generate further competitive bidding and, in accordance with the process contemplated and authorized by the Bid Procedures Order, the Debtors, upon consultation with the Creditors' Committee, agreed to establish Global Gaming RP as the "stalking horse" for Remington Park and enter into that certain Asset Purchase Agreement, dated August 10, 2009, by and among Magna Entertainment, Remington Park, Inc., 50000 Delaware, LLC and Global Gaming RP. On August 26, 2009, the Bankruptcy Court entered an order, pursuant to which the Bankruptcy Court, among other things, (i) established Global Gaming RP as the "stalking horse" and (ii) approved the Global Gaming RP's bid to purchase Remington Park in the amount of Eighty Million Two Hundred Fifty Thousand Dollars ($80,250,000).

The Debtors held the auction for Remington Park on September 8, 2009. Global Gaming RP was the only bidder to attend the auction and the Debtors did not receive any other bids for Remington Park. Accordingly, on September 15, 2009, the Bankruptcy Court entered an order authorizing the Debtors to sell Remington Park to Global Gaming RP and that sale closed on January 1, 2010.

### b. Lone Star Park Sale and Chapter 11 Filing

With respect to the marketing and sale of the partnership interests in MEC Lone Star, Miller Buckfire contacted fifty-two (52) potential buyers. Of those buyers, fifty (50) executed confidentiality agreements and Miller Buckfire received seven (7) first round non-binding indications of interest. In addition, five (5) parties attended management presentations and toured Lone Star Park, and three (3) of those parties submitted second rounds bids through August 31, 2009.

As a result, Miller Buckfire was successful in securing a bid from Global Gaming LSP, LLC ("Global Gaming LSP"), for Lone Star Park that, in the Debtors' business judgment (upon consultation with the Creditors' Committee), was worth pursuing as a stalking horse for Lone Star Park. That bid, however, sought to purchase Lone Star Park and the assets of MEC Lone Star, pursuant to section 363 of the Bankruptcy Code, instead of the Lone Star Interests. Accordingly, to accommodate a bid that the Debtors believed would capture the highest and best value for the Debtors' estates, on September 14, 2009, MEC Lone Star commenced its case under chapter 11 of the Bankruptcy Code.

In an effort to further stimulate the auction process for Lone Star Park and generate further competitive bidding, the Debtors, upon consultation with the Creditors' Committee, agreed to establish Global Gaming LSP as the "stalking horse" for Lone Star Park and enter into that certain Asset Purchase Agreement, dated September 14, 2009, by and among MEC Lone Star and Global Gaming with a purchase price of Twenty Seven Million Dollars ($27,000,000.00). On September 23, 2009, the Court entered an order, pursuant to which the Bankruptcy Court, among other things, established Global Gaming LSP as the "stalking horse" for Lone Star Park.

33

The Debtors held the auction for Lone Star Park on October 7, 2009.  Global Gaming LSP was the only bidder to attend the auction, however, the Debtors received a subsequent offer by LSP Gaming Ventures, Inc. ("LSP Gaming").  At the hearing on October 14, 2009, having been apprised of the facts and circumstances associated with (i) the submission of bids, (ii) the conduct of the Auction and (iii) the submission of the subsequent offer by LSP Gaming, the Bankruptcy Court entered an order reopening the Auction (the "Order to Reopen").  On October 23, 2009, Global Gaming LSP filed a Notice of Appeal from the Order to Reopen.

Pursuant to the Order to Reopen, the Debtors reopened the auction on October 23, 2009.  After forty-three rounds (43) of bidding between LSP Gaming and Global Gaming LSP, Global Gaming LSP ultimately submitted the highest and best offer with a purchase price of Forty Seven Million Eight Hundred Fifty-Seven Thousand Dollars ($47,857,000.00), upon the condition that the appeal would be withdrawn, with prejudice.  On October 29, 2009, the Bankruptcy Court entered that certain order authorizing the Debtors to sell Lone Star Park to Global Gaming LSP and on November 30, 2009, Global Gaming withdrew its Notice of Appeal.

On January 20, 2010, Global Gaming LSP filed its application for a racing license with the Texas Racing Commission. The Debtors have been advised that approval of the application may take between four (4) and six (6) months.  Accordingly, the Debtors will endeavor to close the sale of Lone Star Park during the second quarter of 2010.

### c.      Thistledown

With respect to the marketing and sale of Thistledown, Miller Buckfire contacted forty-nine (49) potential buyers.  Of those buyers, forty-six (46) executed confidentiality agreements and Miller Buckfire received nine (9) first round non-binding indications of interest.  In addition, four (4) parties attended management presentations and toured Thistledown, and three (3) parties submitted qualified bids.  Upon receipt of qualified bids from Cleveland Gaming Ventures, LLC ("Penn National"), Harrah's Operating Company, Inc. ("Harrah's") and PNK Development 18, LLC ("Pinnacle"), the Debtors determined that the selection of Penn National as a "stalking horse" with a purchase price of $22,300,000.00 afforded the Debtors with certainty of securing a minimal acceptable bid and enhancing the bidding process at the Auction.  In the Debtors' opinion, without the establishment of a "stalking horse," there was no assurance that a satisfactory bid would be submitted.

Pursuant to the agreement with Penn National, and consistent with the establishment of Penn National as a "stalking horse," the Debtors agreed, subject to Bankruptcy Court approval, to seek (a) reimbursement of Penn National's expenses in an amount up to $125,000.00, and (b) a break-up fee in the amount of two percent (2%) of the Penn National purchase price, $446,000.00.

The Debtors held an auction for Thistledown on September 14, 2009 and Penn National, Harrah's and Pinnacle attended.  The Debtors informed these parties that they had established Penn National as a "stalking horse," with the entitlements attendant thereto, including, without limitation, the provisions for the reimbursement of expenses and the payment of a break-up fee.  Harrah's agreed to participate in the auction, subject to its right to contest the obligation to satisfy the reimbursement obligation and payment of the break-up fee.

At the conclusion of the Auction, Harrah's submitted the highest and best bid.  On September 15, 2009, the Bankruptcy Court (i) approved the sale of Thistledown to Harrah's for $89,500,000.00, of which $42,000,000.00 would be paid immediately upon closing and $47,500,000.00

34

would be paid provided that certain conditions related to video lottery licensing in the State of Ohio were met and (ii) denied the Debtors' request to pay Penn National the break-up fee and reimbursement of expenses.

On September 21, 2009, the Ohio Supreme Court ruled that certain legislation regarding video lottery licensing was subject to referendum under the constitution of Ohio.  By letter, dated September 23, 2009, Harrah's asserted that this ruling gave it a right to terminate its purchase agreement pursuant to Section 9.1(m) thereof, but, without waiving its right to terminate in the future, it was not electing to do so.  Pursuant to the purchase agreement, all obligations and duties of the parties to consummate the sale may be terminated by either Harrah's or the Debtors if the sale has not closed on or prior to May 15, 2010.  Accordingly, the Debtors continue to explore their options with respect to the sale of Thistledown.

### d.    The Ocala Property

In late 2007, as part of the MEC Debt Elimination Plan summarized above, Magna Entertainment initiated an active program to sell the Ocala Property and listed the property with a real estate broker.  In connection with the Debtors' Chapter 11 Cases, the Debtors reaffirmed their desire to sell the Ocala Property and continued to aggressively market the property.  On August 8, 2008, the Debtors entered into a purchase and sale contract with Lincoln Property Co. ("Lincoln") with a contracted purchase price of $16,500,000.00.  However, on October 31, 2008, during Lincoln's due diligence review period, and as market conditions deteriorated, Lincoln terminated the contract.

In 2009, the Debtors engaged a real estate broker and their marketing efforts generated offers from two (2) prospective purchasers: Par Avenue Properties, LLC ("Par") and Mr. Frank Stronach, Chairman of Magna Entertainment's Board of Directors.  Par submitted an initial informal bid in the form of a marked purchase agreement that provided a purchase price of $5,500,000.00 (the "Par Bid").  Ocala Meadows Lands, LLC (the "Ocala Meadows"), a newly-formed entity indirectly controlled by Fair Enterprises Limited, a company that is part of an estate planning vehicle for the family of Mr. Frank Stronach, countered the Par Bid with an offer to purchase the Ocala Property for $5,750,000.00.  Although the Debtors approached Par to solicit a counter-offer, on July 30, 2009, the Debtors received only a definitive bid from Par that was in the same amount as the initial Par Bid.  As a result, on August 4, 2009, the Ocala Debtors agreed to sell the Ocala Property to Ocala Meadows, subject to Bankruptcy Court approval and higher or better offers.  In that regard, in an effort to solicit further bids from Par, as well as from other parties, the Debtors filed a motion to sell the Ocala Property to Ocala Meadows, subject to higher or better offers and proposed to hold an auction on August 26, 2009.

On August 26, 2009, the Debtors held an auction and both Par and Ocala Meadows attended.  At the conclusion of the auction, Par submitted the highest and best offer to purchase the Ocala Property with a purchase price of $8,100,000.00.  Accordingly, on September 2, 2009, the Bankruptcy Court entered an order authorizing the Debtors to sell the Ocala Property to Par and that sale closed on September 17, 2009.

### e.    The Dixon Property

In late 2007, as part of the MEC Debt Elimination Plan summarized above, Magna Entertainment initiated an active program to sell the Dixon Property and in connection with the Debtors' Chapter 11 Cases, the Debtors reaffirmed their desire to sell the Dixon Property and continued to aggressively market the property. The Debtors received three (3) offers from prospective purchasers: (i) an offer from Kenneth L. Wallace ("Wallace") in the amount of $3,200,000.00; (ii) an offer from USA

35

Land Company, LLC in the amount of $2,000,000.00; and (iii) an offer from AKT Properties in the amount of $1,300,000.00. After further negotiations with these parties, the Debtors negotiated the highest and best offer with Wallace for a purchase price in the amount of $4,000,000.00.

Subsequently thereto, the Debtors received an offer from Duffel Financial and Construction Company, Inc. ("Duffel") in the amount of $5,000,000.00, however, days later Duffel submitted a revised offer of $3,000,000.00. Accordingly, the Debtors executed an Agreement of Purchase and Sale for the Dixon Property (the "Wallace Purchase Agreement") with Wallace for $4,000,000.00 and on September 18, 2009, the Debtors filed that certain Motion for Authorization to Sell the Dixon Property Pursuant to Section 363 of the Bankruptcy Code to Wallace (the "First Dixon Motion"), free and clear of all liens, claims and encumbrances [Docket No. 1174]. Prior to the expiration of the applicable due diligence period, however, Wallace terminated the Wallace Purchase Agreement and as a result, the Debtors withdrew the First Dixon Motion by notice, dated October 9, 2009.

In an effort to solicit bids for the Dixon Property and maximize value for the Debtors' estates, the Debtors filed that certain Motion of the Debtors for an Order Authorizing the Sale of the Dixon Property Pursuant to Sections 105(a) and 363 of the Bankruptcy Code (the "Second Dixon Motion"), dated October 22, 2009, requesting that the Bankruptcy Court approve the sale of the Dixon Property to the bidder that submits the highest and best offer for the property at an auction held for the Dixon Property (the "Dixon Auction").

Prior to the Dixon Auction, the Debtors received two (2) bids for the Dixon Property: (i) a bid from Ocala Meadows in the amount of $3,050,000.00 and (ii) a bid from the Marvin L. Oates Trust (the "Oates Trust") in the amount of $3,005,000.00.

On November 17, 2009, the Dixon auction was held and both potential purchasers participated in such auction. The Oates Trust declined to submit a higher bid and Ocala Meadows was determined to be the winning bidder at the Dixon Auction. Accordingly, on November 19, 2009, the Bankruptcy Court entered that certain order authorizing the Debtors, pursuant to sections 105(a) and 363 of the Bankruptcy Code, to sell the Dixon Property to Ocala Meadows free and clear of all liens, claims, and encumbrances and that sale closed on November 30, 2009.

## f.    StreuFex

MEC Projektentwicklungs GmbH  ("MEC GmBH"), a limited liability company incorporated under the laws of Austria and a direct non-debtor subsidiary of Magna Entertainment, owned all shares (the "Stock Interests") of FEX ÖKO-Faserverarbeitungs-GmbH, Dobermannsdorferstraße ("Fex Öko"), a company acquired by MEC GmBH and Magna Entertainment in 2002. Fex Öko is a limited liability Austrian company that owns and operates a manufacturing plant in Neusied/Zaya, Austria which manufactures StreuFex, an environment-friendly horse bedding product.

Subsequent to this acquisition, Magna Entertainment purchased approximately eighty (80) acres of land in Lumberton, North Carolina to accommodate a StreuFex manufacturing facility that is currently owned and operated by Fex Straw Manufacturing, Inc. ("Fex Straw"), a direct non-debtor subsidiary of Magna Entertainment. StreuFex was introduced to the North American market in 2004 and is currently used at Gulfstream Park and the Palm Meadows Training Center.

In 2007, Fex Straw entered into a license agreement with Premier Equine Products Pty Ltd. ("Premier Equine") granting Premier Equine the exclusive license to manufacture and sell StreuFex in Australia, New Zealand, Hong Kong, Macau, Japan, and Singapore for twenty years. Fex Straw

received a one-time up-front license fee and continues to receive royalty fees for the duration of the agreement based on the tons of StreuFex manufactured by Premier Equine.  If Premier Equine enters into a sublicense agreement, Fex Straw is entitled to a sublicense fee as well as similar royalty fees.

In 2008, Fex Öko's revenues totaled approximately € 1,000,000.00, however, taking into consideration operating expenses and other costs, its net loss was approximately *negative* € 130,000.00. The Debtors decided to sell Fex Öko after determining that continuance of the Fex Öko operations, including the continued maintenance of the facility, was burdensome and would not be in the best interests of their estates or creditors.  Moreover, if the Debtors did not sell the Stock Interests, the Debtors would be bound by Austrian law that would require the Debtors to fund costs of approximately € 130,000.00 to wind down the operations of an entity like Fex Öko and such winddown would take at least six (6) months.  Further, given the fact that Fex Öko was operating at a loss for a few years and the limited market of potential purchasers, the Debtors did not believe that a public sale of the Stock Interests would generate any bidders.  Based on these circumstances, the Debtors decided to sell the Stock Interests to Ing Johann Payerl ("Payerl"), the former owner and current managing director of Fex Öko, for € 1.00. Payerl, as the former owner of Fex Öko, had a distinct interest in purchasing the Stock Interests and continuing Fex Öko's manufacturing operations.  In addition, the Debtors were able to include several protective provisions in the purchase agreement to ensure that the sale will not affect Fex Straw's operations' in the United States, and that the Debtors will benefit from subsequent profits, if any, that he receives either from Fex Öko's operations or from a subsequent sale of Fex Öko.

On July 29, 2009, MEC GmBH and Payerl entered into that certain Share Purchase Agreement whereby MEC GmBH sold the Stock Interests to Payerl (the "Share Purchase Agreement"). Subsequently, the Debtors filed that certain Motion for Authorization to Consummate the Sale of Fex Öko Stock Interests, dated August 4, 2009, requesting that the Bankruptcy Court approve the Share Purchase Agreement.  Although the Debtors believed that Bankruptcy Court approval was not required for the sale of the Stock Interests which were owned by the non-debtor MEC GmBH, out of an abundance of caution, the Debtors requested Bankruptcy Court approval as such transaction was tantamount to the sale of all of the Debtors' value in MEC GmBH.  By order, dated August 26, 2009, the Bankruptcy Court authorized the Debtors to consummate the sale of the Stock Interests to Payerl and that sale was consummated on September 1, 2009.

### g.    Magna Racino

MEC Grundstucksentwicklungs GmbH (Austria) ("Magna Austria"), an indirect non-debtor subsidiary of Magna Entertainment, owned Magna Racino, a horse racing facility located in Ebreichsdorf, Austria, approximately twenty-five (25) kilometers from the city of Vienna.  MEC Magna Racing Veranstaltungs GMbH, another indirect non-debtor subsidiary of Magna Entertainment, operated the track and other facilities at Magna Racino (the "Magna Operations").

Although Magna Racino featured both thoroughbred and standardbred racing on three different tracks, a 5/8-mile sand track, a one-mile sand track and a one-mile turf course, during 2008, Magna Racino held only 14 race days between April and November and attracted only 16,000 guests.

Surrounding Magna Racino sits Golfclub Ebreichsdorf, residential building land and forest land (together with Magna Racino and the Magna Operations, the "Racino Assets").  Golfclub Ebreichsdorf is an eighteen (18) hole golf facility currently leased to Golfplatz Schlo Ebreichsdorf Errichtungs und Vermietungs Gesellschaft m.b.H. & Co Kommanditgessellschaft, which also has a club house owned by the tenant.

37

Magna Austria was party to that certain credit agreement with Raiffeisenlandesbank Niederoesterreich-Wien AG ("RLB"), dated October 10, 2006 (as amended, the "RLB Loan"), pursuant to which Magna Austria borrowed € 15,000,000.00 to finance the construction of its horse racing facilities. The RLB Loan was secured by substantially all of Magna Austria's assets and matured on December 31, 2009. In July 2009, the aggregate principal amount outstanding under the RLB Loan was € 6,000,000.00 and an installment payment of € 2,500,000.00 was due on June 30, 2009. Pursuant to Austrian law, the Debtors believed that a failure to pay the installment would allow RLB to commence foreclosure proceedings on Magna Austria's assets, absent a bankruptcy filing by Magna Racino and the Magna Operations.

To prevent foreclosure, the Debtors marketed the Racino Assets through their Austrian broker to solicit offers that could generate funds sufficient to retire the RLB Loan. The Debtors received an offer for the Racino Assets in the amount of € 6,500,001.00 from Bvsarantaexi Beteiligungsverwaltung GmBH ("BB-GmBH"), a newly-formed entity indirectly controlled by Fair Enterprises Limited, a company that is part of an estate planning vehicle for the family of Mr. Frank Stronach. The Debtors' broker tried to re-engage two potential buyers who previously expressed interest in the Racino Assets to encourage them to submit higher offers than BB-GmBH's offer. However, one buyer decreased its initial offer 20%, reflecting its perception of the changes in the Austrian real estate market and the other buyer withdrew its offer entirely. Given Magna Racino's level of revenue, and the fact that Magna Racino had been operating at a loss for a few years, the Debtors did not believe that a materially higher or better offer would be obtained through a public sale of the Racino Assets.

On or about June 29, 2009, RLB agreed that if Magna Austria paid € 500,000.00 of the € 2,500,000.00 due by June 30, 2009, RLB would refrain from taking any foreclosure action against Magna Racino or the Magna Operations. Accordingly, on June 30, 2009, Magna Austria paid € 500,000.00 to RLB. The agreement between Magna Austria and RLB further required that the Racino Assets be sold to BB-GmBH no later than July 31, 2009 or RLB would likely commence foreclosure proceedings.

To effect such sale, the Debtors filed that certain Motion for Authorization to Sell Certain Austrian Assets Pursuant to Section 363 of the Bankruptcy Code, dated July 2, 2009, requesting that the Bankruptcy Court approve the sale of the Racino Assets to BB-GmBH for € 6,500,001.00. Although the Debtors believed that Bankruptcy Court approval was not required for the sale of the Racino Assets which were owned by the non-debtor Magna Austria, out of an abundance of caution, the Debtors requested Bankruptcy Court approval as such transaction was tantamount to the sale of all of the Debtors' value in Magna Austria. By order, dated July 31, 2009, the Bankruptcy Court authorized the Debtors to consummate the sale of the Racino Assets to BB-GmBH.

## 8.    MEC Pennsylvania.

On November 8, 2005, Magna Entertainment entered into that certain Stock Purchase Agreement (as amended, the "PA Meadows Agreement") with PA Meadows, LLC ("PA Meadows"), pursuant to which Magna Entertainment agreed to sell, subject to certain conditions, including regulatory approval, all of the issued and outstanding shares of common stock of Washington Trotting Association, Inc. ("WTA, Inc.") and Mountain Laurel Racing, Inc. ("Mountain Laurel") to PA Meadows for the aggregate price of $200 million of which $25 million (the "Holdback Amount") was retained by PA Meadows pursuant to that certain Holdback Agreement entered into between Magna Entertainment and PA Meadows on November 14, 2006 (the "Holdback Agreement"). The sale closed on November 14, 2006. As a result of the PA Meadows transaction, PA Meadows owns The Meadows, a harness horse racing facility located in Meadow Lands, Pennsylvania and its surrounding buildings and facilities (collectively, the "Meadows Facility").

38

In connection with the PA Meadows Agreement, and as consideration for part of the purchase price, the Debtors also entered into that certain Racing Services Agreement, dated July 26, 2006 (as amended by the First Addendum to the Racing Services Agreement, dated June 28, 2007, the "RSA"), by and among MEC Pennsylvania and CCR Racing Management, *f/k/a* MEC Racing Management ("CCR Racing Management"), Mountain Laurel, WTA, Inc., CCR Pennsylvania Racing, Inc., *f/k/a* MEC Pennsylvania, CCR Pennsylvania Food Service, Inc., *f/k/a* MEC Pennsylvania Food Service, Inc. ("CCR Food Service," and, collectively with CCR Racing Management, Mountain Laurel, WTA, Inc., and CCR Pennsylvania, the "Owners"), pursuant to which the Owners retained the services of MEC Pennsylvania to manage and operate the racing activities conducted at The Meadows and maintain certain aspects of the Meadows Facility.  The term of the RSA provides that, only on or after the fourth anniversary of the RSA, *i.e.* July 26, 2010, may either party terminate its services under the RSA by giving twelve (12) months written notice to the other parties.

### a.    Events Leading Up to MEC Pennsylvania's Chapter 11 Case

Pursuant to the RSA, MEC Pennsylvania, at its sole cost and expense, provided management services necessary for (a) the conduct of the harness racing business and operation at the Meadows Facility, (b) the conduct of all of the business and operations at certain off-track betting facilities and, in both cases, (c) all related wagering activity, including the transmission and receipt of audio, visual and/or data signals with respect to harness races conducted either at the Meadows Facility or at other racetracks.  MEC Pennsylvania is required to conduct no fewer than the minimum number of harness races necessary to maintain the Owners' racing and gaming licenses and is responsible for performing all necessary track maintenance and ensuring that the racing premises are in good state of repair.  In addition, Magna Entertainment has guaranteed certain of MEC Pennsylvania's obligations arising under the RSA related to, among other things, racing operation agreements, non-compete obligations, transition services, winding-up obligations, insurance and indemnification.

In addition, pursuant to the RSA, in connection with the sale of the Meadows Facility, MEC Pennsylvania agreed to pay the Owners $12,500 each quarter as an operating fee and is responsible for any losses incurred from the racing operations.  The EBITDA losses MEC Pennsylvania incurred in 2007 and 2008 amounted to approximately $1.7 million and $2.2 million, respectively.  Although the RSA does not explicitly provide that MEC Pennsylvania is entitled to compensation in exchange for its services, as consideration for its services, MEC Pennsylvania may retain any revenues generated from the racing operations conducted at The Meadows by virtue of the fact that the RSA does not require MEC Pennsylvania to forward the revenues to the Owners.

Historically, however, the amounts MEC Pennsylvania expended to fund its obligations under the RSA exceeded the revenues generated from the racing operations by over $1 million annually.  Prior to its chapter 11 filing, MEC Pennsylvania continued to suffer from decreased revenues at The Meadows and its off-track betting facilities because of a general decline in attendance and wagering at these facilities.  Accordingly, MEC Pennsylvania filed for chapter 11 protection on June 16, 2009.

### b.    Motion to Reject RSA

As discussed above, MEC Pennsylvania incurred significant losses in managing the racing operations at The Meadows.  Due to these operational losses and the significant amount of time and resources that were required to manage the Meadows Facility, the Debtors believed that rejection of the RSA was in the best interests of the Debtors' estates, as the Debtors financial projections predicted that MEC Pennsylvania would continue to operate The Meadows at a loss without a reasonable likelihood

39

of achieving profitability.  Accordingly, on July 2, 2009, the Debtors filed that certain Motion to Reject the RSA.

