IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

---------------------------------------------------------------x
                                                               :
*In re*                                                        :   **Chapter 11**
                                                               :
**MAGNA ENTERTAINMENT CORP.,** *et al.*,                       :   **Case No. 09-10720 (MFW)**
                                                               :
                                                               :
                      **Debtors.**                             :   **Jointly Administered**
                                                               :   (Proposed) Obj. Deadline: 6/15/10 at 4:00 p.m. (ET)
---------------------------------------------------------------x   (Proposed) Hearing Date: 6/17/10 at 2:00 p.m. (ET)

## MOTION OF THE POST-EFFECTIVE DATE DEBTORS FOR AN ORDER (I) AUTHORIZING THE SALE OF NEW THISTLEDOWN LLC PURSUANT TO SECTIONS 105(a), 1146(a) AND 363 OF THE BANKRUPTCY CODE AND (II) IN AID OF CONSUMMATION PURSUANT TO SECTION 1142(b) OF THE BANKRUPTCY CODE

Magna Entertainment Corp. ("Magna Entertainment") and certain of its affiliated debtors (together, the "Post-Effective Date Debtors" or the "Debtors"),[1] respectfully represent:

### Jurisdiction

1. The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Magna Entertainment Corp., 8374; (ii) The Santa Anita Companies, Inc., 6180; (iii) Los Angeles Turf Club, Incorporated, 6200; (iv) Pacific Racing Association, 5367; (v) MEC Land Holdings (California) Inc., 7410; (vi) Gulfstream Park Racing Association Inc., 6292; (vii) GPRA Thoroughbred Training Center, Inc., 2326; (viii) MEC Dixon, Inc., 7005; (ix) MEC Holdings (USA) Inc., 8494; (x) Sunshine Meadows Racing, Inc., 4288; (xi) Thistledown, Inc., 5742; (xii) MEC Maryland Investments, Inc., 4637; (xiii) 30000 Maryland Investments LLC, 1704, (xiv) Old RP, Inc., 2024; (xv) GPRA Commercial Enterprises Inc., 6156; (xvi) Pimlico Racing Association, Inc., 4527; (xvii) The Maryland Jockey Club of Baltimore City, Inc., 3840; (xviii) Laurel Racing Association Limited Partnership, 0504; (xix) Laurel Racing Assoc., Inc., 0505; (xx) Prince George's Racing, Inc., 6493; (xxi) Southern Maryland Racing, Inc., 9850; (xxii) Southern Maryland Agricultural Association, 9661; (xxiii) Maryland Jockey Club, Inc., 3124; (xxiv) AmTote International, Inc., 1143; (xxv) MEC Pennsylvania Racing Services, Inc., 9924; and (xxvi) MEC Lone Star, LP, 0489.

2. In addition, on April 29, 2010, the Bankruptcy Court confirmed that certain Second Modified Third Amended Joint Plan of Affiliated Debtors, the Official Committee of Unsecured Creditors, MI Developments Inc. and MI Developments US Financing Inc. Pursuant to Chapter 11 of the United States Code, dated April 28, 2010 (the "Plan").[2] Pursuant to Section 30.1 of the Plan, the Bankruptcy Court has retained, and has exclusive jurisdiction over, any matter arising under the Bankruptcy Code, arising in or related to the Chapter 11 Cases or the Plan or that relates to, among other things, any matters related to the assets of the Thistledown Trust, including the disposition thereof.

## Background

3. Commencing on March 5, 2009 (the "Petition Date"), each of the Post-Effective Date Debtors filed petitions under chapter 11, title 11 of the United States Code (the "Bankruptcy Code") with the Bankruptcy Court. In accordance with an Order of the Bankruptcy Court, the Debtors' cases were jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4. On March 18, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the statutory committee of unsecured creditors (the "Creditors' Committee").

## Chapter 11 Plan

5. On April 29, 2010, the Bankruptcy Court confirmed the Plan and entered the Findings of Fact, Conclusions of Law, and Order Confirming Second Modified Third Amended Joint Plan of Affiliated Debtors, the Official Committee of Unsecured Creditors, MI

---

[2] Unless otherwise indicated, capitalized terms used herein shall have the meaning ascribed to such terms in the Plan.

Developments Inc. and MI Developments US Financing Inc. Pursuant to Chapter 11 of the United States Code, dated April 29, 2010 (the "Confirmation Order").

6. On April 30, 2010 (the "Effective Date"), all of the conditions to effectiveness of the Plan either had been satisfied or waived, and the Plan was substantially consummated, including, among other things, with the creation of the Thistledown Trust (as set forth in more detail below).