In an effort to transition MEC Pennsylvania's obligations thereunder with minimal disruption to the operations of The Meadows Facility and thereby minimize, or preempt, any claim of the Owners for damages that may arise in connection with the RSA's termination, on July 29, 2009, after negotiations with the Owners, the Debtors filed that certain Amended Motion to Reject the RSA, pursuant to which the Debtors agreed, among other things, to assume and assign certain contracts to the Owners.  By order, dated August 26, 2009, the Debtors were authorized to reject the RSA and the RSA was deemed rejected, without further action of the Debtors, on August 31, 2009.

        c.        **PA Meadows Litigation**

On September 21, 2009, the Debtors commenced the PA Meadows Litigation asserting that pursuant to the terms of the Holdback Agreement, PA Meadows was contractually obligated to make installment payments to the Debtors upon the occurrence of certain triggering events.  PA Meadows disputes the Debtors' assertions.  Discovery is currently underway in this matter and the parties plan to submit motions for summary judgment upon conclusion of that discovery.

        **9.**        **<u>The Committee Litigation.</u>**

Pursuant to paragraph 18(a) of the Final DIP Order, the Creditors' Committee was entitled to investigate the validity, perfection and enforceability of the prepetition secured claims held by MID Islandi and any causes of action against MID Islandi related to such claims, provided that the Creditors' Committee had to initiate any action against MID Islandi by no later than June 30, 2009 (the "<u>Investigation Deadline</u>"), without seeking further order of the Bankruptcy Court.

Subsequent thereto, the Bankruptcy Court approved two (2) extensions of the Investigation Deadline pursuant to (i) that certain Order Extending Deadline Provided for in the Final DIP Order, dated July 2, 2009, extending the Investigation Deadline from June 30, 2009 up to and including July 15, 2009 and (ii) that certain Order Further Extending Deadline Provided for in the Final DIP Order, dated July 20, 2009, extending the Investigation Deadline from July 15, 2009 up to and including July 29, 2009.

After investigating the validity of the claims of MID Islandi, on July 21, 2009, the Creditors' Committee commenced that certain adversary complaint (the "<u>Complaint</u>") against MID Islandi seeking (i) recharacterization of MID Islandi's claims as equity with respect to the Gulfstream Park Agreement, the Remington Park Agreement, the Bridge Loan Agreement, and the 2008 Agreement; (ii) equitable subordination of all claims asserted against the Debtors by MID Islandi; and (iii) the avoidance of alleged fraudulent transfers made by MID Islandi and filed a motion seeking standing to prosecute certain claims and causes of action against MID and Messrs.  Frank Stronach, Jerry D. Campbell, William J. Menear, Anthony R. Campbell and W. Thomas Hodgson as defendants (the "<u>Third Party Defendants</u>").  On August 19, 2009, the Bankruptcy Court entered an order granting the Creditors' Committee's request for standing.

On August 21, 2009, the Creditors' Committee filed that certain Amended Complaint (the "<u>Amended Complaint</u>") to (i) add the Third Party Defendants and (ii) include additional claims for relief, specifically a breach of fiduciary duty claim against the Third Party Defendants, a breach of fiduciary duty claim against MID and MID Islandi, and a claim for aiding and abetting a breach of

fiduciary duty claim against all defendants.  At the time the Amended Complaint was filed, the Third Party Defendants were all current or former directors and/or officers of Magna Entertainment.

Thereafter, the parties to the Amended Complaint engaged in extensive discovery for the next four months, including, but not limited to, multiple document production requests and numerous depositions of party and non-party witnesses and the parties agreed to litigate the equitable subordination and recharacterization causes of action on an expedited basis with trial on such claims commencing on January 11, 2010.  Following extensive negotiations among the Creditors' Committee, MID and certain of the Third Party Defendants, the parties agreed to the Settlement in principle and advised the Bankruptcy Court of the Settlement in principle on January 11, 2010.  The parties agreed that the terms and conditions of the Settlement in principle would be incorporated and implemented through the Plan.

## 10.    The Maryland Jockey Club.

On October 28, 2009, the Bankruptcy Court entered that certain order establishing, among other things, bidding procedures for the sale of Maryland Jockey Club or its assets, in whole or in part.  By notice, dated March 24, 2010, and for the reasons set forth on the record at the hearing on March 23, 2010, the Debtors adjourned the auction of the Maryland Jockey Club or its assets, in whole or in part to a date to be determined.

### a.    The Formation Agreement

As of the Petition Date, Pimlico, Laurel Racing, Laurel Racing Association and The Maryland Jockey Club of Baltimore City were parties to that certain Formation Agreement, dated November 27, 2002 (the "Formation Agreement"), with Joseph DeFrancis, FJN LLC, The Martin Jacobs 2002 Irrevocable Trust, LUK-Flats LLC and Laurel Guida Group (collectively, the "Participating Members").  The Formation Agreement obligated the Debtors to create a limited liability company ("MV LLC") and to contribute to MV LLC all "Alternative Gaming Rights" that the Debtors then owned or obtained over the next ten years and provided a formula for the distribution of Alternative Gaming net profits to the Participating Members.  "Alternative Gaming Rights" generally refer to a license or other means needed to engage in video lottery gaming in the State of Maryland.

On October 23, 2009, the Debtors filed that certain Motion to Reject the Formation Agreement and certain other agreements related thereto (the "Motion to Reject the Formation Agreement") to ensure that potential purchasers interested in the Maryland Jockey Club or its assets, in whole or in part, would not discount the revenue stream that could be received if the necessary authority was obtained to receive Alternative Gaming Rights, due to the risk that the Participating Members would try to enforce the Formation Agreement against them.

On November 6, 2009, the Participating Members commenced an adversary proceeding styled *DeFrancis et al. v. Pimlico Racing Ass'n, Inc. et al.*, (Adversary No. 09-52306) against the MJC Debtors by filing a complaint seeking a declaratory judgment relating to the Formation Agreement.  In their complaint, the Participating Members alleged that the Debtors conveyed Alternative Gaming Rights to MV LLC in 2002, when it was formed, and thus, those rights were not property of the Debtors' estates. The Participating Members later asserted that they also owned an easement in the Debtors' Laurel Park racetrack.  In response to the complaint, the Debtors filed a counterclaim seeking three declarations relating to Alternative Gaming Rights:

(1) Because Alternative Gaming Rights do not exist, the Debtors cannot have conveyed them to MV LLC in 2002 or anytime thereafter and thus MV LLC does not own any Alternative Gaming Rights;

(2) The Debtors' obligation to convey Alternative Gaming Rights does not run with the land or assets proposed to be sold and thus a purchaser of those assets will not be obligated to convey to MV LLC any Alternative Gaming Rights that it obtains in the future, nor will a purchaser be required to allow MV LLC to operate alternative gaming activities on the location of any of the purchased assets; and

(3) The Debtors may sell their assets free and clear of any obligations to convey Alternative Gaming Rights or any other obligation in the Formation Agreement under section 363 of the Bankruptcy Code.

On December 11, 2009, the parties each moved for summary judgment.

On December 16, 2009, the Bankruptcy Court entered an order approving a stipulation whereby the Participating Members agreed that the rejection date of the Formation Agreement would be December 16, 2009 (the "Rejection Date"), provided that such rejection did not affect their claims and causes of action asserted in their adversary proceeding. Furthermore, the parties agreed that the Participating Members were required to file any amendments to their previously filed proofs of claim to address any rejection damage claims within thirty (30) days after the Rejection Date and that the parties would negotiate a litigation schedule that would result in a hearing to be held no later than May 15, 2010 for purposes of determining the validity, priority and amount of the amended claims.

The Bankruptcy Court heard oral argument on the adversary proceeding on January 5, 2010. By order dated January 11, 2010, the Bankruptcy Court granted the Debtors' motion for summary judgment, denied the Participating Members' motion, dismissed the complaint with prejudice, and granted the Debtors' counterclaims. The Participating Members have not appealed this order and such time to appeal the order expired as of January 25, 2010.

On January 15, 2010, the Participating Members amended their proofs of claim to, among other things, add rejection damages claims against Pimlico, Laurel Racing, Laurel Racing Association, The Maryland Jockey Club of Baltimore City and Magna Entertainment. On February 17, 2010, the Debtors filed that certain Objection or, in the Alternative, Motion to Estimate the Participating Members' Proof of Claim. In an effort to move expeditiously, on February 23, 2010, the Court entered a stipulated scheduling order on February 23, 2010, that contemplated mediation among the parties, summary judgment, and trial to commence on April 23, 2010. Pursuant to that scheduling order, the Debtors filed a motion for summary judgment on March 2, 2010 and the Participating members filed their answering brief on March 11, 2010. The parties, MID and the Committee also mediated their dispute on March 8th and 9th and continued settlement discussions thereafter. Those discussions culminated in a settlement term sheet, read into the record on the Debtors' March 17, 2010 hearing, and a settlement agreement, dated March 21, 2010.

42

The salient terms of the settlement are as follows:

| | |
|---|---|
| **SETTLEMENT AND ALLOWED CLAIMS** | In exchange for the Participating Members' membership units in MV LLC, which units shall be assigned and transferred to Magna Entertainment (the "Assignment"), and in full and complete satisfaction of the proofs of claim filed by the Participating Members, the Participating Members shall receive (a) allowed claims (the "Allowed Claims") in the amounts of: (i) $8 million against MEC, to be treated as an Allowed Non-MJC General Unsecured Claim, and (ii) $4 million against the MJC Debtors, to be treated as an Allowed MJC Claim under the Plan (the "PMs' Allowed MJC Claim"), (b) the MID Payment (as defined below), and (c) a distribution from the proceeds of the MJC Sale as follows:<br><br>15% of MJC Sale Proceeds in excess of $39 million up to $45 million<br><br>20% of MJC Sale Proceeds in excess of $45 million up to $50 million<br><br>25% of MJC Sale Proceeds in excess of $50 million. |
| **DISALLOWED CLAIMS** | All other claims filed by the Participating Members and Joseph and Karin De Francis shall be disallowed. |
| **ADDITIONAL CONSIDERATION** | In the event that MID (or any affiliate, associate or nominee thereof) is the ultimate acquiror of the MJC Debtors' assets and either (i) such assets were not subject to an auction or (ii) such assets were subject to an auction but the purchase price is less than $39 million, the Participating Members shall be entitled to additional consideration for the Assignment of $1 million payable by MID (the "MID Payment," and together with the Allowed Claims, the "Settlement Amounts"). |
| **MUTUAL RELEASES** | The parties will exchange broad, mutual general releases. |

The Bankruptcy Court entered an order approving the settlement pursuant to Bankruptcy Rule 9019 of the Bankruptcy Code on March 23, 2010.

### b.    Maryland's Right of First Refusal

In connection with the sale of the Maryland Jockey Club or its assets, in whole or in part, the State of Maryland maintains that, pursuant to Maryland state law, if the Preakness Stakes were offered for sale, the State of Maryland has the option to purchase the Preakness Stakes from Pimlico, as the licensee, for the same purchase price as that offered by any third party. *Md. Bus. Reg.* § 11-520(d). To facilitate the State of Maryland's "right of first refusal," Maryland state law provides that Pimlico must give the State of Maryland notice of an offer it wishes to accept within thirty (30) days of receiving the offer, and if the State of Maryland wishes to exercise the option, it will notify Pimlico within sixty (60)

43

days after it receives such notice (the "<u>Maryland ROFR</u>").  The Debtors disagreed with the assertions of the State of Maryland and believe that such provision and the State of Maryland's efforts in connection therewith may be unconstitutional and present a chilling effect on the Debtors' sales efforts.

### c.    The Cloverleaf Litigation

As described earlier, the Debtors hold licenses and operate two (2) racetracks in Maryland, Laurel Park and Pimlico Race Course, about thirty (30) miles apart from each other.

Cloverleaf Enterprises, Inc. ("<u>CEI</u>") owns and operates Rosecroft Raceway, a racetrack located in Fort Washington, Maryland.  CEI holds a license from the Maryland Racing Commission to conduct standardbred horse races and pari-mutuel wagering.  Rosecroft Raceway is located within sixty (60) miles of Laurel Park and Pimlico.

As mentioned previously, horse racing is a highly regulated industry at both the State and federal levels, as it involves legalized pari-mutuel wagering.  At the State level, the Maryland Racing Commission, a State agency, regulates all aspects of horse racing in the State of Maryland.  Wagering conducted on out-of-state simulcast races at in-state racetracks (and off-track betting facilities) is also governed by the Interstate Horse Racing Act, 15 U.S.C. §3001, *et seq* (the "<u>Act</u>").

Certain mandatory consents are required by law as a condition of accepting wagering on either in-state, intra-track simulcast races or out-of-state, inter-track simulcast races imported into the State.  As to in-state, intra-track wagering, under Maryland law the organizations representing the majority of the horsemen and breeders at both the sending and receiving tracks must consent to any simulcasts for wagering purposes received by or emanating from racetracks licensed for that breed.  Md. Code Ann. Bus. Reg. §11-811(f).  The Maryland Racing Commission must also consent.  As to out-of-state, inter-track simulcast races imported for the purpose of wagering, the IHA controls.  Inter-state, off-track wagering is permissible if, and only if: (1) it is authorized by the racing commissions of both the out-of-state, or "host," track (where the race is being conducted) and the MRC; (2) the receiving track obtains the approval of all racetracks conducting live races within 60 miles of its betting facility; and (3) obtains the consent of the horsemen's group representing the majority of horsemen at the host track.

To facilitate compliance with the Act, Maryland law and for other reasons, The Maryland Jockey Club of Baltimore City, the operator of the Debtors' Maryland facilities, CEI, Maryland Thoroughbred Horsemen's Association, Inc. ("<u>MTHA</u>"), Maryland Horse Breeders Association, Inc. ("<u>MHBA</u>"), Cloverleaf Standardbred Owners Association, Inc. ("<u>CSOA</u>"), and Maryland Standardbred Breeders Association, Inc. ("<u>MSBA</u>") entered into that certain Cross-Breed Simulcasting Memorandum of Understanding, dated March 28, 2006.

Pursuant to the Cross-Breed Agreement, The Maryland Jockey Club of Baltimore City and CEI agreed to grant each other authorization to conduct cross-breed thoroughbred and standardbred simulcast wagering during the period April 9, 2006 to December 31, 2021 and  The Maryland Jockey Club of Baltimore City gave CEI the consent to conduct wagering on thoroughbred racing signals at its racetrack located within the relevant market area.  Due to the substantial difference in the number of thoroughbred races (the type of races conducted by the Debtors) and the amount of wagering generated on those races, compared to the number of standardbred races (the type of races conducted by CEI) and the respective wagering in connection therewith, and for other reasons, the parties to the Cross-Breed Agreement acknowledged that simulcasts of thoroughbred races had considerably greater value.  Thus, as a condition for The Maryland Jockey Club of Baltimore City's (and the thoroughbred horsemen and

breeders) consent, CEI agreed to pay an annual "premium" equal to $5.9 million (the "Premium") for the opportunity to simulcast and accept wagers at Rosecroft Racecourse on all live thoroughbred races conducted at Laurel Park and Pimlico and all out-of-state thoroughbred races.

The Premium is allocated as follows: forty-seven percent (47%) to MJC, forty-seven percent (47%) to MTHA to pay purses and support the labor pool of trainers, groomers and other employees, and six percent (6%) to MHBA.   The Cross-Breed Agreement provides that CEI will pay the Premium in equal weekly installments on a pro-rated basis, less certain offsets.

As required under the Cross-Breed Agreement, CEI made the Premium payments for the years 2006, 2007 and 2008.  CEI has not made any payments due with respect to the Premium in 2009. On or about April 21, 2009, The Maryland Jockey Club of Baltimore City, along with the MTHA and the MHBA, gave written notice to CEI of its failure to make timely payments of the Premium.  On or about April 24, 2009 The Maryland Jockey Club of Baltimore City petitioned the Maryland Racing Commission, a State agency, to have the Maryland Racing Commission revoke its consent for CEI to engage in simulcasting of thoroughbred horse races for the purpose of wagering.  On May 1, 2009, MJC notified CEI and others that it was withdrawing its consent to permit the simulcast of live thoroughbred horseraces.  Thereafter, on May 2, 2009, the day of the running of the Kentucky Derby, CEI sought and obtained a TRO from the United States District Court for the District of Maryland enjoining TrackNet and Churchill Downs from denying the Kentucky Derby simulcast signal to CEI.  On Friday, May 8, 2009, a preliminary injunction hearing was scheduled to be heard by the United States District Court before the Honorable Deborah K. Chasanow.  On the evening of Thursday, May 7, 2009, CEI voluntarily dismissed the case.  The Court approved the dismissal on Friday, May 8.  CEI has not sought to obtain or receive thoroughbred simulcast signals through a judicial proceeding at any time after the TRO lawsuit was voluntarily dismissed on May 7, 2009.

On June 3, 2009, CEI filed a voluntary petition for relief pursuant to the Bankruptcy Code in the United States Bankruptcy Court for the District of Maryland, Greenbelt Division (the "Maryland Bankruptcy Court").  Prior to the deadline to file proofs of claim in the CEI bankruptcy case, The Maryland Jockey Club of Baltimore City filed a proof of claim asserting an unsecured claim in the amount of $1,762,042 based on obligations due under the Cross-Breed Agreement (the "Proof of Claim").

On or about July 6, 2009, CEI filed an adversary proceeding against TrackNet Media and sixteen (16) other defendants alleging breach of contract and tortuous interference with contract claims (the "CEI Complaint").  In the CEI Complaint, CEI alleges that the out-of-state racetrack defendants, simulcasting through TrackNet Media, breached their simulcast wagering agreements with CEI by refusing to provide CEI with a simulcast signal at the direction of certain other defendants and The Maryland Jockey Club of Baltimore City, each of whom claimed that CEI no longer had consent to receive simulcast signals because of CEI's failure to pay the Premium due in 2009 under the Cross-Breed Agreement.  On or about August 6, 2009, TrackNet Media and certain of the defendants named in the Complaint filed a motion to dismiss the Complaint for failure to join a necessary party, The Maryland Jockey Club of Baltimore City.

On or about August 28, 2009, CEI filed a motion seeking relief from the automatic stay to proceed with CEI's objection to the Proof of Claim, to determine post petition amounts due to CEI by The Maryland Jockey Club of Baltimore City, and to join The Maryland Jockey Club of Baltimore City as a defendant in the Complaint.  On October 23, 2009, the Bankruptcy Court granted CEI's motion and CEI amended the CEI Complaint to join The Maryland Jockey Club of Baltimore City as a defendant.  On February 19, 2010, The Honorable Richard D. Bennett, United States District Court for the District of Maryland granted the Joint Motion to Withdraw the Reference of Adversary Proceeding and the matter

was transferred to the United States District Court for the District of Maryland.  The Maryland Jockey Club of Baltimore City and others have filed partial Motions to Dismiss the Amended Complaint, including the anti-trust claims.  All matters in these proceedings are strenuously disputed between the parties.

11.    <strong>Canadian Securities Regulatory Proceedings Against MID</strong>.

During the course of the Debtors' Chapter 11 Cases, certain parties commenced regulatory proceedings against MID with the OSC by filing two applications: (i) an application, dated July 10, 2009, by Farallon Capital Management, L.L.C., Hotchkis and Wiley Capital Management, LLC, Donald Smith & Co. Inc., Owl Creek Asset Management, L.P., North Run Capital, LP and Pzena Investment Management, LLC, on behalf of themselves and funds and entities under their management; and (ii) an application, dated March 30, 2009 (as amended and restated on April 9, 2009 and July 13, 2009), by Greenlight Capital, Inc. (collectively, the "<u>MID Dissident Shareholders</u>").

The MID Dissident Shareholders' applications related to allegations of MID's non-compliance with certain Canadian securities laws, in particular, Multilateral Instrument 61-101 – *Protection of Minority Security Holders in Special Transactions* ("<u>MI 61-101</u>")[2].  The applications did not assert any allegations directly against Magna Entertainment.  However, Magna Entertainment sought, and obtained, intervener status in connection with the hearing of the applications.

On August 11, 2009, the OSC issued a Notice of Hearing scheduling a hearing for September 9 and 10, 2009 to consider the applications brought by the MID Dissident Shareholders.

On August 20, 2009, following a motions hearing to consider certain procedural matters, the OSC issued an order granting Magna Entertainment limited intervener status to make oral and written submissions with respect to the appropriateness and scope of any order made by the OSC in disposing of the applications.

On September 9 and 10, 2009, the OSC held a hearing on the merits of the MID Dissident Shareholders' applications.  The MID Dissident Shareholders alleged that certain lending and corporate reorganization transactions that were entered into and proposed to be entered into by MID and Magna Entertainment, among other parties, in November 2008, and certain debtor-in-possession financing and stalking horse bid transactions entered into and proposed to be entered into by MID and Magna Entertainment in March 2009, in connection with Magna Entertainment's Chapter 11 Cases, were related party transactions that failed to comply with the minority shareholder approval and formal valuation requirements under MI 61-101.  Moreover, the MID Dissident Shareholders sought a determination by the OSC that those contested transactions violated MI 61-101 because minority shareholder approval was required and not obtained, and because a formal valuation was required and not provided.  The MID Dissident Shareholders further sought orders from the OSC that would, in effect, prohibit MID from relying on any exemption from the requirement to obtain minority approval and to

---

[2]    MI 61-101 is a Canadian securities law that regulates special types of transactions, including certain types of related party transactions, by providing a number of protections to minority shareholders. Those protections include extending voting rights to minority shareholders and requiring that a formal valuation of the assets involved in a related party transaction be obtained from a qualified and independent valuator in certain limited circumstances. More specifically, unless exemptions are available, a "related party transaction" (within the meaning of MI 61-101) must be approved by at least a simple majority of the votes cast by minority shareholders of the issuer and be the subject of a formal valuation.

46

provide a formal valuation under MI 61-101 in connection with any future related party transactions between MID and Magna Entertainment.

MID vigorously defended its actions and the availability of exemptions from the requirements of MI 61-101.  Magna Entertainment also strongly objected to the orders sought by the MID Dissident Shareholders on the basis that such orders would be punitive and have a devastating impact on Magna Entertainment and its stakeholders.

On September 14, 2009, the OSC issued an order dismissing the applications brought by the MID Dissident Shareholders in their entirety, and releasing MID from an undertaking previously made to the OSC staff to the effect that it would not enter into certain transactions with Magna Entertainment pending the outcome of the proceedings.

## 12.    The ODS Litigation.

On May 18, 2007, ODS Technologies, L.P., *d/b/a* TVG Network and ODS Properties, Inc. ("ODS"), filed a patent infringement action against Magna Entertainment, its non-Debtor subsidiary XpressBet, Inc. ("XpressBet") and HRTV, Inc. in the United States District Court for the Central District of California (the "California District Court").  In the action, ODS asserted that the defendants directly infringed, contributorily infringed, and/or actively induced infringement of five of ODS's patents relating to an interactive wagering system.  Specifically, ODS asserted that the defendants market and sell racetrack audiovisual and wagering services under the brand names of "XpressBet" and "HRTV" that allegedly use technology protected by ODS's patents.

On April 17, 2009, the Debtors commenced that certain adversary proceeding (the "ODS Litigation") against ODS in response to the California District Court's denial of Magna Entertainment and XpressBet's Ex Parte Application for a temporary stay of the District Court action in light of the bankruptcy proceedings.  The adversary proceeding sought to extend the automatic stay to enjoin the prosecution of the California District Court action against the defendants.  After executing numerous stipulations extending the objection deadline related to the Debtors' motion, on December 15, 2009, the Debtors withdrew, without prejudice the ODS Litigation.

## 13.    The Red Rock Adversary.

On June 30, 2009, Redrock Administrative Services LLC and a group of simulcast sites filed that certain Complaint for Declaratory and Other Relief against certain of the Debtors.  The complaint has since been amended twice.  In the complaint, the plaintiffs allege that the Debtors improperly withheld payment of certain money room settlements of pari-mutuel pools because the funds at issue are not property of the Debtors' estates.  The complaint alleges that the funds belong to the plaintiffs under the theories of constructive trust, bailment and conversion.

On November 2, 2009, the Debtors moved to dismiss the complaint for failure to state a claim.  The motion is fully briefed and awaits disposition by the Bankruptcy Court.