**Thistledown**

7. Thistledown racecourse sits on approximately 128 acres in North Randall, Ohio. Thistledown's 2009 racing season consisted of 122 racing days that fell between April and October. Thistledown hosts the Summit, Thistledown, Randall and Cranwood meets. Annually, Thistledown hosts the Ohio Derby, which is the premier graded stakes race in Ohio. Throughout the year, Thistledown operates as an inter-track wagering facility where customers can wager on races that are imported to Thistledown from other racetracks.

8. In 2009, Thistledown's handle was approximately $147 million, which amount includes wagers made at (i) Thistledown on its races, (ii) other wagering venues and through various account wagering operations on Thistledown's races and (iii) Thistledown on races imported through Thistledown's inter-track facilities. Thistledown also exports its simulcast signal to as many as 700 off-track and inter-track wagering facilities in the United States.

9. Thistledown's facilities include a grandstand with seating for approximately 8,000 customers, a 600 seat tiered dining room, a 200 seat private party suite, a luxury suite for corporate and group events, a one-mile oval track, stalls for approximately 1,200 horses and parking for approximately 6,000 cars.

**Thistledown Sale Process**

10.     The Debtors held an auction for the sale of Thistledown on September 14, 2009. At that auction, Harrah's Operating Company, Inc. ("Harrah's") submitted the highest and best bid, $89,500,000.00, of which $42,000,000.00 would be paid immediately upon closing and $47,500,000.00 would be paid provided that certain conditions related to video lottery licensing in the State of Ohio were met. On September 15, 2009, the Bankruptcy Court entered an order (the "First Sale Order") approving the sale of Thistledown and authorizing the sale to Harrah's in accordance with the terms of that certain Purchase Agreement, dated September 14, 2009, between Magna Entertainment Corp., Thistledown, Inc. and Harrah's Operating Company, Inc. (the "Initial Agreement").

11.     On September 21, 2009, the Ohio Supreme Court ruled that certain legislation regarding video lottery licensing was subject to referendum under the constitution of Ohio. By letter, dated September 23, 2009, Harrah's asserted that such ruling gave it a right to terminate the Initial Agreement pursuant to Section 9.1(m) thereof, but, without waiving its right to terminate in the future, it was not electing to do so at such time. Pursuant to the Initial Agreement, all obligations and duties of the parties to consummate the sale could be terminated by either Harrah's or the Debtors if the proposed transaction had not been consummated on or prior to May 15, 2010. To address this contingency, the Plan, which went effective prior to such date, provided that, in the event that the Debtors had not consummated the Thistledown Sale and received the Thistledown Sales Proceeds on or subsequent to the Confirmation Date, the Debtors would create the Thistledown Trust to hold, for the benefit of holders of the Thistledown Trust Interests, the Reorganized Thistledown Stock and all of the Assets of Reorganized Thistledown.

12. The sale to Harrah's did not close on or prior to the Confirmation Date, and thus, on the Effective Date, the Reorganized Thistledown Stock and all of the Assets of Reorganized Thistledown were transferred to the Thistledown Trust. In addition, the sale to Harrah's did not close on or prior to May 15, 2010, and, by letter, dated May 17, 2010, a copy of which is annexed hereto as Exhibit "A", the Post-Effective Date Debtors provided notice to Harrah's terminating the Initial Agreement, effective immediately, pursuant to Section 9.1(b) thereof.

13. As contemplated by the Plan, after terminating the Initial Agreement, the Debtors, in conjunction with MI Developments US Financing Inc. ("MID US Financing") and the Creditors' Committee, reinstituted the marketing and sales process, received initial bids and proposed purchase agreements and conducted a second auction for Thistledown on May 25, 2010. Harrah's and Cleveland Gaming Ventures, LLC participated in the auction and the Debtors, in consultation with MID US Financing and the Creditors' Committee, determined that Harrah's (the "Purchaser") submitted the highest and best bid in the amount of Forty Three Million Dollars ($43,000,000.00).

14. Thereafter, the Thistledown Trust and New Thistledown, LLC entered into that certain Purchase Agreement, dated May 25, 2010 (the "Purchase Agreement") with the Purchaser, a copy of which is annexed hereto as Exhibit "B". The principal terms and conditions of the Purchase Agreement are as follows:[3]

    (i)    Assets. All right, title and interest of the Seller in the Purchased Assets set forth in Section 2.1.