## 14.    The California Litigation.

On November 16, 2009, the Debtors filed that certain Motion for Authorization Pursuant to Section 105(a) of the Bankruptcy Code to Distribute Certain Statutory Disbursements (the "Disbursement Motion").  Pursuant to the Disbursement Motion, the Debtors requested authorization to

make distributions to certain entities within the State of California as provided for in the California Business and Professions Code.

On December 4, 2009, Redrock Administrative Services LLC and a group of simulcast sites filed an objection to the Disbursement Motion asserting that the Debtors failed to demonstrate (i) that the proposed disbursements were critical to their reorganization and (ii) that the Debtors acted as a conduit on behalf of certain advance deposit wagering companies.

On December 4, 2009, a group of California-licensed racing associations, authorized off-track wagering facilities, the State of California and certain related entities (together, the "California Entities"), as the recipients of certain distributions provided for by California law, filed a response in support of the Disbursement Motion.  The California Entities filed a supplemental response on December 11, 2009 providing additional evidence of the importance of the disbursements to the California entities.

Subsequently thereto, limited discovery was conducted in connection with the Disbursement Motion.  On February 1, 2010, the Bankruptcy Court denied the Disbursement Motion.

On February 8, 2010, the California Entities filed that certain Complaint for Declaratory and Other Relief against certain of the Debtors.  In the complaint, the California Entities are seeking, among other things, (i) a declaratory judgment that the defendants have held the required statutory distributions in a statutory and/or constructive trust for the benefit of the California Entities and such distributions are not property of the estate, (ii) a declaratory judgment the defendants have obtained the statutory distributions as a result of fraudulent or negligent misrepresentations and (iii) injunctive relief requiring the Defendants to immediately disburse the statutory disbursements to the California Entities.  The Debtors filed an answer to the complaint on March 19, 2010, asserting certain defenses and counterclaims.

### 15.    Claims Process.

On April 5, 2009, the Debtors, excluding MEC Pennsylvania and MEC Lone Star, filed their Schedules.  On July 16, 2009, MEC Pennsylvania filed its Schedules and on September 18, 2009, MEC Lone Star filed its Schedules.  Pursuant to an order of the Bankruptcy Court, dated March 6, 2009, the Debtors retained Kurtzman Carson Consultants LLC (the "Solicitation Agent") to act as the Debtors' claims and noticing agent and assist with "among other things, the solicitation and calculation of votes and the distribution as required in furtherance of plan(s) of reorganization."  Pursuant to orders, dated April 29, 2009, August 10, 2009 and November 17, 2009, respectively, the Bankruptcy Court established the deadlines for (a) all persons and entities to file proofs of claim against the Debtors, except for MEC Pennsylvania and MEC Lone Star as July 1, 2009 at 5:00 p.m. and, solely as to governmental units to file proofs of claim against the Debtors, as September 1, 2009 at 5:00 p.m., (b) all persons and entities to file proofs of claim against MEC Pennsylvania as October 9, 2009 at 5:00 p.m. and, solely as to governmental units to file proofs of claim against MEC Pennsylvania, as December 13, 2009 at 5:00 p.m., and (c) all persons and entities to file proofs of claim against MEC Lone Star as January 18, 2010 at 5:00 p.m. and, solely as to governmental units, to file proofs of claim against MEC Lone Star, as March 13, 2010 at 5:00 p.m. (collectively, the "Bar Dates").

To date, over 1,800 proofs of claim have been filed in the Debtors' chapter 11 cases.  The Debtors have begun the process of reviewing and reconciling the filed proofs of claim.  This process includes identifying particular categories of proofs of claims that may be targeted for disallowance, reduction and allowance, or reclassification and allowance.  To avoid possible double or improper

recovery by claimants and to reduce the number of claims, the Debtors began filing a series of objections to various categories of Claims.

Thus far, the Debtors have filed six omnibus non-substantive claims objections and four omnibus substantive claims objection.  The Debtors anticipate filing additional objections to Claims in the coming months.

## V.    THE PLAN OF REORGANIZATION

This section of the Disclosure Statement summarizes the Plan, a copy of which is attached hereto as Exhibit "A".  This summary is qualified in its entirety by reference to the Plan.

### A.    Chapter 11 Generally

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders.  In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and equity interests in a debtor.  Confirmation of a plan by a bankruptcy court binds, amongst others, the debtor, any person acquiring property under the plan and any creditor or equity interest holder of a debtor whether or not such creditor or equity holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions, the order approving confirmation of a plan of reorganization discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan.

### B.    Implementation of Settlement

As mentioned throughout, the Plan and classification of Claims and Equity Interests embodies a negotiated compromise of the Committee Litigation (described above in Section IV.E.9) brought by the Creditors' Committee against MID, MID Islandi and the Third Party Defendants.  The Proponents believe that the Plan is fair, equitable and reasonable, in the best interests of all Creditors and is an essential component of the Debtors' reorganization.  Indeed, the Proponents believe that the Plan is the best way to ensure a prompt and fair resolution of the Debtors' Chapter 11 cases that avoids the uncertainty and delay of protracted litigation.  Although litigation of the Committee Litigation could produce somewhat different absolute and relative recoveries for Creditors from those provided by the Plan, such litigation would be expensive, uncertain and, taking into account likely appeals, would not be finally resolved for years, thus delaying and potentially reducing the value of distribution to Creditors.

As part of the Plan, the Bankruptcy Court can, and should, approve the settlement pursuant to Bankruptcy Rule 9019(a).  In determining whether to approve a settlement, the "ultimate inquiry…[is]… 'whether the compromise is fair, reasonable, and in the interest of the estate.'"  In re Marvel Entm't Group, Inc., 222 B.R. 243, 249 (Bankr. D. Del 1998) (quoting In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997)).  In doing so, a bankruptcy court "'need only conclude that the settlement falls within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness.'"  In re Nutritional Sourcing Corp., 315 B.R. 321, 330 (Bankr. D. Del. 2004)).  There can be no doubt that the standard is easily met here.

49

The claims asserted in the Committee Litigation involve extremely complex issues of both fact and law. The settlement reflected in the Plan is the result of extensive good faith negotiations among the parties and represents each of the parties' assessments of the potential risks and costs of the Committee Litigation. The Plan affords Creditors a reasonable recovery in the near term that avoids both the uncertainty and delay of recoveries that might be available after trial and appeal.

### C.    Administrative Expense Claims and Priority Claims

To confirm the Plan, Allowed Administrative Expense Claims and Allowed Priority Tax Claims must be paid in full or in a manner otherwise agreeable to the holders of such Claims.

### 1.    Administrative Expense Claims.

Administrative Expense Claims are any Claims constituting a cost or expense of administration of the Chapter 11 Case asserted or authorized to be asserted in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the estates of the Debtors, any actual and necessary costs and expenses of operating the businesses of the Debtors, any costs and expenses of the Debtors for the management, maintenance, preservation, sale or other disposition of any assets, the administration and implementation of the Plan, the administration, prosecution or defense of Claims by or against the Debtors and for distributions under the Plan, any Claims for reclamation in accordance with section 546(c)(2) of the Bankruptcy Code allowed pursuant to Final Order, any Claims for compensation and reimbursement of expenses arising during the period from and after the Petition Date and prior to the Effective Date and awarded by the Bankruptcy Court in accordance with sections 328, 330, 331 or 503(b) of the Bankruptcy Code or otherwise in accordance with the provisions of the Plan, whether fixed before or after the Effective Date, any fees or charges assessed against the Debtor's estate pursuant to section 1930, chapter 123, Title 28, United States Code and any obligations arising in connection with the Reorganized Debtors' assumption of their indemnification and reimbursement obligations pursuant to Section 23.4 of the Plan.

Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, which sections require MID US Financing to provide the MID Cash Consideration and the Committee Litigation Settlement, on the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim shall become an Allowed Claim, upon receipt of sufficient funds from MID Transferee, the Disbursing Agent shall (i) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim or (ii) satisfy and discharge such Allowed Administrative Expense Claim in accordance with the terms and conditions of the agreements with respect thereto.

### 2.    Priority Tax Claims.

Priority Tax Claims are any Claims of a governmental unit against the Debtor entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, which sections require MID US Financing to provide the MID Cash Consideration and the Committee Litigation Settlement, on the Effective Date, each holder of an Allowed Priority Tax Claim shall be entitled to receive distributions in an amount equal to the full amount of such Allowed Priority Tax Claim. At the option and discretion of MID Transferee, which option shall be exercised, in writing, on or prior to the commencement of the Confirmation Hearing, upon receipt of sufficient funds from MID Transferee, such payment shall be made by the Disbursing Agent (a) in full, in Cash, on the Effective Date, (b) in accordance with section

50

1129(a)(9)(C) of the Bankruptcy Code, in full, in Cash, in equal quarterly installments, commencing on the first (1st) Business Day following the Effective Date and ending on the fifth (5th) anniversary of the commencement of the Chapter 11 Cases, together with interest accrued thereon at a rate of four percent (4%) per annum or at such other rate to be determined by the Bankruptcy Court and set forth in the Confirmation Order, or (c) by mutual agreement of the holder of such Allowed Priority Tax Claim and the Debtors or Reorganized Debtors (as directed by Transferee), as the case may be.

###### 3.    Debtor in Possession Financing.

On the Effective Date, (a) a portion of the cash held in the Remington Escrow shall be used to pay and satisfy in full all outstanding DIP Obligations, (b) the Debtors shall be relieved of any and all other obligations with respect thereto and (c) all Liens and other encumbrances granted pursuant to the DIP Orders with respect to the property and interests in property claimed by the Debtors shall be released.

###### D.    Classification and Treatment of Claims and Equity Interests

Claims and Equity Interests are classified into sixty-one (61) Classes under the Plan and the proposed treatment of Claims and Equity Interests in each Class is described in the Plan and in the discussion below.  The classification takes into account the different nature and priority of the Claims and Equity Interests.

###### 1.    Class 1: Priority Non-Tax Claims.

Priority Non-Tax Claims are any Claims against the Debtor, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment in accordance with sections 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code, but only to the extent entitled to such priority.

Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, which sections require MID US Financing to provide the MID Cash Consideration and the Committee Litigation Settlement, unless otherwise mutually agreed upon by the holder of an Allowed Priority Non-Tax Claim and MID Transferee, upon the Disbursing Agent's receipt of sufficient funds from the MID Transferee, each holder of an Allowed Priority Non-Tax Claim shall receive from the Disbursing Agent in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Priority Non-Tax Claim, Cash in an amount equal to such Allowed Priority Non-Tax Claim on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is possible.

###### 2.    Class 2: MID Claims.

The MID Claims are the Allowed Bridge Loan Claims, Allowed Gulfstream Park Claim, Allowed Old RP Claim and the Allowed 2008 Claim.

Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, which sections require MID US Financing to provide the MID Cash Consideration and the Committee Litigation Settlement, the holder of the MID Claims shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for such MID Claims:

(a)    On the Effective Date, (i) the MID LSP Sale Proceeds and the MID Thistledown Sale Proceeds, if any, or (ii) if the Operating Trusts are created, the LSP Trust Interests and/or the

51

Thistledown Trust Interests, as applicable, entitling the holder of the MID Claims to receive the MID LSP Sale Proceeds and the MID Thistledown Sale Proceeds, as soon as practicable upon consummation of the LSP Sale and/or Thistledown Sale, if any, as applicable;

(b)    On the Effective Date, the PA Meadows Proceeds or, in the event that the PA Meadows Litigation has not been settled or resolved by Final Order, the PA Meadows Litigation shall be assigned to MID; provided, however, that notwithstanding anything to the contrary, including, without limitation, Article XXXIV of the Plan, the Plan shall not limit or impair any defenses (including, but not limited to, any rights of setoff preserved or permitted under the Bankruptcy Code or rights of recoupment under applicable law) that have been asserted by PA Meadows in connection with the PA Meadows Litigation, whether the PA Meadows Litigation is assigned to MID Transferee or retained by the estate;

(c)    the MID Non-Debtor Assets;

(d)    the MID Reorganized Debtor Stock; and

(e)    the MID Reorganized Debtor Assets;

Notwithstanding the foregoing, the Assets of Gulfstream Park Racing and the Reorganized GPRA Commercial Stock shall be transferred to the MID Transferee immediately prior to the transfer of the Reorganized Gulfstream Park Racing Stock and all the parties (including, without limitation, the Debtors or the Reorganized Debtors) agree to report such transfers consistently with the foregoing for federal, state and local income tax purposes.

### 3.    Class 3: Wells Fargo Claim.

The Wells Fargo Claim consists of any and all claims of Wells Fargo, including the Wells Fargo Guarantee Claim, against the Debtors.

Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, unless otherwise mutually agreed upon by the holder of the Allowed Wells Fargo Claim and MID Transferee, on the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Wells Fargo Claim, the holder of the Allowed Wells Fargo Claim  shall receive payment of such holder's Allowed Wells Fargo Claim in Cash.

### 4.    Class 4: PNC Claim.

The PNC Claim consists of any and all Claims of PNC against the Debtors.

Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, on the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed PNC Claim, each holder of an Allowed PNC Claim shall receive payment of such holder's Allowed PNC Claim in Cash.  The terms and conditions of Section 23.3 of the Plan shall not apply to the payment due to PNC Bank under Section 8.1 of the Plan.

5.      **Class 5: BMO Claim.**

The BMO Claim consists of any and all Claims of BMO against the Debtors.

Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan unless otherwise mutually agreed upon by the holder of the Allowed BMO Claim and MID Transferee, on the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed BMO Claim, the holder of the Allowed BMO Claim shall receive payment in full of such holder's Allowed BMO Claim in Cash.

6.      **Class 6: Secured Claims.**

Secured Claims are Claims against the estate of any of the Debtors, other than the BMO Claim, the PNC Claim, the Wells Fargo Claim or the MID Claims, (a) secured by a valid, perfected and unavoidable Lien on Collateral, including secured tax claims or (b) subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Collateral or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or as otherwise agreed to, in writing, by (1) any of the Debtors and the holder of such Claim or (2) any of the Reorganized Debtors or MID Transferee and the holder of such Claim; provided, however, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as a Non-MJC General Unsecured Claim or MJC Claim, as applicable, unless, in any such case, the Class of which such Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, which sections require MID US Financing to provide the MID Cash Consideration and the Committee Litigation Settlement, on the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Secured Claim, the holders of Allowed Secured Claims shall receive one of the following distributions: (i) the payment of such holder's Allowed Secured Claim in Cash; (ii) the sale or disposition proceeds of the property securing an Allowed Secured Claim to the extent of the value of their respective interests in such property; (iii) the surrender to the holders of the Allowed Secured Claims of the property securing such Claim; (iv) such other distributions as shall be necessary to satisfy the requirements of chapter 11 of the Bankruptcy Code, including, without limitation, the payment of interest with respect thereto, at the lesser of (a) the non-default rate set forth in the applicable contractual documentation and (b) the rate applicable pursuant to applicable non-bankruptcy law as determined by the Bankruptcy Court or (v) such other treatment as may be agreed upon by MID Transferee and holder of the Allowed Secured Claim.  The manner and treatment of Allowed Secured Claims shall be determined by MID Transferee, subject to the consent of the Debtors, in writing, to be received by the holder of the Secured Claim two (2) business days prior to the Ballot Date.

7.      **Class 7: 8.55% Note Claims.**

The 8.55% Note Claims are any and all Claims or Equity Interests against Magna Entertainment arising under or in connection with the 8.55% Notes.

Commencing on the Effective Date, each holder of an Allowed 8.55% Note Claim shall receive on account of such Allowed 8.55% Note Claim:

53

(a)      Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, which sections require MID US Financing to provide the MID Cash Consideration and the Committee Litigation Settlement,  on the Effective Date, distributions of such holder's Pro Rata Share of Creditor Cash; and

(b)      In the event that the Operating Trusts are created, such holder's Pro Rata Share of the LSP Trust Interests and/or the Thistledown Trust Interests, as applicable.

**8.      Class 8: 7.25% Note Claims.**

The 7.25% Note Claims are any and all Claims or Equity Interests against Magna Entertainment arising under or in connection with the 7.25% Notes.

Commencing on the Effective Date, each holder of an Allowed 7.25% Note Claim shall receive on account of such Allowed 7.25% Note Claim:

(a)      Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, which sections require MID US Financing to provide the MID Cash Consideration and the Committee Litigation Settlement, on the Effective Date, distributions of such holder's Pro Rata Share of Creditor Cash; and

(b)      In the event that the Operating Trusts are created, such holder's Pro Rata Share of the LSP Trust Interests and/or the Thistledown Trust Interests, as applicable.

**9.      Classes 9 – 26: Non-MJC General Unsecured Claims.**

Non-MJC General Unsecured Claims are Claims against the estate of any of the Debtors, a 8.55% Note Claim and a 7.25% Note Claim, other than an MID Claim,  a Secured Claim, an Administrative Expense Claim, a Priority Non-Tax Claim, a Priority Tax Claim, the BMO Claim, the Wells Fargo Claim, the PNC Claim or an MJC Claim.

Commencing on the Effective Date, each holder of an Allowed Non-MJC General Unsecured Claim (other than holders of 8.55% Note Claims and 7.25% Note Claims, which shall receive the treatment set forth above) shall receive on account of such Allowed Non-MJC General Unsecured Claim:

(a)      Subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, which sections require MID US Financing to provide the MID Cash Consideration and the Committee Litigation Settlement,  distributions of such holder's Pro Rata Share of Creditor Cash; and

(b)      In the event that the Operating Trusts are created, such holder's Pro Rata Share of the LSP Trust Interests and/or the Thistledown Trust Interests, as applicable.

**10.      Classes 27-34: MJC Claims.**

MJC Claims are any Claims against the MJC Debtors other than (a) the PNC Claim, (b) an Administrative Expense Claim, (c) a Secured Claim, (d) a Priority Non-Tax Claim or (e) a Priority Tax Claim.

Subject to the provisions of Sections 2.1(d) and 23.2 hereof, unless otherwise mutually agreed upon by the holder of an Allowed MJC Claim and MID Transferee, MID Transferee shall pay to each holder of an Allowed MJC Claim in full satisfaction, settlement, release, and discharge of, and in

54

exchange for such Allowed MJC Claim, Cash in an amount equal to one hundred percent (100%) of such holder's Allowed MJC Claim on the Effective Date.

      **11.**      **Class 35: General Liability Insured Litigation Claims**.

      Insured Litigation Claims are Claims against the Debtors for which the claimant or the Debtors may recover under a General Liability Insurance Policy.

      On the Effective Date, Reorganized Magna Entertainment shall assume and, to the extent the applicable coverage period extends beyond the Effective Date, all General Liability Insurance Policies and each General Liability Insurance Carrier providing insurance pursuant to General Liability Insurance Policy shall continue to provide coverage to the Reorganized Debtors in accordance with the terms and provisions set forth therein, including, without limitation, remitting to Reorganized Magna Entertainment such amounts of excess collateral or surplus premiums in accordance with the General Liability Insurance Policy.

      Unless otherwise mutually agreed upon by the holder of an Allowed General Liability Insured Litigation Claim and the Debtors or the Reorganized Debtors, as the case may be, each holder of an Allowed General Liability Insured Litigation Claim shall be entitled, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed General Liability Insured Litigation Claim, to proceed with the liquidation of such Claim, including any litigation pending as of the Petition Date and seek recovery from the applicable General Liability Insurance Carrier; provided, however, that, under no circumstances, shall the holder of an Allowed General Liability Insured Litigation Claim recover from the Reorganized Debtors any amounts with respect to such Allowed General Liability Insured Litigation Claim, except with respect to the payment of a deductible which may be required thereunder, which such amount, upon settlement or resolution of the litigation underlying the Allowed General Liability Insured Litigation Claim, the holder to the Allowed General Liability Insured Litigation Claim may assert as a Non-MJC General Unsecured Claim or an MJC General Unsecured Claim, as applicable.

      **12.**      **Class 36: MEC Maryland Investments Stock**.

      MEC Maryland Investments Stock is equity interests in MEC Maryland Investments represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

      On the Effective Date, (a) the MEC Maryland Investments Stock, shall be cancelled and the holder of MEC Maryland Investments Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized MEC Maryland Investments Stock shall be issued and distributed in accordance with the terms and provisions of Section 6.1 of the Plan; provided, however, that, in the event the MID Transferee elects to acquire Reorganized AmTote Stock pursuant to the AmTote Option, the Reorganized MEC Maryland Investments Stock shall be issued and distributed to the Reorganized Debtors Plan Administrator.

      **13.**      **Class 37: AmTote Stock**.

      AmTote Stock is equity interests in AmTote represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the AmTote Stock, shall be cancelled and the holder of AmTote Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized AmTote Stock shall be issued and distributed in accordance with the terms and provisions of Sections 6.1 and 30.3 of the Plan; provided, however, that, in the event the MID Transferee elects to acquire Reorganized MEC Maryland Investments Stock pursuant to the AmTote Option, the Reorganized AmTote Stock shall be issued and distributed to the Reorganized 30000 Maryland.

14.      **Class 38: GPRA Commercial Stock.**

GPRA Commercial Stock is equity interests in GPRA Commercial represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the GPRA Commercial Stock, shall be cancelled and the holder of GPRA Commercial Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized GPRA Commercial Stock shall be issued and distributed in accordance with the terms and provisions of Section 6.1 of the Plan.

15.      **Class 39: Gulfstream Park Racing Stock.**

Gulfstream Park Racing Stock is equity interests in Gulfstream Park Racing represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the Gulfstream Park Racing Stock, shall be cancelled and the holder of Gulfstream Park Racing Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized Gulfstream Park Racing Stock shall be issued and distributed in accordance with the terms and provisions of Section 6.1 of the Plan.

16.      **Class 40: L.A. Turf Club Stock.**

L.A. Turf Club Stock is equity interests in L.A. Turf Club represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the L.A. Turf Club Stock, shall be cancelled and the holder of L.A. Turf Club Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized L.A. Turf Club Stock shall be issued and distributed in accordance with the terms and provisions of Section 6.1 of the Plan.

17.      **Class 41: Magna Entertainment Stock.**

Magna Entertainment Stock is equity interests in Magna Entertainment represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the later to occur of the Effective Date and the date the LSP Sale is consummated, (a) the Magna Entertainment Stock, shall be cancelled and the holders of Magna Entertainment Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized Magna Entertainment Stock shall be issued and distributed to the Reorganized Debtors Plan Administrator.

18.    **Class 42: MEC Land Holdings Stock.**

MEC Land Holdings Stock is equity interests in MEC Land Holdings represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the MEC Land Holdings Stock, shall be cancelled and the holder of MEC Land Holdings Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized MEC Land Holdings Stock shall be issued and distributed to the Reorganized Debtors Plan Administrator.

19.    **Class 43: Pacific Racing Stock.**

Pacific Racing Stock is equity interests in Pacific Racing represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the Pacific Racing Stock, shall be cancelled and the holder of Pacific Racing Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized Pacific Racing Stock shall be issued and distributed in accordance with the terms and provisions of Section 6.1 of the Plan.

20.    **Class 44: Santa Anita Companies Stock.**

Santa Anita Companies Stock is equity interests in Santa Anita Companies represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the Santa Anita Companies Stock, shall be cancelled and the holder of Santa Anita Companies Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized Santa Anita Companies Stock shall be issued and distributed to the Reorganized Debtors Plan Administrator.

21.    **Class 45: Palm Meadows Training Center Stock.**

Palm Meadows Training Center Stock is equity interests in Palm Meadows Training Center represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the Palm Meadows Training Center Stock, shall be cancelled and the holder of  Palm Meadows Training Center Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized Palm Meadows Training Center Stock shall be issued and distributed in accordance with the terms and provisions of Section 6.1 of the Plan.

22.    **Class 46: MEC Pennsylvania Stock.**

MEC Pennsylvania Stock is equity interests in MEC Pennsylvania represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the MEC Pennsylvania Stock, shall be cancelled and the holder of MEC Pennsylvania Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized MEC Pennsylvania Stock shall be issued and distributed to the Reorganized Debtors Plan Administrator.