---

[3] To the extent there are any inconsistencies between the summary description of the Purchase Agreement contained herein and the terms and conditions of the Purchase Agreement, the terms of the Purchase Agreement control. Capitalized terms used in this paragraph 14, but not defined herein, shall have the meanings ascribed to them in the Purchase Agreement.

(ii) Purchase Price. Forty Three Million Dollars ($43,000,000.00), subject to the adjustment provided in Section 2.5 of the Purchase Agreement (the "Purchase Price").

(iii) Termination of Purchase Agreement. The Purchase Agreement may be terminated at any time prior to the Closing upon the occurrence of any of the following:

(a) By mutual written consent of the Seller and the Purchaser;

(b) By either the Purchaser or the Seller, if the Closing has not occurred on or prior to 5:00 p.m. on July 31, 2010 (the "Outside Date");

(c) By either the Purchaser or the Seller, if any Governmental Authority issues a final and nonappealable order or takes any other action, in either case, conclusively denying Purchaser (or its Affiliated designee) any Requisite Governmental Consent;

(d) By either the Purchaser or the Seller, if a court or other Governmental Authority of competent jurisdiction shall have issued a final order or taken any other nonappealable final action, in each case, having the effect of permanently restraining, enjoining or otherwise prohibiting the Transaction; provided, however, that if such final order or other nonappealable final action shall have been issued or taken by such Governmental Authority primarily due to a breach of any representation, warranty, covenant or agreement contained in this Agreement by either the Purchaser or the Seller or the Trust then the breaching party (or its Affiliate) may not terminate the Purchase Agreement pursuant to this section of the Purchase Agreement; and, provided further, that this termination provision does not govern the denial of a Requisite Governmental Consent to Purchaser as specified in Section 8.1(c) of the Purchase Agreement, which denial shall be governed instead exclusively by the terms of that section;

(e) By the Purchaser, if the Seller or the Trust has breached in any material respect any representation, warranty, covenant or agreement contained in this Agreement which breach (i) would result in a failure of a condition set forth in Section 6.1 of the Purchase Agreement if occurring or continuing on the Closing Date, and (ii) is either incapable of being cured or, if capable of being cured, is not cured in all material respects within the earlier of (x) thirty (30) calendar days after written notice thereof and (y) the Outside Date; provided, however, that Purchaser's right to terminate the Purchase Agreement under this section shall not be available if, at the time of such intended termination, the Seller has (or would have after the

passage of time) the right to terminate under Section 8.1(f) of the Purchase Agreement;

(f) By the Seller, if the Purchaser has breached in any material respect any representation, warranty, covenant or agreement contained in the Purchase Agreement which breach (i) would result in a failure of a condition set forth in Section 6.2 of the Purchase Agreement, if occurring or continuing on the Closing Date and (ii) is either incapable of being cured or, if capable of being cured, is not cured in all material respects within the earlier of (x) thirty (30) calendar days after written notice thereof and (y) the Outside Date; provided, that the Seller's right to terminate this Agreement under this section shall not be available if, at the time of such intended termination, Purchaser has (or would have after the passage of time) the right to terminate under Section 8.1(e) of the Purchase Agreement; and

(g) By the Purchaser pursuant to Section 4.7(b) or 4.8(b) of the Purchase Agreement.

**Thistledown Sale Proceeds**

15. Pursuant to the Plan, MID US Financing is entitled to receive up to the first Twenty Million Dollars ($20,000,000.00) of Thistledown Sale Proceeds (the "MID Thistledown Sale Proceeds") and holders of Non-MJC General Unsecured Claims are entitled to receive an amount, if any, in excess of the first Twenty Million Dollars ($20,000,000.00) of Thistledown Sale Proceeds (the "Creditor Thistledown Sale Proceeds").[4] The term "Thistledown Sale Proceeds" includes the proceeds from the sale of Thistledown, net of certain fees and expenses, such as cure costs, and provides that, for purposes of paying any such costs that are

---

[4] As reflected in the Purchase Agreement, the Purchaser does not wish to continue and assume certain defined benefit pension plans associated with Thistledown. As the Post-Effective Date Debtors may be deemed to be in Thistledown's "control group," the Post-Effective Date Debtors may be subject to certain withdrawal liability. MID US Financing and the Creditors' Committee disagree on how such withdrawal liability should be treated for purposes of distribution of the Thistledown Sale Proceeds under the terms of the Plan and may request that the Court decide this issue if they are unable to reach a resolution..

netted in the calculation, such amounts will be paid on a *pro rata* basis based on the Creditor Thistledown Sale Proceeds and the MID Thistledown Sale Proceeds. *See* Plan at § 1.282.