23.    **Class 47:  Pimlico Stock.**

Pimlico Stock is equity interests in Pimlico represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the Pimlico Stock, shall be cancelled and the holders of Pimlico Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized Pimlico Stock shall be issued and distributed to the Reorganized Debtors Plan Administrator; provided, however, that, in the event the MID Transferee elects to acquire Reorganized Pimlico Stock pursuant to the MJC Option, the Reorganized Pimlico Stock shall be issued and distributed in accordance with the terms and provisions of Section 6.1 of the Plan.

24.    **Class 48: Prince George's Racing Stock.**

Prince George's Racing Stock is equity interests in Prince George's Racing represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the Prince George's Racing Stock, shall be cancelled and the holder of Prince George's Racing Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized Prince George's Racing Stock shall be issued and distributed to the Reorganized Debtors Plan Administrator; provided, however, that, in the event the MID Transferee elects to acquire Reorganized Prince George's Racing Stock pursuant to the MJC Option, the Reorganized Prince George's Racing Stock shall be issued and distributed in accordance with the terms and provisions of Section 6.1 of the Plan.

25.    **Class 49: Maryland Jockey Club Stock**.

Maryland Jockey Club Stock is equity interests in Maryland Jockey Club represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the Maryland Jockey Club Stock, shall be cancelled and the holder of Maryland Jockey Club Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized Maryland Jockey Club Stock shall be issued and distributed to the Reorganized Debtors Plan Administrator; provided, however, that, in the event the MID Transferee elects to acquire Reorganized Maryland Jockey Club Stock pursuant to the MJC Option, the Reorganized Maryland Jockey Club Stock shall be issued and distributed in accordance with the terms and provisions of Section 6.1 of the Plan.

26.    **Class 50: The Maryland Jockey Club of Baltimore City Stock**.

The Maryland Jockey Club of Baltimore City Stock is equity interests in The Maryland Jockey Club of Baltimore City represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) The Maryland Jockey Club of Baltimore City Stock, shall be cancelled and the holders of The Maryland Jockey Club of Baltimore City Club Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized Maryland Jockey Club of Baltimore City Stock shall be issued and distributed to the Reorganized Debtors Plan Administrator; provided, however, that, in the event the MID Transferee elects to acquire Reorganized Maryland Jockey Club of Baltimore City Stock pursuant to the MJC Option, the Reorganized Maryland Jockey Club of Baltimore City Stock shall be issued and distributed in accordance with the terms and provisions of Section 6.1 of the Plan.

27.    **Class 51: Southern Maryland Racing Stock**.

Southern Maryland Racing Stock is equity interests in Southern Maryland Racing represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the Southern Maryland Racing Stock, shall be cancelled and the holder of Southern Maryland Racing Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized Southern Maryland Racing Stock shall be issued and distributed to the Reorganized Debtors Plan Administrator; provided, however, that, in the event the MID Transferee elects to acquire Reorganized Southern Maryland Racing Stock pursuant to the MJC Option, the Reorganized Southern Maryland Racing Stock shall be issued and distributed in accordance with the terms and provisions of Section 6.1 of the Plan.

28.      **Class 52: Southern Maryland AA Stock.**

Southern Maryland AA Stock is equity interests in Southern Maryland AA represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the Southern Maryland AA Stock, shall be cancelled and the holders of Southern Maryland AA Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized Southern Maryland AA Stock shall be issued and distributed to the Reorganized Debtors Plan Administrator; provided, however, that, in the event the MID Transferee elects to acquire Reorganized Southern Maryland AA Stock pursuant to the MJC Option, the Reorganized Southern Maryland AA Stock shall be issued and distributed in accordance with the terms and provisions of Section 6.1 of the Plan.

29.      **Class 53: Laurel Racing Stock.**

Laurel Racing Stock is equity interests in Laurel Racing represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the Laurel Racing Stock, shall be cancelled and the holders of Laurel Racing Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized Laurel Racing Stock shall be issued and distributed to the Reorganized Debtors Plan Administrator; provided, however, that, in the event the MID Transferee elects to acquire Reorganized Laurel Racing Stock pursuant to the MJC Option, the Reorganized Laurel Racing Stock shall be issued and distributed in accordance with the terms and provisions of Section 6.1 of the Plan.

30.      **Class 54: Laurel Racing Association Stock.**

Laurel Racing Association Stock is equity interests in Laurel Racing Association represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the Laurel Racing Association Stock, shall be cancelled and the holders of Laurel Racing Association Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized Laurel Racing Association Stock shall be issued and distributed to the Reorganized Debtors Plan Administrator; provided, however, that, in the event the MID Transferee elects to acquire Reorganized Laurel Racing Association Stock pursuant to the MJC Option, the Reorganized Laurel Racing Association Stock shall be issued and distributed in accordance with the terms and provisions of Section 6.1 the Plan.

31.      **Class 55: MEC Lone Star Stock.**

MEC Lone Star Stock is equity interests in MEC Lone Star represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership,

partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the MEC Lone Star Stock, shall be cancelled and the holder of MEC Lone Star Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) in the event that the LSP Sale has not been consummated, the Reorganized MEC Lone Star Stock shall be issued and transferred to the LSP Trust in accordance with the terms and provisions of Section 19.4 of the Plan.

### 32.    **Class 56: Thistledown Stock.**

Thistledown Stock is equity interests in Thistledown represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the Thistledown Stock, shall be cancelled and the holder of Thistledown Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) in the event that the Thistledown Sale has not been consummated, the Reorganized Thistledown Stock shall be issued and transferred to the Thistledown Trust in accordance with the terms and provisions of Section 19.4 of the Plan.

### 33.    **Class 57: Old RP Stock.**

Old RP Stock is equity interests in Old RP represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the Old RP Stock, shall be cancelled and the holder of Old RP Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized Old RP Stock shall be issued and distributed to the Reorganized Debtors Plan Administrator.

### 34.    **Class 58: MEC Dixon Stock.**

MEC Dixon Stock is equity interests in MEC Dixon represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the MEC Dixon Stock, shall be cancelled and the holder of MEC Dixon Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized Dixon Stock shall be issued and distributed to the Reorganized Debtors Plan Administrator.

### 35.    **Class 59: Sunshine Meadows Stock.**

Sunshine Meadows Stock is equity interests in Sunshine Meadows represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership,

61

partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the Sunshine Meadows Stock, shall be cancelled and the holder of Sunshine Meadows Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized Sunshine Meadows Stock shall be issued and distributed to the Reorganized Debtors Plan Administrator.

36.     **Class 60: 30000 Maryland Stock.**

300000 Maryland Stock is equity interests in 300000 Maryland represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the 30000 Maryland Stock, shall be cancelled and the holder of 30000 Maryland Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized 30000 Maryland Stock shall be issued and distributed in accordance with the terms and provisions of Section 6.1 of the Plan; provided, however, that, in the event the MID Transferee elects to acquire Reorganized MEC Maryland Investments Stock pursuant to the AmTote Option, the Reorganized 30000 Maryland Stock shall be issued and distributed to  Reorganized Maryland Investments.

37.     **Class 61: MEC Holdings Stock.**

MEC Holding Stock is equity interests in MEC Holding represented by duly authorized, validly issued and outstanding shares of preferred stock, common stock or any membership, partnership or other interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to the Petition Date.

On the Effective Date, (a) the MEC Holdings Stock, shall be cancelled and the holder of MEC Holdings Stock shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan and (b) the Reorganized MEC Holdings Stock shall be issued and distributed to the Reorganized Debtors Plan Administrator.

E.     **Provision for Treatment of Intercompany Claims**

On the Effective Date, all Intercompany Claims shall be either (i) discharged and extinguished, in which case such discharged and extinguished portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest on account of such portion under this Plan, or (ii) contributed to capital, distributed, transferred, setoff or subject to any other arrangement, as determined by the Debtors and MID.  Pursuant to section 1126(f) and 1126(g) of the Bankruptcy Code, the holders of Intercompany Claims against the Debtors are not entitled to vote to accept or reject the Plan.

F.    **Provisions for the Treatment of Disputed Claims**

1.    **Objections to Claims and Prosecution of Disputed Claims.**

The Reorganized Debtors Plan Administrator shall object to the allowance of Claims filed with the Bankruptcy Court with respect to which they dispute liability, priority or amount, including, without limitation, objections to Claims which have been assigned and the assertion of the doctrine of equitable subordination with respect thereto.  All objections, affirmative defenses and counterclaims shall be litigated to Final Order; provided, however, that the Reorganized Debtors Plan Administrator (within such parameters as may be established by the Board of Directors of the Reorganized Debtors) shall have the authority to file, settle, compromise or withdraw any objections to Claims; and, provided, further, that (i) objections and/or settlements, compromises or withdrawal of any objections to the allowance of Non-MJC General Unsecured Claims, 8.55% Note Claims and 7.25% Note Claims shall be made in consultation with the Creditors' Committee and any costs and expenses incurred by the Reorganized Debtors Plan Administrator in connection therewith shall be funded by Creditor Cash and (ii) objections and/or settlements, compromises or withdrawal of any objections to the allowance of MJC Unsecured Claims, Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims shall be made in consultation with MID US Financing and any costs and expenses incurred by the Reorganized Debtors Plan Administrator in connection therewith shall be funded by MID Transferee.  Unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors Plan Administrator shall file and serve all objections to Claims as soon as practicable, but, in each instance, not later than ninety (90) days following the Effective Date or such later date as may be approved by the Bankruptcy Court.

2.    **Estimation of Claims.**

Unless otherwise limited by an order of the Bankruptcy Court, the Reorganized Debtors Plan Administrator, upon consultation with the Creditors' Committee and MID US Financing, may at any time request the Bankruptcy Court to estimate for final distribution purposes any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the estimated amount shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; provided, however, that, if the estimate constitutes the maximum limitation on such Claim, the Debtors or the Reorganized Debtors Plan Administrator, as the case may be, may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim; and, provided, further, that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

3.    **Payments and Distributions on Disputed Claims.**

a.    **Disputed Claims Reserve**

Subject to the provisions of Section 2.1(d) and 23.2 of the Plan, from and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by order of the Bankruptcy Court, the Disbursing Agent shall reserve and hold in escrow for the benefit of each holder of a Disputed Claim, Cash, in an amount equal to the distributions which would

63

have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the Disputed Claim Amount, (ii) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, shall constitute and represent the maximum amount in which such Claim may ultimately become an Allowed Claim or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Reorganized Debtors Plan Administrator.  Any Cash reserved and held for the benefit of a holder of a Disputed Claim shall be treated as a payment and reduction on account of such Disputed Claim for purposes of Section 23.1 of the Plan and computing any additional amounts to be paid in Cash in the event the Disputed Claim ultimately becomes an Allowed Claim.  Such Cash reserved for the benefit of holders of Disputed Claims shall be either (x) held by the Disbursing Agent, in an interest-bearing account or (y) invested in interest-bearing obligations issued by the United States Government, or by an agency of the United States Government and guaranteed by the United States Government, and having (in either case) a maturity of not more than thirty (30) days, for the benefit of such holders pending determination of their entitlement thereto under the terms of the Plan.  No payments or distributions shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof by Final Order.  For purposes of calculating the KLNF Contingency Fee, the amounts held in reserve for Disputed Claims that consist of Non-MJC General Unsecured Claims shall be adjusted for such fee prior to being placed in reserve.

b.    <strong>Allowance of Disputed Claims</strong>

At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, subject to the provisions of Sections 2.1(d) and 23.2 of the Plan, the Disbursing Agent shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan together, with any interest that has accrued on the amount of Cash (net of any expenses, including any taxes of the escrow, relating thereto), but only to the extent that such interest is attributable to the amount of the Allowed Claim.  Such distribution, if any, shall be made as soon as practicable after an order or judgment of the Bankruptcy Court is entered allowing such Disputed Claim becomes a Final Order but in no event more than sixty (60) days thereafter.

c.    <strong>Tax Treatment of Escrow</strong>

Subject to the receipt of contrary guidance from the IRS or a court of competent jurisdiction (including the receipt by the Disbursing Agent of a private letter ruling requested by the Disbursing Agent, or the receipt of an adverse determination by the IRS upon audit if not contested by the Disbursing Agent, or a condition imposed by the IRS in connection with a private letter ruling requested by the Debtors), the Disbursing Agent shall (i) treat the escrow as one or more disputed ownership funds for federal income tax purposes within the meaning of Treasury Regulations Section 1.468B-9(b)(1) and (ii) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes.  All holders of Allowed Claims shall report, for tax purposes, consistent with the foregoing.

G.    <strong><u>The Operating Trusts</u></strong>

1.    <strong><u>Establishment of the Trusts.</u></strong>

Upon the determination of the Debtors or the Reorganized Debtors, as the case may be, on the Confirmation Date, the Debtors or the Reorganized Debtors, as the case may be, on their own behalf and on behalf of holders of Allowed Claims in Classes 2 and 7 through 26, shall execute the respective Operating Trust Agreements and shall take all other steps necessary to establish the respective

64

Operating Trusts.  On such date, or as soon as practicable thereafter, including, without limitation, subject to appropriate or required governmental, agency or other consents, and in accordance with and pursuant to the terms of Section 19.4 of the Plan, the Debtors or the Reorganized Debtors, as the case may be, shall transfer to the respective Operating Trusts all of their right, title, and interest in the Assets subject to the respective Operating Trust Agreements.

## 2.    Purpose of the Operating Trusts.

The Operating Trusts are intended to be treated, for federal income tax purposes, as liquidating trusts within the meaning of Treasury Regulations Section 301.7701-4(d) and shall be established for the sole purpose of holding and liquidating their respective assets in accordance with the terms and provisions of the Operating Trust Agreements and, except as provided herein, with no objective to continue or engage in the conduct of a trade or business.

## 3.    Funding Expenses of the Operating Trusts.

In accordance with the respective Operating Trust Agreements and any agreements entered into in connection therewith, on the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, shall have no obligation to provide any funding with respect to any of the Operating Trusts. The funding of each Operating Trust shall be as follows:

**a.**    **The LSP Trust**: Until the LSP Sale is consummated and the Creditor LSP Sale Proceeds and MID LSP Sale Proceeds are distributed in accordance with the provisions herein, the Disbursing Agent, through the use of Creditor Cash and funds from MID US Financing, shall fund one hundred percent (100%) of the costs and expenses incurred by the LSP Trustee in connection with the operations of the Assets in the LSP Trust on a pro rata basis based upon the Creditor LSP Sale Proceeds and MID LSP Sale Proceeds.

**b.**    **The Thistledown Trust**: Until the Thistledown Sale is consummated and the Creditor Thistledown Sale Proceeds and MID Thistledown Sale Proceeds are distributed in accordance with the provisions set forth herein, the Disbursing Agent, through the use of Creditor Cash and funds from MID US Financing, as applicable, shall fund the costs and expenses incurred by the Thistledown Trustee in connection with the operations of the Assets in the Thistledown Trust, as follows: until the MID Thistledown Sole Funding Termination Date, one hundred percent (100%) from MID US Financing and if the Thistledown Sale has not been consummated by the MID Thistledown Sole Funding Termination Date, thereafter, fifty percent (50%) from Creditor Cash and fifty percent (50%) from MID US Financing, with a reconciliation, solely for amounts funded after the MID Thistledown Sale Funding Termination Date, upon the definitive agreement for the Thistledown Sale on a pro rata basis based upon the non-contingent amount of the Creditor Thistledown Sale Proceeds and MID Thistledown Sale Proceeds and additional reconciliations as additional proceeds are received based on the satisfaction of contingencies, if any, to ensure that the funding provided from the Creditor Cash and by MID US Financing represents a Pro Rata Share based upon the Creditor Thistledown Sale Proceeds and the MID Thistledown Sale Proceeds;

## 4.    Transfer of Assets.

**a.**    The transfer of assets to the Operating Trusts shall be made, as provided in the Plan, for the benefit of the holders of Allowed Claims in Classes 2 and 7 through 26, only to the extent such holders in such Classes are entitled to distributions under the Plan.  In partial satisfaction of Allowed Claims in Classes 2 and 7 through 26, the assets subject to the respective Operating Trusts shall

be transferred to such holders of Allowed Claims, to be held by the Reorganized Debtors on their behalf. Immediately thereafter, on behalf of the holders of Allowed Claims in Classes 2 and 7 through 26, the Debtors or the Reorganized Debtors, as the case may be, shall transfer such assets to the Operating Trusts for the benefit of holders of Allowed Claims in Classes 2 and 7 through 26, in accordance with the Plan.

       **b.**      For all federal income tax purposes, all parties (including, without limitation, the Debtors or the Reorganized Debtors, as the case may be, the Operating Trustee and the beneficiaries of the Operating Trusts) shall treat the transfer of assets to the respective Operating Trusts in accordance with the terms of the Plan, as a transfer to the holders of Allowed Claims in Classes 2 and 7 through 26, followed by a transfer by such holders to the respective Operating Trusts and the beneficiaries of the Operating Trusts shall be treated as the grantors and owners thereof. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

       **5.**      **Valuation of Assets.**

       The value of the assets transferred to the respective Operating Trusts on the Effective Date shall be the purchase price set forth in a binding contract in existence on the Effective Date to purchase the applicable assets. In the absence of such a binding contract to purchase any asset transferred to an Operating Trust, the value of such asset shall be determined jointly by MID US Financing and the Debtors and the Debtors shall notify the Operating Trustee of the value of such assets. In all circumstances, the Operating Trustee shall apprise, in writing, the beneficiaries of the respective Operating Trusts of the valuation of all assets transferred to the respective Operating Trusts. The valuation shall be used consistently by all parties (including the Debtors, the Reorganized Debtors, the Operating Trustee and the beneficiaries of the Operating Trusts) for all federal income tax purposes and to the extent applicable, state and local income tax purposes.

       **6.**      **Investment Powers.**

       The right and power of the Operating Trustee to invest assets transferred to the Operating Trusts, the proceeds thereof, or any income earned by the respective Operating Trusts, shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with Section 19.7 the Plan) in Cash Equivalents; provided, however, that (a) the scope of any such permissible investments shall be limited to include only those investments, or shall be expanded to include any additional investments, as the case may be, that a liquidating trust, within the meaning of Treasury Regulation Section 301.7701-4(d) may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise, and (b) the Operating Trustee may expend the assets of the Operating Trusts (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Operating Trusts during liquidation, (ii) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Operating Trusts or fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Operating Trusts (and to which the assets are otherwise subject) in accordance with the Plan and the Operating Trust Agreements; and, provided, further, that, under no circumstances, shall the Operating Trusts segregate the assets of the Operating Trusts on the basis of classification of the holders of respective Operating Trust Interests, other than with respect to distributions to be made on account of Disputed Claims in accordance with the provisions of the Plan.

7.      **Annual Distribution and Withholding**.

The Operating Trustee shall distribute at least annually to the holders of respective Operating Trust Interests all net cash income plus all net cash proceeds from the liquidation of assets (including as Cash for this purpose, all Cash Equivalents); provided, however, that the Operating Trusts may retain such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Operating Trusts during liquidation, (ii) to pay reasonable administrative expenses (including any taxes imposed on the Operating Trusts or in respect of the assets of the Operating Trust), and (iii) to satisfy other liabilities incurred or assumed by the Operating Trusts (or to which the assets are otherwise subject) in accordance with the Plan or the Operating Trust Agreements.  All such distributions shall be pro rata based on the number of Operating Trust Interests held by a holder compared with the aggregate number of Operating Trust Interests outstanding, subject to the terms of the Plan and the respective Operating Trust Agreements.  The Operating Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Operating Trustee's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.

8.      **Reporting Duties**.

a.      **Federal Income Tax**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Operating Trustee of a private letter ruling if the Operating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Operating Trustee), the Operating Trustee shall file returns for the Operating Trusts as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and in accordance with Section 19.8 of the Plan.  The Operating Trustee shall also annually send to each holder of a Operating Trust Interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and shall instruct all such holders to report such items on their federal income tax returns.

b.      **Allocations of Operating Trusts Taxable Income**

Allocations of an Operating Trusts' taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the applicable Operating Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the Operating Trust Interests (treating any holder of a Disputed Claim, for this purpose, as a current holder of a Operating Trust Interest entitled to distributions), taking into account all prior and concurrent distributions from the Operating Trusts (including all distributions held in escrow pending the resolution of Disputed Claims).  Similarly, taxable loss of the Operating Trusts shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets of an Operating Trust.  The tax book value of the assets of an Operating Trust for this purpose shall equal their fair market value on the date such Operating Trusts were created or, if later, the date such assets were acquired by the Operating Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the regulations and other applicable administrative and judicial authorities and pronouncements.

c.    **Other**

The Operating Trustee shall file (or cause to be filed) any other statements, returns or disclosures relating to the Operating Trust that are required by any governmental unit.

9.    **Trust Implementation.**

On or after the Effective Date, the Operating Trusts shall be established and become effective for the benefit of Allowed Claims in Classes 2 and 7 through 26. The Operating Trust Agreements shall be filed in the Plan Supplement and shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to ensure the continued treatment of each Operating Trust as a grantor trust for federal income tax purposes. All parties (including the Debtors or the Reorganized Debtors, as the case may be, the Operating Trustee and holders of Allowed Claims in Classes 2 and 7 through 26) shall execute any documents or other instruments as necessary to cause title to the applicable assets to be transferred to the Operating Trusts.

10.    **Registry of Beneficial Interests.**

Each Operating Trustee shall maintain a registry of the holders of Operating Trust Interests.

11.    **Termination.**

Each Operating Trust shall terminate no later than the consummation of the LSP Sale or Thistledown Sale, as applicable; provided, however, that, on or prior to such termination, the Bankruptcy Court, upon motion by a party in interest, including, without limitation, the applicable Operating Trustee or any member of the LSP Trust Board and Thistledown Trust Board, may extend the term of the applicable Operating Trust if it is necessary to the liquidation of the assets of such Operating Trust. Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained at least two (2) months prior to the expiration of each extended term.

12.    **Non-Transferability or Certification.**

Upon the creation of each Operating Trust, the beneficial interests in such Operating Trust shall be allocated on the books and records of such Operating Trust to the appropriate holders thereof, but such interests shall not be certificated and shall not be transferable by the holder thereof except through the laws of descent or distribution or to an affiliate of such holder.

13.    **Applicability to Certain Claims.**

In the event that allocations of Operating Trust Interests are made to holders of Allowed Claims in accordance with the provisions of Articles VI, XI through XIII of the Plan, all provisions contained in Article XIX of the Plan shall be for the benefit of and be applicable to such holders of Allowed Claims, as though set forth in Article XIX in the first instance.

14.    **Post-Effective Date Thistledown Sale Process**:

In connection with the Thistledown Sale contemplated by Section 19.3(b) of the Plan, in the event that any offer to purchase either the Reorganized Thistledown Stock or substantially all of the

68

Assets of the Thistledown Trust is conveyed to the Thistledown Trustee, the Creditors' Committee and MID US Financing will cooperate to maximize the overall value of the sale of the Reorganized Thistledown Stock or the Assets of the Thistledown Trust through an auction; provided, that as long as the non-contingent amount of any offer exceeds Twenty Million Dollars ($20,000,000.00), MID will not object to the Creditors' Committee's determination as to which offer constitutes the highest and best offer and provided, lastly, that if the non-contingent amount of any offer is less than Twenty Million Dollars ($20,000,000.00) and the Creditors' Committee and MID US Financing do not agree on which offer constitutes the highest and best offer (considering non-contingent, contingent and future payments), the Creditors' Committee and MID US Financing reserve their respective rights to object to the acceptance of any offer for the Reorganized Thistledown Stock or the Assets of the Thistledown Trust.

### H.    Prosecution of Claims

From and after the Effective Date, MID Transferee, as successor to the rights of the estates of the Debtors, shall have the right to litigate (or abandon) any claims or causes of action that constituted Assets of the Debtors or Debtors in Possession, including, without limitation, any avoidance or recovery actions under sections 541, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, any claims under the Shared Insurance Policies and any other causes of action, rights to payments of claims that may be pending on the Effective Date, to a Final Order, and may compromise and settle such claims, without further approval of the Bankruptcy Court.  The proceeds of any such litigation or settlement shall be solely for the benefit of MID Transferee.