**Thistledown Cure Schedule**

16. On Schedule 1.2(a) of the Initial Agreement (the "Assumed Contracts"), the Debtors listed the executory contracts and unexpired leases they sought to assume and assign to Harrah's in connection with the sale of Thistledown. The First Sale Order provides that the Debtors demonstrated that it was an exercise of their sound business judgment to assume and assign the Assumed Contracts to Harrah's in connection with the sale and that upon payment of the Cure Amount (as defined in the First Sale Order), there would be no outstanding defaults of the Debtors and their estates under the Assumed Contracts. Accordingly, as of the Effective Date, the Assumed Contracts were subject to the First Sale Order and would be assumed by the Debtors, and assigned to Harrah's, in connection with consummation of the sale of Thistledown.

17. Pursuant to Section 26.1 of the Plan and paragraph 22 of the Confirmation Order, the Debtors are deemed to have rejected each executory contract and unexpired lease to which they were party, unless such executory contract or unexpired leases (i) was previously assumed or rejected by the Debtors, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties, (iii) was the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, (iv) was set forth in the Assumption Schedule as an executory contract or unexpired lease to be assumed and assigned to MID Transferee or (v) was set forth in the Plan Supplement as an executory contract or unexpired lease to be assumed and assigned upon the consummation of the LSP Sale and/or Thistledown Sale. Accordingly, prior to confirmation of the Plan, the Debtors set forth the executory contracts and unexpired leases relating to the operations of Thistledown (the "Thistledown Cure Schedule") that the Debtors

intended to assume and assign upon the consummation of the Thistledown Sale on Exhibit G of the Plan Supplement, dated April 19, 2010. The Thistledown Cure Schedule, however, inadvertently excluded certain of the Assumed Contracts under which the Debtors did not owe any cure amount, but nonetheless sought to assume and assign in connection with the sale and sought to assume and assign in connection with the Initial Agreement. The revised Thistledown Cure Schedule is annexed hereto as Exhibit "C" (the "Revised Thistledown Cure Schedule").

18. The Post-Effective Date Debtors submit that, because the First Sale Order and the Initial Agreement were binding as of the Effective Date, the Assumed Contracts were not "deemed rejected" pursuant to Section 26.1 of the Plan, notwithstanding their omission in the Plan Supplement. Furthermore, the Post-Effective Date Debtors and the counterparties to the Assumed Contracts have continued to perform under the Assumed Contracts since the Effective Date. The Post-Effective Date Debtors, however, out of an abundance of caution, and for the sake of clarity, believe that the Plan Supplement should be modified to include the Revised Thistledown Cure Schedule.

## Relief Requested

19. By this Motion, the Post-Effective Date Debtors request entry of the proposed order, annexed hereto as Exhibit "D," (a) approving the sale of Thistledown to the Purchaser on substantially the same terms and conditions set forth in the Purchase Agreement pursuant to sections 105(a), 1146(a) and 363 of the Bankruptcy Code, and (b) aiding in consummation of the Plan by authorizing the modification of Exhibit G of the Plan Supplement to include the executory contracts and unexpired leases listed on the Revised Thistledown Cure Schedule and authorizing the Debtors to assume and assign those executory contracts and unexpired leases to the Purchaser as contemplated by the Plan.

## Basis for Relief

20. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be undertaken by private sale or by public auction. *In re Dura Automotive Sys., Inc.,* Case No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, *253 (Bankr. D. Del. Aug. 15, 2007) ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.") (internal citations omitted).

21. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *In re Dura Automotive,* 2007 Bankr. LEXIS 2764 at *258, citing *Myers v. Martin (In re Martin),* 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Penn., Inc.,* 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re Delaware and Hudson Ry. Co.,* 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision); *In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (D. Del. 1999) (same).

22. In the circumstances of valid business justifications, applicable principles of law attach to a debtor's decision a strong presumption "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Sub. Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted). In this District, once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor in possession has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *In re Delaware and Hudson Ry. Co.*, 124 B.R. at 166; *accord In re Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749 at *3 (Bankr. D. Del. May 20, 2002).