### I.    Provisions Regarding Distributions

#### 1.    Distributions of Cash to Allowed Claims.

Subject to the provisions of Section 21.2 of the Plan, on the Effective Date, the Disbursing Agent shall distribute to each holder of an Allowed Administrative Expense Claim, Allowed Priority Claim, Allowed Wells Fargo Claim, Allowed PNC Claim, Allowed BMO Claim, Allowed Secured Claim, Allowed Non-MJC General Unsecured Claim, Allowed 8.55% Note Claims, Allowed 7.25% Note Claims Allowed MJC Claim (or cause to be distributed to each holder of a Disputed Claim in accordance with Section 17.3 of the Plan) the distributions set forth in Articles III through XIV of the Plan.

#### 2.    Sources of Cash for Distribution.

Except as otherwise provided in the Plan or the Confirmation Order, all Cash required for the payments to be made to Allowed Claims shall be from the Debtors' Cash, the MID Cash Consideration, Committee Litigation Settlement Payment, MID Litigation Cash Consideration, the LSP Sale Proceeds and Thistledown Sale Proceeds.

#### 3.    Timeliness of Payments.

Any payments or distributions to be made pursuant to the Plan shall be deemed to be timely made if made within fifteen (15) days after the date therefor specified in the Plan.  Whenever any distribution to be made under this Plan shall be due on a day other than a Business Day, such distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

4.      **Distributions by the Disbursing Agent**.

All distributions to be made pursuant to the Plan shall be made by the Disbursing Agent at the direction of the Reorganized Debtors, the Creditors' Committee or MID Transferee, as applicable. The Disbursing Agent shall be deemed to hold all property to be distributed hereunder in trust for the Persons entitled to receive the same.  The Disbursing Agent shall not hold an economic or beneficial interest in such property.

5.      **Manner of Payment under the Plan**.

Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made pursuant to this Plan, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank; provided, however, that no Cash payments shall be made to a holder of an Allowed Claim until such time, if ever, as the amount payable thereto is equal to or greater than Ten Dollars ($10.00).

6.      **Delivery of Distributions**.

Subject to the provisions of Rule 9010 of the Bankruptcy Rules, and except as provided in Section 23.5 of the Plan, distributions and deliveries to holders of Allowed Claims shall be made at the address of each such holder as set forth on the Schedules filed with the Bankruptcy Court unless superseded by the address set forth on a proof of claim filed by such holder, or at the last known address of such a holder if no proof of claim is filed or if the Debtors have been notified in writing of a change of address.

7.      **Undeliverable Distributions**.

a.      **Holding of Undeliverable Distributions**

If any distribution to any holder is returned to the Reorganized Debtors as undeliverable, no further distributions shall be made to such holder unless and until the Reorganized Debtors are notified, in writing, of such holder's then-current address.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable.  All Entities ultimately receiving undeliverable Cash shall not be entitled to any interest or other accruals of any kind. Nothing contained in the Plan shall require the Reorganized Debtors to attempt to locate any holder of an Allowed Claim.

b.      **Failure to Claim Undeliverable Distributions**

On or about the six (6) month anniversary of the Effective Date, the Reorganized Debtors shall file a list with the Bankruptcy Court setting forth the names of those Entities for which distributions have been made hereunder and have been returned as undeliverable as of the date thereof.  Any holder of an Allowed Claim that does not assert its rights pursuant to the Plan to receive a distribution within one (1) year from and after the Effective Date shall have its entitlement to such undeliverable distribution discharged and shall be forever barred from asserting any entitlement pursuant to the Plan against the Reorganized Debtors or their property.  In such case, any consideration held for distribution on account of such Claim shall revert to the Disbursing Agent for purposes of (i) calculating and distributing "Creditor Cash" to the extent such undeliverable distribution is on account of an Allowed Non-MJC General Unsecured Claim, Allowed 8.55% Note Claim, and Allowed 7.25% Note Claim or (ii) distributing to

MID Transferee to the extent such undeliverable distribution is on account of an Allowed Administrative Expense Claim, Allowed Priority Tax Claim, Allowed Priority Non-Tax Claim or Allowed MJC Claim.

### 8.    Indenture Trustee.

**a.**    The Indenture Trustee shall be deemed to be the holder of all, 8.55% Note Claims and 7.25% Note Claims for purposes of distributions to be made hereunder, and all distributions on account of such notes shall be made to or on behalf of the Indenture Trustee.  The Indenture Trustee shall hold or direct such distributions for the benefit of the holders of record of Allowed Subordinated Note Claims.

**b.**    To the extent that the MID Litigation Consideration is insufficient to compensate the reasonable fees and expenses of the Indenture Trustee, the Indenture Trustee shall be paid in Cash on the Effective Date from the distributions otherwise allocable to holders of record of Allowed 8.55% Note Claims and Allowed 7.25% Note Claims.

### 9.    Compliance with Tax Requirements.

The Reorganized Debtors shall comply with all applicable tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.

### 10.    Time Bar to Cash Payments.

Checks issued by the Reorganized Debtors on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of a voided check shall be made on or before the later of (a) the first (1st) anniversary of the Effective Date or (b) ninety (90) days after the date of issuance of such check, if such check represents a final distribution hereunder on account of such Claim.  After such date, all Claims in respect of voided checks shall be discharged and forever barred and all monies related thereto shall be remitted to (i) the Disbursing Agent for purposes of calculating and distributing as "Creditor Cash," to the extent relating to Non-MJC General Unsecured Claims, 8.55% Note Claim, and 7.25% Note Claim and (ii) MID Transferee, to the extent relating to MJC Claims, Administrative Claims, Priority Non-Tax Claims or Priority Tax Claims.

### 11.    Distributions After Effective Date.

Distributions made after the Effective Date to holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims shall be deemed to have been made in accordance with the terms and provisions of Section 23.1 of the Plan.

### 12.    Setoffs.

The Disbursing Agent, solely as agent for MID Transferee, may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Allowed MJC Claim, Allowed Administrative Claim, Allowed Priority Non-Tax Claim or Allowed Priority Tax Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim), the claims, rights and causes of action of any nature against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall

constitute a waiver or release by MID Transferee of any such claims, rights and causes of action that MID Transferee may possess against such holder; and, provided, further, that nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559 or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment.

### 13.    Allocation of Plan Distributions Between Principal and Interest.

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest or original issue discount. The Assets of Gulfstream Park Racing, the Reorganized GPRA Commercial Stock and the Reorganized Gulfstream Park Racing Stock transferred to the MID Transferee in satisfaction of the MID Claims shall be treated as first satisfying all or a portion of the principal amount of the Gulfstream Park Claim (as determined for federal income tax purposes). To the extent such transfers are insufficient to satisfy the full principal amount of the Gulfstream Park Claim, (as determined for federal income tax purposes), the remaining distributions to the MID Transferee in satisfaction of the MID Claims shall be treated as first satisfying the principal amount of the Gulfstream Park Claim (as determined for federal income tax purposes) and, thereafter, shall be treated as satisfying the remaining MID Claims in accordance with the first sentence of this Section 23.13. All of the parties (including, without limitation, the Debtors or the Reorganized Debtors) agree to report such transfers consistently with the foregoing for federal, state and local income tax purposes.

### 14.    Exemption from Securities Law.

To the fullest extent provided for in section 1145 of the Bankruptcy Code, the issuance of the Equity Interests of the Reorganized Debtors, and, to the extent considered securities, the LSP Trust Interests and the Thistledown Trust Interests, on account of, and in exchange for, the Claims against the Debtors shall be exempt from registration pursuant to section 5 of the Securities Act of 1933 and any other applicable non-bankruptcy law or regulation.

### J.    Executory Contracts and Unexpired Leases

### 1.    Assumption and Assignment of Executory Contracts and Unexpired Leases.

On the Effective Date, the Debtors shall reject all executory contracts and unexpired leases that (i) have not previously been assumed and assigned or rejected with the approval of the Bankruptcy Court, (ii) are not as of the Confirmation Date the subject of a motion to assume or reject, (iii) have not expired by their own terms on or prior to the Confirmation Date (iv) are not listed on the Schedule of "Assumed and Assigned Executory Contracts and Unexpired Leases" filed with the Bankruptcy Court, and served on parties whose executory contracts and unexpired leases are intended to be assumed, seven (7) days prior to the Ballot Date, which executory contracts and unexpired leases will be assumed and assigned to MID Transferee as of the Effective Date; provided, however, that notwithstanding the foregoing, executory contracts and unexpired leases relating to the operations of Lone Star Park or Thistledown shall be set forth on a schedule which shall be filed with the Plan Supplement, which executory contracts and unexpired leases shall be assumed and assigned upon the consummation of the LSP Sale and/or Thistledown Sale. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and assignments and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code. The Debtors or Reorganized Debtors, as applicable, as directed by MID

72

Transferee, reserve the right to modify the Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases at any time through and including fifteen (15) days after the Effective Date, including with respect to any cure amount listed in the Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases.

## 2.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

The Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases shall designate the cure amount owing with respect to each such executory contract and unexpired lease to be assumed pursuant to Section 25.1 hereof.  Any monetary amounts required as cure payments on each executory contract and unexpired lease to be assumed and assigned to MID Transferee pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment by MID Transferee of the cure amount in Cash on the later of Effective Date or as soon as practicable after resolution of any dispute as to such cure amount, or on such other terms and dates as the parties to such executory contracts or unexpired leases otherwise may agree.  In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of MID Transferee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption arises, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be subject to the jurisdiction of the Bankruptcy Court and made following the entry of a Final Order resolving such dispute, but in no event later than twenty-five (25) days after the Effective Date.

For purposes of adequate assurance of future performance for those executory contracts and unexpired leases that will be assigned to MID Transferee pursuant to the Plan, MID is a publicly traded real estate operating company.  Its real estate businesses reported assets of approximately $1.9 billion and revenues of  approximately $219 million for the period ending on December 31, 2008.  MID Transferee is a subsidiary of MID.  Counterparties may obtain further information regarding MID at http://www.midevelopments.com or by contacting counsel for MID, Attn: Michael G. Burke, Sidley Austin LLP, 787 Seventh Avenue, NY, NY, 07040, phone (212) 839-6742, email: mgburke@sidley.com.

## 3.    Modifications, Amendments, Supplements, Restatements or Other Agreements

Unless otherwise provided by the Plan or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed, whether or not such executory contract or unexpired lease relates to the use, acquisition or occupancy of real property, shall include (i) all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements and any other interests in real estate or rights in remedy related to such premises, unless any of the foregoing agreements has been or is rejected pursuant to an order of the Bankruptcy Court or is otherwise rejected as part of the Plan.

Modifications, amendments, supplements and restatements to pre-petition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases and actions taken in accordance therewith, (i) do not alter in any way the pre-petition nature of the executory contracts and unexpired leases, or the validity, priority or amount of any Claims against the Debtors that may arise under the same, (ii) are not and do not create post-petition contracts or leases, (iii) do not

73

elevate to administrative expense priority any Claims of the counterparties to the executory contracts and unexpired leases against any of the Debtors and (iv) do not entitle any entity to a Claim under any section of the Bankruptcy Code on account of the difference between the terms of any pre-petition executory contracts or unexpired leases and subsequent modifications, amendments, supplements or restatements.

### 4.   Rejection Damage Claims.

If the rejection of an executory contract or unexpired lease by the Debtors hereunder results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors, or its properties or agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon attorneys for the Debtors on or before thirty (30) days after the later to occur of (a) the Confirmation Date and (b) the date of entry of an order by the Bankruptcy Court authorizing rejection of a particular executory contract or unexpired lease.

### 5.   Indemnification and Reimbursement Obligations.

For purposes of the Plan, (a) the obligations of the Debtors to indemnify and reimburse their directors or officers that were directors or officers, respectively, on or prior to the Petition Date including, with respect to W. Thomas Hodgson, the obligations of the Debtors to indemnify W. Thomas Hodgson pursuant to the Consulting Agreement, dated August 7, 2007, between W. Thomas Hodgson and Magna Entertainment, shall be assumed by the Reorganized Debtors and MID and (b) indemnification obligations of the Debtors arising from services as officers and directors during the period from and after the Petition Date shall be Administrative Expense Claims to the extent previously authorized by a Final Order. Nothing in the foregoing shall in any way limit the Debtors' indemnification of the Individual Defendant Claims as set forth in Article II of the Plan.

### K.   Rights and Powers of Disbursing Agent

### 1.   Exculpation.

From and after the Effective Date, the Disbursing Agent, in its capacity as such, shall be exculpated by all Persons and Entities, including, without limitation, holders of Claims and other parties in interest, from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct of such Disbursing Agent. No holder of a Claim or other party in interest shall have or pursue any claim or cause of action against the Disbursing Agent for making payments in accordance with the Plan or for implementing the provisions of the Plan.

### 2.    Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to (a) take all steps and execute all instruments and documents necessary to effectuate the Plan, (b) make distributions contemplated by the Plan, (c) comply with the Plan and the obligations thereunder, and (d) exercise such other powers as may be vested in the Disbursing Agent pursuant to order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### 3.    Fees and Expenses Incurred From and After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent from and after the Effective Date and any reasonable compensation and expense reimbursement claims, including, without limitation, reasonable fees and expenses of counsel, shall be made by the Disbursing Agent, paid proportionately from Creditor Cash and funds of the MID Transferee based on amounts attributable to each constituency as a result of use without further order of the Bankruptcy Court within fifteen (15) days of submission of an invoice by the Disbursing Agent.  In the event that the Creditors' Committee or MID Transferee objects to the payment of such invoice for post-Effective Date fees and expenses, in whole or in part, and the parties cannot resolve such objection after good faith negotiations, the Bankruptcy Court shall retain jurisdiction to make a determination as to the extent to which the invoice shall be paid by the Creditors' Committee or MID Transferee.

### L.    The Reorganized Debtor Plan Administrator

### 1.    Appointment of Reorganized Debtor Plan Administrator.

On the Effective Date, compliance with the provisions of the Plan shall become the general responsibility of the Reorganized Debtor Plan Administrator, an employee of the Reorganized Debtors, pursuant to and in accordance with the provisions of the Plan and the Reorganized Debtor Plan Administration Agreement.

### 2.    Responsibilities of the Reorganized Debtor Plan Administrator.

In accordance with the Reorganized Debtor Plan Administration Agreement, the responsibilities of the Reorganized Debtor Plan Administrator shall include (a) facilitating the Reorganized Debtors' prosecution or settlement of objections to and estimations of Claims, (b) if requested by MID Transferee, prosecution or settlement of claims and causes of action held by the Debtors and Debtors in Possession, (c) calculating and assisting the Disbursing Agent in implementing all distributions in accordance with the Plan, (d) filing all required tax returns and paying taxes and all other obligations on behalf of the Reorganized Debtors from funds held by the Reorganized Debtors, (e) periodic reporting to the Bankruptcy Court, of the status of the Claims resolution process, distributions on Allowed Claims and if requested by MID Transferee, prosecution of causes of action, and (f) such other responsibilities as may be vested in the Reorganized Debtor Plan Administrator pursuant to the Plan, the Reorganized Debtor Plan Administration Agreement or Bankruptcy Court order or as may be necessary and proper to carry out the provisions of the Plan.

### 3.    Powers of the Reorganized Debtor Plan Administrator.

The powers of the Reorganized Debtor Plan Administrator shall, without any further Bankruptcy Court approval in each of the following cases, include (a) the power to invest funds in, and

withdraw, make distributions and pay taxes and other obligations owed by the Reorganized Debtors from funds held by the Reorganized Debtor Plan Administrator and/or the Reorganized Debtors in accordance with the Plan, (b) if requested by MID Transferee, the power to compromise and settle claims and causes of action on behalf of or against the Reorganized Debtors and (c) such other powers as may be vested in or assumed by the Reorganized Debtor Plan Administrator pursuant to the Plan, the Reorganized Debtor Plan Administration Agreement or as may be deemed necessary and proper to carry out the provisions of the Plan; provided, however, that any compromise and settlement of Non-MJC General Unsecured Claims, shall be in consultation with the Creditors' Committee.

### 4.    Compensation of the Reorganized Debtor Plan Administrator.

In addition to reimbursement for actual out-of-pocket expenses incurred by the Reorganized Debtor Plan Administrator, the Reorganized Debtor Plan Administrator shall be entitled to receive reasonable compensation for services rendered on behalf of the Reorganized Debtors in an amount and on such terms as may be reflected in the Reorganized Debtor Plan Administration Agreement.

### 5.    Termination of Reorganized Debtor Plan Administrator.

The duties, responsibilities and powers of the Reorganized Debtor Plan Administrator shall terminate pursuant to the terms of the Reorganized Debtor Plan Administration Agreement.

### M.    Conditions Precedent

### 1.    Conditions Precedent to Effective Date of the Plan.

The occurrence of the Effective Date and the substantial consummation of the Plan are subject to satisfaction of the following conditions precedent:

### a.    Entry of the Confirmation Order

The Clerk of the Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtors and the Creditors' Committee, and the Confirmation Order shall have become a Final Order.

### b.    Effective Date

The Effective Date shall occur on or before April 30, 2010.

### c.    Plan Support Agreement Still in Effect

The Plan Support Agreement shall not have terminated in accordance with the terms thereof.

### d.    Regulatory Approvals

MID, MID Transferee and the Reorganized Debtors shall have received the following authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are necessary to implement the Plan and that are required by law, regulations or order, including those set forth on Exhibit C of the Plan.

e.  **Formation Agreement Claims and
Formation Agreement Guarantee Claims**

The Bankruptcy Court shall have entered an order resolving the Debtors' objections to the Formation Agreement Claims and Formation Agreement Guarantee Claims by the Confirmation Date.

f.  **Alameda Adversary**

The Bankruptcy Court shall have entered an order resolving the Alameda Adversary by the Confirmation Date.

g.  **Red Rock Adversary**

The Bankruptcy Court shall have entered an order resolving the Red Rock Adversary by the Confirmation Date.

h.  **MID Asset Transfer Agreement**

The MID Asset Transfer Agreement among MID Transferee, MEC Canada, MEC Media and, subject to the exercise of the XpressBet Option, XpressBet, shall be executed and delivered with respect to the MID Non-Debtor Assets.

i.  **Consents**

The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are necessary to implement the Plan and that are required by law, regulation or order..

j.  **Execution of Documents; Other Actions**

All other actions and documents necessary to implement the Plan shall have been effected or executed, including, but not limited to the Reorganized Plan Administrator Agreement and the Operating Trusts Agreements, if applicable.

2.  **Waiver of Conditions Precedent.**

To the extent practicable and legally permissible, each of the conditions precedent in the above section, may be waived, in whole or in part, only with the approval of the Debtors, the Creditors' Committee and MID US Financing.  Any such waiver of a condition precedent may be effected at any time by filing a notice thereof with the Bankruptcy Court.

N.  **Retention of Jurisdiction**

The Bankruptcy Court shall retain and have exclusive jurisdiction over, among other specified matters, any matter arising under the Bankruptcy Code, arising in or related to the Chapter 11 Cases or the Plan unless any such agreements or documents contain express enforcement and dispute resolution provisions to the contrary, in which case, such provisions shall govern.

**O.**     **Modification, Revocation or Withdrawal of the Plan**

    **1.**     **Modification of Plan.**

    Proponents, acting jointly, reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules in the event any amendment or modification would materially adversely affect the substance of the economic and governance provisions set forth in the Plan, to amend or modify the Plan or any exhibits to the Plan at any time prior to the entry of the Confirmation Order.  Upon entry of the Confirmation Order, the Proponents, acting jointly, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.  Any amendment or modification contemplated in this Section 28.1 shall require the consent of the Debtors, the Creditors' Committee and MID.

    **2.**     **Revocation or Withdrawal.**

    The Plan may be revoked or withdrawn prior to the Confirmation Date by the Proponents, acting jointly.

    If the Plan is revoked or withdrawn prior to the Confirmation Date, or if the Plan does not become effective for any reason whatsoever, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by the Debtors or any other Entity, including, without limitation, the Creditors' Committee with respect to the Committee Litigation, or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceedings involving the Debtors.

**P.**     **Provision for Management**

    **1.**     **Reorganized Debtors Directors.**

    From and after the Effective Date, the board of directors of the Reorganized Debtors shall consist of William Ford, Blake Tohana and a person to be determined, in each case, as proposed by the Debtors and consented to by the Creditors' Committee and MID (not to be unreasonably withheld). Except as set forth herein, provisions regarding members of the Reorganized Debtors Board of Directors shall be as set forth in the Reorganized Debtors By-laws.

**Q.**     **Articles of Incorporation and By-Laws of the Debtor; Corporate Action**

    **1.**     **Amendment of Articles of Incorporation/Charter.**

    On or prior to the Effective Date, the Debtors shall file the Reorganized Debtors Certificate of Incorporation and the Reorganized Debtors By-laws under the general supervision of the Office of the Attorney General.

    **2.**     **Corporate Action.**

    On the Effective Date, the adoption of the Reorganized Debtors Certificate of Incorporation and the Reorganized Debtors By-laws shall be authorized and approved in all respects, in

each case without further action under applicable law, regulation, order, or rule, including, without limitation, any action by the stockholders of the Debtors or the Reorganized Debtors.  The cancellation of all Equity Interests, Subordinated Notes, employment agreements, and other matters provided under the Plan involving the corporate structure of the Reorganized Debtors or corporate action by the Reorganized Debtors shall be deemed to have occurred, be authorized, and shall be in effect without requiring further action under applicable law, regulation, order, or rule, including, without limitation, any action by the stockholders of the Debtors or the Reorganized Debtors.  Without limiting the foregoing, from and after the Confirmation Date, the Debtors, and the Reorganized Debtors may take any and all actions deemed appropriate in order to consummate the transactions contemplated herein.

### 3.      Issuance of Equity Interests in the Reorganized Debtors.

The issuance of Equity Interests in the Reorganized Debtors is authorized without the need for any further corporate action.  Immediately prior to or on the Effective Date, all MID Reorganized Stock shall be distributed to the holder of  the MID Claims pursuant to the Plan.

### 4.      Cancellation of Existing Securities and Agreements.

On the Effective Date, the 7.25% Indenture, the 7.25% Notes, the 8.55% Indenture, the 8.55% Notes and the Equity Interests in the Debtors shall be cancelled; provided, however, the 7.25% Indenture and the 8.55% Indenture shall continue in effect solely for the purpose of (i) allowing the holders of the Allowed 8.55% Note Claims and Allowed 7.25% Note Claims to receive their distributions hereunder and (ii) permitting the Indenture Trustee to maintain any rights or Liens it may have for fees, costs and expenses under the 7.25% Indenture and the 8.55% Indenture to the extent that such amounts are not satisfied pursuant to Section 23.8(b) of the Plan.

### 5.      Surrender of Existing Securities.

As soon as practicable, on or after the Effective Date, each holder of an 8.55% Note Claim and 7.25% Note Claim shall surrender its Subordinate Note(s) to the Indenture Trustee or in the event such Subordinated Note(s) are held in the name of, or by nominees of, The Depository Trust Company, Euroclear S.A./N.V. or Clearstream International, as applicable, the Reorganized Debtors shall seek the cooperation of The Depository Trust Company to provide appropriate instructions to the Indenture Trustee.  No distributions under the Plan shall be made for or on behalf of such holder unless and until (a) such Subordinated Note is received by the Indenture Trustee, (b) the Indenture Trustee receives appropriate instructions from The Depository Trust Company, Euroclear S.A./N.V. or Clearstream International, as applicable, or (c) the loss, theft or destruction of such Subordinated Note is established to the reasonable satisfaction of the Indenture Trustee, which such satisfaction may require such holder to submit (1) a lost instrument affidavit and (2) an indemnity bond holding the Debtors, the Reorganized Debtors, and the Indenture Trustee harmless in respect of such Subordinated Note and any distributions made thereof.  Upon compliance with this Section by a holder of the 8.55% Note Claim and 7.25% Note Claim, such holder shall, for all purposes under the Plan, be deemed to have surrendered such note.  Any holder that fails to surrender such Subordinated Note or fails to satisfactorily explain its non-availability to the Indenture Trustee within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors and the Reorganized Debtors (or their property) or the Indenture Trustee in respect of such Claim and shall not participate in any distribution under the Plan.  All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Reorganized Debtors by the Indenture Trustee and any such note shall be cancelled.