23. The Post-Effective Date Debtors submit that the decision to sell Thistledown to the Purchaser is based upon their sound business judgment and should be approved. Furthermore, as the Thistledown Sale Proceeds are to be distributed to MID US Financing and holders of Non-MJC General Unsecured Claims, the Plan provides that the Creditors' Committee and MID US Financing will cooperate to maximize the overall value of the sale of Thistledown. *See* Plan at § 20.14. Both MID US Financing and the Creditors' Committee attended the auction and agreed with the Post-Effective Date Debtors and the Thistledown Trustee that the Purchaser submitted the highest and best bid and that the purchase price provided for in the Purchase Agreement is fair and reasonable. Accordingly, the Post-

Effective Date Debtors submit that the sale of Thistledown to the Purchaser is within their business judgment and in the best interests of the estates.

## Sale Free and Clear of Liens

24. Pursuant to the Confirmation Order, from and after the Effective Date, the Reorganized Debtors are "vested with all property of the Estates not otherwise transferred pursuant to the terms of the Plan, free and clear of all claims, liens, encumbrances, charges and other interests of creditors and equity security holders of the Debtors." *See* Confirmation Order at ¶ 11. In addition, as of the Effective Date, the Plan discharged and released all Claims against or in the Debtors of any nature whatsoever. *Id.* at ¶ 32. Accordingly, the Post-Effective Date Debtors submit that the sale of Thistledown to the Purchaser will be free and clear of liens, claims, and encumbrances that existed on or prior to the Effective Date.

## The Winning Bidder Should be Afforded All Protections Under Section 363(m) as a Good Faith Purchaser

25. Section 363(m) of the Bankruptcy Code protects the sale of a debtor's property to a good faith purchaser. Section 363(m) provides,

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Although the Bankruptcy Code does not define "good faith," the Bankruptcy Court of Appeals for the Third Circuit (the "Third Circuit") has noted that the phrase "encompasses one who purchases in 'good faith' and 'for value.'" *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986). Further, the Third Circuit has recognized that the type of misconduct that would destroy a purchaser's good faith status involves "'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair

advantage of other bidders.'" *Id.* (remanding case involving insider transaction back to the bankruptcy court for further consideration of good faith where there was evidence that the sale had been orchestrated between insiders and some of the sale conditions were not disclosed to the debtor's creditors) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978).

26. The sale of Thistledown to the Purchaser was proposed in good faith as a result of arms'-length negotiations between the Post-Effective Date Debtors and the Purchaser. The sale of Thistledown to the Purchaser was subject to a marketing process and was the result of not one, but two auction processes. Under such circumstances, the Post-Effective Date Debtors submit that the Purchaser should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

## 11 U.S.C. § 1146(a) Should Apply to the Sale

27. Pursuant to section 1146(a) of the Bankruptcy Code,[5] the "transfer…or the making or delivery of an instrument to transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp or similar tax." 11 U.S.C. § 1146(a). This provision has been broadly construed to include sales and transfers that occur outside a chapter 11 plan and before or after plan confirmation, provided that such sales or transfers enable the confirmation and consummation of a chapter 11 plan for the debtor. *See e.g., In re Lopez Dev. Inc.*, 154 B.R. 607 (Bankr. S.D. Fla. 1993); *City of New York v. Jacoby-Bender, Inc. (In re Jacoby-Bender, Inc.)*, 758 F.2d 840, 842 (2d. Cir. 1985); *City of New York v. Smoss Enterprises Corp. (In re Smoss Enterprises Corp.)*, 54 B.R. 950, 951 (E.D.N.Y. 1985) (holding that section 1146(a) applied when "the transfer of property was essential to the confirmation of a plan"); *In re United Press Int'l, Inc.*, Case No. 91-B-13955 (FSC) 1992

---

[5] Effective October 18, 2005, subsection (c) of section 1146 of the Bankruptcy Code was redesignated to subsection (a) of section 1146 of the Bankruptcy Code.

Bankr. LEXIS 842 at *4 (Bankr. S.D.N.Y. May 18, 1992) (finding that the section 1146(a) exemption applied to section 363 sale where the "value of debtor's assets [were] likely to deteriorate [during the] time necessary to…confirm a plan.")

28. The Sale of the Thistledown Assets has been pursued by the Post-Effective-Date Debtors in accordance with Article XX of the confirmed Plan, which specifically contemplated and authorized the Trustee of the Thistledown Assets to seek a prompt sale of the Thistledown Assets in connection with the implementation and consummation of the Plan. Further, Sections 13.1 and 6.1 of the confirmed Plan specifically provides for the distribution of the proceeds from a sale of the Thistledown Assets. Accordingly, the Post-Effective Date Debtors submit that the Sale falls within the scope of section 1146(a) of the Bankruptcy Code. *See In re Permar Provisions, Inc.*, 79 B.R. 530, 534 (Bankr. E.D.N.Y. 1987) (sale of property outside of plan confirmation was exempt under section 1146(a) of the Bankruptcy Code where sale proceeds were distributed to secured and unsecured creditors).