6.        **Cancellation of Liens.**

Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, any Lien securing any Secured Claim that is satisfied in full and discharged hereunder shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any Collateral or other property of the Debtors (including any cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Reorganized Debtors.

R.        **Certain Tax Matters**

1.        **Exemption from Transfer Taxes.**

Pursuant to section 1146(a) of the Bankruptcy Code, the creation of any mortgage, deed of trust, or other security interest, the issuance, transfer or exchange of any securities, instruments or documents the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the transfers to MID Transferee contemplated by Section 6.1 hereof and the sale of the Assets in the Operating Trusts, shall not be subject to any stamp, real estates transfer, mortgage recording or other similar tax.  The Confirmation Order shall direct the appropriate federal, state and/or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

2.        **Tax Election.**

a.        Magna Entertainment shall make a timely and valid election pursuant to Treasury Regulation Section 1.1502-36(d)(6)(i)(A) to reduce the basis of the stock of Reorganized Debtors transferred to MID Transferee or one of its affiliates pursuant to the Plan to the extent necessary to prevent any attribute reduction pursuant to Treasury Regulation Section 1.1502-36(d)(6).

b.        The Debtors shall not make an election pursuant to IRC Section 108(b)(5) to apply any portion of the reduction of tax attributes under IRC Section 108(b)(1) first to the basis of depreciable property.

3.        **Tax Refunds.**

On the Effective Date, the Debtors shall assign to MID US Financing their respective rights to any refund for taxes that are attributable to tax periods (or portions thereof) ending prior to the Effective Date.

4.        **Designation of Substitute Agent.**

On the Effective Date, Magna Entertainment shall designate Reorganized Gulfstream Park Racing as (i) its agent to take any and all actions necessary or incidental to the preparation and filing by Reorganized Magna Entertainment of any tax returns required to be filed by Reorganized Magna Entertainment after the Effective Date, including, without limitation, the execution of any necessary authorizations and powers of attorney and (ii) as "substitute agent" (pursuant to Treasury Regulation Section 1.1502-77(d)), and any similar provisions of applicable state income or franchise tax laws, and

shall take any and all actions necessary to obtain the approval of such designation by the IRS, or any other relevant taxing authority, prior to the Effective Date.

### S.    Miscellaneous Provisions

#### 1.    Discharge of Claims and Termination of Equity Interests.

**a.**    Except as expressly provided in the Plan or the Confirmation Order, all distributions and rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and of all Equity Interests, or other rights of a holder of an Equity Interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and estates, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, or Interests or other rights of a holder of an equity security or other ownership interest, and upon the Effective Date, the Debtors and the Reorganized Debtors shall (i) be deemed discharged under Section 1141(d)(1)(A) of the Bankruptcy Code and released from any and all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Interests or other rights of a holder of an equity security or other ownership interest, of any nature whatsoever, including, without limitation, liabilities that arose before the Effective Date (including prior to the Petition Date), and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code (or is otherwise resolved), or (c) the Holder of a Claim based upon such debt voted to accept the Plan and (ii) terminate and cancel all rights of any equity security holder in any of the Debtors and all Equity Interests.

**b.**    Except as expressly provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against each of the Debtors, the Debtors' respective assets, property and Estates, the Reorganized Debtors, the Creditors' Committee, MID, MID Transferee and their respective Related Persons any other or further Claims, or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and all Equity Interests or other rights of a holder of an Equity Interest, relating to any of the Debtors or Reorganized Debtors or any of their respective assets, property and estates based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Interests or other rights of a holder of an Equity Interest and termination of all rights of any such holder in any of the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors, the Reorganized Debtors or MID Transferee or any of their respective assets, property and Estates at any time, to the extent such judgment is related to a discharged Claim, debt or liability or terminated right of any holder of any Equity Interest in any of the Debtors or terminated Equity Interest.

#### 2.    Injunction on Claims.  Except as otherwise expressly provided in the Plan, the Confirmation Order or such other order of the Bankruptcy Court that may be applicable, all Persons or Entities, and each Related Person of such Persons or Entities, who have held, hold or

may hold Claims or any other debt or liability that is discharged or Equity Interests or other right of equity interest that is terminated or cancelled pursuant to the Plan, or who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to Sections 34.1 and 34.5 of the Plan, respectively, are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt or liability or Equity Interest that is terminated or cancelled pursuant to the Plan against the Debtors, the Debtors in Possession or the Reorganized Debtors, the Debtors' estates, or their respective properties, assets or interests in properties, MID Transferee or its respective properties, assets or interests in properties,  (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Debtors in Possession or the Reorganized Debtors, the Debtors' estates, MID Transferee or their respective properties or interests in properties, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Debtors in Possession or the Reorganized Debtors, the Debtors' estates, or their respective properties, assets or interests in properties, MID Transferee or its respective properties, assets or interests in properties, and (d) except to the extent provided, permitted or preserved by sections 553, 555, 556, 559 or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors, the Debtors in Possession or the Reorganized Debtors, or against their respective property or interests in property, or MID Transferee MID Transferee or its respective properties, assets or interests in properties, with respect to any such Claim or other debt or liability that is discharged or Equity Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan; **provided, however,** that such injunction shall not preclude the United States of America, any state or any of their respective police or regulatory agencies from enforcing their police or regulatory powers; and, **provided, further,** that, except in connection with a properly filed proof of claim, the foregoing proviso does not permit the United States of America, any State or any of their respective police or regulatory agencies from obtaining any monetary recovery from the Debtors, the Debtors in Possession or the Reorganized Debtors or their respective property or interests in property with respect to any such Claim or other debt or liability that is discharged or Equity Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan, including, without limitation, any monetary claim or penalty in furtherance of a police or regulatory power.  Such injunction shall extend to all successors of the Debtors and Debtors in Possession, and their respective properties and interests in property.  Notwithstanding anything to the contrary, including, without limitation, the terms of this Article XXXIV, the Plan shall not limit or impair any defenses (including, but not limited to, any rights of setoff preserved or permitted under the Bankruptcy Code or rights of recoupment under applicable law) that have been asserted.

       **3.**      **Integral to Plan.**  Each of the discharge, injunction and release provisions provided in Article XXXIV of the Plan is an integral part of the Plan and is essential to its implementation.  Each of the Debtors, the Reorganized Debtors and MID Transferee shall have the right to independently seek the enforcement of the discharge, injunction and release provisions set forth in Article XXXIV of the Plan.

       **4.**      **Releases by the Debtors.**  Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtors and the Reorganized Debtors on its own behalf and as representative of its respective estate, and each of its respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all Released Parties of and from any and all Claims, any and all other obligations, suits, judgments,

damages, debts owing, causes of action, rights, liabilities of any nature whatsoever and remedies of the Debtors' estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against the Released Parties arising from or relating to the period prior to the Effective Date as released by this Plan, including any act, omission or transaction in connection with the Chapter 11 Cases, the Plan, the Disclosure Statement, the Plan Support Agreement, the Committee Litigation and the settlement thereof, that may be asserted by or on behalf of the Debtors or the Reorganized Debtors or their respective estates.

        5.        **Releases by Holders of Claims and Equity Interests.**  Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Equity Interest, or other right of a holder of an equity security or other ownership interest that is terminated, and each of its respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally each and all of the Released Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors or their respective assets, property and estates, the Chapter 11 Cases or the Plan, the Disclosure Statement, or the Plan Support Agreements, including the matters asserted in the Committee Litigation and the settlement thereof; provided, however, that each Entity that has submitted a Ballot may elect, by checking the appropriate box on its Ballot, not to grant the releases set forth in Section 34.5 with respect to those Released Parties other than the Debtors, the Reorganized Debtors, and their respective predecessors, successors and assigns (whether by operation of law or otherwise). Notwithstanding such election, the Debtors intend to seek enforcement of the releases contained in this Article XXXIV as to all parties regardless of whether such party elects to opt-out.

        6.        **Injunction Related to Releases.  Except as provided in the Plan or the Confirmation Order, as of the Effective Date, (i) all Entities that hold, have held, or may hold a Claim or any other obligation, suit, judgment, debt, right, remedy, causes of action or liability of any nature whatsoever, or any Equity Interest or other right of a Holder of an equity security or other ownership interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and Estates, that is released pursuant to Section 34.5 of the Plan, (ii) all other parties in interest, and (iii) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and of all Equity Interests or other rights of a holder of an equity security or other ownership interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or**

**obligation owed to any Entity released under Section 34.5 of the Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; provided, that this provision shall not apply to the rights of the Debtors, Reorganized Debtors or MID Transferee to take any action with respect to any of or all the Shared Insurance Policies.**

   **7.**  **Exculpation.** The Debtors, the Reorganized Debtors, MID, the Creditors' Committee and any of their respective directors, officers, officials, employees, members, attorneys, consultants, advisors and agents (acting in such capacity), shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Chapter 11 Cases (including any actions taken by the Creditors' Committee after the Effective Date), the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement related thereto or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the foregoing provisions of this Section 34.7 of the Plan shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.  Any of the foregoing parties in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

   **8.**  **Deemed Consent.** By submitting a Ballot and not electing to withhold consent to the releases of the applicable Released Parties set forth in Section 34.5 of the Plan by marking the appropriate box on the Ballot, each holder of a Claim or Interest shall be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the releases set forth in Section 34.5 of the Plan.

   **9.**  **No Waiver**:. Notwithstanding anything to the contrary contained in Sections 32.4 and 32.5 of the Plan, the releases and injunctions set forth in such sections shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Reorganized Debtors, the Creditors' Committee or MID Transferee to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by any of them.

   **10.**  **Supplemental Injunction. Notwithstanding anything contained herein to the contrary, all Persons, including Person acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, any Claims or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and all Equity Interests, or other rights of a holder of an equity security or other ownership interest, against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against or Equity Interest in any of the Debtors, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Equity Interests or other rights of a Holder of an equity security or other ownership interest, arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:**

        **a.**     **Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Equity Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties or the assets or property of any Released Party;**

        **b.**     **Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Equity Interests or other rights of a holder of an equity security or other ownership interest;**

        **c.**     **Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Equity Interests or other rights of a Holder of an equity security or other ownership interest;**

        **d.**     **Except as otherwise expressly provided in the Plan or the Confirmation Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Equity Interests or other rights of a Holder of an equity security or other ownership interest; and**

        **e.**     **Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, or the Confirmation Order relating to such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Equity Interests or other rights of a holder of an equity security or other ownership interest;**

**provided, however, that the Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.**

        **11.**     **Preservation of Rights of Action.**  Except as otherwise provided in the Plan, including, without limitation, Section 18.1 hereof, or in any contract, instrument, release or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain sole and exclusive authority to enforce any claims, rights or causes of action that the Debtors, the Debtors in Possession or its chapter 11 estates may hold against any Entity, including any claims, rights or causes of action arising under sections 541, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code.

        **12.**     **Payment of Statutory Fees.**  All fees payable pursuant to section 1930 of title 28 of the United States Code, and, if applicable, any interest payable pursuant to section 3717 of title 31 of the United States Code, as determined by the Bankruptcy Court, shall be paid on the Effective Date or thereafter as and when they become due and owing.

13.    **Retiree Benefits.**  From and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the MID Transferee shall assume and pay all retiree benefits (within the meaning of section 1114 of the Bankruptcy Code) and contribute to the Pension Plans the amount necessary to satisfy the minimum funding standards under sections 302 and 303 of ERISA, 29 U.S.C. §§ 1082 and 1083, and sections 412 and 430 of the Internal Revenue Code, 26 U.S.C. §§ 412 and 430, if any, relating to the Pension Plans, at the level established in accordance with subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, and for the duration of the period during which the Debtors have obligated themselves to provide such benefits; provided, however, that the Reorganized Debtors may modify such benefits to the extent permitted by applicable law.  Nothing in the Plan of Reorganization shall be construed as discharging, releasing, or relieving Debtors, or their successors, including the Reorganized Debtors, or any party, in any capacity, from any liability imposed under any law or regulatory provision with respect to the Pension Plans or the Pension Benefit Guaranty Corporation ("PBGC").  PBGC and the Pension Plans will not be enjoined or precluded from enforcing such liability as a result of any provision of the Plan of Reorganization or the Confirmation Order.

14.    **Preservation of Insurance.**  Nothing in the Plan, the Plan Documents or the Confirmation Order, including the discharge and release of Debtors, shall diminish or impair the enforceability of any of the Shared Insurance Policies that may be obligated to provide, coverage for Debtors or other Entities.

15.    **Post-Effective Date Fees and Expenses.**  From and after the Effective Date, the Reorganized Debtors and the Creditors' Committee shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, retain such professionals and pay the reasonable professional fees and expenses incurred by the Reorganized Debtors and/or the Creditors' Committee related to implementation and consummation of the Plan pursuant to a budget approved by the Creditors' Committee and the Debtors without further approval from the Bankruptcy Court; provided, however, that with regards to the Creditors' Committee's retention of Blackstone, Blackstone's compensation for services rendered after the Effective Date shall be limited to the following: Blackstone shall be entitled to compensation in the form of five percent (5%) of the Creditor Thistledown Sale Proceeds in excess of Twenty Million Dollars ($20,000,000.00), if any, after accounting for the reconciliations contemplated by Section 19.3(b) hereof, upon consummation of the Thistledown Sale and as additional proceeds are received based on the satisfaction of contingencies.

## VI.  CERTAIN FACTORS TO BE CONSIDERED

### A.    Certain Bankruptcy Considerations

Although the Debtors believe that the Plan satisfies the requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.

The Bankruptcy Court may only confirm the Plan if at least one impaired Class of Claims votes to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class).  Thus, for the Plan to be confirmed, one of the impaired Classes must vote to accept the Plan.

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date following satisfaction of any applicable conditions precedent, there can be no

86

assurance as to the timing of the Effective Date.  The Effective Date may be delayed for several months pending the fulfillment of such conditions.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or been waived by the Debtors, the Creditors and MID, then the Confirmation Order will be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims and Equity Interests would be restored to the status quo ante as of the day immediately preceding the Confirmation Date and the Debtors' obligations with respect to Claims and Equity Interests would remain unchanged.

**B.      Certain Risk Factors Relating to Confirmation of the Plan**

     **1.      Parties Adverse to the Settlement.**

As mentioned throughout, the Plan and the classification of Claims and Equity Interests embodies a negotiated compromise between the Creditors' Committee and MID Islandi.  Although the Creditors' Committee is the statutory representative for all general unsecured creditors, certain parties in interest may not embrace the settlement terms and object to the Plan.

**C.      Additional Risk Factors and Considerations**

     **1.      Operating Trusts.**

In the event that the sales of Lone Star Park or Thistledown are not consummated by the Effective Date, there is no assurance that the Operating Trustees will be able to negotiate and close, on acceptable terms, one or more of the contemplated sales transactions.  Any failure or additional delays in completing assets sales, whether under the Plan or otherwise, or in the applicable Operating Trustees' ability to negotiate and close, on acceptable terms, one or more sales will adversely affect their ability to satisfy operational requirements or continue, Thistledown, Lone Star Park or the Maryland Jockey Club as a going concern.

     **2.      MID Regulatory Approval.**

The transfer of Gulfstream Park, Santa Anita Park, Golden Gate Fields, Portland Meadows, the Maryland Jockey Club and XpressBet, Inc. to MID is contingent upon regulatory approval of MID, and MID could be subjected at any time to additional or more restrictive regulation.  MID may be unable to obtain all governmental licenses, registrations, permits and approvals necessary for the operation of the applicable pari-mutuel wagering and other gaming facilities.  Licenses to conduct live horse racing and wagering, simulcast wagering and alternative gaming at the applicable racetracks must be obtained from each applicable jurisdiction's regulatory authority, in many cases annually.  In addition, licenses or approvals to conduct account wagering must be obtained in certain jurisdictions in which the applicable account wagering customers reside.  The denial of any licenses, registrations, permits or approvals will affect the occurrence of the Effective Date.

Notwithstanding any other provision herein, the Plan does not relieve the MID Transferee or any other transferee from the obligation to fully comply with the "Florida Pari-Mutuel Wagering Act" (Chapter 550, Florida Statutes), Florida slot machine gaming law (Chapter 551, Florida Statutes), Florida cardroom law (Section 849.086, Florida Statutes) and the rules of the Florida Division of Pari-Mutuel Wagering implementing those laws - including, by way of example, but not limitation, obtaining the required permits and licenses or complying with the requirements of Section 550.1815 and Section 551.104 (4)(d), Florida Statutes, that any person or entity acquiring an interest in a Florida pari-mutuel

wagering permit or slot machine gaming license must obtain prior approval of the Florida Division of Pari-Mutuel Wagering to hold an ownership or similar controlling interest, just as if Gulfstream Park were acquired outside of bankruptcy.

# VII.  ALTERNATIVES TO THE PLAN

The Debtors have evaluated several alternatives to the Plan, including liquidation.  After studying these alternatives, the Debtors have concluded that the Plan, which encompasses the settlement and compromise of the Committee Litigation (and has been agreed to by the parties thereto), is the best option and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  The following discussion provides a summary of the Debtors' analysis leading to their conclusion that a liquidation or alternative plan of reorganization would not provide the highest value to parties in interest.

In the event that the Plan is not confirmed and consummated, the Debtors intend to protect their rights and interests and the rights and interests of their creditors, including the protection of all of the Debtors' assets.

## A.      Liquidation Under Chapter 7 of the Bankruptcy Code

If no plan of reorganization can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.

As will be analyzed in greater depth in the liquidation analysis on Schedule III, the Debtors believe that liquidation under chapter 7 would result in less certainty with respect to the size and timing of distributions made to creditors than those provided for in the Plan.  Liquidation under chapter 7 would also result in the absolute certainty of loss of future business for those creditors who seek to continue to do business with the Debtors as a going concern, as there is no assurance that a chapter 7 liquidation would be able to fund the Debtors' racetracks operations to accommodate sales on a going concern basis.

## B.      Alternative Chapter 11 Plans

If the Plan is not confirmed, the Debtors or any other party in interest (to the extent the Debtors' exclusive period to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code expires) could attempt to formulate a different plan.  Such a plan might not embody the terms and conditions of the settlement of the Committee Litigation.

The Debtors believe that the Plan enables holders of Claims to realize the greatest recovery under the circumstances and a faster recovery than would be achieved under any other plan.

# VIII.   VALUATION

THE VALUATION ESTIMATES AND RESULTING RECOVERIES SET FORTH HEREIN REPRESENT ESTIMATED DISTRIBUTABLE VALUE AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE FUTURE INCLUDING IN ANY PUBLIC OR PRIVATE MARKETS. THE DISTRIBUTABLE VALUE AND RECOVERY

88

ESTIMATES SET FORTH HEREIN ARE NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN.

In connection with developing the Plan, the Debtors determined that it was appropriate to estimate, with the assistance of their financial advisor and investment banker Miller Buckfire, the estimated range of values and resulting recoveries, net of any related obligations, provided to MID Transferee and Non-MJC General Unsecured Claim holders pursuant to the terms of the Settlement. In preparing the estimated range of values and resulting recoveries set forth herein, Miller Buckfire: (i) reviewed certain historical financial information of the Debtors for recent years and interim periods; (ii) communicated with certain members of senior management of the Debtors to discuss the Debtors' assets and operations; (iii) considered certain economic and industry information relevant to the Debtors' operating businesses; (iv) considered various indications of interest received by the Debtors in connection with the sales marketing efforts conducted by Miller Buckfire during the Chapter 11 Cases for a majority of the Debtors' assets; (v) reviewed certain analyses prepared by the Debtors' management and other firms retained by the Debtors, including certain real estate appraisals; and (vi) conducted such other analyses as Miller Buckfire deemed appropriate. Miller Buckfire relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors and other appraisal and financial advisory firms. The analysis set forth herein as Schedule II is the Debtors' analysis prepared with the assistance of its advisors, and does not necessarily reflect the views of, or any analysis done by, the Committee or MID in connection with the Settlement or their respective determinations to support and be a co-proponent of the Plan.

This analysis is an estimate of the value of distributions, net of related obligations, that are provided to each of MID Transferee and Non-MJC General Unsecured Claim holders pursuant to the terms of the Settlement. The distributions contemplated in the Settlement are comprised of certain of the Debtors' reorganized assets and equity interests, cash and stipulated percentages of net proceeds from certain pending or planned asset sales. The related obligations include the funding of various cash payments and satisfaction of certain administrative, priority and other claims. Refer to Sections II and V herein for a more detailed description of the Settlement.

Due to, among other things, the unique operating profile of the Debtors' assets and the ongoing challenging conditions in the industry in which the Debtors operate, in addition to the lack of companies with publicly-traded securities that have operations similar to those of the Debtors, the commonly relied upon valuation approach referred to as the Comparable Company Methodology was deemed not to be relevant or applicable in assessing the value of distributions. Similarly, due to the negative cash flow profile of many of the Debtors' assets and the absence of medium to long-term financial projections for the Debtors' assets, the Discounted Cash Flow Methodology, another commonly relied upon valuation approach, was also deemed not to be relevant or applicable. To estimate a range of value for the Debtors' reorganized assets that form the basis for the distributions provided to MID Transferee and Non-MJC General Unsecured Claim holders, Miller Buckfire relied upon the numerous verbal and written, non-binding indications of interest submitted by various interested parties in connection with the extensive marketing of the Debtors' assets since the Petition Date, recognizing that these indications did not result in completed transactions. Miller Buckfire also took into consideration, where available, recent appraisals of the real estate underlying certain of the Debtors' assets prepared on an "as-if vacant" basis by an independent, third-party appraiser.

MID Transferee's total pre-petition secured claims, including approximately $43 million of unpaid and accrued interest through January 31, 2010, are approximately $412 million. Based upon

the methods described above, the value of the distribution, net of related obligations, provided to MID Transferee pursuant to the terms of the Settlement is significantly less than $412 million.

Based upon the methods described above, the value of the distribution, net of related obligations, provided to Non-MJC General Unsecured claim holders pursuant to the terms of the Settlement, is estimated to be between $94 million and $119 million with a midpoint estimate of $107 million.  Based on estimated Non-MJC General Unsecured Claims of $255 million to $261 million, holders of Non-MJC General Unsecured Claims are estimated to receive a recovery of 36% to 47% with a midpoint estimate of 41%.

This analysis is based upon information available to, and analyses undertaken by, Miller Buckfire as of March 15, 2010, and reflects, among other factors discussed below, information from the Debtors' extensive sales marketing processes, the Debtors' income statements and balance sheets and current financial market conditions. This valuation also reflects the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein.

This estimate of value is not mathematical but, rather, involves complex considerations and judgments concerning various factors that could affect the value of the Debtors' assets.  Moreover, the value of the Debtors' assets is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such assets.

Because valuation and recovery estimates are inherently subject to uncertainties, neither the Debtors, Miller Buckfire, nor any other person assumes responsibility for their accuracy, but the Debtors believe the estimates have been prepared in good faith based on reasonable assumptions.

Furthermore, in the event that the actual distributions in these Chapter 11 Cases differ from those the Debtors assumed in their recovery analysis, Claims holders actual recoveries could be significantly higher or lower than estimated by the Debtors.

This analysis does not constitute a recommendation to any holder of claims against the Debtors as to how to vote on the Plan, nor does it constitute an opinion as to the fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

## IX.  CERTAIN SECURITIES LAW MATTERS

Under the Plan, the issuance of the Equity Interests of the Reorganized Debtors and, to the extent considered securities, the LSP Trust Interests and the Thistledown Trust Interests, on account of, and in exchange for the Claims against the Debtors (the "1145 Securities") will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon the exemption set forth in section 1145(a)(1) of the Bankruptcy Code.   Notwithstanding, the Debtors believe that the LSP Trust Interests and the Thistledown Trust Interests do not constitute "securities" within the meaning of the federal securities laws and the blue sky laws.

The Equity Interests of the Reorganized Debtors that are being issued to MID Transferee are being issued under Section 1145 of the Bankruptcy Code.  Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to a registration exemption under section 1145(a)(1) of the Bankruptcy Code are deemed to have been issued pursuant to a public offering.  Therefore, the securities issued pursuant to a section 1145 exemption may generally be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof, unless the holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1)

of the Bankruptcy Code.  In addition, such securities generally may be resold by the recipients thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states.