## Modification of the Plan Supplement

29. Sections 30.1(b) and (h) of the Plan provide that the Bankruptcy Court retains jurisdiction to "enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan…" and "to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code." Section 1142(b) of the Bankruptcy Code provides the Bankruptcy Court broad authority and jurisdiction to "direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the

consummation of the plan." 11 U.S.C. § 1142(b). This section vests the Bankruptcy Court "with authority to oversee the implementation of the plan and retain jurisdiction for acts necessary for the consummation of the plan." *See In re Johns-Manville Corp.*, 2004 WL 1876046 at * 26 (Bankr. S.D.N.Y. Aug. 17, 2004); *In re Chateaugay Corp.*, 201 B.R. 48, 66 (Bankr. S.D.N.Y. 1997) (noting that the clear intent of section 1142(b) is to assure that the terms and provisions of a chapter 11 plan are carried out until plan is completed and a final decree is entered closing case). Moreover, a bankruptcy court's jurisdiction "continues post-confirmation as to fundamental questions of interpretation and administration of a plan." *In re Johns-Manville Corp.*, 97 B.R. 174, 180 (Bankr. S.D.N.Y. 1986).

30.     The Post-Effective Date Debtors submit that, because certain of the Assumed Contracts were inadvertently omitted from the Plan Supplement, it may be unclear whether those contracts were "deemed rejected" notwithstanding the First Sale Order. Accordingly, as the Assumed Contracts were subject to the First Sale Order, the Post-Effective Date Debtors believe that authorizing modification of the Plan Supplement to include the Revised Thistledown Cure Schedule is necessary to implement the Plan, consummate the sale of Thistledown and will not prejudice any parties in interest. The Post-Effective Date Debtors and the contract counterparties have continued post-Effective Date to perform under those contracts, including with respect to the Debtors' financial obligations thereunder. In addition, not only are the Post-Effective Date Debtors current with respect their postpetition and post-Effective Date obligations under those contracts, the prepetition cure amounts associated with those contracts are zero and, to date, the Post-Effective Date Debtors have not received any proofs of claim from the counterparties asserting a rejection damage claim. Accordingly, the Post-Effective Date

Debtors submit that modification of the Plan Supplement to include the Revised Thistledown Cure Schedule is appropriate and in the best interests all parties.

## Waiver of Bankruptcy Rule 6004(h)

31.  To successfully implement the foregoing, the Debtors seek a waiver of the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d).

## Notice

32.  Notice of this Motion has been provided to: (i) the U. S. Trustee; (ii) the Creditors' Committee; (iii) the SEC; (iv) the IRS; (v) The Bank of Montreal; (vi) MID Islandi SF.; (vii) MI Developments Inc.; (viii) PNC Bank, N.A.; (ix) SunTrust Bank; (x) Wells Fargo Bank, N.A.; (xi) The Bank of New York; (xii) the Oklahoma Horse Racing Commission; (xiii) the Florida Department of Business and Professional Regulation Division of Pari-Mutuel Wagering; (xiv) the Maryland Racing Commission; (xv) the California Horse Racing Board; (xvi) the Ohio State Racing Commission; (xvii) the Maryland Slots Commission; (xviii) the Texas Racing Commission; (xix) the Virginia Racing Commission; (xx) the Pennsylvania State Harness Racing Commission; (xxi) the Pennsylvania Gaming Control Board; (xxii) the Nevada Gaming Commission; (xxiii) the New Jersey Casino Control Commission; (xxiv) the Oregon Racing Commission; (xxv) all parties who have filed a notice of appearance and request for service pursuant to Bankruptcy Rule 2002; and (xxvi) all counterparties listed on the Revised Thistledown Cure Schedule. The Post-Effective Date Debtors submit that such notice is sufficient under the circumstances.

## No Previous Request

33.  Other than the relief requested in connection with the First Sale Order, no previous request for the relief sought herein has been made to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Bankruptcy Court may deem just and appropriate.

Dated: June 7, 2010
      Wilmington, Delaware

*/s/ Katherine Good*
Mark D. Collins, Esq. (No. 2981)
L. Katherine Good, Esq. (No. 5101)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for the Debtors and Debtors in Possession