WHETHER OR NOT MID TRANSFEREE WOULD BE DEEMED TO BE AN "UNDERWRITER" OF SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF THE DEBTORS WOULD DEPEND UPON VARIOUS FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON.  ACCORDINGLY, THE DEBTORS AND THE REORGANIZED DEBTORS EXPRESS NO VIEW AS TO WHETHER MID TRANSFEREE WOULD BE SUCH AN "UNDERWRITER" OR AN "AFFILIATE."  IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS AND THE REORGANIZED DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF MID TRANSFEREE TO TRADE IN SECURITIES OF THE REORGANIZED DEBTORS. ACCORDINGLY, THE DEBTORS RECOMMEND THAT MID TRANSFEREE CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

## X.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to holders of certain Claims, based on the IRC, existing and proposed Treasury regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof.  These rules are subject to change, possibly on a retroactive basis, and any such change could significantly affect the U.S. federal income tax consequences described below.  The following summary does not address the U.S. federal income tax consequences to holders whose Claims are unimpaired or otherwise entitled to payment in full in cash under the Plan (e.g., Priority Non-Tax Claims, Priority Tax Claims, Wells Fargo Claims, PNC Claims, BMO Claims and Secured Claims), to holders of Claims extinguished without a distribution in exchange therefor, to holders of Equity Interests or generally those holders who negotiated their own settlements with the Debtors.

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the Debtors for federal income tax purposes.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.  In addition, this summary does not discuss all aspects of federal income taxation that may be relevant to a particular holder in light of its individual investment circumstances or to certain types of holders subject to special treatment under the federal income tax laws (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, persons holding a Claim as part of a hedging, integrated constructive sale or straddle, and investors in pass-through entities). There also may be state, local or foreign income or other tax considerations applicable to each holder.

**Accordingly, the following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.**

**IRS Circular 230 Notice:  To ensure compliance with IRS Circular 230, holders of Claims are hereby notified that: (a) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims for the purpose of avoiding penalties that may be imposed on them under the IRC; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) holders of Claims should seek advice based on their particular circumstances from an independent tax advisor.**

### A.      Tax Consequences to the Debtors

In connection with the Plan, the assets of the Debtors will be, on or before the Effective Date, as applicable, (i) distributed to the MID Transferee in full satisfaction of the MID Claims and (ii) sold to third parties with holders of certain Claims (including the MID Transferee) receiving on account of such Claims their pro rata share (as described in the Plan) of Creditor Cash or in the event that the Operating Trusts are created pursuant to the Plan, such assets will be transferred to the applicable Operating Trust and the holders of such Claims will receive interests in the applicable Operating Trust entitling them to their pro rata share (as described in the Plan) of Creditor Cash.  Following the transfer of the assets as described above, the Debtors and their subsidiaries (to the extent the equity in such subsidiaries is not transferred to the MID Transferee or the Operating Trusts) will dissolve.  In connection with the implementation of the Plan, it is expected that the Debtors will incur a significant amount of cancellation of indebtedness ("COD") income for U.S. federal income tax purposes.

COD income is the amount by which indebtedness discharged (reduced by any unamortized original issue discount) exceeds the amount of cash and the fair market value of any other consideration given in exchange therefor.  Although any COD incurred will be excluded from the taxable income of Magna Entertainment Corp. and its consolidated subsidiaries for U.S. federal income tax purposes under a special bankruptcy exception contained in the IRC, the IRC provides that a debtor in a bankruptcy case generally must reduce certain of its tax attributes – such as net operating loss ("NOL") carryforwards and current year NOLs, capital loss carryforwards, tax credits and any other tax attributes, and tax basis in assets (including the stock of its subsidiaries) – by the amount of the excluded COD.  Any reduction in tax attributes in respect of excluded COD income does not occur until after the computation of tax for the taxable year in which the COD is incurred.

Although not free of doubt, the Debtors intend to take the position that for federal income tax purposes, the transfers of the assets to the MID Transferee (other than the transfer of the Gulfstream Park Racing Stock, to the extent discussed below) will be a taxable event to the Debtors.  In addition, the transfers of certain assets to the Operating Trusts, if created, will be a taxable event to the Debtors.  The tax consequences of the implementation of the Plan to the Debtors are complex.  Some asset transfers to the MID Transferee may be subject to the provisions of Section 304 of the IRC and/or Section 1059 of the IRC, which would result in such asset transfers being characterized as either a dividend or capital gain or loss depending on the amount of earnings and profits of the Debtors.  In addition certain asset transfers to the MID Transferee may result in the Debtors' recognition of losses and in such cases the Debtors intend to elect pursuant to Treasury Regulation Section 1.1502-36(d)(6)(i)(A) not to utilize such losses for U.S. federal income tax purposes.  As to other asset transfers, to the extent the Claims (or portion thereof) being exchanged for the transferred assets or, if applicable, the Operating Trusts Interests are considered "recourse" debt for U.S. federal income tax purposes such transfers by the Debtors will result in the recognition of gain or loss by the Debtors in an amount equal to difference between (i) the fair market value of the transferred assets and (ii) such transferred assets' tax basis, and the remainder of the debt will be treated as COD income.  If the Claims (or portion thereof) being exchanged for the transferred assets or, if applicable, the Operating Trusts Interests are considered "non-recourse" debt for U.S. federal

92

income tax purposes such transfers by the Debtors will result in the recognition of gain or loss by the Debtors in an amount equal to difference between (i) the amount of the Claim being exchanged and (ii) such transferred assets' tax basis.  To the extent that the implementation of the Plan results in net gain, the Debtors will offset such net gain with existing NOLs and other tax attributes.  To the extent that the implementation of the Plan will result is a net gain in excess of the existing NOLs and other tax attributes, any tax liability will be borne by the MID Transferee pursuant to the Plan.  The amount of the Debtors' tax attributes and any limitations with respect to the utilization of NOLs remain subject to audit by the IRS.  Any NOLs of a Debtor the stock of which will not be transferred to the MID Transferee pursuant to the Plan that are not otherwise utilized prior to the Effective Date will be eliminated upon liquidation of the applicable Debtors.

Certain Debtors are treated as "disregarded entities" for U.S. federal income tax purposes.  The U.S. federal income tax consequences of the Plan described in this section will generally not be borne by such Debtors and instead will be borne by their respective direct or indirect equity holders (who themselves may be Debtors) which are regarded entities for U.S. federal income tax purposes.  Additionally, certain Debtors are treated as partnerships for U.S. federal income tax purposes.  When an entity that is taxed as a partnership realizes income (including COD income), for U.S. federal income tax purposes such income "flows through" and the entity's equity holders (and not the entity itself) are treated as recognizing their allocable share of such income.  Thus, the tax consequences of any COD income or gain from disposition of assets incurred by a Debtor treated as a partnership for U.S. federal income tax purposes will generally not be borne by such entity and instead will be borne by the entity's direct and indirect equity holders (who themselves may be Debtors).

Although not free of doubt, the Debtors are currently contemplating to treat all or portion of the transfer of the Reorganized Gulfstream Park Racing Stock in exchange for an amount of the Gulfstream Park Claim of equal fair market value as a "reorganization" within the meaning of Section 368(a)(1)(E) of the IRC (the "Exchange").  The U.S. federal income tax consequences of the Exchange depend on whether the Gulfstream Park Claim constitutes a "security" for U.S. federal income tax purposes.  This determination is made separately for each tranche of the Gulfstream Park Claim.  The term "security" is not defined in the IRC or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions.  The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt.  One of the most significant factors considered in determining whether a particular debt is a security is its original term.  In general, debt obligations issued with a weighted average maturity at issuance of less than five years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities.  Additionally, the IRS has ruled that new debt instruments with a term of less than five (5) years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, since the new debt represented a continuation of the holder's investment in the corporation in substantially the same form.  The Debtors may take the position that some or all of the tranches comprising the Gulfstream Park Claim are securities for federal income tax purposes.  The Debtors do not intend to request a ruling from the IRS or an opinion of counsel with respect to the Exchange.  Accordingly, there can be no assurance that the IRS would not take a contrary position.  If the IRS were to challenge successfully the tax treatment of the Exchange, the Debtors believe that existing NOLs are sufficient to offset any gain that may be required to be recognized as a result of such challenge.  To the extent that the income from the Plan, including the Exchange exceeds existing NOLs, any tax liability as a result of the Exchange will be borne by the MID Transferee pursuant to the Plan.

B.    **Tax Consequences to the Holder of the MID Claims**

Pursuant to the Plan, the holder of the MID Claims will receive, in exchange for the satisfaction of the MID Claims, the cash transferred by the MID Transferee, if any, to the Disbursing Agent and the assumption of certain liabilities, a combination of (i) cash or interests in the Operating Trusts, if such trusts are created pursuant to the Plan (for the tax consequences of the receipt of interest in the Operating Trusts see section D below, "Tax Treatment of the Operating Trusts and Holders of Beneficial Interests), (ii) the MID Reorganized Debtor Stock and (iii) the MID Reorganized Debtor Assets as well as other rights and assets as provided in Article II of the Plan (collectively, the "MID Claim Assets").

As previously described, the Debtors and the MID Transferee generally intend to treat the transfers to the MID Transferee as a taxable transaction.  Accordingly,  in general, the holder of the MID Claims will recognize gain or loss in an amount equal to the difference between (i) the fair market value of the MID Claim Assets received in respect of its Claims (other than any amount received for accrued but unpaid interest) and (ii) such holder's adjusted tax basis in the MID Claims (other than any tax basis attributable to accrued but unpaid interest), the cash transferred by the MID Transferee, if any, to the Disbursing Agent and the liabilities being assumed.  To the extent that an amount received by a holder of debt is received in satisfaction of accrued interest or original issue discount during its holding period, such amount generally will be taxable to the holder as interest income (if not previously included in the holder's gross income).  Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest previously included in its gross income is not paid in full.  Pursuant to the Plan, all distributions from the Debtors in satisfaction of Claims will be allocated first to the principal amount of such Claims, as determined for U.S. federal income tax purposes, and thereafter to the portion of such Claim, if any, representing accrued but unpaid interest or original issue discount.  There is no assurance that the IRS will respect the above described tax treatment or the allocation of the distributions for U.S. federal income tax purposes.  The MID Claims holder is urged to consult its tax advisor regarding the tax treatment of the asset transfers and the receipt of interests in the Operating Trusts, the allocation of consideration to, and the deductibility of accrued but unpaid interest or original issue discount for U.S. federal income tax purposes.

Where gain or loss is recognized by the MID Claims holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including whether the claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction.

C.    **Tax Consequences to Holders of the Allowed Non-MJC General Unsecured Claims, Allowed 8.55% Note Claims, and Allowed 7.25% Note Claims**

Pursuant to the Plan holders of Allowed Non-MJC General Unsecured Claims, Allowed 8.55% Note Claims and Allowed 7.25% Note Claims will receive, in satisfaction of such Claims, either cash or interests in the Operating Trusts, if such trusts are created pursuant to the Plan (for the tax consequences of the receipt of interest in the Operating Trusts please see section D below, "Tax Treatment of the Operating Trusts and Holders of Beneficial Interests).

In general, each holder of an Allowed Non-MJC General Unsecured Claims, Allowed 8.55% Note Claims and Allowed 7.25% Note Claims should recognize gain or loss in an amount equal to the difference, if any, between (i) the cash received or, if applicable, the fair market value of its undivided interest in the relevant Operating Trusts Assets (as defined below) received in satisfaction of its Claim

(other than in respect of any amount received for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest).  See section D below, "Tax Treatment of the Operating Trusts and Holders of Beneficial Interests," regarding the treatment of a holder of Beneficial Interests in the Operating Trusts as a direct owner of an undivided interest in the underlying assets for U.S. federal income tax purposes.

Where gain or loss is recognized by a holder of a Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction.

In general, to the extent that any consideration received pursuant to the Plan by a holder of an Allowed Non-MJC General Unsecured Claim, Allowed 8.55% Note Claims or Allowed 7.25% Note Claims is received in satisfaction of accrued interest or original issue discount during its holding period, such amount will be taxable to the holder as interest income (to the extent such accrued interest or original issue discount was not previously included in the holder's gross income).  Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed or amortized original issue discount was previously included in its gross income and is not paid in full.  Pursuant to the Plan, all distributions from the Debtors in satisfaction of Claims will be allocated first to the principal amount of such Claims, as determined for U.S. federal income tax purposes, and thereafter to the portion of such Claim, if any, representing accrued but unpaid interest or original issue discount.  However, there is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.  Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration to and the deductibility of accrued but unpaid interest or original issue discount for U.S. federal income tax purposes.

With respect to holders of Allowed Non-MJC General Unsecured Claims, Allowed 8.55% Note Claims, or Allowed 7.25% Note Claims, in general, such holder's tax basis in its undivided interest in the Operating Trusts Assets should be equal to its fair market value, which will reflect any obligations to which those assets are subject, and the holding period for such assets should begin on the day following the receipt of such interest.

After the Effective Date, any amount that a holder of Allowed Non-MJC General Unsecured Claims, Allowed 8.55% Note Claims, or Allowed 7.25% Note Claims receives as a distribution from the Operating Trusts in respect of its Beneficial Interest generally should not be included in the holder's amount realized in respect of its Claim for U.S. federal income tax purposes, but should be separately treated as a distribution received in respect of its Beneficial Interest.  See section D below, "Tax Treatment of the Operating Trusts and Holders of Beneficial Interests," regarding the treatment of distributions received in respect of Beneficial Interest.

### D.    Tax Treatment of the Operating Trusts and Holders of Beneficial Interests

#### 1.    In General

Pursuant to the Plan, holders of certain Claims will receive a Beneficial Interest in the applicable Operating Trusts.  For U.S. federal income tax purposes, each Operating Trust has been structured to qualify as a "grantor trust."  See section D.2. below, "Tax Treatment of the Operating Trusts and Holders of Beneficial Interests."  As a result, the receipt of a Beneficial Interest in the Operating Trusts by a holder of a Claim generally should be treated for U.S. federal income tax purposes as the receipt of a direct undivided interest in the underlying assets of the Operating Trusts (the "Operating

Trusts Assets"), subject to any obligations of the Operating Trusts and the contribution of such interest to the Operating Trust, and all holders are required to report consistently therewith.  In addition, pursuant to the Plan, the Operating Trust Assets shall be valued in accordance with section 17.5 of the Plan, and all parties must consistently use such valuation for all U.S. federal income tax purposes.

## 2.    Classification of the Operating Trusts

Each Operating Trust is intended to qualify as a liquidating trust for U.S. federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (i.e., a pass-through entity).  However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes.  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  The Operating Trusts have been structured with the intention of complying with such general criteria.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Operating Trustee and the holders of the Operating Trust Interests) are required to treat, for U.S. federal income tax purposes, each of the Operating Trusts as a grantor trust of which the holders of the Operating Trust Interests are the owners and grantors.  The following discussion assumes that the Operating Trusts will be so respected for U.S. federal income tax purposes.  However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of each of the Operating Trusts as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position.  If the IRS were to challenge successfully the classification of the Operating Trusts, the U.S. federal income tax consequences to the Operating Trusts, the holders of the Operating Trust Interests and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on any income of the Operating Trusts).

## 3.    General Tax Reporting by the Operating Trusts and Beneficiaries

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Operating Trustee and the holders of the Operating Trust Interests) must treat the transfer of the Operating Trusts Assets to the applicable Operating Trust, in accordance with the terms of the Plan, as a transfer of the Operating Trust Assets directly to the holders of Claims in satisfaction of their Claims, followed by the transfer by the holders of such Operating Trust Assets to the applicable Operating Trust in exchange for beneficial interests in the Operating Trust.  Accordingly, all parties must treat the applicable Operating Trust as a grantor trust of which such holders are the owners and grantors.  Thus, such holders will be treated as the direct owners of an undivided interest in the assets of the applicable Operating Trust Assets for all U.S. federal income tax purposes (which assets will generally have a tax basis equal to their fair market value on the Effective Date) and any liabilities deemed assumed.  The Operating Trust Assets shall be valued in accordance with section 17.5 of the Plan; and all parties (including, without limitation, the Debtors, the Operating Trustee and the holders of the Operating Trust Interests) must consistently use such valuation for all federal income tax purposes.  The valuation will be made available as necessary for tax reporting purposes (on an asset or aggregate basis, as relevant).

Allocations of an Operating Trust's taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the applicable Operating Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the Operating Trust Interests (treating any holder of a Disputed Claim, for this purpose, as a current holder of a Operating Trust Interest entitled to distributions), taking into account all prior and concurrent distributions from the Operating Trusts (including all distributions held in escrow

pending the resolution of Disputed Claims). Similarly, taxable loss of the Operating Trusts shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets of an Operating Trust. The tax book value of the assets of an Operating Trust for this purpose shall equal their fair market value on the date such Operating Trusts were created or, if later, the date such assets were acquired by the Operating Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

The U.S. federal income tax obligations of a holder are not dependent on the Operating Trust's distributing any cash or other proceeds. Therefore, a holder may incur a federal income tax liability with respect to its allocable share of the income of the trust regardless of the fact that the Operating Trust has not made any concurrent distribution to the holder. In general, a holder of Operating Trust Interests should not be separately taxable on a distribution of cash by the Operating Trust.

The Operating Trustee will file with the IRS returns for the applicable Operating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Operating Trustee shall also annually send to each holder of an Operating Trust Interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and shall instruct all such holders to report such items on their federal income tax returns.

E.    **Tax Treatment of the Disputed Claims Escrow**

Subject to the receipt of contrary guidance from the IRS or a court of competent jurisdiction (including the receipt by the Disbursing Agent of a private letter ruling requested by the Disbursing Agent, or the receipt of an adverse determination by the IRS upon audit if not contested by the Disbursing Agent, or a condition imposed by the IRS in connection with a private letter ruling requested by the Debtors), the Disbursing Agent shall (i) treat the escrow as one or more "disputed ownership funds" governed by Treasury Regulation Section 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All holders of Allowed Claims shall report, for tax purposes, consistently with the foregoing.

Accordingly, the escrow will be subject to tax annually on a separate entity basis on any net income earned on the cash deposited in such escrow, and all distributions from the escrow will be treated as received by holders of Disputed Claims as if distributed by the Debtors. See section B above, "Tax Consequences To The Holder Of The MID Claims" and section C above, "Tax Consequences To Holders Of The Allowed Non-MJC General Unsecured Claims," for tax treatment of distributions by the Debtors. All parties (including, without limitation, the Debtors, the Operating Trustee and the holders of Disputed Claims) will be required to report for tax purposes consistently with the foregoing.

F.    **Information Reporting and Withholding**

All distributions to holders of Claims under the Plan are subject to any applicable withholding (including employment tax withholding). Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate (currently 28%). Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial

97

institutions.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS.

**The foregoing summary has been provided for informational purposes only.  All holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences applicable under the Plan.**

## XI.  CERTAIN CANADIAN SECURITIES LAW MATTERS

Magna Entertainment submits that the Plan of reorganization is a "related party transaction" for purposes of applicable Canadian securities law and, in particular, Multilateral Instrument 61-101 – *Protection of Minority Security Holders in Special Transactions* ("MI 61-101"). This is because the acquisition transactions contemplated by the Plan between Magna Entertainment and its controlling shareholder, MID, fall within the designated types of related party transactions that are caught by the requirements of MI 61-101.

MI 61-101 requires that, unless exempted, an issuer proposing to carry out certain types of related party transactions is required to obtain a formal valuation of the assets involved in a related party transaction from a qualified and independent valuator. MI 61-101 also requires that, unless exempted, a related party transaction must be approved by at least a simply majority of the votes cast by minority shareholders of each class of equity securities of the issuer.

Besides the apparent benefits of transactions contemplated by the Plan, Magna Entertainment submits that there are exemptions (the "Bankruptcy Exemptions") from the formal valuation requirement and the minority shareholder approval requirement for a related party transaction under MI 61-101 which provide that a formal valuation and minority shareholder approval are not required where: (i) the transaction is subject to court approval, or a court orders that the transaction be effected, under bankruptcy or insolvency law; (ii) the court is advised of the requirements of MI 61-101 regarding formal valuations and minority shareholder approval for related party transactions and of the provisions of the Bankruptcy Exemptions; and (iii) the court does not require a formal valuation or minority shareholder approval to be obtained.

In the event this Court approves the proposed transactions between the Debtors and MID contemplated by the Plan, such approval would be relied upon by Magna Entertainment as the basis for the Bankruptcy Exemptions from the formal valuation and minority shareholder approval requirements of MI 61-101 pursuant to Sections 5.5(f) and 5.7(d) thereof, with respect to its consummation of the proposed transaction.

## XII. VOTING PROCEDURES AND REQUIREMENTS

### A.    Holders of Claims Entitled to Vote

The following classes are the <u>only</u> ones entitled to vote to accept or reject the Plan.

| | |
|---|---|
| Class 2 | MID Claims |
| Classes 3, 5, 6 | Wells Fargo Claim, BMO Claim, and Secured Claim |
| Classes 7-26 and 35 | 8.55% Note Claims, 7.25% Claims, Non-MJC General Unsecured Claims and Insured Litigation Claims |

If your Claim or Equity Interest is not in one of these Classes, you are not entitled to vote and you will not receive a Ballot with this Disclosure Statement.  If your Claim is in one of these Classes, you should read your Ballot and follow the listed instructions carefully.  Please use only the Ballot that accompanies this Disclosure Statement.

If a Ballot is damaged or lost, or if you have any questions concerning voting procedures, you may contact:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Arielle G. Lenza, Esq.
(212) 310-8000

### B.    Voting Deadlines

The Debtors in Possession have engaged the Solicitation Agent to assist in the transmission of voting materials and in the tabulations of votes with respect to the Plan.

IT IS IMPORTANT THAT THE HOLDERS OF CLAIMS IN CLASSES 2, 3, 5, 6, 9 THROUGH 26 AND 35 TIMELY EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN.
IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE SOLICITATION AGENT BEFORE THE "VOTING DEADLINE" OF 4:00 P.M. (PREVAILING EASTERN TIME), ON APRIL 16, 2010.
ALL BALLOTS FOR HOLDERS OF CLAIMS IN CLASSES 2, 3, 5, 6, 9 THROUGH 26 AND 35 SHOULD BE SENT TO:
Magna Entertainment Ballot Processing Center
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA 90245
For additional information, please visit http://www.kccllc.net/magna or email
KCC_Magna@kccllc.com

ALL BALLOTS FOR HOLDERS OF CLAIMS IN CLASSES 7 AND 8 SHOULD BE SENT TO YOUR NOMINEE SO THAT IT CAN PROCESS YOUR INSTRUCTIONS AND SUBMIT A

**MASTER BALLOT THAT IS ACTUALLY RECEIVED BY THE SOLICITATION AGENT NO LATER THAN 4:00 P.M. (PREVAILING EASTERN TIME) ON APRIL 16, 2010, UNLESS SUCH TIME IS EXTENDED BY THE DEBTORS.  EACH NOMINEE SHOULD SUBMIT THE MASTER BALLOT TO THE SOLICITATION AGENT IN THE ENVELOPE PROVIDED OR AT THE FOLLOWING ADDRESS:**

**Magna Entertainment Corp.**
**c/o Kurtzman Carson Consultants LLC**
**1230 Avenue of the Americas, 7th Floor**
**New York, NY 10020**
**Attn: David M. Sharp**
**(917) 639-4276**

**ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN.**

C.    **Voting Procedures**

Detailed voting instructions are provided with the Ballot accompanying this Disclosure Statement.  All holders of Claims in Classes 2, 3, 5 through 26 and 35, as of the Ballot Date established for purposes of this solicitation, may vote to accept or reject the Plan to the extent and in the manner provided in the Disclosure Statement Order or in any other order or orders of the Bankruptcy Court.

1.    **Acceptance by a Class.**

The Bankruptcy Code defines "acceptance" of a chapter 11 plan by a class of creditors as acceptance by creditors holding at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims in such class (other than any such creditor designated under section 1126(e) of the Bankruptcy Code), but for that purpose only counts those creditors that actually cast ballots.  Holders of claims that fail to vote are not counted as either accepting or rejecting.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with provisions of the Bankruptcy Code.

2.    **Withdrawal or Change of Vote.**

Any voter that has delivered a valid Ballot may withdraw its vote by delivering a written notice of withdrawal to the Solicitation Agent before the Voting Deadline.  To be valid, the notice of withdrawal must be (a) signed by the party who signed the Ballot to be revoked and (b) received by the Solicitation Agent by the Voting Deadline.  The Debtors in Possession may contest the validity of any withdrawals.  Any holder that has delivered a valid ballot may change its vote by delivering to the Solicitation Agent a properly completed subsequent Ballot so as to be received before the Voting Deadline.  In the case where more than one timely, properly completed ballot is received, only the Ballot that bears the latest date will be counted.

## XIII.    CONFIRMATION OF THE PLAN

### A.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold the Confirmation Hearing to confirm the Plan.  The Confirmation Hearing with respect to the Plan has been scheduled for April __, 2010, commencing at ___ a.m. (Prevailing Eastern Time), before the Honorable Mary F. Walrath, United States Bankruptcy Judge, at the United States Bankruptcy Court, 824 North Market Street, Wilmington, Delaware  19801.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing or at any subsequent continued Confirmation Hearing.

### B.    Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  Any objection to confirmation of the Plan must be made in writing, must conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Equity Interest of the Debtors held by the objector.  Any such objection shall be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 North Market Street, Wilmington, Delaware  19801, on or before ___p.m. (prevailing Eastern Time) on April __, 2010, or such later date and time as the Debtors may agree; and (d) be served so as to be received no later than ___p.m. (prevailing Eastern Time) on the same day, upon (i) Magna Entertainment Corp., 337 Magna Drive, Aurora, Ontario L46  7K1 (Attn: William G. Ford, General Counsel); (ii) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware  19801 (Attn: Mark D. Collins, Esq.), co-counsel for the Debtors; (iii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York  10153 (Attn: Brian S. Rosen, Esq.), co-counsel for the Debtors; (iv) Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York  10036-2714 (Attn: Kenneth Eckstein, Esq.), counsel to the Creditors' Committee; (v) the Office of the United States Trustee, 844 King Street, Room 2313, Wilmington, Delaware  19801; and (vi) Sidley Austin LLP, 787 7th Avenue Manhattan, New York, NY 10019 (Attn: Lee Attanasio, Esq.), counsel to MID.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

> **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### C.    General Requirements for Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are satisfied.  Among the requirements for confirmation of a plan are that the plan is accepted by all impaired classes of claims and equity interests or, if rejected by an impaired class, that the plan (i) is accepted by at least one impaired class (without counting the votes of insiders), (ii) "does not discriminate unfairly" against any rejecting class and (iii) is "fair and equitable" as to each rejecting class.  In addition, among other provisions of section 1129(a), the Bankruptcy Court must find that the Plan is in the "best interests" of creditors and equity holders that are impaired pursuant to the Plan and that the Plan is feasible.

D.        **Best Interests Test**

As described above, the Bankruptcy Code requires that each holder of an impaired claim or equity interest either (i) accepts the Plan, or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The gross amount of Cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the Cash held by the Debtors at the time of the commencement of the chapter 7 case.  The next step is to reduce that total by the amount of any claims secured by such assets, the costs and expenses of the liquidation and such additional administrative expenses and priority claims that may result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation.  Any remaining net Cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below).  Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the chapter 11 case and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals and costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code and any other committee so appointed.  Moreover, in a chapter 7 liquidation, additional claims would arise by reason of the breach or rejection of obligations incurred and executory contracts or leases entered into by the Debtors both prior to, and during the pendency of, these Chapter 11 Cases.

In addition, as discussed above, horse racing is a highly regulated industry and individual states control the operations of racetracks located within their respective jurisdictions.  Regulatory authorities perform background checks on all racetrack owners prior to granting them the necessary operating licenses.  A chapter 7 liquidation would have an adverse impact on the Debtors' racetrack operations, because it is likely that appointment of a chapter 7 trustee to oversee the Debtors' operations pending a liquidation would generate concern from the regulatory authorities and would likely impact continuation or renewal of the necessary licenses.

The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured claims.  Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full, with interest.  The Debtors believe that in a chapter 7 case, holders of Non-MJC General Unsecured Claims would receive no distributions of property after payment of the aforementioned fees and the Debtors' prepetition secured obligations and DIP Obligations.  Accordingly, the Plan satisfies the rule of absolute priority.

102

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail and (iii) substantial increases in claims which would be satisfied on a priority basis, the Debtors have determined that confirmation of the Plan and implementation of the Settlement will provide each creditor with a recovery that is more than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

Moreover, the Debtors believe that the value of any distributions from the liquidation proceeds to each class of allowed claims in a chapter 7 case would be the less than the value of distributions under the Plan because such distributions in a chapter 7 case may not occur for a substantial period of time.  Conclusion of the  Committee Litigation would be necessary to resolve claims asserted in the chapter 7 case, and the delay could be further prolonged and administrative expenses further increased.  In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for a year or more after the completion of such liquidation in order to resolve the claims and prepare for distributions.

**The Debtors' complete liquidation analysis is annexed hereto as Schedule III.**

### E.        No Unfair Discrimination / Fair and Equitable Test

In the event that any impaired Class of Claims or Equity Interests does not accept, or is deemed to reject, the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, as to each impaired Class of Claims or Equity Interests which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class of Claims or Equity Interests.

The "unfair discrimination" test applies to Classes of Claims or Equity Interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is entitled to receive for its claims or equity interests.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The "fair and equitable" test applies to Classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting Class, the test sets different standards, depending on the type of Claims or Equity Interests in such class:

### 1.        Unsecured Creditors.

Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of  the dissenting class will not receive any property under the plan.

2.    **Equity Interests.**

Either (i) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption prove, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan.

These requirements are in addition to other requirements established by case law interpreting the statutory requirements.

The Debtors believe the Plan satisfies the "unfair discrimination" and "fair and equitable" requirement. As described throughout, the Plan is an embodiment of the settlement and compromise of the Committee Litigation. Claims of equal priority are receiving the treatment ascribed to such claims pursuant to that settlement and such treatment is fair under the circumstances. Furthermore, holders of equity interests, the only claims or interests junior to the MJC Claims and Non-MJC General Unsecured Claims, will not receive any recovery under the Plan.

The only impaired unsecured claims are classified as the Subordinated Note Claims and the Non-MJC General Unsecured Claims. With respect to these Claims, the Plan does not "unfairly discriminate" because Claims of equal priority are not receiving different treatment under the Plan. Although the MJC Claims are classified separately from Non-MJC General Unsecured Claims, the Debtors believe the Plan satisfies the "unfair discrimination" test, as the Plan is an embodiment of a settlement and the MJC Claims consist of holders of Claims that will continue doing business with the Reorganized MJC Debtors and thus, were a necessary component of the settlement.

F.    **Classification of Claims and Equity Interests Under the Plan**

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code which requires that a chapter 11 plan place each claim or equity interest into a class with other claims or equity interests that are "substantially similar." The Plan establishes Classes of Claims and Equity Interests as required by the Bankruptcy Code and summarized above. Consistent with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified.

G.    **Feasibility**

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their financial obligations as contemplated thereunder. As set forth in Section 19.3 of the Plan and summarized above, the Plan provides that until the remaining sales are consummated, specifically, the LSP Sale, and the Thistledown Sale the applicable Operating Trust shall be funded through the use of Creditor Cash and funds from MID US Financing.

Accordingly, the Debtors believe they will be able to perform all of the obligations required pursuant to the Plan.

XIV.    **CONCLUSION**

The Debtors believe the Plan is in the best interests of all creditors and urges the holders of impaired Claims in Classes 2, 3, 5 through 26 and 35 to vote to accept the Plan and to evidence such acceptances by returning their Ballots so that they will be received no later than April 16, 2010.

Dated: Wilmington, Delaware
           March 24, 2010

                                        Respectfully submitted,
                                        MAGNA ENTERTAINMENT CORP. AND ITS
                                        AFFILIATED DEBTORS


                                        By:    /s/ William G. Ford
                                              Name: William G. Ford
                                              Title: Executive Vice President, General Counsel
                                                  & Secretary


                                        By:    /s/ Blake Tohana
                                              Name: Blake Tohana
                                              Title: Executive Vice President &
                                                  Chief Financial Office


WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
(212) 310-8000

        – and –

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700

Attorneys for Debtors and
Debtors in Possession

RLF1 3552646v.1

I.      INTRODUCTION ................................................................................................. 1

II.     COMPROMISE AND SETTLEMENT ............................................................... 4

III.    OVERVIEW OF PLAN ....................................................................................... 6

IV.     OVERVIEW OF THE DEBTORS' OPERATIONS AND CHAPTER 11 CASES ....... 13

        A.      The Debtors' Corporate Structure ........................................................ 12

        B.      The Debtor's Prepetition Business Operations ................................... 13

                1.      Racetracks. ............................................................................. 15

                a.      Gulfstream Park and the Palm Meadows Training Center ..................... 15

                b.      Golden Gate Fields ........................................................................... 16

                c.      Santa Anita Park and The Shops at Santa Anita .................................. 16

                d.      Remington Park ................................................................................ 17

                e.      The Maryland Jockey Club: Pimlico Race Course, Laurel Park and
                        the Bowie Training Center ................................................................. 18

                f.      Thistledown .................................................................................... 19

                g.      Lone Star Park at Grand Prairie ......................................................... 20

                h.      Portland Meadows ........................................................................... 20

                i.      Magna Racino .................................................................................. 20

                2.      Non-Racetrack Operations ................................................................. 21

                3.      Real Property ................................................................................. 21

                a.      The Ocala Property ........................................................................... 21

                b.      The Dixon Property .......................................................................... 22

        C.      The Debtor's Capital Structure and Prepetition Financing ........................... 22

                1.      Secured Financings ........................................................................... 22

                a.      PNC Agreements ............................................................................. 22

                b.      The Wells Fargo Agreement ................................................................ 22

                c.      The BMO Credit Agreement ................................................................ 23

                d.      The Remington Park Agreement ............................................................ 23

                e.      The Gulfstream Agreement ................................................................ 23

                f.      SunTrust Agreement .......................................................................... 24

                g.      The Bridge Loan Agreement ................................................................ 24

                h.      The 2008 Loan Agreement ................................................................ 25

                2.      Convertible Unsecured Notes ............................................................... 25

a.    8.55% Notes ............................................................................ 25

b.    7.25% Notes ............................................................................ 26

D.    Significant Events Leading to Commencement of the Chapter 11 Case ............ 26

1.    Highly-Leveraged Structure .................................................... 26

2.    Revenues and Expenses. ......................................................... 27

3.    Unsuccessful Prepetition Restructuring Initiatives. .................. 27

E.    The Chapter 11 Cases ........................................................................ 29

1.    Commencement of the Chapter 11 Cases. ............................... 29

2.    "First-Day" Orders. ................................................................ 29

3.    Appointment of the Creditors' Committee. ............................. 29

4.    DIP Financing. ........................................................................ 30

5.    Corporate Governance Developments. .................................... 31

6.    The Greenlight Examiner Motion. .......................................... 32

7.    The Postpetition Sales Processes. ........................................... 32

a.    Remington Park Sale ............................................................... 33

b.    Lone Star Park Sale and Chapter 11 Filing ............................. 34

c.    Thistledown ............................................................................. 34

d.    The Ocala Property ................................................................. 35

e.    The Dixon Property ................................................................. 35

f.    StreuFex .................................................................................. 36

g.    Magna Racino ......................................................................... 37

8.    MEC Pennsylvania .................................................................. 38

a.    Events Leading Up to MEC Pennsylvania's Chapter 11 Case ............... 39

b.    Motion to Reject RSA ............................................................. 39

c.    PA Meadows Litigation .......................................................... 40

9.    The Committee Litigation. ...................................................... 40

10.    The Maryland Jockey Club. .................................................... 41

a.    The Formation Agreement ...................................................... 41

b.    Maryland's Right of First Refusal .......................................... 43

c.    The Cloverleaf Litigation…………………………………………….44

11.    Canadian Securities Regulatory Proceedings Against MID. ................... 46

2

12.    The ODS Litigation................................................................. 47

13.    The Red Rock Adversary......................................................... 47

14.    The California Litigation. ....................................................... 47

15.    Claims Process. ...................................................................... 48

V.    THE PLAN OF REORGANIZATION.................................................. 49

A.    Chapter 11 Generally ....................................................................... 49

B.    Implementation of Settlement .......................................................... 49

C.    Administrative Expense Claims and Priority Claims ........................ 50

1.    Administrative Expense Claims............................................. 50

2.    Priority Tax Claims................................................................ 50

3.    Debtor in Possession Financing ............................................ 51

D.    Classification and Treatment of Claims and Equity Interests........... 51

1.    Class 1: Priority Non-Tax Claims.......................................... 51

2.    Class 2: MID Claims.............................................................. 51

3.    Class 3: Wells Fargo Claim. .................................................. 52

4.    Class 4: PNC Claim ............................................................... 52

5.    Class 5: BMO Claim. ............................................................. 53

6.    Class 6: Secured Claims......................................................... 53

7.    Class 7: 8.55% Note Claims. ................................................. 53

8.    Class 8: 7.25% Note Claims. ................................................. 54

9.    Classes 9 – 26: Non-MJC General Unsecured Claims. .......... 54

10.    Classes 27-34: MJC Claims. ................................................. 54

11.    Class 35: General Liability Insured Litigation Claims. .......... 55

12.    Class 36: MEC Maryland Investments Stock. ........................ 55

13.    Class 37: AmTote Stock. ....................................................... 55

14.    Class 38: GPRA Commercial Stock. ...................................... 56

15.    Class 39: Gulfstream Park Racing Stock. ............................... 56

16.    Class 40: L.A. Turf Club Stock. ............................................ 56

17.    Class 41: Magna Entertainment Stock.................................... 56

18.    Class 42: MEC Land Holdings Stock. .................................... 57

19.    Class 43: Pacific Racing Stock. ............................................. 57

20.    Class 44: Santa Anita Companies Stock................................. 57

3

21.    Class 45: Palm Meadows Training Center Stock. ................................... 57

22.    Class 46: MEC Pennsylvania Stock. ....................................................... 58

23.    Class 47:  Pimlico Stock. ....................................................................... 58

24.    Class 48: Prince George's Racing Stock. ............................................... 58

25.    Class 49: Maryland Jockey Club Stock. ................................................ 59

26.    Class 50: The Maryland Jockey Club of Baltimore City Stock. .............. 59

27.    Class 51: Southern Maryland Racing Stock. .......................................... 59

28.    Class 52: Southern Maryland AA Stock. ................................................ 60

29.    Class 53: Laurel Racing Stock. .............................................................. 60

30.    Class 54: Laurel Racing Association Stock. ........................................... 60

31.    Class 55: MEC Lone Star Stock. ............................................................ 60

32.    Class 56: Thistledown Stock. .................................................................. 61

33.    Class 57: Old RP Stock. .......................................................................... 61

34.    Class 58: MEC Dixon Stock. .................................................................. 61

35.    Class 59: Sunshine Meadows Stock. ....................................................... 61

36.    Class 60: 30000 Maryland Stock. ........................................................... 62

37.    Class 61: MEC Holdings Stock. ............................................................. 62

E.    Provision for Treatment of Intercompany Claims ............................................. 62

F.    Provisions for the Treatment of Disputed Claims............................................. 63

1.    Objections to Claims and Prosecution of Disputed Claims .................... 63

2.    Estimation of Claims............................................................................... 63

3.    Payments and Distributions on Disputed Claims.................................... 63

a.    Disputed Claims Reserve ........................................................................ 63

b.    Allowance of Disputed Claims ............................................................... 64

c.    Tax Treatment of Escrow ........................................................................ 64

G.    The Operating Trusts ....................................................................................... 64

1.    Establishment of the Trusts..................................................................... 64

2.    Purpose of the Operating Trusts ............................................................. 65

3.    Funding Expenses of the Operating Trusts ............................................. 65

a.    The LSP Trust ......................................................................................... 65

4.    Transfer of Assets. .................................................................................. 65

5.    Valuation of Assets. ................................................................................ 66

4

6.      Investment Powers ...................................................................... 66

7.      Annual Distribution and Withholding ...................................................... 67

8.      Reporting Duties ........................................................................ 67

a.      Federal Income Tax ...................................................................... 67

b.      Allocations of Operating Trusts Taxable Income .................................... 67

c.      Other ..................................................................................... 68

9.      Trust Implementation .................................................................. 68

10.     Registry of Beneficial Interests ...................................................... 68

11.     Termination ............................................................................ 68

12.     Non-Transferability or Certification ................................................ 68

13.     Applicability to Certain Claims ...................................................... 68

14.     Post-Effective Date Thistledown Sale Process............................................68

H.      Prosecution of Claims .......................................................................... 69

I.      Provisions Regarding Distributions ........................................................ 69

1.      Distributions of Cash to Allowed Claims ............................................ 69

2.      Sources of Cash for Distribution...................................................... 69

3.      Timeliness of Payments .................................................................. 69

4.      Distributions by the Disbursing Agent .................................................. 70

5.      Manner of Payment under the Plan...................................................... 70

6.      Delivery of Distributions ................................................................ 70

7.      Undeliverable Distributions ............................................................ 70

a.      Holding of Undeliverable Distributions.................................................. 70

b.      Failure to Claim Undeliverable Distributions.......................................... 70

8.      Indenture Trustee. ...................................................................... 71

9.      Compliance with Tax Requirements..................................................... 71

10.     Time Bar to Cash Payments............................................................ 71

11.     Distributions After Effective Date ...................................................... 71

13.     Allocation of Plan Distributions Between Principal and Interest ........... 72

14.     Exemption from Securities Law ...................................................... 72

J.      Executory Contracts and Unexpired Leases ............................................ 72

1.      Assumption and Assignment of Executory Contracts and Unexpired
        Leases...................................................................................... 72

5

2. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ................................................................................................ 73

3. Modifications, Amendments, Supplements, Restatements or Other Agreements.................................................................................73

4. Rejection Damage Claims........................................................................ 74

5. Indemnification and Reimbursement Obligations ................................... 74

K. Rights and Powers of Disbursing Agent ............................................................. 74

1. Exculpation ............................................................................................. 74

2. Powers of the Disbursing Agent ............................................................. 75

3. Fees and Expenses Incurred From and After the Effective Date............. 75

L. The Reorganized Debtor Plan Administrator ...................................................... 75

1. Appointment of Reorganized Debtor Plan Administrator ....................... 75

2. Responsibilities of the Reorganized Debtor Plan Administrator............. 75

3. Powers of the Reorganized Debtor Plan Administrator........................... 75

4. Compensation of the Reorganized Debtor Plan Administrator ............... 76

5. Termination of Reorganized Debtor Plan Administrator......................... 76

M. Conditions Precedent ......................................................................................... 76

1. Conditions Precedent to Effective Date of the Plan............................... 76

a. Entry of the Confirmation Order............................................................. 76

b. Effective Date ......................................................................................... 76

c. Plan Support Agreement Still in Effect ................................................... 76

d. Regulatory Approvals ............................................................................. 76

e. Formation Agreement Claims and Formation Agreement Guarantee Claims ..................................................................................................... 77

f. Alameda Adversary ................................................................................ 77

g. Red Rock Adversary................................................................................77

h. MID Asset Transfer Agreement............................................................... 77

i. Consents ................................................................................................. 77

j. Execution of Documents; Other Actions ................................................ 77

2. Waiver of Conditions Precedent ............................................................ 77

N. Retention of Jurisdiction .................................................................................... 77

O. Modification, Revocation or Withdrawal of the Plan ......................................... 78

6

1.      Modification of Plan ................................................................. 78

2.      Revocation or Withdrawal ....................................................... 78

P.      Provision for Management ................................................................ 78

1.      Reorganized Debtors Directors ................................................ 78

Q.      Articles of Incorporation and By-Laws of the Debtor; Corporate Action ........... 78

1.      Amendment of Articles of Incorporation/Charter .................... 78

2.      Corporate Action ...................................................................... 78

3.      Issuance of Equity Interests in the Reorganized Debtors ........ 79

4.      Cancellation of Existing Securities and Agreements ............... 79

5.      Surrender of Existing Securities .............................................. 79

6.      Cancellation of Liens ............................................................... 80

R.      Certain Tax Matters ......................................................................... 80

1.      Exemption from Transfer Taxes. ............................................. 80

2.      Tax Election. ............................................................................ 80

3.      Tax Refunds. ............................................................................ 80

4.      Designation of Substitute Agent. ............................................ 80

S.      Miscellaneous Provisions ................................................................ 81

1.      Discharge of Claims and Termination of Equity Interests ...... 81

2.      Injunction on Claims ............................................................... 81

3.      Integral to Plan ........................................................................ 82

4.      Releases by the Debtors ........................................................... 82

5.      Releases by Holders of Claims and Equity Interests .............. 83

6.      Injunction Related to Releases ................................................. 83

7.      Exculpation .............................................................................. 84

8.      Deemed Consent ...................................................................... 84

9.      No Waiver ................................................................................. 84

10.     Supplemental Injunction .......................................................... 84

11.     Preservation of Rights of Action ............................................. 85

12.     Payment of Statutory Fees ....................................................... 85

13.     Retiree Benefits ....................................................................... 86

14.     Preservation of Insurance ........................................................ 86

15.     Post-Effective Date Fees and Expenses .................................. 86

7

VI.    CERTAIN FACTORS TO BE CONSIDERED ............................................................. 86

    A.    Certain Bankruptcy Considerations .................................................... 86

    B.    Certain Risk Factors Relating to Confirmation of the Plan ................................. 87

        1.    Parties Adverse to the Settlement. ........................................... 87

    C.    Additional Risk Factors and Considerations.......................................... 87

        1.    Operating Trusts.......................................................... 87

        2.    MID Regulatory Approval. ................................................. 87

VII.    ALTERNATIVES TO THE PLAN ....................................................................... 88

    A.    Liquidation Under Chapter 7 of the Bankruptcy Code ..................................... 88

    B.    Alternative Chapter 11 Plans ......................................................... 88

VIII.    VALUATION ............................................................................................ 88

IX.    CERTAIN SECURITIES LAW MATTERS ............................................................. 90

X.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........ 91

    A.    Tax Consequences to the Debtors.................................................... 92

    B.    Tax Consequences to the Holder of the MID Claims .......................................... 94

    C.    Tax Consequences to Holders of the Allowed Non-MJC General Unsecured Claims, Allowed 8.55% Note Claims and Allowed 7.25% Note Claims ................................................................................. 94

    D.    Tax Treatment of the Operating Trusts and Holders of Beneficial Interests ....... 95

        1.    In General................................................................. 95

        2.    Classification of the Operating Trusts .................................... 96

        3.    General Tax Reporting by the Operating Trusts and Beneficiaries ......... 96

    E.    Tax Treatment of the Disputed Claims Escrow ................................ 97

    F.    Information Reporting and Withholding .......................................... 97

XI.    CERTAIN CANADIAN SECURITIES LAW MATTERS………………………………..98

XII.    VOTING PROCEDURES AND REQUIREMENTS ............................................... 99

    A.    Holders of Claims Entitled to Vote.................................................... 99

    B.    Voting Deadlines .................................................................. 99

    C.    Voting Procedures............................................................... 100

        1.    Acceptance by a Class. .................................................... 100

        2.    Withdrawal or Change of Vote............................................. 100

XII.    CONFIRMATION OF THE PLAN.................................................................... 101

A.    The Confirmation Hearing .................................................................... 101

B.    Objections to Confirmation ................................................................... 101

C.    General Requirements for Confirmation ............................................... 101

D.    Best Interests Test ................................................................................ 102

E.    No Unfair Discrimination / Fair and Equitable Test ............................. 103

    1.    Unsecured Creditors ................................................................ 103

    2.    Equity Interests. ...................................................................... 104

F.    Classification of Claims and Equity Interests Under the Plan ............... 104

G.    Feasibility ............................................................................................ 104

XIV.    CONCLUSION .............................................................................................. 105

SCHEDULE I:  2009 FINANCIAL INFORMATION
SCHEDULE II: ESTIMATE OF DISTRIBUTABLE VALUE TO MID
SCHEDULE III: LIQUIDATION ANALYSIS

9